# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

MIKE BENAVIDES, VICTORIA §
BRANNING, WALTER BRANNING, §
KURTIS BROWN, THOMAS BRYAN, §
PETE DIDONATO, SUSAN ERWIN, §
BRYAN FITZPATRICK, CATHERINE §
GERAC, CAROL PIERCE, COREY §
RICKETSON, TEMPLE THOMAS, §
GARY WADHAM, GREGORY WELLER, §
DANI WINKLER, MICHAEL WRIGHT, §
GLENN ANDERSON, PAUL ALVAREZ, §
JANELLE BOONE, MICHAEL §
BROADWATER, JOHNNIE HALL, §        A-11-CV-438-LY
ERIC JAKUBAUSKAS, MARK §        (Consolidated with A-11-CV-471 LY)
KARONIKA, DAVID LINDSLEY, §
JASON MARTIN, MARK §
MONTGOMERY, GLEN WOSKY, §
MICHAEL WRIGHT, AMELIA ZAPATA, §
LANDON WILLHOITE, AND EDWARD §
JOHNS, §
§
            PLAINTIFFS, §
§
V. §
§
CITY OF AUSTIN, §
§
            DEFENDANT. §

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:    THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion for Summary Judgment, filed June 18, 2012 (A-11-CV-438, Clerk's Dkt. #38); Plaintiffs' Response to Defendant's Motion for Summary Judgment, filed July 9, 2012 (A-11-CV-438, Clerk's Dkt. #49); Defendant's Motion for Summary Judgment Reply, filed July 16, 2012 (A-11-CV-438, Clerk's Dkt. #51); Plaintiffs' Sur-reply to Defendant's

Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment, filed July 25, 2012 (A-11-CV-438, Clerk's Dkt. #57); Defendant's Motion for Summary Judgment, filed June 18, 2012 (A-11-CV-471, Clerk's Dkt. #38); Plaintiffs' Response to Defendant's Motion for Summary Judgment, filed July 9, 2012 (A-11-CV-471, Clerk's Dkt. #47); Defendant's Motion for Summary Judgment Reply, filed July 16, 2012 (A-11-CV-471, Clerk's Dkt. #49); Plaintiffs' Sur-reply to Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment, filed July 25, 2012 (A-11-CV-471, Clerk's Dkt. #55).

The motions were referred by United States District Judge Lee Yeakel to the undersigned for a Report and Recommendation as to the merits of the motions pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. After reviewing the parties' pleadings, relevant case law, as well as the entire case file, the undersigned issues the following Report and Recommendation to the District Court.

## I. BACKGROUND

Plaintiffs in this consolidated case are (current or former) Commanders employed by Defendant City of Austin's ("the City") Emergency Medical Services Department ("EMS").[1] Plaintiffs claim that they have been misclassified as "exempt" employees for purposes of the overtime requirements of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"). In A-11-CV-438 ("*Benavides*"), 17 of the 29 Plaintiffs in A-11-CV-471 ("*Alvarez*") brought suit against the City, alleging willful violations of the FLSA.

---

[1] This title of this job function has changed over time. For ease of reference, the position held by the Plaintiffs will be generically referred to as "Commander."

The City moves for summary judgment in both *Alvarez* and *Benavides*. The City has indicated that the motion for summary judgment in *Alvarez* is nearly identical to the motion for summary judgment in *Benavides* but for an issue which is now irrelevant as the District Court entered an order consolidating A-11-CV-438 and A-11-CV-471. (A-11-CV-438, Clerk's Dkt. #60). Given the City's indication that the motions for summary judgment are identical but for the additional, now irrelevant claim in the *Alvarez* motion, the undersigned will jointly address the two pending motions for summary judgment as though they are identical. The City argues (1) the Plaintiffs are (or were) properly classified as exempt "executive" and/or "administrative" employees; (2) the Plaintiffs are (or were) properly classified as exempt because they are (or were) "highly compensated employees;" and (3) the City did not willfully misclassify the Plaintiffs. The parties have filed responsive pleadings and the matter is now ripe for determination.

## II. STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254,106 S. Ct. 2505, 2513 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 585-87, 106 S. Ct. 1348, 1355-56 (1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992).

The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 110, 122 (1993). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Id*.

### III. DISCUSSION

The FLSA generally requires employers to pay their employees overtime compensation for hours worked in excess of forty in a seven day week. *Vela v. City of Houston¸* 276 F.3d 659, 666 (5th Cir. 2001). The City argues that a number of exemptions apply to the Plaintiffs in this case such that they are not entitled to overtime compensation.

The FLSA excepts employees who are covered by the executive, administrative or professional exemptions ("white collar exemptions"). 29 U.S.C. § 213(a)(1); *Moore v. Hannon Food Services, Inc.*, 317 F.3d 489, 492 (5th Cir. 2003). In order to determine whether an employee is exempt under Section 213(a), courts must "determine the employee's chief or principal duty . . . [which] will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1227 (5th Cir.1990) (internal citations omitted).

While historical facts regarding the employment history and inferences based on these facts are questions of fact, the ultimate decision whether an employee is exempt is a question of law. *Smith v. City of Jackson*, 954 F.2d 296, 298 (5th Cir. 1992). These exemptions are construed narrowly, and the employer bears the ultimate burden of proving that an employee is exempt. *Tyler v. Union Oil Co.*, 304 F.3d 379, 402 (5th Cir. 2002).

## A. Field Commanders and the Executive Exemption

### 1. Relevant Facts

The Austin/Travis County Emergency Medical Service ("EMS") provides emergency medical care. (Kurt Brown Aff. ¶ 6). The rank structure of the uniformed EMS staff is, in ascending order:

- Emergency Medical Technicians ("EMTs")
- Paramedics
- Clinical Specialists ("Captains")
- Operations Supervisors ("District Commanders" or "Commanders")
- Operations Managers ("Division Chiefs" or "Chiefs")
- Assistant Chiefs
- Department Director

(Bryan Fitzpatrick Aff. ¶ 8). EMTs, Captains, and Paramedics are classified by EMS as "nonexempt" employees for purposes of the FLSA but all ranks above that, starting with Commanders, are classified by the department as "exempt" for FLSA purposes. (Bryan Fitzpatrick Aff. ¶ 9).

