FILED

NOV - 9 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| MIKE BENAVIDES, et al. | § | |
|     Plaintiffs | § | |
| | § | |
| v. | § | Civil No. 1:11-CV-438 LY |
| | § | |
| CITY OF AUSTIN | § | |
|     Defendant | § | |

## PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiffs Mike Benavides, et al., respectfully file their Motion for Judgment as a Matter of Law. Defendant has failed to present evidence providing the jury a legally sufficient basis to rule in its favor. Therefore, because reasonable jurors could not reach a contrary conclusion, Plaintiffs respectfully argue that they are entitled to judgment as a matter of law.

### I.   STANDARD OF LAW

A.   Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50

A motion for judgment as a matter of law ("JMOL") is appropriate under Federal Rule of Civil Procedure ("FRCivP") 50 when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue." FRCivP 50(a). "There is no legally sufficient evidentiary basis when 'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.'" *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir.2001) (citing *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir.2000) (internal quotations omitted)); *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (citation omitted).

In reviewing such a motion, the Court should review all of the evidence presented.

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). However, the Court "may not make credibility determinations or weigh the evidence" as these are functions of a jury, not a judge. *Id.* Furthermore, a court must "draw all reasonable inferences in favor of the non-moving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* "A court should grant a Rule 50(a) motion not only when the non-movant presents no evidence, but also when there is not a sufficient 'conflict in substantial evidence to create a jury question.'" *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir.1997) (citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir.1997)). Therefore a court need not present a question to the jury based on "[a] mere scintilla of evidence." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969), *overruled in part on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir.1997).

      B.     The FLSA, Its White Collar Exemptions and the First Responder Regulation

Plaintiffs respectfully direct the Court to the parties' Joint Proposed Jury Instructions for a review of the relevant statutory and regulatory language governing the applicability of the FLSA, the relevant exemptions, and the first responder regulation. *See* Doc. 93.

      C.     Burden and Level of Proof Required.

FLSA exemptions are construed narrowly, and the employer bears the burden of proof. *Cheatham v. Allstate Insurance Company,* 465 F.3d 578, 584 (5th Cir. 2006); *Vela v. City of Houston,* 276 F.3d 659, 666 (5th Cir. 2001); *Gellhaus,* 769 F. Supp. 2d at 1077. The employer must show that the employee falls "plainly and unmistakably" within the claimed exemption. *Brennan v. Texas City Dike & Marina, Inc.,* 492 F.2d 1115, 1117 (5th Cir. 1974), citing *A. H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493 (1945); *Maestas v. Day & Zimmerman, LLC,* 664 F.3d 822, 826 (10th Cir. 2012).

2

## II.     EVIDENCE PRESENTED AT TRIAL

### A.     Field Commanders are not Compensated "On a Salary Basis"

The Plaintiffs presented conclusive evidence that they are not compensated "on a salary basis" as defined by the relevant DOL regulations and case law.

Plaintiffs Fitzpatrick, Brown, and Wright testified that they have never been told by Defendant that Commanders' would "receive[] each pay period . . . a predetermined amount . . . not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602. On the contrary, the Plaintiffs testified that they understand that their pay is subject to reduction if, during a given week, they do not work 48 hours and do not or cannot use "benefit" or "leave" time to supplement hours worked below 48. In fact, the Defendant's own witness, who has many years of experience in compensation matters, testified that the Defendant does not guarantee any employee his or her pay without regard to the hours that they work each week.

If a Commander reports late to a scheduled shift, that Commander will be placed on uncompensated "zero time" for the amount of time not worked. *See* Trial Exhibits P-52 and P-53 (pay statements and hours worked for Plaintiffs Benavides, Bryan, Hall, Johns, and Martin). An employee who is placed on "light duty" as a result of an injury or medical condition is required to work the same number of regularly scheduled hours. Commanders on 48-hour weekly schedules must work 48 hours of light duty per week in order to receive their full weekly compensation, supplement hours under 48 with benefit or leave time, or have their pay reduced for working fewer than 48 hours per week. *See* Trial Exhibit P-51 at 2 (Light Duty policy). Plaintiffs who worked insufficient hours of limited duty per day were docked pay for each such

3

day. *See* Trial Exhibits P-52 and P-53 (Plaintiff Erwin's March 4, 2011 pay statement and hours worked).