In 2011, there were 331 Paramedics and Captains assigned to the field and each one of them was supervised by one of twenty-five Commanders assigned to the field ("Field Commanders"). (*Id.* at 3-4). Each Field Commander is responsible for a district, and thus seven Field Commanders are on duty at all times. (*Id.* at 4). In addition to Field Commanders, there are three non-Field Commanders. (*Id.*).

Field Commanders are scheduled for two twenty-four hour shifts per week. (Shamard Aff. ¶16). During their shift, Field Commanders are the highest ranking officer in a district, and they are responsible for operations in the district. (*Id.*). One Plaintiff stated the "primary goal" of Field Commanders is to supervise his or her crews of Paramedics and Captains. (DiDonato Dep. at 35). However, other Field Commanders view their primary duty as their first responder work on medical and other emergencies. (Fitzpatrick Aff. ¶¶29, 75; Brown Aff. ¶21; Wright Aff. ¶21).

Field Commanders undertake both managerial and first responder tasks. Regarding managerial duties, Field Commanders are responsible for the operations in their district, and they supervise and manage the twelve to sixteen Paramedics and Captains assigned to their district. (Shamard Aff. ¶ 28). Field Commanders' management tasks include: evaluation, implementing policies, discipline, keeping and creating disciplinary records, conducting investigations, reviewing performance reports, customer service, participating in hiring and promotion interview panels, recommending personnel actions involving changes in status, managing EMS special teams, recommending changes to policy and scheduling, ensuring that supervisees have functional equipment, serving on committees on topics including scheduling, ensuring that stations are kept clean, attending monthly command meetings, and incident management. (Shamard Aff. ¶¶16-43, 48; Rodriguez Aff. ¶¶11-21).

Field Commanders conduct disciplinary investigations of Captains and Paramedics and then recommend disciplinary action to be approved by the supervising chief. (Fitzpatrick Aff. ¶55-56; Brown Aff. ¶29-30). Plaintiffs' personnel recommendations, at least with respect to employee discipline, are usually followed. (Fitzpatrick Dep. at 181-82; Branning Dep. at 95-97). However, it

is not uncommon for disciplinary decisions to be modified by a higher rank official. (Fitzpatrick Aff. ¶55; Brown Aff. ¶30; Brown Dep. at 150-151; Branning Dep. at 98-99).

Prior to 2008, Field Commanders conducted performance reviews on their crews. (Fitzpatrick Aff. ¶¶70-71). Since 2008, performance reviews have become informal discussions between Field Commanders and crews. (*Id.* ¶72). In addition to monitoring performance through direct observation, Field Commanders also receive daily reports on crew performance and system operation that they may address with crews. (Fitzpatrick Dep. at 97-99). Field Commanders track supervisee performance in a computer database for recommending promotions or supervisee discipline. (*Id.* at 167-71; Branning Dep. at 88-89). Field Commanders can also put supervisees on performance improvement plans and ensure that their supervisees comply with those plans. (Fitzpatrick Dep. at 186-87).

Employees of various EMS ranks, including employees occupying the same rank as the position being filled, may participate in interview panels for hiring or promotion. (Fitzpatrick ¶¶59-60). It is the Department Director who makes the final determination about hiring and promotion decisions. (Rodriguez Aff. ¶3). Commanders—most of whom are Field Commanders—represent management during every interview of a potential entry level employee. (Shamard Aff. ¶38; Rodriguez Aff. ¶12).

Regarding first responder duties, Field Commanders perform the same type of first response field duties as do their subordinates. (Fitzpatrick Aff. ¶26; Brown Aff. ¶16). Plaintiffs testified that they are dispatched to the most important calls, such as cardiac and Priority 1 and 2 calls, and special rescue calls. (Fitzpatrick Aff. ¶¶34-37; Brown Aff. ¶12). They perform duties including: vehicle extrication, performing chest compressions, inserting IV lines, administering medications, checking

the patient's home or car for medications, talking to family members, and retrieving equipment. (Fitzpatrick Aff. ¶40).

Field Commanders are at all times during their shift on call and subject to being dispatched to emergency scenes, including vehicular accidents, crime scenes, fires, and a wide range of other medical emergencies. (*Id.* ¶29). If dispatched, Field Commanders have no discretion to decide whether to respond. (*Id.* ¶38). In addition, they self-assign to a number of calls each shift as well. (Shamard Aff. ¶50).

## 2. Analysis

The City first argues that the Field Commanders are properly classified as exempt and meet the "executive exemption." The executive exemption exempts from the FLSA's overtime requirements "any employee employed in a bona fide executive . . . capacity . . .." 29 U.S.C. § 213(a).

> The term "employee employed in a bona fide executive capacity" . . . shall mean any employee:
>
> > (1) Compensated on a salary basis at a rate of not less than $455 per week ..., exclusive of board, lodging or other facilities;
> > (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> > (3) Who customarily and regularly directs the work of two or more other employees; and
> > (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

The City argues it has properly classified the Field Commanders as executive employees because (1) they are paid at least $455 a week on a salary basis, (2) their primary duty is

management, (3) they customarily supervise two or more employees, and (4) their recommendations on employment and personnel actions are given particular weight. Plaintiffs do not dispute that Field Commanders earn at least $455 per week and customarily direct the work of two or more other employees. Thus, only the second and fourth factors are disputed. (Pl. Res. Mot. Sum. J. at 7).

### a. Recommendations on Employment and Personnel Actions

As to the fourth factor, the governing regulation provides:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 CFR 541.105.