If, during a week in which Commanders transition from one schedule to a different schedule, a Commander is scheduled to work fewer than their regularly scheduled 48 hours per week because of the schedule transition, that Commander, "[t]o minimize the financial impact" must sign up to work additional hours, use leave time, trade shifts to and from another pay period, or have his or her pay decreased by the number of hours not worked (the default choice under the policy). *See* Trial Exhibit P-15 at ¶12. This policy will be applied to Plaintiffs Wright and Gerac during the January 2013 shift transition week. *See* Trial Exhibit P-54 (email indicating Plaintiff Gerac will receive "no-pay" for part of her January 5, 2013, shift unless she makes alternate arrangements).

The Commanders' compensation is at all times expressed in terms of an *hourly rate*. Commanders' pay statements and pay schedules (as well as other documents in their personnel files) all indicate that the Plaintiffs are compensated on an hourly basis. *See* Trial Exhibits P-52 (sample pay statements) and D-36 (EMS pay schedules).

Because Defendant has been fully heard on the issue of whether it pays Commanders "on a salary basis" and because the evidence points so strongly and overwhelmingly in the Plaintiffs' favor, Plaintiffs respectfully argue that they are entitled to judgment that they are not compensated on a salary basis as a matter of law.

B.  Field Commanders' Primary Duty is First Response

Plaintiffs provided overwhelming testimony that "field" Commanders' primary duty is first-response work.

4

1.   Work Location, Vehicles and Equipment

Commanders, like other field medics, report to emergency stations throughout Travis County. Medics and Commanders are required to work 48 hours per week. Like many medics, Commanders work two 24 hour shifts every week. When both medics and Commanders report to the start of their shift, their duties are the same: to debrief with the off-going crews, to place their equipment and belongings in their respective vehicles, to ensure that the vehicles are restocked and prepared for a new shift, and to deal with other station cleanliness and preparedness. Importantly, Commanders and medics must be available to respond to emergency calls, even while shift change is occurring. *See* Trial Exhibit P-16 (Daily Duties).

Medics and commanders are assigned very similar vehicles. Medics are assigned ambulances, which are considered "Advanced Life Support" ("ALS") resources, meaning that they are outfitted with the equipment and medications required to provide advanced-level medical care at the scene of an emergency. Commanders are assigned to "Command trucks," also considered ALS resources, and also carry the overwhelming majority of equipment and medications carried by ambulances. Both ambulances and Command trucks are equipped with Mobile Digital Computer ("MDC") terminals. The geographic location of both types of vehicles is tracked by a Computer-Aided Dispatch ("CAD") system, and both types of vehicles are considered part of the "dispatch matrix" that the department utilizes to dispatch vehicles to emergency scenes.

2.   Types of Emergency Calls to Which Commanders Respond

Commanders are dispatched to every cardiac arrest call. Commanders are routinely dispatched to "Priority 1" and "Priority 2" calls (the highest severity calls), if a Commander is closer to the scene of such emergency than an ambulance and can arrive faster by a

predetermined time factor. Commanders are dispatched to every vehicle pin-in rescue call and to calls involving multiple potential patients. "Special Operations" (or "SpecOps") Commanders are dispatched to specialized calls such as rescue calls involving wilderness or water areas, and others. *See* Exhibits P-12 and P-13 ("Urban" and "Suburban" dispatch matrix). If a particular call requires specialized equipment carried only in Command trucks, a Commander must be dispatched to that call. When dispatched, Commanders do not have a choice but to respond to an emergency; they must set aside any other work.

Commanders routinely "self-assign" to additional calls per shift for a number of reasons, including: because they are closer to the scene; because they recognize that a particular call may involve a difficult technique, patient, location or some other challenge; because an extra set of hands may improve the quality of patient care; to observe a particular crew at work; or to provide relief during busier call times. In fact, Commanders' supervisors expect them to "garner relief" "[i]f the system is getting 'hammered' . . . ." *See* Trial Exhibit (P-44). Commanders also go on "stealth" calls (those calls to which a Commander will assign without officially "self-assigning" on the system) for the same reasons that they would go on a self-assigned call. Because officially self-assigning to a call removes Commanders from the dispatch matrix, they would render themselves unavailable for a call of higher severity or importance, and a "stealth" call leaves them as available resources.

3.   Commanders' Duties During Call Response

Commanders perform the same or nearly the same types of duties on dispatch, self-assign and stealth calls. Those duties are the same duties that captains, paramedics, and EMTs perform on a call in the absence of a Commander.