Concerning hiring and promotion, employees of various EMS ranks, including employees occupying the same rank of the position being filled, may participate in interview panels for hiring or promotion. (Fitzpatrick Aff. ¶¶59-60). It is the Director who makes the final determination about hiring and promotion decisions. (Rodriguez Aff. ¶3). Concerning disciplinary authority, Commanders conduct disciplinary investigations of Captains and Paramedics and then recommend disciplinary action to be approved by the supervising chief. (Fitzpatrick Aff. ¶55-56; Brown Aff. ¶29-30). Plaintiffs state that their personnel recommendations, at least with respect to employee discipline, are usually followed. (Fitzpatrick Dep. at 181-82; Branning Dep. at 95-97). However, disciplinary recommendations have been modified by the higher rank officials. For example,

Commander Brown's recommendations to terminate employees have been overruled on a number of occasions. (Brown Aff. ¶¶31-32; Brown Dep. at 144-148).

Despite the fact that higher level managers' decisions are more important and that Field Commanders do not have the authority to make ultimate decisions in employee status, the Field Commanders' job duties include making suggestions and recommendations on employment and personnel actions. They regularly make such suggestions and their suggestions, at least regarding disciplinary actions, are usually relied upon. Given that these facts are uncontested, the Field Commanders fulfill the fourth factor of the executive exemption.

### b. Primary Duty

Concerning the second "executive exemption" factor, "'primary duty' means the principle, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). A non-exclusive set of factors considered when determining an employee's primary duties includes:

> (1) the relative importance of the exempt duties as compared with other types of duties;
> (2) the amount of time spent performing non-exempt work;
> (3) the employee's relative freedom from direct supervision; and
> (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* Determining the primary duty requires placing a "major emphasis on the character of the employee's job as a whole," however "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty." 29 C.F.R. § 541.700(a)-(b).

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work

among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 CFR § 541.102.

On April 23, 2004, Department of Labor ("DOL") issued changes to the White Collar Exemptions in its Final Rule for Part 541 ("the Final Rule"). 69 Fed.Reg. 22122 (April 23, 2004). The Final Rule revised the FLSA regulations adding 29 CFR § 541.3(b) ("first responder regulation"), which states:

> (1) The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as . . . rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.
>
> (2) Such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under § 541.100. Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire.

29 CFR § 541.3(b).

The City argues there is an absence of a genuine issue of material fact as to whether the Field Commanders' primary duty is management or first response. In support of its claim, the City offers evidence that Field Commanders engage in evaluation, implementing policies, discipline, keeping

11

and creating disciplinary records, conducting investigations, reviewing performance reports, customer service, tracking narcotics, participating in hiring and promotion interview panels, recommending personnel actions involving changes in status, managing EMS special teams, recommending changes to policy and scheduling, controlling the budget by managing field operations, ensuring that supervisees have functional equipment, serving on committees on topics including scheduling, ensuring that stations are kept clean, attending monthly command meetings, and incident management. (Shamard Aff. ¶¶16-43, 48; Rodriguez Aff. ¶¶11-21).

Plaintiffs respond that their primary duty is emergency first response as they respond in the same manner as ambulance crews when dispatched to emergency calls. (Fitzpatrick Aff. ¶39). Field Commanders perform a variety of first response activities on a daily basis, including hands-on direct patient care, vehicle extrication, performing chest compressions, inserting IV lines, and administering medications. (*Id.* ¶¶26, 40; Kurt Brown Aff. ¶16; Michael Wright Aff. ¶15). They are tracked by the CAD dispatch system, which dispatches them to the most important calls. (Fitzpatrick Aff. ¶30).

The first factor in determining an employee's primary duties, the relative importance of the exempt duties as compared with other types of duties, is disputed. Some Field Commanders view their primary duty as their first responder work on medical and other emergencies. (Bryan Fitzpatrick Aff. ¶¶29, 75; Kurt Brown Aff. ¶21; Michael Wright Aff. ¶21). However, the City has offered evidence that Field Commanders' are primarily responsible for supervising and managing the day to day field operations of EMS. (Shamard Aff. ¶11; DiDonato Dep. at 35; Smith Aff. Attach. 1 at 5).

The second factor, the amount of time spent performing nonexempt work, is also disputed.

Chief of Staff James Shamard states that Commanders observe and direct operations in the field and infrequently provide patient care. (Shamard Aff. ¶30). However, Plaintiffs state that they perform the same type of first responder duties as do Paramedics and Captains, including direct patient care, on a daily basis. (Fitzpatrick Aff. ¶¶26, 40; Brown Aff. ¶16; Wright Aff. ¶15). During a twenty-four hour shift, Fitzpatrick estimates that he spends approximately six hours traveling through his district from station to station checking in with his crews. He estimates he spends an additional four to five hours at stations talking to the crews and only a couple hours performing office-type duties. (*Id.* ¶¶48, 76).

Field Commanders are dispatched to fewer incidents than their supervisees. Fitzpatrick stated he is dispatched to two to three calls per shift, as compared to the six to eight calls for his crews. (Fitzpatrick Aff. ¶49). The dispatch records do not accurately capture self-assigned calls because Commanders do not always press the self-assign button when choosing to respond to a call. (*Id.* ¶51). Fitzpatrick stated that he made one to two self-assign calls on average each shift. (*Id.* ¶52).