6

Commanders engage in the following types of duties while on the scene: performing chest compressions; intubating patients; inserting intravenous ("IV") lines; mixing medications; performing surgical or medical procedures; retrieving medications and equipment from EMS vehicles; interviewing patients, family members and bystanders to determine the cause of the emergency; holding back distraught family members or witnesses; directing traffic if on a busy street; and so forth. All of these activities are necessary in order for the department to provide patient care to its customers. In the absence of a Commander, those integral patient care duties are performed by a captain or paramedic.

It is not the Commanders' responsibility to supervise medics at the scene. Commanders' role is to serve as "an extra set of hands" and to function as a third paramedic. Defendant's clinical guidelines establish a hierarchy of "On-Scene Authority" regarding Patient Care, which places the clinical specialist paramedic on the transporting unit (ambulance) as the person (other than a physician) with the highest level of authority. *See* Trial Exhibit P-20. Where a call rises to the level of complexity that an "Incident Command Structure" ("ICS") is activated, a Commander may perform duties such as coordinating resources among different emergency-response agencies (the fire and police departments, for example), may direct incoming vehicles and personnel, may contact area hospitals to coordinate the treatment of patients, and may task individual ambulances with transporting specific patients to specific hospitals. However, every level of employee in EMS operations is trained on ICS responsibilities, and every level of employee is expected to assume the ICS role upon reporting to the scene. ICS duties are typically completed within the first 2-5 minutes of a call, at which point the incident commander resumes other aspects of patient care. Commanders who arrive at an ICS scene after other medics often

allow a medic to continue fulfilling the role of incident commander while the Commander assists other medics on the call.

       4.   Number of Emergency Calls to Which Commanders Respond and Time Spent in the Field

      Plaintiffs' calculations derived from dispatch data provided by Defendant indicates that Commanders on average respond to about 30-35% as many calls as other medics. When "self-assign" calls are excluded, Commanders on average still respond to about 18-23% as many calls as other medics. The proportion of calls that Commanders respond to has increased over the years. *See* Trial Exhibits P-46, D-6. The Plaintiffs' testimony showed that, on an average shift, Commanders may respond to 4-6 calls, whereas medics in their district may respond to 12-18 calls per shift.

      Defendant's suggestions that Commanders only respond to about 5% of the system's calls and that Commanders only spend 5% of their on-duty time on emergency scenes are misleading. Defendant fails to account for the fact that field Commanders represent a very small proportion of the EMS operations workforce used as available resources for emergency calls. Defendant's own estimates indicate that there are about 23 field Commanders and about 334 medics. It is not surprising that 6.5% of the operations workforce responds to 5% of the system's calls. Secondly, the City failed to perform a comparison of the percentage of Commanders' on-scene time versus that of Paramedics and/or Captains. Plaintiffs provided testimony indicating that in 2011 Commanders spent slightly less than 18% as much time on emergency scenes as paramedics and captains, a calculation consistent with the fact that ambulances do not "clear" a call until after transporting a patient to the hospital and being restocked for the next call—two tasks that Command trucks do not perform.

8

### 5.    The Commanders' Supervisory Duties

Plaintiffs acknowledge that they are charged with certain supervisory duties. However, those duties are secondary and incidental to their primary first response duties.

Commanders are assigned a number of captains and paramedics as supervisees. Commanders may also supervise those employees scheduled to work during a Commander's shift and within that Commander's district. Commanders from time to time investigate disciplinary matters involving their crews, make disciplinary, training, certification, congratulatory and other notes into a "Records Management System," address employee and customer complaints, and conduct informal reviews of their crews.

However, Commanders spend a very small amount of time performing these tasks. Plaintiffs testified that they spend between 2-3 hours of their 24-shift in the office performing some of the supervisory tasks listed above. Disciplinary investigations do not happen on a daily basis (Plaintiff Wright testified he has not done one in weeks), and informal reviews happen only twice a year. The supervisory duties above always or almost always give way to an emergency. In many instances, Commanders' supervisory duties take place in the field when Commanders are working alongside paramedics and captains.