Defendant's retained expert stated that EMS dispatch data from 2008 through 2011 demonstrates that Commanders respond to less than 5% of total calls, and are involuntarily dispatched to only 3% of total calls received. (Smith Expert Report at 4-5). However, Plaintiffs point out there are only 6–7% as many Commanders as there are Paramedics and Captains. (*Id.* at 15). Plaintiffs thus argue the question is not what percentage of total calls field Commanders attend, but rather, whether their medical duties are a significant portion of the work that they perform each shift.[2]

---

[2] Plaintiffs' Response to Defendant's Motion for Summary Judgment seeks to utilize CAD data (1) to compare the average number of calls made by Commanders, and the average number made by Paramedics and Captains; and (2) to compare the average number of calls made by Commanders with those made by two-person crews. Although the brief makes some conclusions about this analysis, such conclusions are nowhere stated in the evidence, which merely provides the raw data without any analysis. As it is not

Concerning freedom from direct supervision, the City argues Field Commanders have considerable autonomy and discretion. The City points out Field Commanders are frequently the highest ranking EMS officials on duty. (Shamard Aff. ¶9). Field Commanders also have discretion to choose how to resolve equipment problems, conduct investigations, and address customer complaints. (DiDonato Dep. at 124-125; Hawley Dep. at 80-81; Branning Dep. at 138-39; Brown Dep. at 108-10). They also manage large scale incidents and have discretion to call for additional resources, coordinate with other departments, and communicate with the media. (Fitzpatrick Dep. at 131-32; DiDonato Dep. at 120; Brown Dep. at 103-04).

Plaintiffs respond that the DOL and courts have specifically rejected the theory that being the only supervisors in the field equates to having wide discretion. *See Mullins v. City of New York*, 653 F.3d 104, 119 (2nd Cir. 2011) ("The district court's conclusion that plaintiffs are often the only supervisors in the field and thus exercise discretion in the performance of their duties . . . overlooks the fact that such discretion forms part of their performance of law enforcement work in the field. *See* DOL *Amicus* Br. at 10."). They further argue that, while Commanders can self-dispatch to some calls, they are automatically dispatched to others. This lack of discretion has been treated by the Final Rule as signifying non-exempt first responder status. *See* Final Rule, 69 Fed.Reg. 22130 (April 23, 2004) ("exempt police and fire executives generally are not dispatched to calls, but rather have discretion to determine whether and where their assistance is needed").

The relationship between the Field Commanders' salaries and the wages paid to other employees for the kind of nonexempt work performed by the Field Commanders is also disputed.

the Court's job to sift through the evidence and perfrom such analysis, the undersigned will not consider this analysis.

The City argues the evidence demonstrates that Field Commanders earn a higher wage than their subordinates who are also scheduled to work forty-eight hours per week in the field. (Rodriguez Aff. ¶22; EMS Pay Schedules). The Defendant's retained expert, Karen Dulaney Smith ("Smith"), states that the pay differential between Commanders and Paramedics is 31%. (Smith Dep. at 132-134). Smith testified that she arrived at this figure by comparing the hourly pay amounts for similarly experienced Commanders and Paramedics. (*Id.*). However, she did not compare the hourly figures for Commanders and Captains, which is the rank immediately below Commanders. (*Id.*). She also did not include regularly scheduled overtime pay in the salary figure for Paramedics. (*Id.* at 134-135). Captains and Paramedics work forty-eight hours per week and receive eight hours overtime pay as nonexempt employees. (EMS Pay Schedules).

A comparison of similarly senior Commanders and Captains shows that, even without considering regularly scheduled overtime, the pay differential is approximately 15%. (*Id.* at 133-134). If regularly scheduled overtime is included, the difference is approximately 8%. (*Id.* at 134-135). Smith stated that a Captain who works an overtime shift as a Commander is actually paid more than a Commander on a per hour basis, and it is probable that some Captains, with overtime, are paid more per year than similarly senior Commanders. (*Id.* at 136-137). Plaintiffs argue this difference strongly suggests nonexempt status. *See Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 830 (10th Cir. 2012) (10% differential between pay of field lieutenants and subordinates supports non-exempt status). The parties disagree as to whether the comparison should take into consideration the subordinate's regularly scheduled overtime earnings.

Given the City's burden in moving for summary judgment and the fact that many of the factors in determining primary duty are disputed, summary judgment is not appropriate. The

employer's burden includes proving that the employee falls "plainly and unmistakably" within the claimed exemption. *Brennan v. Tex. City Dike & Marina, Inc.*, 492 F.2d 1115, 1117 (5th Cir. 1974). Here, the City has provided evidence that the Field Commanders may fall into the executive exemption. However, viewing summary judgment evidence in the light most favorable to the non-movant, the Plaintiffs' evidence that their primary duty is first response sufficiently creates a genuine issue of material fact as to the Field Commanders' primary duty. Accordingly, summary judgment should not be granted with regard to the Field Commanders' executive exemption.

**B.      Field Commanders and Exempt Administrative Work**

The City additionally argues that, even if this court finds that the evidence is insufficient to establish that Field Commanders qualify for the executive exemption as a matter of law, they may still be considered exempt if their other exempt work, combined with their management duties, demonstrates that their primary duties are exempt work. The City cites a case from the Eastern District of Texas for this proposition: "an employer may combine exemptions in cases where an employee fails to meet the primary duty requirement of any one exemption, but the employer must still establish the remaining elements of the exemptions at issue." *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F.Supp.2d 1071, 1079 (E.D.Tex. 2011) (citing *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294–96 (4th Cir. 2007)). The undersigned notes the City provides no binding case law for this proposition.

The City argues that, combined with their exempt managerial work, the Field Commanders' administrative work duties should exempt them from the FLSA's overtime regulations. In support of this claim, the City points out that high-level first responders may be exempt if their primary duty "is performing managerial tasks such as … handling community complaints, including determining

whether to refer such complaints to internal affairs for further investigation." 69 Fed.Reg. 22130 (April 23, 2004).

The City argues an important aspect of the Field Commanders' duties is investigating customer or community complaints. (Fitzpatrick Dep. at 163-65; Branning Dep. at 138-139; Broadwater Dep. at 78-80). If the complaint is serious, Field Commanders will notify their manager, conduct an investigation, and make their own recommendation about whether a violation occurred and the appropriate discipline. (Brown Dep. at 108-110). The Division Chiefs give serious consideration to, and typically, follow the recommendations of the Field Commanders. (DiDonato Dep. at 83-86; Hawley Dep. at 82-84). Plaintiffs respond that such activities are not necessarily an exempt duty. *See* 69 Fed.Reg. 22133 (April 23, 2004) ("'handling customer complaints' . . . could qualify as either management or production type functions depending on the specific facts involved."). Plaintiffs contend this activity is not their "primary duty," and is only performed in the context of first response field work.