### 6.    Comparison of Commanders' Pay and Medics' Pay

The compensation of Commanders, Paramedics, Captains and other EMS employees is shown, in hourly rates, in Trial Exhibit D-36. Paramedics and Captains, who are classified as non-exempt employees, are regularly scheduled to work 8 hours of overtime every week. Additionally, they may volunteer or be asked to work additional 12- or 24-hour shifts beyond their regular hours. Because Paramedics and Captains earn one-and-a-half their hourly rate for hours worked over 40 while Commanders earn "straight time," Paramedics and Captains earn

more on an hourly basis for those hours than similarly experienced Commanders. In several instances, Paramedics and Captains earn more for hours over 40 than *more experienced* Commanders.

As previously noted, employees in ranks up to and including Commanders are all first responders who report to the same stations, drive overwhelmingly similar vehicles, are on call their entire shifts and perform first-responder patient care several times during each shift. It is worth noting that some Captains work "Out of Class Assignments," in which they work a Commander's shift, performing almost every duty that a Commander performs during a shift (with the exception of some disciplinary matters, which the evidence shows are infrequent and when they occur take up a very small part of a Commander's shift). Therefore, Paramedics and Captains are compensated at a comparable or higher rate than Commanders for performing the same or similar duties.

C.    Field Commanders' Recommendations as to Employees' Change of Status are not Given
Particular Weight

Commanders do not have the authority to hire or fire personnel. Their involvement is limited to being asked (though not required) to participate in interview panels for candidates for hire. Interview panels, however, are made up of exempt and non-exempt employees of various ranks from throughout the department, including paramedics and captains. Panelists ask scripted questions to candidates and discuss the candidates' strengths and weaknesses. A panel makes a recommendation to the hiring coordinator. In the Plaintiffs' experience, those recommendations have often been disregarded to the point that some of them refuse to continue participating in interview panels.

Commanders serve as conduits of disciplinary information to their Chiefs, who are informed at every step of the investigation. Commanders may make a recommendation as to the

10

level of discipline that should be given (oral or written counseling, letter of concern, reprimand, suspension, termination, etc.). Commanders also write draft disciplinary documents to be given to employees. However, Commanders' disciplinary recommendations and drafts are always subject to modification, editing, reduction, and enhancement (and often are modified in these ways) by Chiefs and Human Resources.

   D.  <u>Commander Lindsley's Primary Duty is not Exempt "Administrative" Work</u>

  Plaintiff Lindsley testified that his primary duty is the performance of first responder work. Plaintiff Lindsley undertakes that duty partly by working in the field during his daily assignment and by taking on extra field shifts that must be filled by the Department. In the last few years, Plaintiff Lindsley has worked an average of 35 extra shifts per year, equivalent to 17.5 weeks of a field Commander's annual duty time. During both his regular duty time and on extra shifts, he responds to emergency calls (because he is dispatched, contacted by the Department's Communications Division, or because he self-assigns to calls).

  About half of Plaintiff Lindsley's non-response duties are performed away from an office environment and in the field, including in City garages, shops, and stations. He routinely performs inspections of vehicles and stations and spends part of his duty time shuttling vehicles or equipment from location to location. A great number of the responsibilities in fleets, facilities, and equipment are ones Plaintiff Lindsley shares with a non-exempt paramedic who earned more than he did in the last calendar year, and are duties that Plaintiff Lindsley learned while he himself was a non-exempt paramedic.

  E.  <u>Commander Lindsley does not have Discretion and Independent Judgment in Matters of Significance</u>

  Commander Lindsley does not exercise significant discretion and independent judgment in the area of logistics or fleet and facilities for the EMS department. The limited discretion and

judgment that Commander Lindsley does exercise is on matters of smaller significance. Plaintiff Lindsley testified that though he is able to make certain recommendations, he does not have control over the budgets in fleets, facilities, and equipment. Some aspects of the budget are tied to the previous year's expenses. Decisions regarding new vehicles or equipment to be ordered or stations to be built are made by a number of different individuals and entities inside and outside the Department. Those decisions have input from the lowest-ranked employees (submitted via committees or repair requests) all the way to the Assistant Chief, the City's Fleet and Public Works Departments, and the City Council. The non-exempt paramedic working alongside Plaintiff Lindsley in Fleet & Facilities also provides input into those recommendations. Plaintiff Lindsley cannot exercise his own discretion and independent judgment in these matters.

## III.    THE FIRST RESPONDER REGULATION

The 2004 First Responder regulation promulgated by the Department of Labor states that employees who perform first response work are not exempt executive or administrative employees. Furthermore the Secretary of Labor's interpretations of the regulation, as expressed in her amicus brief to the Second Circuit and accepted by that court in *Mullins v. City of New York*, 918 F.2d 1220 (2d Cir. 2011), indicate that duties performed by first response personnel, when they are performed in the course of their first response work, are non-exempt duties, even if they would otherwise be considered exempt when performed away from the field.