The City next points out that Field Commanders are Incident Commanders for large scale incidents and have the discretion to call for additional resources, coordinate with other departments, and even communicate with the media. (Fitzpatrick Dep. at 131-32; DiDonato Dep. at 120; Brown Dep. at 103-04). Plaintiffs point out that the Incident Command role at a large scene is a first responder field duty performed by Commanders, Captains and Paramedics alike and is not an administrative duty. (Fitzpatick Aff. ¶45). The City's Reply does not address Plaintiffs' responses to either of the City's arguments. Given that the City has not cited any binding case law for this "exemption combination" argument, and, given Plaintiffs' uncontested response to the City's arguments, summary judgment is not appropriate on these grounds and should be denied.

## C. Non-Field Commanders and the Administrative Exemption

### 1. Relevant Evidence

Three of the Plaintiffs—David Lindsley, Eric Jakubauskas, and Mark Montgomery—are non-Field Commanders. As Fleet and Facilities Commander, Lindsley is tasked with implementing maintenance, repair and acquisition of EMS vehicles and physical facilities. (Lindsley Aff. ¶13). He is required to make daily inspections of ambulances and other vehicles, as well as of the equipment associated with those vehicles. (*Id.* ¶8). Although he is assigned to headquarters, he spends the majority of his time on duty away from the office, visiting various repair facilities, EMS stations and vehicles in the field. (*Id.* ¶9).

Lindsley reviews bids, audits bills, tracks repairs, and prioritizes repairs and equipment purchases. (Shamard Aff. ¶52). Lindsley operates with considerable autonomy and is able to exercise is his independent judgment when performing these tasks. (*Id.* ¶53). Lindsley states that he recommends or proposes the purchase of ambulances and other emergency vehicles but does not make the final decision to purchase vehicles. (Lindsley Aff. ¶¶17-18). He also recommends construction of new stations or other facilities as well as repairs on existing facilities. (*Id.*).

Lindsley is at times called upon to attend the scene of an accident or other problem involving an ambulance or other EMS vehicle and may be called upon to perform patient care on an EMS employee or customer. (*Id.* ¶11). Additionally, at those scenes, he is tasked with arranging for repairs, and towing as necessary. (*Id.*).

Jakubauskas, who was recently promoted from Commander to Division Chief, was the Special Operations Commander responsible for event planning and community outreach. (Shamard Aff. ¶58). In that role, Jakubauskas designed plans to provide emergency medical services at large

and medium scale events in the EMS Area, such as football games and music events. (*Id.*). Jakubauskas also designed community outreach programs, including child car seat safety checks. (*Id.* ¶59).

Jakubauskas was typically scheduled to work as an Incident Commander during special events, just as a Field Commander would during a large emergency situation. (Jakubauskas Aff. ¶9). Jakubauskas routinely visited the site of a planned event to evaluate access to emergency vehicles, location and number of medical or first aid stations. (*Id.* ¶11). Jakubauskas also reviewed and revised agreements between event organizers and the City in order to provide feedback regarding the adequacy of emergency response plans. (*Id.* ¶¶12-13). In addition to special events emergency response, Jakubauskas was involved in "community integration" efforts by attending and sometimes delivering educational presentations. (*Id.* ¶19).

Jakubauskas had considerable discretion and authority to work with event planners, EMS officials, and other agencies to design and implement plans. (Shamard Aff. ¶61). Jakubauskas stated that he had the ability to make recommendations for emergency plans, but he did not have authority to impose additional conditions on event planners, especially when changes were more than minor. (Jakubauskas Aff.¶13).

Montgomery, as the Commander in the Emergency Management section, is involved in monitoring, responding to, and planning for large-scale emergency response situations involving man-made and natural disasters. (Montgomery Aff. ¶6). Montgomery monitors unusual or suspicious activity in the Austin and Travis County area for possible large-scale events such as an increase in a particular type of call or multiple calls from a particular area. (*Id.* at ¶3).

Montgomery, who does most of his work in an office environment, forms and implements plans for emergency medical response to natural and man-made disasters. In connection with this work, he prepares applications for grant funding, organizes, plans, and conducts large scale training exercises, reviews EMS operational plans, and attends training. Montgomery also represents EMS on statewide, regional or national committees that deal with emergency response to large scale incidents or disasters. (Shamard Aff. ¶¶55-57).

At times, Montgomery is required to report to the scene of suspicious activity or of a large emergency where he takes on the role of Incident Commander at the scene. (*Id.* ¶4). Additionally, Montgomery may be required to report to the "Emergency Operations Center" ("EOC") for the EMS Area. (*Id.*). Montgomery and his supervisor, Chief Michael Elliott ("Elliott"), are both responsible for different aspects of emergency preparedness plans involving major weather events and other large-scale emergency situations. While Elliott is in charge of larger-scale or more significant decisions, Montgomery is tasked with reviewing and processing information on a smaller scale or of less significance. (*Id.* ¶6).

Lindsley, Jakubauskas, and Montgomery sometimes respond to the scene of an emergency. (Jakubauskas Aff. ¶9; Lindsley Aff. ¶¶11-12; Montgomery Aff. ¶4). Each of them may be dispatched to a call depending upon the site of the emergency, the Commander's location, and the seriousness of the emergency. (Lindsley Aff. ¶20; Montgomery Aff. ¶8). Each of them sometimes monitors the department's communications and self-assigns to a call. (Jakubauskas Aff. ¶10; Lindsley Aff. ¶20; Montgomery Aff. ¶8).