In this case, the Plaintiffs have provided conclusive evidence that they perform patient care on the scene of emergencies *on a daily basis*. Therefore, the Plaintiffs are "first responders" for the purpose of 29 C.F.R. § 541.3(b)(1). Even though the Plaintiffs do perform some duties that would under other conditions be considered exempt, the Secretary of Labor's carefully considered interpretation renders those field duties non-exempt.

12

## IV.   CONCLUSION

For the above reasons, and because the Defendant has been fully heard on the applicability of the FLSA executive and administrative exemptions, the Plaintiffs respectfully argue that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Defendant on these issues.

Therefore, the Plaintiffs request that the Court enter judgment in their favor as a matter of law, that the Court declare that Defendant has violated the Fair Labor Standards Act by failing to pay Plaintiffs one and one-half times their regular rate of pay for all hours worked over forty in a work week; permanently enjoin Defendant from failing and refusing to pay Plaintiffs one and one-half times their regular rate for all hours in excess of 40 worked in each work week; order Defendant to pay each Plaintiff back pay for the relevant period equal to the difference between what the Plaintiff would have received for overtime hours worked had the Plaintiff been paid one and one-half times his or her "regular rate" and what the Plaintiff actually was paid for those hours, for all pay periods occurring within the applicable limitations period; order Defendant to pay each Plaintiff liquidated damages in an amount equal to the back pay awarded to that Plaintiff; order Defendant to pay Plaintiffs' reasonable attorney fees and costs pursuant to 29 U.S.C. §216(b); order Defendants to pay post-judgment interest at the highest lawful rate for all amounts, including attorney fees, awarded against Defendants; and order all further relief, whether legal, equitable or injunctive, as may be necessitated to effectuate full relief to the Plaintiffs.

Respectfully submitted,

/s/ B. Craig Deats

_____
B. Craig Deats
TBN:  05703700

13

Manuel Quinto-Pozos
TBN: 24070459
DEATS, DURST, OWEN & LEVY, P.L.L.C.
1204 San Antonio St., Suite 203
Austin, Texas 78701
(512) 474-6200
FAX (512) 474-7896
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on counsel for Defendant, Christopher Coppola and Mishell Kneeland, City Attorney's Office, P.O. Box 1546, Austin, Texas 78767-1546; Fax: (512) 974-1311; Email: Christopher.Coppola@austintexas.gov and Mishell.Kneeland@austintexas.gov by hand delivery on this 9th day of November, 2012.

/s/ B. Craig Deats
_____
B. Craig Deats / Manuel Quinto-Pozos

14

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| MIKE BENAVIDES, et al. | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Civil No. 1:11-CV-438 LY |
| | § | |
| CITY OF AUSTIN | § | |
| Defendant | § | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW

On this day, having considered the Plaintiffs' Motion Judgment as a Matter of Law, the Court is of the opinion that the motion is meritorious and should be **GRANTED.**

THEREFORE, it is hereby ORDERED judgment be entered in favor of the Plaintiffs as follows:

- The Court DECLARES that Defendant has violated the Fair Labor Standards Act by failing to pay Plaintiffs one and one-half times their regular rate of pay for all hours worked over forty in a work week;

- The Court permanently ENJOINS Defendant from failing and refusing to pay Plaintiffs one and one-half times their regular rate for all hours in excess of 40 worked in each work week;

- The Court ORDERS Defendant to pay each Plaintiff back pay for the relevant period equal to the difference between what the Plaintiff would have received for overtime hours worked had the Plaintiff been paid one and one-half times his or her "regular rate" and what the Plaintiff actually was paid for those hours, for all pay periods occurring within the applicable limitations period;

- The Court ORDERS Defendant to pay each Plaintiff liquidated damages in an amount equal to the back pay awarded to that Plaintiff;

- The Court ORDERS Defendant to pay Plaintiffs' reasonable attorney fees and costs pursuant to 29 U.S.C. §216(b);

- The Court ORDERS Defendants to pay post-judgment interest at the highest lawful rate for all amounts, including attorney fees, awarded against Defendants.

SIGNED this _____ day of _____, 2012.

_____

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

2