2.      **Analysis**

The City argues Lindsley, Jakubauskas, and Montgomery work in administrative positions and are properly classified as exempt administrative employees. The FLSA regulations define the term "employee in a bona fide administrative capacity" as any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. 541.200(a). It is undisputed that the three Commanders earn more than $455 per week. Thus, at issue here is whether their primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer and whether those duties include the exercise of discretion and independent judgment with respect to matters of significance.

Regarding primary duty, the FLSA regulations provide a list of activities that are considered exempt administrative tasks. These include but are not limited to work in the following functional areas:

> tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 CFR 541.201(b).

Regarding whether the primary duty includes the exercise of discretion and independent judgment with respect to matters of significance, the factors to consider:

include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. §541.202(b).

    a.    **Lindsley**

The City argues that Lindsley has the primary duty of managing EMS's fleet and facilities. As Fleet and Facilities Commander, Lindsley reviews bids, audits bills, tracks repairs, and prioritizes repairs and equipment purchases. (Shamard Aff. ¶52). Lindsley serves as the chair of the EMS equipment committee, where he reviews proposals for new equipment and is closely involved in decisions to purchase new equipment. (*Id.* ¶53). Lindsley states that he recommends or proposes the purchase of ambulances and other emergency vehicles but does not make the final decision to purchase vehicles. (Lindsley Aff. ¶¶17-18).

Although he is assigned to headquarters, Lindsley spends the majority of his time on duty away from the office, visiting various repair facilities, EMS stations and vehicles in the field. (*Id.* ¶9). Lindsley states that his position requires him to perform substantial "hands-on" work at the EMS garage or other EMS and City facilities that play a role in vehicle repairs or replacement. (*Id.*). The activities include inspecting vehicles, equipment and facilities as well as arranging for repairs.(*Id.*). Under the DOL's regulations, inspection work does not qualify as exempt "administrative" work:

> Public sector inspectors or investigators of various types, such as fire prevention or safety, building or construction, . . . and similar employees, generally do not meet the duties requirements for the administrative exemption . . . because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met.

29 C.F.R. § 541.203(j).

Lindsley is at times called upon to attend the scene of an accident or other problem involving an ambulance or other EMS vehicle and may be called upon to perform patient care on an EMS employee or customer. (Lindsley Aff ¶ 11). Additionally, at those scenes, he is tasked with arranging for repairs, and towing as necessary. (*Id.*).

Lindsley undertakes tasks involving purchasing, which qualifies as a functional area of general business operations. However, he also performs work that is neither office nor non-manual work such as on-site vehicle inspection, which does not qualify as exempt administrative work. The parties dispute which of these sets of duties constitutes Lindsley's primary duty. To succeed in establishing that the exempt duties were his primary duties as a matter of law, the City is required to come forth with some evidence, such as the relative importance of the duties or the amount of time spent performing the duties. The City provides no such evidence. In response to Lindsley's claim that he spends most of his day in the field inspecting vehicles, the City merely states: "Lindsley claims that he must spend most of his day in the field, but ignores the fact that he is able to work from home on occasion." This response clearly does not adequately address Lindsley's claim that he spends the majority of his day in the field doing non-exempt work. Thus, a genuine dispute of material fact exists with regard to Lindsley's primary duty. Accordingly, summary judgment should not be granted with regard to Lindsley and the administrative exemption.

### b.       Jakubauskas

As Special Operations Commander, Jakubauskas was the Commander responsible for event planning and community outreach. (Shamard Aff. ¶58). Jakubauskas designed plans to provide emergency medical services at large and medium scale events in the EMS area, such as football games and music events. (*Id.*). As part of his job, he met with event organizers, coordinating with other agencies and City departments, and created and implemented plans to provide emergency medical services. Jakubauskas also reviewed and revised agreements between event organizers and the City of Austin in order to provide feedback regarding the adequacy of emergency response plans. (*Id.* ¶¶12-13). Jakubauskas routinely visited the site of a planned event to evaluate access to emergency vehicles, location and number of medical or first aid stations, and similar matters. (*Id.* ¶11). Jakubauskas was involved in "community integration" efforts by attending and sometimes delivering educational presentations in the Austin-Travis County community. (*Id.* ¶19). During special events, Jakubauskas would be scheduled to work as an Incident Commander. (Jakubauskas Aff. ¶9). During those events, it was not unusual for him to engage in direct patient care. (*Id.* ¶¶8-9).

Jakubauskas undertook tasks involving government relations and public relations, which qualifiy as functional areas of general business operations. Although he also performed work that was neither office nor non-manual work, such as serving as an Incident Commander at special events, these occasional duties do not outweigh his daily work of planning special events and engaging in community outreach. Plaintiffs also argue Jakubauskas could be dispatched or self-assign to emergencies; however, no evidence is provided demonstrating that this was more than an occasional occurrence. Thus, his primary duty was planning for special events and engaging in

community outreach, which qualifies as performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers.

The evidence also shows former Commander Jakubauskas exercised discretion and independent judgment on matters of significance for EMS. Jakubauskas served as EMS's point person for all large and medium scale event planning and had considerable discretion and autonomy in this arena. (Shamard Aff. ¶61). He also implemented important public outreach programs. (*Id.* at ¶59). By his own admission he exercised independent discretion and judgment in developing plans, implementing the plan on scene, and in speaking to the public about EMS and other community health services. (Jakubauskas Dep. at 74-76, 80, 95-96). He also admits that his two main job tasks—event planning and public outreach—are important for the overall operation of EMS. (*Id.* at 94-95).

Plaintiffs point out that, while Jakubauskas exercised judgment in some matters, that discretion was limited as he largely continued practices and policies that were established long before he occupied the position. Jakubauskas' emergency planning recommendations for special events are many times taken from pre-existing contracts that the City of Austin has utilized for special events in the past. The fact that Jakubauskas chose not to depart from existing policies does not somehow imply that he did not have the authority to exercise discretion and independent judgment on matters of significance. This argument is without merit.

Since Jakubauskas' primary duty was the performance of office or non-manual work directly related to the management or general business operations of the EMS and his primary duty included the exercise of discretion and independent judgment with respect to matters of significance,

Jakubauskas was properly classified as an exempt administrative employee under 29 C.F.R. 541.200. Accordingly, summary judgment should be granted with regard to Jakubauskas' FLSA claim.

### c. Montgomery

As the Emergency Management Commander, Montgomery is involved in monitoring, responding to, and planning for large-scale emergency response situations involving man-made and natural disasters. (Montgomery Aff. ¶6). He plans and implements plans for emergency medical response to natural and manmade disasters. (Shamard Aff. ¶56). In connection with this work, he prepares applications for grant funding, organizes, plans, and conducts large scale training exercises, reviews EMS operational plans, attends trainings, and represents EMS on statewide, regional or national committees that deal with emergency response to large scale incidents or disasters. (*Id.* at ¶56). He is based in an office and is generally not dispatched to ordinary emergency calls but he is expected to respond to large scale incidents—either to the scene or to an emergency operations center. (*Id.* at ¶57). When Montgomery is required to report to the scene of a large emergency, he takes on the role of "Incident Commander" at the scene. (Montgomery Aff. ¶4).

Montgomery undertakes tasks involving finance, quality control and research, which qualify as functional areas of general business operations. Although he also performs work that is neither office nor non-manual work, such as serving as an Incident Commander at the scene of a large emergency, these occasional duties do not outweigh his daily work of planning for large scale emergencies. Plaintiffs also argue Montgomery could be dispatched or self-assign to emergencies; however, no evidence is provided demonstrating that this was more than an occasional occurrence. To the contrary, he is based in an office and is generally not dispatched to emergency calls but for exceptional events such as large scale emergencies. Thus, Montgomery's primary duty is planning

for large-scale emergency response situations, which qualifies as performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers.

Montgomery also exercises discretion and independent judgment on matters of significance for EMS. For instance, when a major weather event is approaching or another potentially serious incident has occurred, Montgomery exercises independent judgment in making a recommendation to open the area Emergency Operations Center. (Montgomery Dep. at 48- 49). Montgomery also, as part of his EMS job duties, sits on various regional and statewide committees that take important actions with respect to EMS. While he may consult with others in EMS before he acts on the committee, he uses his independent judgment as the chair of the committee. (*Id.* at 57-60). Montgomery also has the discretion to make his own emergency plans and to make recommendations about when emergency plans should be activated. (*Id.* at 37-39).

Plaintiffs point out that, while Montgomery exercises judgment in some matters, that discretion is limited as he largely continues practices and policies that were established long before he occupied the position. Montgomery's involvement in Emergency Management for the most part consists of application of emergency preparedness plans that have been previously developed, often by other agencies or bodies. The fact that Montgomery has chosen not to depart from existing policies does not somehow imply that he does not have the authority to exercise discretion and independent judgment on matters of significance. This argument is without merit.

Plaintiffs additionally argue that matters of significance are left to employees of higher ranks. Specifically, Montgomery is assigned lower level and limited preparation duties, while his Chief is responsible for the more significant or substantial elements of preparation. Based on the evidence

provided by the City, it appears Montgomery's responsibilities are extensive and significant. Plaintiffs cannot rebut the significance of those duties simply by pointing out that someone else has more significant duties. Plaintiffs also point out that Montgomery does not have the discretion to make decisions that significantly impact the budget. Budgetary decision-making is not required to exercise discretion and independent judgment on matters of significance. Plaintiffs thus fail to provide evidence demonstrating a genuine dispute of material fact as to whether Montgomery exercises discretion and independent judgment on matters of significance for EMS.

Since Montgomery's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the EMS and his primary duty includes the exercise of discretion and independent judgment with respect to matters of significance, Montgomery is properly classified as an exempt administrative employee under 29 C.F.R. 541.200. Accordingly, summary judgment should be granted with regard to Montgomery's FLSA claim.

**D.    "Highly Compensated Employee" Exemption**

The City argues that, even if the Court finds that Plaintiffs' primary job duties are not exempt work, many of the Plaintiffs are exempt as "Highly Compensated Employees" according to 29 CFR 541.601. The regulations provide that an employee whose primary duty is office or non-manual work, and who earns a total annual compensation in excess of $100,000 in non-discretionary payments (with at least $455 per week paid on a salary basis), will be exempt if he regularly or customarily performs any of the exempt duties of an executive or administrative employee. 29 CFR 541.601.

In one or more of the calendar years 2008, 2009, and 2010, some Plaintiffs earned more than $100,000 (paid largely on a salary basis) in non-discretionary income. (Rodriguez Aff., Attach 2).

The City argues Plaintiffs all regularly or customarily perform non-manual office work as their primary duty. Even the Field commanders spend significant time observing and speaking to their employees, reviewing reports, or using a computer for email or making personnel reports. (Fitzpatrick Dep. at 97-99, 106-07, 168-171). While this work does not always take place in an office, it is non-manual and is similar to work that would take place in an office environment. The City thus argues these Plaintiffs fit the definition of Highly Compensated Employees.

Plaintiffs respond that 29 U.S.C. §541.601(d) states workers "who perform work involving repetitive operations with their hands, physical skill and energy are not exempt under [§541.601] no matter how highly paid they might be." In the Final Rule issued in 2004, the DOL specifically noted that §541.601(d) precludes application of the Highly Compensated Employees exemption to Paramedics and EMT's covered by the first responder regulation:

> [P]olice officers, fire fighters, paramedics, EMTs and other public safety employees also cannot qualify as exempt under the highly compensated test in final section 541.601. As discussed below, final section 541.601(b) [sic] provides that the highly compensated test "applies only to employees whose primary duty includes performing office or nonmanual work." Federal courts have recognized that such public safety employees do not perform "office or non-manual" work.

69 Fed.Reg. 22129-30 (April 23, 2004) (citations omitted). Thus, the Highly Compensated Employees exemption depends on whether the Plaintiffs are properly considered as first responders. If Plaintiffs are in fact first responders, then §541.601(d) precludes application of the Highly Compensated Employees exemption because their primary duty by definition is not "office or non-manual" work. The City does not reply to Plaintiffs' argument on this matter, and the undersigned has not recommended that any Plaintiff is both not a first responder and not exempt. Accordingly, summary judgment should not be granted on these grounds.

### E.    Willful Misclassification

#### 1.    Relevant Evidence

After the Plaintiffs raised their FLSA complaints, the City took positive steps to ensure that it had properly classified the Plaintiffs. In 2006, an Assistant Director of the City's Human Resources Department met with a group of Commanders who had lodged complaints about their exempt status. (Flores Aff. ¶3). One Plaintiff testified that when she initially spoke with the former director of the department regarding the correctness of Commanders' compensation, he replied that he had in his possession a letter from DOL stating that Commanders were properly classified as exempt. (Branning Dep. at 28).

The City initiated a desk audit to personally interview Commanders to determine whether they were properly classified. (*Id.* at ¶4). The desk audit determined that the Commanders were exempt. (*Id.* at ¶5). However, it appears that City's staff had "areas of concerns" revealed by the desk audit. (Summary of EMS District Commanders – Summary of Findings up Until December 7, 2006). Plaintiffs state the City failed to share any information from the desk audit with the Commanders. (Fitzgerald ¶87).

The City then hired Karen Dulaney Smith as an expert consultant to determine whether it had properly classified the Commanders. Smith interviewed all or nearly all of the Commanders, reviewed pertinent documents, spoke to EMS officials, and determined that the City had properly classified the Commanders. (Smith Aff. ¶¶3-4). However, no information from her investigation was shared with Commanders. (Fitzpatrick Aff. ¶91). Smith prepared a draft request to the DOL for an opinion on whether they were properly classified. (Smith Dep. at 15-16; Unsent draft letter from the

City to DOL). For reasons the City refuses to reveal, asserting attorney-client privilege, the City never sent the opinion request to DOL. (Smith Dep. at 24-25, 44-45).

## 2. Analysis

A violation of the FLSA is willful if the employer either "knew or showed reckless disregard for … whether its conduct was prohibited by the statute." *Singer v. City of Waco*, 324 F.3d 813, 821 (5th Cir. 2003). Plaintiffs bear the burden of proving a willful violation. *Id.* The City argues there is no evidence that the City knew of a violation or showed reckless disregard for the strictures of the FLSA and thus summary judgment is appropriate on this issue.

The City points out that the affirmative steps it took to properly classify Plaintiffs precludes a finding of willful misclassification. Upon receiving Plaintiffs' complaints in 2006, the City's Human Resources Department investigated the complaints by initiating a desk audit, which concluded that Plaintiffs were properly classified. (Flores Aff. ¶¶ 3-5). The City also hired Smith, a former DOL investigator who investigated exemption issues, to investigate the issue, and she concluded that the City had properly classified the Commanders as exempt employees. (Smith Aff. ¶¶3-4).

Regarding the desk audit, Plaintiffs respond that, despite having conducted a number of interviews and writing a partial summary of findings, including some "areas of concerns," conclusions were never communicated to the Commanders or to department leaders. (Fitzgerald ¶87). It is not clear how the City's lack of communication of this result to the Commanders or department leaders could demonstrate the City knew or showed reckless disregard for whether its conduct was prohibited by the statute. Plaintiffs have thus not shown this evidence is relevant to a willfulness determination.

Plaintiffs point out that, although Smith drafted a letter requesting a DOL opinion, it was never sent. And when Plaintiffs' counsel made repeated attempts to find out the reason, the City's counsel continually objected, citing attorney-client privilege. (Smith Dep. at 44-45; Rodriguez Dep. at 126-128). Additionally, one Plaintiff testified that when she initially spoke with the former director of EMS regarding the correctness of Commanders' classification, he replied that he had in his possession a "letter" from DOL stating that Commanders were properly classified as exempt. (Branning Dep. at 28).

Taken together, this evidence establishes that the City was reluctant to seek a DOL opinion and a former director of the department stated that the DOL had opined the Commanders were exempt. Willful misclassification requires a greater showing of knowledge or reckless disregard. *See, e.g. Reich v. Bay, Inc.*, 23 F.3d 110 (5th Cir. 1994) (willful misclassification where employers continued payment practice without further investigation after being informed by local Wage and Hour office that payment method violated FLSA); *Castillo v. Givens*, 704 F.2d 181(5th Cir. 1983) (willful misclassification where farm and bank owner knew of and paid minimum wage to his bank employees but not farm employees); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973) (willful misclassification where management intentionally restricted number of overtime hours reported to less than the hours actually worked). Moreover, courts have rejected the notion that employers have committed a willful violation if they merely "should have known" that their practices violated the FLSA. *See McClaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988) (rejecting a "knew or should have known" standard for willful violations). Plaintiffs' evidence does not even demonstrate the City should have known their practices violated the FLSA. Thus, Plaintiffs fail to demonstrate that the City knew or showed reckless disregard for whether its conduct was

prohibited by the statute. Accordingly, there is no evidence to support a willful violation of the FLSA and summary judgment should be granted regarding this claim.

## IV. RECOMMENDATION

The Magistrate Court **RECOMMENDS** that the District Court **GRANT IN PART AND DENY IN PART** Defendant's Motion for Summary Judgment (A-11-CV-438, Clerk's Dkt. #38) and Defendant's Motion for Summary Judgment (A-11-CV-471, Clerk's Dkt. #38) as described above.

## V. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 U.S. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is

ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED on September 21, 2012.

_____

MARK  LANE
UNITED STATES MAGISTRATE JUDGE