```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3   MIKE BENAVIDES, VICTORIA BRANNING, WALTER      )
     BRANNING, KURTIS BROWN, THOMAS BRYAN, PETE     )
 4   DIDONATO, SUSAN ERWIN, BRYAN FITZPATRICK,      )
     CATHERINE GERAC, CAROL PIERCE, COREY           )
 5   RICKETSON, TEMPLE THOMAS, GARY WADHAM,         )
     GREGORY WELLER, DANI WINKLER, MICHAEL          )
 6   WRIGHT, GLENN ANDERSON, JANELLE BOONE,         ) AU:11-CV-00438-LY
     AMELIA ZAPATA, GLEN WOSKY, PAUL ALVAREZ,       )
 7   MARK MONTGOMERY, JOHNNIE HALL, PAUL ALVAREZ,   )
     JANELLE BOONE, MICHAEL BROADWATER, JOHNNIE     )
 8   HALL, ERIC JAKUBAUSKAS, EDWARD JOHNS, MARK     )
     KARONIKA, DAVID LINDSLEY, JASON MARTIN, MARK   )
 9   MONTGOMERY, LANDON WILLHOITE, GLEN WOSKY,      )
     AMELIA ZAPATA,                                 )
10                                                  )
        Plaintiffs,                                 )
11                                                  )
     VS.                                            ) AUSTIN, TEXAS
12                                                  )
     CITY OF AUSTIN,                                )
13                                                  )
        Defendant.                                  ) NOVEMBER 5, 2012
14
                ***********************************************
15                     TRANSCRIPT OF JURY TRIAL

16              BEFORE THE HONORABLE LEE YEAKEL

17                      VOLUME 1 OF 8
                ***********************************************
18
     APPEARANCES:
19
     FOR THE PLAINTIFFS:        B. CRAIG DEATS
20                              DEATS DURST OWEN & LEVY, PLLC
                                1204 SAN ANTONIO STREET, SUITE 203
21                              AUSTIN, TEXAS 78701

22                              MANUEL ALFONSO QUINTO-POZOS
                                DEATS, DURST, OWEN & LEVY PLLC
23                              1204 SAN ANTONIO STREET, SUITE 203
                                AUSTIN, TEXAS 78701

24

25
```

```
 1  APPEARANCES (CONTINUED):

 2  FOR THE DEFENDANT:          CHRISTOPHER J. COPPOLA
                                MISHELL B. KNEELAND
 3                              CITY OF AUSTIN LAW DEPARTMENT
                                LITIGATION DIVISION
 4                              P.O. BOX 1546
                                301 W. 2ND STREET
 5                              AUSTIN, TEXAS 78767-1546

 6  COURT REPORTER:            ARLINDA RODRIGUEZ, CSR
                               501 WEST 5TH STREET, SUITE 4152
 7                             AUSTIN, TEXAS 78701
                               (512) 391-8791
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Proceedings recorded by computerized stenography, transcript

25  produced by computer.
```

1                          **EXAMINATION INDEX**

2

BRYAN FITZPATRICK
3        DIRECT BY MR. DEATS                              152
         CROSS BY MR. COPPOLA                             265
4

5

6                            **EXHIBIT INDEX**

                                                      OFFD/ADM
7  Plaintiff
   1      April 23, 2001 City of Austin Job Description  192 ---
8         for EMS District Commander Position

9  2      October 20, 2006 E-mail from James Hawley re:  198 ---
          DRAFT of District Command Job Description
10

   3      Draft City of Austin Job Description for EMS   198 ---
11        District Commander

12 4      June 30, 2008 Memorandum from E.M. Rodriguez   151 151
          re:  Reorganization
13

   5      July 29, 2008 City of Austin Job Description   151 151
14        for EMS Operations Supervisor

15 6      Operations Supervisor Job Expectations --     151 151
          8-2008
16

17 7      Functional Job Expectations                   151 151

   8      December 21, 2009 City of Austin Job          151 151
18        Description for EMS Operations Supervisor

19 9      April 22, 2011 City of Austin Job Description  151 151
          for EMS Operations Supervisor
20

   10     Functional Job Expectations Clinical          151 151
21        Specialist -- Operations

22 12     Urban Response Plan                           151 151

23 13     Suburban Response Plan                        151 151

24 14     Austin-Travis County EMS Policy and Procedure 151 151
          A08-D -- Scheduled Overtime List, On-Call List
25        and Cumulative List (effective May 27, 2010)

**EXHIBIT INDEX (CONTINUED)**

OFFD/ADM

Plaintiff

15    Austin-Travis County EMS Policy and Procedure    151 151
      A10-D -- Shift Bidding Process (effective May
      20, 2011)

16    Austin-Travis County EMS Policy and Procedure    151 151
      B 11-B -- Daily Duties

17    Clinical Operating Guidelines Clinical           151 151
      Standard CS-2 ("Cancellation or Alteration of
      Response")

18    Clinical Operating Guidelines Clinical           151 151
      Standard CS-13 ("Emergency Medical Dispatch")

19    Clinical Operating Guidelines Clinical           151 151
      Standard CS-20 ("Minimal Equipment Patient
      Side")

20    Clinical Operating Guidelines Clinical           151 151
      Standard CS-21 ("On Scene Authority -- Patient
      Care")

21    "Comprehensive Medical Practice Management       151 151
      Program v10.01.08 – Professional
      Practice-Guiding Principle – What Medical
      Equipment Should be Immediately Available at
      Patient Contact."

22    Command Update – December 18, 2007 –             151 151
      Management of DC Overtime for New Bid

23    Command Update – January 19,2011 – Option        151 151
      for Availability While On Scene

26    City of Austin EMS Pay Scale – Fiscal Year 08    151 151
      09

27    City of Austin EMS Pay Schedule for Meet and     151 151
      Confer FY 2010-11

28    City of Austin EMS Pay Schedule for Meet and     151 151
      Confer FY 2A011-12

29    EMS Non-Civil Service Pay Scale                  151 151

**EXHIBIT INDEX (CONTINUED)**

OFFD/ADM

Plaintiff

| | | | |
|---|---|---|---|
| 31 | Video of February 7, 2012 Testimony Before Austin City Council Briefing ("EMS Staffing Configuration") | 151 | 151 |
| 33 | Summary of EMS District Commanders -- Summary of Findings Up Until December 7, 2006 | 212 | 212 |
| 34 | December 11, 2006 E-mail from Richard Herrington re:  Desk Audit and Legal Review Of FLSA Issues | 202 | 203 |
| 35 | January 4, 2007 E-mail from Richard Herrington Re:  Desk Audit and Legal Review of FLSA Issues | 212 | 212 |
| 36 | January 26, 2007 E-mail from Vivian Holmes re: [No Subject] w/attachment ("DC -- Dulaney Smith Memo.pdf") | 205 | --- |
| 37 | December 10, 2007 Memorandum from E.M. Rodriguez re:  Pay Conversion for Non-Exempt Status | 207 | --- |
| 38 | March 12, 2009 E-mail from James Hawley re: General Note for Command | 151 | 151 |
| 39 | May 6, 2009 E-mail from James Hawley re: Mid-Year SSPR Division Command Review | 151 | 151 |
| 40 | October 1, 2010 E-mail from James Hawley re: Follow-up from District Command Meetings | 151 | 151 |
| 41 | October 7, 2010 E-mail from James Hawley re: Functional Job Description for Command w/attachment ("Functional Job Description Operations Supervisor FINAL.document | 151 | 151 |
| 42 | September 2, 2011 E-mail from James Hawley Re:  FW:   YEAR-END SSPRs - FY 10-11 | 151 | 151 |
| 43 | October 14, 2011 E-mail from James Hawley re: Command Notes w/attachment ("Command Notes 10.14.11.document | 151 | 151 |
| 44 | March 30, 2012 E-mail from James Hawley re: Command Expectations for North Area Command | 151 | 151 |

# EXHIBIT INDEX (CONTINUED)

OFFD/ADM

**Plaintiff**

| | | | |
|---|---|---|---|
| 45 | City of Austin Medical Release to Return to Work | 151 | 151 |
| 46 | Summary of dispatch data -- Proportion of Commander-versus-Crew calls for years 2008 and 2011. | 151 | 151 |
| 51 | Austin-Travis County EMS Policy and Procedure A29-A -- Light Duty Assignments (effective August 7, 2009) | 177 | 178 |
| 54 | November 14, 2008 -- Memo regarding EMS Clinical Specialist Internal Transfer | 182 | 183 |

**Defendant**

| | | | |
|---|---|---|---|
| 1 | Austin-Travis County EMS Organizational Chart (effective October 2010) | 151 | 151 |
| 2 | May 30, 2008 -- Memorandum re:  Reorganization from Ernie Rodriguez | 151 | 151 |
| 3 | District Commander Functional Job Expectations | 151 | 151 |
| 4 | 2011 Operations Supervisor Job Description | 151 | 151 |
| 5 | 2008 Operations Supervisor Job Description | 151 | 151 |
| 6 | EMS Commander Response Data | 151 | 151 |
| 7 | Percentage of Time EMS Commanders Assigned | 151 | 151 |
| 8 | EMS Breakdown of Incidents | 151 | 151 |
| 12 | RMS Notes from V. Branning, Brown, Fitzpatrick, and Wright | 151 | 151 |
| 13 | October 8, 2008 Kurt Brown Letter of Intent | 151 | 151 |
| 14 | Kurt Brown -- Resume (2012 Chief Promotion process) | 151 | 151 |
| 15 | Kurt Brown 208 COA Job Application | 151 | 151 |
| 16 | Peter DiDonato -- Resume (2008 Chief promotion) | 151 | 151 |

**EXHIBIT INDEX (CONTINUED)**

                                                              OFFD/ADM

Defendant

17      May 2, 1997 Peter DiDonato Acting Commander      151 151
        Process Intention

18      Michael O. Benavides -- Resume (2012 Chief       151 151
        Promotion process)

19      Temple N. Thomas -- Resume                       151 151

20      September 9, 2009 -- Memo regarding oral         151 151
        reprimand issued by Kurtis Brown

21      February 24, 2009 -0 Memo regarding discipline   151 151
        issued by V. Branning

22      October 18,m 2010 -- Memo regarding written      151 151
        reprimand suspension/probation --
        unprofessional conduct issued by V. Branning

23      April 8, 2009 -- E-mail from James Hawley to     151 151
        Field Commanders regarding cost of lost
        ambulance hours.

24      September 17, 2010 -- E-mail from James Hawley    151 151
        to Field Commanders regarding performance
        feedback

25      December 17, 2010 -- E-mail from James Hawley     151 151
        to Field Commanders regarding Command Workgroups

26      March 20, 2012 -- E-mail from James Hawley to     151 151
        Field Commanders regarding Command
        Expectations

27      Policy B11-B regarding daily duties              151 151

28      January 19, 2011 Command Update -- Option for    151 151
        Availability While on Scene

29      January 25, 2008 Command Update --               151 151
        Multi-Destination Transport

30      January 24, 2008 Command Update -- Vehicle       151 151
        Collision Report

31      January 13, 2009 Command Update -- Tracking      151 151
        and Record-keeping of Personnel Actions

**EXHIBIT INDEX (CONTINUED)**

OFFD/ADM

Defendant

| | | | |
|---|---|---|---|
| 32 | Austin-Travis County EMS Performance Expectation -- Clinical Specialist Reference manual for commanders | 151 | 151 |
| 33 | Operations Supervisor -- Candidate Feedback Form | 151 | 151 |
| 34 | Austin-Travis County EMS -- Task Book for Clinical Specialist | 151 | 151 |
| 35 | Death Pronouncements Performed by Commanders | 151 | 151 |
| 36 | COA EMS pay schedules -- 2008-09, 2010-11, and 2011-12 | 151 | 151 |
| 37 | December 11, 2006 -- E-mail from Richard Herrington to Commanders announcing desk audits | 151 | 151 |
| 38 | January 26, 2007 memo from Richard Herrington to Commanders announcing Karen Dulaney Smith interviews | 151 | 151 |
| 39 | December 7, 2006 Summary of Desk Audit Findings | 151 | 151 |
| 41 | City of Austin Human Resources Dept. Desk Audit - Frank Urias | 151 | 151 |
| 42 | City of Austin Human Resources Dept. Desk Audit - Casey Ping | 151 | 151 |
| 43 | City of Austin Human Resources Dept. Desk Audit - James Hawley | 151 | 151 |
| 44 | City of Austin Human Resources Dept. Desk Audit - G. Wadham | 151 | 151 |
| 45 | City of Austin Human Resources Dept. Desk Audit - H. Phillips | 151 | 151 |
| 46 | City of Austin Human Resources Dept. Desk Audit - S. Erwin | 151 | 151 |
| 47 | 2002 Review of Daily District Commander Duties | 151 | 151 |

1                    **EXHIBIT INDEX (CONTINUED)**

                                                    OFFD/ADM

2  Defendant

   48      2009 Operations Supervisor Job Description    151 151

3

   49      May 5, 2008 personnel Action forms for Bryan  151 151
4          Fitzpatrick, Vicki Branning, Kurtis Brown, and
           Michael Wright

5

   53      Shift Bidding Process                         151 151
6

   54      November 14, 2008 -- Memo regarding EMS       151 151
7          Clinical Specialist Internal Transfer

8  55      Daily Duties -- District Commander Knowledge  151 151
           and Skill Performance

9

   56      EMS Field Structure Org Chart                 151 151
10

   57      Plaintiffs' Response to Defendant's Request   151 151
11         for Admission Number 1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:02:39 | 1 | (Open Court, prospective jury panel present) |
| 09:02:39 | 2 | THE CLERK:  The Court calls this morning for jury |
| 09:02:41 | 3 | selection and trial Cause Number 11-CV-438, *Benavides*, and |
| 09:02:47 | 4 | others, v. *The City of Austin*.  Is the plaintiff ready to |
| 09:02:51 | 5 | proceed? |
| 09:02:52 | 6 | MR. DEATS:  The plaintiffs are ready to proceed, |
| 09:02:54 | 7 | Your Honor. |
| 09:02:55 | 8 | THE COURT:  Is the defendant ready? |
| 09:02:56 | 9 | MR. COPPOLA:  Defendant is ready, Your Honor. |
| 09:02:57 | 10 | THE COURT:  Very good.  Thank you. |
| 09:02:59 | 11 | Good morning, ladies and gentlemen.  I would like to |
| 09:03:02 | 12 | welcome all of you, all members of the jury panel, to our |
| 09:03:07 | 13 | court, the United States District Court, here in Austin.  My |
| 09:03:12 | 14 | name is Lee Yeakel, and I am one of two district judges for the |
| 09:03:15 | 15 | Austin Division of the Western District of Texas. |
| 09:03:20 | 16 | As, Ms. Demmings, the Division Deputy Clerk, |
| 09:03:23 | 17 | explained to you, the Western District of Texas consists of |
| 09:03:26 | 18 | seven divisions:  Austin, Waco, San Antonio, El Paso, Del Rio, |
| 09:03:34 | 19 | Pecos, and Midland/Odessa. |
| 09:03:36 | 20 | The federal court in Austin considers appropriate |
| 09:03:40 | 21 | federal actions brought in Bastrop, Blanco, Burleson, Burnet, |
| 09:03:46 | 22 | Caldwell, Gillespie, Hays, Kimble, Lampasas, Lee, Llano, Mason |
| 09:03:53 | 23 | McCulloch, San Saba, Travis, Washington, and |
| 09:03:58 | 24 | Williamson Counties.  As you can tell, the area covered by the |
| 09:04:03 | 25 | Austin Division is quite large, and that is the reason that |

09:04:06  1   some of you were required to travel a substantial distance to

09:04:10  2   participate in these court proceedings.  The Court recognizes

09:04:14  3   the sacrifices that many of you are making to perform this jury

09:04:19  4   service and appreciates very much your efforts.

09:04:26  5          Now you have been summoned to try a civil case.  When

09:04:29  6   parties to a federal lawsuit like this one desire and qualify

09:04:32  7   for a resolution of their case by a jury, federal law entitles

09:04:37  8   them to receive the benefit of an impartial jury of their

09:04:41  9   peers.  To obtain such a jury, persons are called from

09:04:46  10  throughout the area which comprises the particular division of

09:04:49  11  the district -- in this case, from those 17 counties I just

09:04:53  12  mentioned that make up the Austin Division of Western District

09:04:56  13  of Texas.

09:04:59  14         Persons are selected at random to assure that they

09:05:02  15  represent a cross-section of people, and it was this random

09:05:06  16  selection process which resulted in your being here today.  In

09:05:11  17  fact, you were randomly selected by a computer.  So if there

09:05:15  18  are any of you who believe a computer has never in the past

09:05:19  19  done you a favor, that may be reinforced in your mind today.

09:05:23  20  But we're glad to have you here.

09:05:26  21         Again, your participation in the jury process, which

09:05:29  22  is vital to our nation's judicial system, is especially

09:05:33  23  appreciated by the Court and the parties involved in this

09:05:36  24  litigation.  Now, let me share with you a little bit about the

09:05:40  25  jury system and its importance to our society and why it is

09:05:47   1   important to this Court and to these parties before you and to

09:05:49   2   you.

09:05:50   3          Calling citizens to hear disputes has been known

09:05:53   4   throughout history.  The jury system is mentioned as far back

09:05:58   5   as the Pentateuch, the first five books of the Hebrew Bible.

09:06:02   6   The Jewish people would impanel juries to decide questions of

09:06:05   7   property value and property ownership.  There is some thought

09:06:10   8   that the reason we have had a standard 12 jurors in our typical

09:06:17   9   jury trial is a reflection of the 12 Tribes of Israel and the

09:06:20   10   12 Apostles, although today, we will only select eight jurors.

09:06:25   11          Modern juries have historic roots in parts of

09:06:29   12   Byzantine, Greek, Roman, and European systems.  The Greeks

09:06:36   13   began using the jury system in about 1500 B.C.  Greek juries

09:06:40   14   were sometimes huge.  In fact, 501 jurors decided the fate of

09:06:46   15   Socrates.  And many of you may have thought we had parking

09:06:49   16   problems out there today with the few of you who are present

09:06:51   17   here in the courtroom.

09:06:52   18          The Romans adopted the jury system from the Greeks,

09:06:56   19   and the Romans are responsible for bringing the jury system to

09:06:59   20   England in about the Fourth Century A.D.  The English

09:07:04   21   experience has been a leading influence in shaping the modern

09:07:08   22   American jury system.

09:07:10   23          Following its advance by the Romans, England had a

09:07:14   24   rough system of juries in the late ninth century under Alfred.

09:07:18   25   The Normans following their arrival of the eleventh century,

09:07:25   1   established the foundation of the modern jury system.

09:07:27   2         In 1215 a tyrannical English King, King John,

09:07:31   3   attempted to do away with the right to trial by jury which had

09:07:35   4   been part of the English judicial system for over 700 years.

09:07:39   5   The English people would not stand for the deprivation of this

09:07:43   6   right, among others they cherished.  And so in a misty meadow

09:07:47   7   called Runnymede, King John was forced to signed the Magna

09:07:50   8   Carta, which guaranteed the English people the right to jury

09:07:54   9   trials as well as other rights.

09:07:56   10        The language of the Magna Carta was so simple and so

09:08:01   11   well elegant that 28 states have adopted that language verbatim

09:08:06   12   in their state constitutions to guarantee the right to trial by

09:08:09   13   jury.

09:08:09   14        The concept of jury trials was so deeply ingrained in

09:08:14   15   the American colonists in the settling of America, that when

09:08:17   16   another tyrannical English king, King George, III, attempted to

09:08:21   17   deny the right to jury trials to the colonists,

09:08:24   18   Thomas Jefferson, writing for the Second Continental Congress,

09:08:30   19   in penning the complaints against the Crown in the Declaration

09:08:36   20   of Independence, set out the right to jury trial as one of the

09:08:39   21   specific bases for separation from England.  The War of

09:08:42   22   Independence followed, and people fought and died to secure our

09:08:47   23   rights and independence.  Today the United States Constitution

09:08:51   24   guarantees the right to jury trials.

09:08:53   25        Now, democracy makes very few demands of its

09:08:57  1  citizens.  We're required to pay taxes and to render service in

09:09:00  2  time of war.  Some have said jury service is akin in importance

09:09:05  3  to service for your country in time of war, and I have no

09:09:09  4  quarrel with that statement.

09:09:10  5        For the average citizen, there are in my opinion but

09:09:15  6  two things you must do to preserve democracy:  Respond to jury

09:09:20  7  service and vote.  You have done one of them by being here

09:09:23  8  today.  And we have an important election tomorrow.  If you

09:09:28  9  have not already voted, you should certainly do so.

09:09:31  10        And as an aside, you are going to be part of history

09:09:36  11  this week.  Trials have been held in this courtroom where

09:09:41  12  you're currently seated since 1936.  You are likely to be the

09:09:46  13  last jury to sit in this courtroom and conduct a trial.  We

09:09:50  14  move and will be open on December 3rd at the first new

09:09:54  15  courthouse that Austin has had in those 76 years.  It will be

09:09:58  16  located at 5th and San Antonio Street.

09:10:02  17        I will miss this courtroom.  It has lot more majesty

09:10:08  18  than what the new courtrooms have.  And I doubt that there will

09:10:11  19  be another jury trial scheduled here, so you will be the last,

09:10:15  20  and many of you, I feel certain, looking at you you were not

09:10:18  21  born when the first was held in this courtroom.

09:10:21  22        Now we are here to select a jury for a case styled

09:10:25  23  *Mike Benavides*, and others, *v. The City of Austin*.  It is

09:10:32  24  numbered A-11-CV-438-LY on the docket of my court.  What we are

09:10:38  25  doing now and for the next little bit is what we call

09:10:44   1   "voir dire," which derives its name from the French word

09:10:50   2   *vua-deer*.  But we're not in Paris today.  We're in Texas.  And

09:10:52   3   so we're going to call it voir dire, because it seems to roll

09:10:56   4   off the tongues of Texans somewhat better than the French does.

09:11:00   5          I will ask you a number of questions.  It is

09:11:03   6   imperative that you listen carefully to the questions I'm about

09:11:06   7   to ask because you may be selected to serve on the jury in this

09:11:10   8   case.

09:11:11   9          After I have finished asking these questions, the

09:11:14   10  lawyers for each side will exercise strikes that they are

09:11:18   11  allotted to exclude certain members of the panel so we end up

09:11:22   12  with eight jurors who will ultimately remain and hear the

09:11:26   13  evidence in this case.

09:11:27   14         The process of voir dire requires the Court and the

09:11:31   15  lawyers for each party to ask potential jurors questions about

09:11:36   16  their backgrounds, knowledge, biases, and prejudices.  In the

09:11:41   17  process of doing this, the questions may at times feel

09:11:44   18  intrusive to you.  Please understand that it is certainly not

09:11:49   19  the Court's or the parties' intention to intrude on your

09:11:52   20  personal business.  However, to ensure that the jury selected

09:11:56   21  for this case has no knowledge of the facts or the parties to

09:12:00   22  this case and holds no biases or prejudices, it is necessary to

09:12:05   23  ask these questions.

09:12:06   24         If at any time you would like to provide your answer

09:12:10   25  to any question privately, please simply indicate that you

09:12:14    1    would like to do so, and I will have you approach the bench and

09:12:18    2    you can answer the questions with only the Court and the

09:12:21    3    lawyers present.

09:12:23    4            When you answer a question, I would appreciate it if

09:12:26    5    you would first state your name and your seat number.  That's

09:12:29    6    the seat where you're seated right now, the seat number here in

09:12:33    7    the courtroom, and please use the microphone that will be

09:12:37    8    provided to you by Ms. Miller, so that the court reporter's

09:12:41    9    record will be able to reflect who is answering and what your

09:12:45   10    answer is.

09:12:49   11            Now, Mr. Deats, will you please stand.

09:12:54   12            MR. DEATS:  (Complies)

09:12:54   13            THE COURT:  The person standing is Mr. Craig Deats

09:12:57   14    from the Law Office of Deats, Durst, Owen & Levy PLLC, and he

09:13:02   15    represents the plaintiffs in this case, Mike Benavides, and

09:13:05   16    others.

09:13:10   17            Mr. Deats, will you please name the named plaintiffs

09:13:12   18    in this lawsuit for the jury.

09:13:14   19            MR. DEATS:  Your Honor, that's a tall order.  There

09:13:16   20    are a number of them.

09:13:20   21            THE COURT:  And while he is organizing, listen

09:13:23   22    carefully to these names, ladies and gentlemen, because at this

09:13:27   23    stage there will be numerous names read to you.  And I will

09:13:30   24    then ask you if you know any of these people.  And that's an

09:13:35   25    important point.  Mr. Deats?

| | | |
|---|---|---|
| 09:13:36 | 1 | MR. DEATS:  Yes, sir.  The plaintiffs in this case |
| 09:13:38 | 2 | are the following:  Mike Benavides, Victoria Branning, Walter |
| 09:13:43 | 3 | Branning, Kurtis Brown, Thomas Bryan, Pete DiDonato, Susan |
| 09:13:51 | 4 | Erwin, Bryan Fitzpatrick, Cathy Gerac, Carol Pierce, Corey |
| 09:14:01 | 5 | Ricketson, Temple Thomas, Gary Wadham, Greg Weller, |
| 09:14:10 | 6 | Dani Winkler, Michael Wright, Glenn Anderson, Paul Alvarez, |
| 09:14:18 | 7 | Janelle Boone, Michael Broadwater, Johnnie Hall, Edward Johns, |
| 09:14:25 | 8 | Michael [sic] Karonika, David Lindsley, Jason Martin, |
| 09:14:33 | 9 | Glenn Wosky, Amelia Zapata. |
| 09:14:37 | 10 | THE COURT:  Ladies and gentlemen of the jury panel, |
| 09:14:41 | 11 | do any of you know personally any of the people who were just |
| 09:14:45 | 12 | named by Mr. Deats |
| 09:14:46 | 13 | (No response) |
| 09:14:47 | 14 | THE COURT:  All right.  Now, Mr. Deats, you're not |
| 09:14:50 | 15 | through yet.  Would you please introduce any cocounsel, legal |
| 09:14:55 | 16 | assistants, or others who will be seated with you at the |
| 09:14:58 | 17 | counsel table during this trial. |
| 09:14:59 | 18 | MR. DEATS:  Yes, sir.  Working with me during this |
| 09:15:01 | 19 | trial will be another attorney in my law firm, |
| 09:15:03 | 20 | Manuel Quinto-Pozos, and our legal assistant Alexandra |
| 09:15:09 | 21 | Kaufman.  She goes by Alex. |
| 09:15:11 | 22 | THE COURT:  And would you please read to the members |
| 09:15:13 | 23 | of the panel the witnesses whom you expect to call in this |
| 09:15:22 | 24 | case. |
| 09:15:22 | 25 | MR. DEATS:  Yes, Your Honor.  The anticipated |

09:15:24  1  witnesses at this point in time are Victoria Branning,

09:15:28  2  Kurtis Brown, Bryan Fitzgerald *[sic]*, Michael Wright,

09:15:32  3  David Scott Lindsley, and Bryan Fitzpatrick.

09:15:42  4          THE COURT:  All right.

09:15:43  5          Now, members of the panel, do you recognize -- do any

09:15:47  6  of you recognize or any of you or any member known to you of

09:15:50  7  your family familiar with, personally acquainted with, related

09:15:55  8  to, had any business dealings with, or ever been employed by

09:16:02  9  any of the plaintiffs whose names were read to you or their

09:16:05 10  lawyers or legal assistants whose names were read to you and

09:16:08 11  introduced to you or any of the persons whose names Mr. Deats

09:16:12 12  just listed for you as potential witnesses?

09:16:17 13          If so, please raise your hand.

09:16:24 14     (No response)

09:16:25 15          THE COURT:  Thank you.  Mr. Coppola, would you please

09:16:27 16  stand.

09:16:27 17          MR. COPPOLA:  (Complies)

09:16:27 18          THE COURT:  The person standing is Mr. Christopher J.

09:16:30 19  Coppola from the City of Austin's legal department.  He's an

09:16:33 20  assistant city attorney.  And he represents the defendant in

09:16:37 21  this case, the City of Austin.  Mr. Coppola, would you please

09:16:43 22  introduce any city representatives, cocounsel, legal

09:16:45 23  assistants, or others who will be seated with you during the

09:16:48 24  course of this trial at the conference table.

09:16:50 25          MR. COPPOLA:  From my office, Assistant City Attorney

| | | |
|---|---|---|
| 09:16:53 | 1 | Mishell Kneeland will be another lawyer assisting us with the |
| 09:16:56 | 2 | case.  Kathy Curtis is a paralegal from my office.  And |
| 09:17:00 | 3 | representing the City in this case is James Shamard, who is an |
| 09:17:05 | 4 | assistant director with the City's EMS Department. |
| 09:17:09 | 5 | THE COURT:  And, Mr. Coppola, would you please read |
| 09:17:11 | 6 | to the members of the panel the list of witnesses whom the City |
| 09:17:16 | 7 | expects to call in this case. |
| 09:17:18 | 8 | MR. COPPOLA:  The City expects to call James Shamard, |
| 09:17:22 | 9 | Ernie Rodriguez, James Hawley, Dr. Paul Hinchey, Jeff Steele, |
| 09:17:31 | 10 | Pete DiDonato, Karen Dulaney Smith, and Sylvia Flores. |
| 09:17:37 | 11 | THE COURT:  Now, members of the jury panel, do any of |
| 09:17:39 | 12 | you recognize or do any of you or any member of your family, |
| 09:17:43 | 13 | known to you, familiar with, personally acquainted with, |
| 09:17:46 | 14 | related to, had any business dealings with, or ever been |
| 09:17:50 | 15 | employed by the City of Austin or its lawyers or legal |
| 09:17:55 | 16 | assistants as introduced and any of the persons whose names |
| 09:17:58 | 17 | Mr. Coppola just listed for you? |
| 09:18:00 | 18 | If so, please raise your hand. |
| 09:18:05 | 19 | JUROR CALERO:  My name is Terri Calero, and I was an |
| 09:18:14 | 20 | employee for the City of Austin. |
| 09:18:15 | 21 | THE COURT:  All right.  And what is your seat |
| 09:18:16 | 22 | number?  Sixteen |
| 09:18:17 | 23 | JUROR CALERO:  Sixteen, yes. |
| 09:18:18 | 24 | THE COURT:  All right.  Very good.  Is there anything |
| 09:18:20 | 25 | in that relationship or background as a city employee that |

```
09:18:25    1   would affect your ability to reach a fair and impartial verdict

09:18:31    2   in this case?

09:18:34    3               JUROR CALERO:  No.

09:18:34    4               THE COURT:  All right.  You would not be prejudiced

09:18:37    5   for one side or the other because of your employment with the

09:18:39    6   City; is that correct?

09:18:40    7               JUROR CALERO:  Yes.

09:18:40    8               THE COURT:  And how long ago were you employed by the

09:18:43    9   City.

09:18:43   10               JUROR CALERO:  Two years ago.

09:18:44   11               THE COURT:  You're going to have to speak into the

09:18:48   12   microphone.

09:18:48   13               JUROR CALERO:  I'm sorry.  Two years ago.

09:18:49   14               THE COURT:  All right.  And how long were you

09:18:50   15   employed with the City?

09:18:51   16               JUROR CALERO:  Twelve years.

09:18:52   17               THE COURT:  All right.  And what was your position?

09:18:54   18               JUROR CALERO:  I was assistant senior advocate with

09:18:56   19   the Environmental Department.

09:18:57   20               THE COURT:  All right.  Did you ever work with any of

09:18:59   21   the EMS units for the City or the police department or the fire

09:19:04   22   department?

09:19:04   23               JUROR CALERO:  We did volunteer work with them, but

09:19:07   24   we never worked directly with them.

09:19:08   25               THE COURT:  All right.  Thank you.
```

| | | |
|---|---|---|
| 09:19:10 | 1 | Anyone else? |
| 09:19:12 | 2 | JUROR TALKINGTON:  Scott Talkington, seat 9.  My wife |
| 09:19:16 | 3 | is currently a City of Austin employee. |
| 09:19:19 | 4 | THE COURT:  All right.  And how long has she been |
| 09:19:22 | 5 | employed by the City of Austin? |
| 09:19:24 | 6 | JUROR TALKINGTON:  Almost six years, I believe. |
| 09:19:26 | 7 | THE COURT:  And in what department does she work? |
| 09:19:28 | 8 | JUROR TALKINGTON:  Austin Energy. |
| 09:19:29 | 9 | THE COURT:  All right.  Has she ever been employed in |
| 09:19:32 | 10 | any of the EMS units of the City of Austin or the police |
| 09:19:36 | 11 | department or the fire department of the City of Austin? |
| 09:19:39 | 12 | JUROR TALKINGTON:  No. |
| 09:19:39 | 13 | THE COURT:  Was there anything about your wife's |
| 09:19:41 | 14 | employment that would inhibit your ability to reach a fair and |
| 09:19:45 | 15 | impartial decision in this case? |
| 09:19:47 | 16 | JUROR TALKINGTON:  No. |
| 09:19:48 | 17 | THE COURT:  You would not be prejudiced for or |
| 09:19:50 | 18 | against the City because your wife works for them; is that |
| 09:19:53 | 19 | correct? |
| 09:19:54 | 20 | JUROR TALKINGTON:  Correct. |
| 09:19:54 | 21 | THE COURT:  Thank you. |
| 09:19:55 | 22 | Anyone else? |
| 09:19:56 | 23 | (No response) |
| 09:19:57 | 24 | THE COURT:  To the best of your knowledge, ladies and |
| 09:20:02 | 25 | gentlemen, have any of the attorneys in this case or members of |

| | | |
|---|---|---|
| 09:20:06 | 1 | their firms acted as your attorney or the attorney for any of |
| 09:20:09 | 2 | your immediate family or close friends? |
| 09:20:11 | 3 | (No response) |
| 09:20:19 | 4 | THE COURT:  Now, this is an interesting question, but |
| 09:20:21 | 5 | one I must ask.  Do any of you recognize any other member of |
| 09:20:23 | 6 | the panel as being a close personal friend, acquaintance, or |
| 09:20:27 | 7 | business associate?  Now, you laugh because I've just told you |
| 09:20:30 | 8 | we've drawn you from 17 counties spread out from all over |
| 09:20:34 | 9 | central Texas, and computer has randomly selected you.  But I |
| 09:20:38 | 10 | asked that question one day, and there were two fellows who had |
| 09:20:41 | 11 | played golf in the same foursome every Saturday for about 20 |
| 09:20:45 | 12 | years.  So it does happen.  But do any of you recognize one |
| 09:20:48 | 13 | another or know anybody? |
| 09:20:49 | 14 | Yes, ma'am? |
| 09:20:50 | 15 | JUROR SCHELL:  I have really good friend of the |
| 09:20:54 | 16 | family whose name is Margil Quijano. |
| 09:20:59 | 17 | THE COURT:  And which juror was that? |
| 09:21:00 | 18 | JUROR SCHELL:  I'm six.  What number are you, Margil? |
| 09:21:09 | 19 | JUROR QUIJANO:  Yes.  My name Margil Quijano.  I'm |
| 09:21:11 | 20 | number 11.  And Alma and myself are very good friends since so |
| 09:21:17 | 21 | many years. |
| 09:21:18 | 22 | THE COURT:  All right.  Thank you.  I got one more |
| 09:21:21 | 23 | hand.  And I hope this comes up to an even number, and one of |
| 09:21:24 | 24 | you is not hiding what you know about the other. |
| 09:21:27 | 25 | JUROR COCHRAN:  Denise Cochran, seat number 13.  Seat |

09:21:32  1   number 25 and I teach at the same district, actually, the same

09:21:36  2   subject.

09:21:36  3            THE COURT:  All right.  Very good.

09:21:38  4            JUROR ONTIBEROS:  Seat number 14,

09:21:43  5   Esperanza Ontiberos.  I've been best friends with Andrea Petit

09:21:45  6   for about 15 years.

09:21:51  7            THE COURT:  The computer shot with a very narrow view

09:21:54  8   of this jury, I think.

09:21:56  9            JUROR POPOV:  Seat number 25.  I just also wanted to

09:22:00  10  say I know Denise Cochran.  I've known her since I was about 18

09:22:06  11  years old.

09:22:06  12           THE COURT:  All right.  What else?

09:22:08  13      (No response)

09:22:08  14           THE COURT:  Of that large number of you who know one

09:22:13  15  another, is there anything in that knowledge or relationship

09:22:16  16  that would cause you not to exercise independent -- judgment in

09:22:21  17  your own independent verdict?  In other words, would you be

09:22:25  18  swayed if you and someone known to you appeared on the same

09:22:29  19  jury and have a tendency to be influenced by that juror any

09:22:35  20  more than any others?  If so, please raise your hand.

09:22:41  21      (No response)

09:22:41  22           THE COURT:  By your silence and lack of hand raising,

09:22:44  23  I presume that you will be able to listen to the evidence

09:22:46  24  yourself and reach your own independent judgment as to what you

09:22:49  25  think your verdict should be.  Is there anyone who disagrees

| | | |
|---|---|---|
| 09:22:52 | 1 | with that? |
| 09:22:55 | 2 | (No response) |
| 09:22:56 | 3 | THE COURT:  Thank you. |
| 09:22:57 | 4 | Do any of you -- pardon me.  The attorneys in |
| 09:23:05 | 5 | consultation with the Court in this case, and has been told you |
| 09:23:08 | 6 | by the district clerk, estimate that this case will take |
| 09:23:12 | 7 | approximately six days to try.  Now, let me explain to you what |
| 09:23:19 | 8 | that means.  We're selecting you this morning.  The evidence |
| 09:23:22 | 9 | will start this afternoon.  We will hear evidence, we |
| 09:23:25 | 10 | anticipate and we estimate, for the remainder of the week. |
| 09:23:30 | 11 | Now, to make it easier on you and because the Court |
| 09:23:34 | 12 | has a lot of things going on, you might gather that we have |
| 09:23:38 | 13 | very large dockets arising from all of those counties I |
| 09:23:41 | 14 | mentioned.  We will recess at noon on Friday regardless of |
| 09:23:46 | 15 | where we are in the trial.  So you'll have Friday afternoon off |
| 09:23:50 | 16 | which will give you an opportunity to deal with personal |
| 09:23:53 | 17 | affairs and business situations.  And then Monday is a federal |
| 09:23:58 | 18 | holiday, so we will go until noon on Friday and then recess |
| 09:24:03 | 19 | until Tuesday morning, and it is anticipated by the lawyers and |
| 09:24:08 | 20 | me that we will finish up Tuesday. |
| 09:24:13 | 21 | Now, is there anyone who would suffer any undue |
| 09:24:17 | 22 | hardship or have any special problem serving on a jury for that |
| 09:24:22 | 23 | length of time?  The operative words are "undue" and "special," |
| 09:24:26 | 24 | because I know that you make a sacrifice by being here this |
| 09:24:35 | 25 | week and it creates a hardship and problems for you, but I |

09:24:38  1  think with the little break for the long weekend, you should

09:24:40  2  have some time to deal with what you're doing personally.

09:24:43  3       But if there is anyone that would have a hard --

09:24:46  4  undue hardship or a special problem serving during that period

09:24:52  5  of time, please raise your hand.

09:24:53  6       (No response)

09:24:54  7       THE COURT:  Thank you.  Do any of you have any

09:24:56  8  illness in your family or any business problem or similar

09:24:59  9  personal concern that would make it difficult for you to be

09:25:03  10  attentive to the evidence?  In other words, would you be

09:25:07  11  preoccupied with something else and be unable to devote your

09:25:15  12  attention to what goes on here in this courtroom over the time

09:25:18  13  period that I described for you?

09:25:20  14       (No response)

09:25:21  15       THE COURT:  Thank you.  Do any of you have any

09:25:23  16  problem with your eyesight or your hearing or any other

09:25:25  17  physical disability which in any manner would prevent you from

09:25:28  18  either seeing or hearing the evidence presented in the trial,

09:25:31  19  knowing that the eight of you who are selected for the jury

09:25:34  20  will be seated here to my left in the jury box, so you will be

09:25:37  21  closer.  And also it's generally only the judge that gets

09:25:41  22  accused of not being able to see or hear what's going on in the

09:25:44  23  courtroom.

09:25:46  24       But if any of you would have a problem -- physical

09:25:49  25  problem with seeing or hearing the evidence, please raise your

09:25:51  1    hand.

09:25:52  2         (No response)

09:25:53  3         THE COURT:  Thank you.  Now, what I'm going to share

09:25:56  4    with you now are the statements of the claims by the parties,

09:26:00  5    and these are what the parties claim.  This is not the Court's

09:26:06  6    instruction to you on what the evidence shows.  I'm first going

09:26:10  7    to tell you what the plaintiffs claim in this case, and then

09:26:13  8    I'm going to tell you what the defendant claims in this case.

09:26:16  9         At the end of the trial, you will make a decision

09:26:21  10   based on facts as to what claims are valid or not.  But I want

09:26:26  11   to acquaint you a little bit with what you're going to be

09:26:29  12   hearing during this trial.

09:26:31  13        According to the plaintiffs, this case arises under

09:26:36  14   the Fair Labor Standards Act, a federal law that generally

09:26:41  15   requires employers to pay their employees overtime pay when

09:26:44  16   they work more than 40 hours a week.

09:26:47  17        The plaintiffs are district commanders of the Austin,

09:26:50  18   Travis County Emergency Medical Service, also known as EMS, who

09:26:55  19   claim the City fails to pay them overtime pay as required by

09:26:59  20   law.  Plaintiff claims that the City admits that the plaintiffs

09:27:04  21   work more than 40 hours a week without receiving overtime pay,

09:27:08  22   but the City claims that the employees fall under the executive

09:27:12  23   and administrative exemptions to federal overtime law.  The

09:27:17  24   plaintiffs respond that these exemptions do not apply because

09:27:23  25   they are public safety employees whose primary duty is to

09:27:27  1  respond to accidents and other medical emergencies.

09:27:30  2          The plaintiffs claim that they are equipped and on

09:27:32  3  call throughout their work shift to respond to emergencies and

09:27:35  4  that they do so on a daily basis, working alongside the

09:27:40  5  paramedics they supervise.  The plaintiffs claim that, under

09:27:44  6  the law, the executive and administrative exemptions

09:27:47  7  specifically do not apply to such first responders regardless

09:27:52  8  of their rank and, thus, the plaintiffs contend they are

09:27:57  9  entitled to overtime pay for hours they work in excess of

09:28:01  10  40 hours a week.

09:28:02  11          Now, the City claims as follows.  This is how the

09:28:05  12  City responds.  The City claims that the plaintiffs are EMS

09:28:09  13  district commander and operations supervisors.  They're chiefly

09:28:15  14  responsible for supervising and managing the more than 300

09:28:19  15  EMTs, paramedics, clinical specialists, and captains who

09:28:24  16  perform the vast bulk of the emergency response service

09:28:28  17  provided by EMS.  The City claims that these individuals also

09:28:33  18  perform administrative tasks that are vital to EMS operations.

09:28:38  19          These district commanders are part of EMS's command

09:28:41  20  structure, have substantial discretion in supervising their

09:28:46  21  employees and managing their workload, are paid commensurate

09:28:50  22  with important command level roles, are relatively free from

09:28:54  23  direct supervision, and provide direct patient care only

09:29:01  24  rarely.

09:29:01  25          The City claims that the plaintiffs now ask that

| | | |
|---|---|---|
| 09:29:03 | 1 | their management and administrative roles be downplayed and |
| 09:29:07 | 2 | that they be treated as if they are essentially on the front |
| 09:29:11 | 3 | lines of EMS patient care.  The City claims that the City has |
| 09:29:16 | 4 | correctly classified these district commanders as exempt from |
| 09:29:19 | 5 | overtime because of the roles they play in the EMS |
| 09:29:23 | 6 | organization. |
| 09:29:25 | 7 | Now, that is what the parties claim.  Do any of you, |
| 09:29:32 | 8 | or do you know of anyone directly, who has an interest in the |
| 09:29:36 | 9 | outcome of this litigation based on that brief thumbnail sketch |
| 09:29:40 | 10 | of what I told you were the claims of the parties? |
| 09:29:43 | 11 | (No response) |
| 09:29:45 | 12 | THE COURT:  Later today the lawyers will give their |
| 09:29:51 | 13 | opening statement, which are more detailed renditions of the |
| 09:29:54 | 14 | understanding of the facts involved in this case.  But based |
| 09:29:57 | 15 | upon that short summary, which I just provided to you, I want |
| 09:30:00 | 16 | to ask you a few questions concerning any knowledge you may |
| 09:30:04 | 17 | have about this case.  Have any of you read anything about this |
| 09:30:09 | 18 | case in the newspapers, or have ever heard anything about it on |
| 09:30:13 | 19 | radio or in conversations with others or seen anything on |
| 09:30:17 | 20 | television about it?  Or have you learned, heard, read or seen |
| 09:30:22 | 21 | anything about it from any source whatsoever other than in this |
| 09:30:26 | 22 | courtroom or in connection with your initial qualification and |
| 09:30:30 | 23 | orientation for jury service by Ms. Demmings?  If so, please |
| 09:30:34 | 24 | raise your hand. |
| 09:30:35 | 25 | (No response) |

| | | |
|---|---|---|
| 09:30:37 | 1 | THE COURT:  Now, a few questions about your prior |
| 09:30:48 | 2 | experience in Court:  Is there anyone on this panel who has |
| 09:30:50 | 3 | ever served an a grand jury?  If so, please raise your hand. |
| 09:30:54 | 4 | (No response) |
| 09:30:55 | 5 | THE COURT:  Is there anyone on the panel who has ever |
| 09:30:59 | 6 | served on what we call a regular or petit jury?  That's a jury |
| 09:31:03 | 7 | like the one you've been called here today that considers one |
| 09:31:07 | 8 | case and one case only, and that can be either civil or |
| 09:31:12 | 9 | criminal, and it can be in either federal court or state |
| 09:31:14 | 10 | court.  So is there anyone on this panel who has ever served on |
| 09:31:17 | 11 | a jury before?  If so, please raise your hand. |
| 09:31:25 | 12 | JUROR FERGUSON:  Mark Ferguson, seat seven. |
| 09:31:28 | 13 | THE COURT:  And was your prior juror jury service in |
| 09:31:30 | 14 | federal or state court? |
| 09:31:31 | 15 | JUROR FERGUSON:  I think it was state court. |
| 09:31:33 | 16 | THE COURT:  And how many times have you served on a |
| 09:31:36 | 17 | jury? |
| 09:31:36 | 18 | JUROR FERGUSON:  One time. |
| 09:31:37 | 19 | THE COURT:  All right.  And was the case civil or |
| 09:31:39 | 20 | criminal. |
| 09:31:39 | 21 | JUROR FERGUSON:  It was criminal. |
| 09:31:41 | 22 | THE COURT:  And about how long ago was that? |
| 09:31:43 | 23 | JUROR FERGUSON:  It was about six or seven years ago. |
| 09:31:50 | 24 | THE COURT:  Were you the foreman of that jury? |
| 09:31:52 | 25 | JUROR FERGUSON:  No, sir. |

| | | |
|---|---|---|
| 09:31:52 | 1 | THE COURT:  And without disclosing what the outcome |
| 09:31:54 | 2 | of the trial was or what the jury's verdict was, did the jury |
| 09:31:59 | 3 | deliberate and arrive at a verdict in this case? |
| 09:32:02 | 4 | JUROR FERGUSON:  Yes, sir, they did. |
| 09:32:03 | 5 | THE COURT:  And is there anything about that prior |
| 09:32:05 | 6 | jury experience that would prevent you from being a fair and |
| 09:32:08 | 7 | impartial juror in this case? |
| 09:32:10 | 8 | JUROR FERGUSON:  No, sir. |
| 09:32:11 | 9 | THE COURT:  Thank you.  Anyone else in the first row |
| 09:32:13 | 10 | here? |
| 09:32:15 | 11 | (No response) |
| 09:32:15 | 12 | THE COURT:  All right.  Second row to my right, raise |
| 09:32:16 | 13 | your hand. |
| 09:32:17 | 14 | JUROR EMERSON:  Yes, sir.  Bob Emerson. |
| 09:32:22 | 15 | THE COURT:  All right.  Mr. Emerson, was your prior |
| 09:32:26 | 16 | jury service federal or state? |
| 09:32:28 | 17 | JUROR EMERSON:  It was civil. |
| 09:32:29 | 18 | THE COURT:  Was it federal court or was it state? |
| 09:32:30 | 19 | JUROR EMERSON:  Oh.  State.  I'm sorry. |
| 09:32:32 | 20 | THE COURT:  All right.  And about how long ago was |
| 09:32:34 | 21 | that? |
| 09:32:34 | 22 | JUROR EMERSON:  About 15 years ago. |
| 09:32:35 | 23 | THE COURT:  And have you served on a jury more than |
| 09:32:38 | 24 | once? |
| 09:32:38 | 25 | JUROR EMERSON:  Yes, sir. |

| | | |
|---|---|---|
| 09:32:38 | 1 | THE COURT:  How many times have you served on a jury? |
| 09:32:42 | 2 | JUROR EMERSON:  Three times.  One in grand jury one |
| 09:32:45 | 3 | time in Lampasas County. |
| 09:32:47 | 4 | THE COURT:  All right.  Were the -- disregarding the |
| 09:32:51 | 5 | grand jury experience, were the civil juries -- or were the |
| 09:32:54 | 6 | cases you served on both civil juries? |
| 09:32:57 | 7 | JUROR EMERSON:  Yes, sir. |
| 09:32:57 | 8 | THE COURT:  All right.  And were you the foreman of |
| 09:33:00 | 9 | either of those juries. |
| 09:33:02 | 10 | JUROR EMERSON:  No, sir. |
| 09:33:02 | 11 | THE COURT:  And, again, without disclosing the |
| 09:33:04 | 12 | outcome in both of those cases, did the jury deliberate and |
| 09:33:08 | 13 | arrive at a verdict? |
| 09:33:09 | 14 | JUROR EMERSON:  Yes, sir. |
| 09:33:10 | 15 | THE COURT:  And you have the one time you served on a |
| 09:33:13 | 16 | grand jury; is that correct? |
| 09:33:14 | 17 | JUROR EMERSON:  Right. |
| 09:33:15 | 18 | THE COURT:  Is there anything in any of that prior |
| 09:33:18 | 19 | jury, regular juries or grand juries, anything in your |
| 09:33:22 | 20 | experience that would prevent you from being a fair and |
| 09:33:25 | 21 | impartial juror in this case if selected for this jury? |
| 09:33:28 | 22 | JUROR EMERSON:  No. |
| 09:33:29 | 23 | THE COURT:  Thank you. |
| 09:33:32 | 24 | JUROR NEFF:  Brad Neff, seat 17. |
| 09:33:37 | 25 | THE COURT:  All right.  And Mr. Neff, how many times |

| | | |
|---|---|---|
| 09:33:39 | 1 | have you served on a jury? |
| 09:33:41 | 2 | JUROR NEFF:  One time. |
| 09:33:42 | 3 | THE COURT:  How long ago was that? |
| 09:33:43 | 4 | JUROR NEFF:  About seven years ago. |
| 09:33:44 | 5 | THE COURT:  Was it federal or state? |
| 09:33:46 | 6 | JUROR NEFF:  I believe it was state. |
| 09:33:47 | 7 | THE COURT:  All right.  And was it a civil case or a |
| 09:33:49 | 8 | criminal case? |
| 09:33:50 | 9 | JUROR NEFF:  Civil. |
| 09:33:50 | 10 | THE COURT:  Were you the foreman? |
| 09:33:52 | 11 | JUROR NEFF:  No, sir. |
| 09:33:52 | 12 | THE COURT:  And did the jury deliberate and arrive at |
| 09:33:55 | 13 | a verdict? |
| 09:33:56 | 14 | JUROR NEFF:  We did not. |
| 09:33:57 | 15 | THE COURT:  Is there anything in that prior jury |
| 09:33:59 | 16 | experience that would prevent you from being fair and impartial |
| 09:34:02 | 17 | in this case if selected for this jury? |
| 09:34:05 | 18 | JUROR NEFF:  No, sir. |
| 09:34:06 | 19 | THE COURT:  Thank you.  Anyone to my right with prior |
| 09:34:09 | 20 | jury experience? |
| 09:34:10 | 21 | (No response) |
| 09:34:10 | 22 | THE COURT:  Now moving to the left. |
| 09:34:15 | 23 | JUROR SPIKES:  Brent Spikes, juror number 10. |
| 09:34:17 | 24 | THE COURT:  And about how long did you serve on a |
| 09:34:20 | 25 | jury, Mr. Spikes? |

| | | |
|---|---|---|
| 09:34:21 | 1 | JUROR SPIKES:  About 15 years ago. |
| 09:34:22 | 2 | THE COURT:  Have you only served on one, or have you |
| 09:34:25 | 3 | served on more than one? |
| 09:34:25 | 4 | JUROR SPIKES:  One. |
| 09:34:26 | 5 | THE COURT:  Was it civil or criminal? |
| 09:34:27 | 6 | JUROR SPIKES:  Criminal. |
| 09:34:28 | 7 | THE COURT:  Was it state or federal court? |
| 09:34:30 | 8 | JUROR SPIKES:  State. |
| 09:34:31 | 9 | THE COURT:  Were you the foreman of that jury? |
| 09:34:32 | 10 | JUROR SPIKES:  Yes, sir. |
| 09:34:33 | 11 | THE COURT:  Did the jury deliberate and arrive at a |
| 09:34:36 | 12 | verdict? |
| 09:34:36 | 13 | JUROR SPIKES:  Yes, sir. |
| 09:34:37 | 14 | THE COURT:  Is there anything in that prior jury |
| 09:34:39 | 15 | experience that would prevent you from being fair and impartial |
| 09:34:42 | 16 | in this case? |
| 09:34:42 | 17 | JUROR SPIKES:  No. |
| 09:34:43 | 18 | THE COURT:  Thank you. |
| 09:34:46 | 19 | Anyone else to my left? |
| 09:34:48 | 20 | JUROR ONTIBEROS:  Esperanza Ontiberos, number 14. |
| 09:34:51 | 21 | THE COURT:  Ms. Ontiberos, was your prior jury |
| 09:34:53 | 22 | service federal or state? |
| 09:34:54 | 23 | JUROR ONTIBEROS:  State. |
| 09:34:55 | 24 | THE COURT:  And how many times have you served on a |
| 09:34:57 | 25 | jury? |

| | | |
|---|---|---|
| 09:34:57 | 1 | JUROR ONTIBEROS:  Just once. |
| 09:34:59 | 2 | THE COURT:  About how long ago was that? |
| 09:35:01 | 3 | JUROR ONTIBEROS:  Six months. |
| 09:35:02 | 4 | THE COURT:  All right.  And did you say two times? |
| 09:35:05 | 5 | JUROR ONTIBEROS:  Once. |
| 09:35:06 | 6 | THE COURT:  Once.  I'm sorry.  Was the case civil or |
| 09:35:09 | 7 | criminal? |
| 09:35:09 | 8 | JUROR ONTIBEROS:  Civil. |
| 09:35:10 | 9 | THE COURT:  Were you the foreman of that jury? |
| 09:35:12 | 10 | JUROR ONTIBEROS:  No, sir. |
| 09:35:12 | 11 | THE COURT:  Did the jury deliberate and arrive at a |
| 09:35:15 | 12 | verdict? |
| 09:35:15 | 13 | JUROR ONTIBEROS:  No, sir. |
| 09:35:16 | 14 | THE COURT:  Was there anything about that prior jury |
| 09:35:18 | 15 | experience that would prevent you from being a fair and |
| 09:35:21 | 16 | impartial juror in this case? |
| 09:35:22 | 17 | JUROR ONTIBEROS:  No, sir. |
| 09:35:23 | 18 | THE COURT:  Thank you.  Anyone else with prior jury |
| 09:35:25 | 19 | experience? |
| 09:35:30 | 20 | (No response) |
| 09:35:30 | 21 | THE COURT:  Thank you.  Now this is addressed to |
| 09:35:32 | 22 | those of you who have served in the military.  Have any of you |
| 09:35:36 | 23 | ever served on a general or special courts-martial or |
| 09:35:41 | 24 | court-martial panel or served as a court-martial. |
| 09:35:44 | 25 | (No response) |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 09:35:44 | 1  | THE COURT:  Have you, any member of your family, or |
| 09:35:50 | 2  | any close friend ever participated -- any family member or |
| 09:35:54 | 3  | close friend known to you ever participated in a lawsuit -- |
| 09:35:57 | 4  | that would be a civil case -- as a party, a witness, or in any |
| 09:36:02 | 5  | capacity? |
| 09:36:10 | 6  | JUROR KOEHN:  Jody Koehn, number 26. |
| 09:36:11 | 7  | THE COURT:  In what capacity were you involved in a |
| 09:36:13 | 8  | lawsuit. |
| 09:36:13 | 9  | JUROR KOEHN:  I've been a party to a lawsuit, I've |
| 09:36:18 | 10 | represented clients in lawsuits, and I've testified in |
| 09:36:21 | 11 | lawsuits. |
| 09:36:22 | 12 | THE COURT:  All right.  Is there anything in that |
| 09:36:24 | 13 | prior experience that would prevent you from being a fair and |
| 09:36:27 | 14 | impartial juror in this case? |
| 09:36:29 | 15 | JUROR KOEHN:  No, sir. |
| 09:36:30 | 16 | THE COURT:  All right.  Thank you.  Anyone else?  Any |
| 09:36:32 | 17 | prior experience in a lawsuit? |
| 09:36:33 | 18 | JUROR LAUNIUS:  Robert Launius, seat 12. |
| 09:36:42 | 19 | THE COURT:  All right.  In what capacity were you |
| 09:36:44 | 20 | involved in a lawsuit? |
| 09:36:45 | 21 | JUROR LAUNIUS:  I was actually a witness in a state |
| 09:36:48 | 22 | case about three months ago. |
| 09:36:50 | 23 | THE COURT:  Okay.  Was that a criminal or civil case? |
| 09:36:52 | 24 | JUROR LAUNIUS:  That would -- criminal. |
| 09:36:54 | 25 | THE COURT:  All right.  Is there anything in that |

| | | |
|---|---|---|
| 09:36:56 | 1 | prior experience that would prevent you from being fair and |
| 09:36:59 | 2 | impartial in this case if selected to be a juror? |
| 09:37:01 | 3 | JUROR LAUNIUS:  No, sir. |
| 09:37:02 | 4 | THE COURT:  Thank you. |
| 09:37:04 | 5 | JUROR SPIKES:  Brent Spikes, number 10.  I was in a |
| 09:37:10 | 6 | civil case.  I was a defendant in an auto accident. |
| 09:37:14 | 7 | THE COURT:  All right.  You were an actual party in |
| 09:37:16 | 8 | the lawsuit? |
| 09:37:17 | 9 | JUROR SPIKES:  Yes, sir. |
| 09:37:17 | 10 | THE COURT:  All right.  Is there anything in that |
| 09:37:19 | 11 | prior experience that would prevent you from being a fair and |
| 09:37:22 | 12 | impartial juror in this case? |
| 09:37:23 | 13 | JUROR SPIKES:  No, sir. |
| 09:37:24 | 14 | THE COURT:  All right.  Thank you.  Anyone else to my |
| 09:37:27 | 15 | left? |
| 09:37:27 | 16 | (No response) |
| 09:37:27 | 17 | THE COURT:  Now to my right? |
| 09:37:29 | 18 | JUROR PRYOR:  Mark Pryor, number 23.  I used to be a |
| 09:37:33 | 19 | civil attorney, so I represented clients in civil suits. |
| 09:37:36 | 20 | THE COURT:  All right.  So you were involved in any |
| 09:37:38 | 21 | number of civil suits? |
| 09:37:39 | 22 | JUROR PRYOR:  Yes, Judge. |
| 09:37:40 | 23 | THE COURT:  All right.  Is there anything in that |
| 09:37:42 | 24 | prior experience that would prevent you from being fair and |
| 09:37:45 | 25 | impartial in this case? |

```
09:37:46   1              JUROR PRYOR:  No, sir.
09:37:47   2              THE COURT:  Thank you.  Anyone else to my right?
09:37:50   3              JUROR SHELDON:  Tonya Sheldon, number 24.  I'm a
09:37:53   4    defendant in a lawsuit.
09:37:54   5              THE COURT:  All right.  What type of suit is that?
09:37:56   6              JUROR SHELDON:  A civil suit.
09:37:57   7              THE COURT:  All right.  Is there anything in that
09:37:59   8    experience that would prevent you from being fair and impartial
09:38:02   9    in this case?
09:38:03  10              JUROR SHELDON:  No, sir.
09:38:03  11              THE COURT:  Thank you.
09:38:04  12              JUROR WALKER:  My name is Charles Walker, number 21.
09:38:12  13              THE COURT:  All right.  In what capacity have you
09:38:13  14    been involved in a suit?
09:38:15  15              JUROR WALKER:  My son is a attorney in California.
09:38:19  16              THE COURT:  So does he sue you a lot, or are you just
09:38:21  17    aware of what goes on?
09:38:23  18              JUROR WALKER:  No.
09:38:23  19              THE COURT:  Okay.  Is there anything in your
09:38:25  20    experience or anything your son may have told you or anything
09:38:29  21    in your background that would prevent you from being fair and
09:38:32  22    impartial in this case?
09:38:33  23              JUROR WALKER:  No, sir.
09:38:34  24              THE COURT:  Thank you.  I think there was somebody
09:38:37  25    else down over here.  Oh, yes.  Several.
```

```
09:38:39   1              JUROR ASHBROOK:  I was involved in a small claims
09:38:45   2   court.  I took a company to court because they took a truck
09:38:47   3   through my front yard.  They wouldn't come back and fix my
09:38:51   4   front yard.  And I took them to court.  Oh, Shirley Jean
09:38:56   5   Ashbrook, seat one.  Sorry.
09:38:58   6              THE COURT:  Anything else you want to add to that?
09:39:00   7              JUROR ASHBROOK:  I'm sorry?
09:39:01   8              THE COURT:  Is there anything else you wanted to add?
09:39:04   9              JUROR ASHBROOK:  No.  That's it.
09:39:05  10              THE COURT:  All right.  Is there anything in that
09:39:06  11   prior experience with the Court system or being a party to
09:39:09  12   litigation that would prevent you from being a fair and
09:39:11  13   impartial juror in this?  Case.
09:39:12  14              JUROR ASHBROOK:  No, sir.
09:39:13  15              THE COURT:  Thank you.
09:39:15  16              JUROR MATIC:  Milan Matic, number two.  I was a
09:39:22  17   plaintiff about 15 years ago in a civil suit.
09:39:28  18              THE COURT:  Is there anything in that experience or
09:39:30  19   any of the background involving that suit that would prevent
09:39:32  20   you from being fair and impartial in this case.
09:39:35  21              JUROR MATIC:  No, sir.
09:39:36  22              THE COURT:  Thank you.
09:39:46  23              JUROR JAMES:  Warren James, number 19.
09:39:49  24              THE COURT:  Mr. James, in what capacity have you been
09:39:49  25   involved in prior litigation?
```

| | | |
|---|---|---|
| 09:39:49 | 1 | JUROR JAMES:  A civil lawsuit 20 years ago.  I was a |
| 09:39:53 | 2 | plaintiff. |
| 09:39:53 | 3 | THE COURT:  All right.  Is there anything in that |
| 09:39:54 | 4 | prior experience that would prevent you from being a fair and |
| 09:39:57 | 5 | impartial juror in this case? |
| 09:39:58 | 6 | JUROR JAMES:  No.  And I was also in a criminal |
| 09:40:04 | 7 | federal case, too.  I was a witness. |
| 09:40:06 | 8 | THE COURT:  As a witness?  That's good.  Better to be |
| 09:40:09 | 9 | a witness than it is to be a defendant in a federal criminal |
| 09:40:12 | 10 | charge. |
| 09:40:13 | 11 | Is there anything in that experience that would |
| 09:40:14 | 12 | prevent you being fair and impartial if chosen to be a juror in |
| 09:40:19 | 13 | this case? |
| 09:40:19 | 14 | JUROR JAMES:  No, sir. |
| 09:40:20 | 15 | THE COURT:  Thank you. |
| 09:40:21 | 16 | JUROR SCHELL:  Alma Schell, seat six.  And a |
| 09:40:25 | 17 | defendant in a civil case.  Nothing should impede me. |
| 09:40:27 | 18 | THE COURT:  All right.  You would be able to listen |
| 09:40:29 | 19 | to the evidence here in this courtroom and only consider it and |
| 09:40:33 | 20 | my instructions in reaching your verdict; is that correct? |
| 09:40:36 | 21 | JUROR SCHELL:  Yes. |
| 09:40:37 | 22 | THE COURT:  Thank you. |
| 09:40:37 | 23 | JUROR POPOV:  I'm Allison Popov, seat 25.  I heard |
| 09:40:45 | 24 | small claims court, and I didn't even think about it.  But 20 |
| 09:40:48 | 25 | years ago I was involved in a small claims court case. |

09:40:52   1                THE COURT:  Easy to forget small claims court after

09:40:55   2   20 years.  Anything in that experience that would prevent you

09:40:57   3   from being fair and impartial in this case?

09:40:59   4                JUROR POPOV:  No, sir.

09:41:00   5                THE COURT:  And were you a plaintiff or defendant in

09:41:01   6   small claims court?

09:41:02   7                JUROR POPOV:  I took someone to court.

09:41:03   8                THE COURT:  All right.  Thank you.  Anyone else?

09:41:05   9   Anyone else ever been involved in a lawsuit before?

09:41:08   10               Now, other than that has already been stated by

09:41:11   11  several of you, is there anyone who has ever been a witness in

09:41:15   12  a criminal case?  Anyone else?

09:41:18   13               THE COURT:  Yes, ma'am..

09:41:19   14               JUROR KOEHN:  I'm Jody Koehn, seat 26.  Several.

09:41:24   15               THE COURT:  All right.  Is there a -- and in what

09:41:28   16  capacity were you a witness?  You've been involved in lot of

09:41:32   17  crimes?

09:41:32   18               JUROR KOEHN:  Well, no, sir.  I used to be an

09:41:35   19  assistant district attorney, and I've also been a defense

09:41:38   20  attorney.  And occasionally there was some type of procedural

09:41:42   21  reason or legal opinion that was needed.  And then I think I

09:41:47   22  testified one time in federal court.

09:41:55   23               THE COURT:  All right.  Is there anything in that

09:41:56   24  experience with the Court system that would prevent you from

09:41:59   25  being fair and impartial if selected in this case?

| | | |
|---|---|---|
| 09:42:01 | 1 | JUROR KOEHN:  No, sir. |
| 09:42:01 | 2 | THE COURT:  All right.  Thank you. |
| 09:42:03 | 3 | Anyone on the left? |
| 09:42:05 | 4 | (No response) |
| 09:42:05 | 5 | All right.  Over on the right here? |
| 09:42:10 | 6 | JUROR JAMES:  Warren James, 19.  It's the same case I |
| 09:42:12 | 7 | talked about before. |
| 09:42:13 | 8 | THE COURT:  All right.  That's fine.  Thank you. |
| 09:42:16 | 9 | Anyone else. |
| 09:42:17 | 10 | (No response) |
| 09:42:20 | 11 | THE COURT:  All right.  I've kind of gotten a preview |
| 09:42:22 | 12 | to some of you are going to say in response to this question: |
| 09:42:26 | 13 | Have any of you attended law school or had any special training |
| 09:42:29 | 14 | in the law or worked in a law library, a law school, a lawyer's |
| 09:42:33 | 15 | office, a court or any other business related to the law? |
| 09:42:36 | 16 | Please raise your hand. |
| 09:42:39 | 17 | JUROR SHELDON:  Tonya Sheldon, number 24.  I am chief |
| 09:42:44 | 18 | clerk for the Justice Court, Precinct 1 and 2 of Coryell |
| 09:42:49 | 19 | County.  I am a civil clerk. |
| 09:42:50 | 20 | THE COURT:  Would such experience prevent you from |
| 09:42:53 | 21 | following my instructions in this case even though you might |
| 09:42:56 | 22 | disagree with those instructions? |
| 09:42:57 | 23 | JUROR SHELDON:  No. |
| 09:42:58 | 24 | THE COURT:  All right.  And would the experience |
| 09:43:00 | 25 | prevent you from being fair and impartial? |

09:43:02  1          JUROR SHELDON:  Not that experience.

09:43:04  2          THE COURT:  And would there be anything in your

09:43:06  3  experience with the legal profession or your employment that

09:43:10  4  would prevent you from rendering a verdict based solely on the

09:43:13  5  evidence presented here in this courtroom and the instructions

09:43:16  6  that I give you?

09:43:17  7          JUROR SHELDON:  No, sir.

09:43:18  8          THE COURT:  Thank you.

09:43:21  9          JUROR PRYOR:  Mike Pryor.  I'm 23.

09:43:24  10          THE COURT:  All right.  And what is your experience

09:43:27  11  with the law?

09:43:28  12          JUROR PRYOR:  I went to law school and then was a

09:43:34  13  civil attorney for about five years.  I'm currently an

09:43:36  14  assistant district attorney for Travis County.

09:43:40  15          THE COURT:  All right.  Is there anything in that

09:43:41  16  experience that would prevent you from following my

09:43:43  17  instructions on the law in this case even if your personal

09:43:46  18  experience might lead you to disagree with those instructions?

09:43:49  19          JUROR PRYOR:  No, sir.

09:43:50  20          THE COURT:  That's one of the few things I get to

09:43:53  21  do.  I get the tell you what the law is, and you have to keep

09:43:56  22  up with it.  Would that experience prevent you from being fair

09:43:59  23  and impartial in this case?

09:44:01  24          JUROR PRYOR:  No, sir.

09:44:01  25          THE COURT:  And would it prevent you from rendering a

09:44:04  1  verdict based solely on the evidence presented here in the

09:44:07  2  courtroom and the instructions I give you?

09:44:08  3          JUROR PRYOR:  No, sir.

09:44:09  4          THE COURT:  And the meaning for all of you of that

09:44:12  5  question is whether you can keep an open mind and base your

09:44:15  6  verdict at the end of the trial only on what you hear in the

09:44:17  7  courtroom.

09:44:18  8          Anyone else to my right?  Thank you.

09:44:20  9          JUROR ROWE:  Angela Rowe, number -- seat five.  I'm a

09:44:26  10  paralegal.  I used to work at a law firm.

09:44:28  11          THE COURT:  All right.  And what law firm was that?

09:44:31  12          JUROR ROWE:  Baker Botts.

09:44:32  13          THE COURT:  All right.  And is there anything in that

09:44:34  14  experience that would prevent you from following my

09:44:37  15  instructions in this case even if you disagree with them based

09:44:40  16  on what you have heard in your employment?

09:44:42  17          JUROR ROWE:  No.

09:44:42  18          THE COURT:  And is there anything in your prior

09:44:45  19  experience that would prevent you from being fair and impartial

09:44:48  20  in this case to these parties?

09:44:50  21          JUROR ROWE:  No.

09:44:50  22          THE COURT:  And would your experience prevent you

09:44:53  23  from rendering a verdict based solely on the evidence presented

09:44:57  24  in the courtroom and any instructions that I give you?

09:44:59  25          JUROR ROWE:  No.

| | | |
|---|---|---|
| 09:44:59 | 1 | THE COURT:  Thank you. |
| 09:45:01 | 2 | Anyone else to my right? |
| 09:45:05 | 3 | (No response) |
| 09:45:05 | 4 | THE COURT:  Now to the left. |
| 09:45:06 | 5 | JUROR KOEHN:  Jody Koehn, seat 26.  I've been |
| 09:45:11 | 6 | licensed to practice law since 1980.  I've served as an |
| 09:45:16 | 7 | assistant district attorney in two counties.  I've been in |
| 09:45:17 | 8 | private practice two or three times.  I've also been employed |
| 09:45:20 | 9 | with the Attorney General's Office in the Child Support |
| 09:45:23 | 10 | Enforcement Division and also the Prosecutor's Assistants |
| 09:45:27 | 11 | Division, where I was assigned to the U.S. District Court in |
| 09:45:29 | 12 | Texarkana doing drug cases.  And I'm currently a hearing |
| 09:45:34 | 13 | officer for the Texas Workforce Commission, so I conduct |
| 09:45:37 | 14 | telephone appeals for unemployment cases. |
| 09:45:39 | 15 | THE COURT:  All right.  Now, is there -- would that |
| 09:45:42 | 16 | experience in any way prevent you from following my |
| 09:45:45 | 17 | instructions on the law in this case even if you disagree with |
| 09:45:47 | 18 | them? |
| 09:45:48 | 19 | JUROR KOEHN:  No, sir. |
| 09:45:48 | 20 | THE COURT:  And would the experience prevent you from |
| 09:45:51 | 21 | being a fair and impartial juror in this case? |
| 09:45:54 | 22 | JUROR KOEHN:  No, sir. |
| 09:45:54 | 23 | THE COURT:  And would you be able to set aside your |
| 09:45:57 | 24 | past experiences and render a verdict based solely on the |
| 09:46:00 | 25 | evidence you heard in the courtroom and the instructions on the |

09:46:03  1  law that I give you?

09:46:04  2          JUROR KOEHN:  Absolutely.

09:46:05  3          THE COURT:  Thank you.  Anyone else to my left?

09:46:12  4          JUROR CALERO:  Maria Calero, seat 16.  I'm originally

09:46:18  5  from El Paso, Texas, and I've worked with the El Paso Legal

09:46:21  6  Assistant for seven years and I was legal secretary there.

09:46:23  7          THE COURT:  Is there anything in that experience that

09:46:25  8  would prevent you from following my instructions in this case

09:46:28  9  even if you disagreed with them?

09:46:29  10          JUROR CALERO:  No.  I will be okay.

09:46:32  11          THE COURT:  And would your experience prevent you

09:46:34  12  from being fair and impartial if selected as a juror in this

09:46:37  13  case.

09:46:38  14          JUROR CALERO:  No, sir.

09:46:39  15          THE COURT:  And could you render a verdict based

09:46:41  16  solely on the evidence presented in this courtroom and the

09:46:44  17  instructions I give you regardless of your background and

09:46:48  18  knowledge of the law that you may have acquired from your

09:46:51  19  employment?

09:46:52  20          JUROR CALERO:  Yes, sir.

09:46:52  21          THE COURT:  Thank you.  Anyone else with legal

09:46:55  22  training of any kind?

09:46:56  23      (No response)

09:46:57  24          THE COURT:  Are any of you a member of any

09:47:02  25  organization that pertains to the justice system or the reform

| 09:47:07 | 1 | or modification of the justice system?  Do any of you work with |
| 09:47:12 | 2 | any groups, any charitable groups, do any volunteer work with |
| 09:47:17 | 3 | any of the wide myriad of organizations who seek changes in the |
| 09:47:22 | 4 | justice system or to reform the justice system?  If so, please |
| 09:47:25 | 5 | raise your hand. |
| 09:47:29 | 6 |                   JUROR CALERO:  Maria Calero, 16.  I work for Life |
| 09:47:33 | 7 | Steps, and it's -- we do classes for DWI and repeat offenders |
| 09:47:39 | 8 | and families in transition, families with problems in reference |
| 09:47:43 | 9 | to visitations and exchanges to benefit the children.  I'm a |
| 09:47:49 | 10 | visit coordinator and also a class coordinator. |
| 09:47:52 | 11 |                   THE COURT:  All right.  Is there anything in that |
| 09:47:53 | 12 | experience that would prevent you from following my |
| 09:47:57 | 13 | instructions on the law in this case? |
| 09:47:58 | 14 |                   JUROR CALERO:  No, sir. |
| 09:47:59 | 15 |                   THE COURT:  Or would it prevent you from being a fair |
| 09:48:02 | 16 | and impartial juror if selected in this particular case. |
| 09:48:04 | 17 |                   JUROR CALERO:  No, sir. |
| 09:48:05 | 18 |                   THE COURT:  And would it prevent you from rendering a |
| 09:48:07 | 19 | verdict based solely on the evidence presented in the courtroom |
| 09:48:10 | 20 | and the instructions that I give you? |
| 09:48:12 | 21 |                   JUROR CALERO:  No, sir. |
| 09:48:16 | 22 |                   THE COURT:  Thank you.  Anyone else? |
| 09:48:23 | 23 |                   JUROR NEFF:  Brad Neff, 17.  Probably doesn't |
| 09:48:27 | 24 | pertain, but my wife works for CASA of Travis County. |
| 09:48:31 | 25 |                   THE COURT:  All right.  Anything in that experience |

09:48:33   1    of yours and your knowledge of what your wife does that would

09:48:36   2    prevent you from following my instructions in this case?

09:48:39   3                JUROR NEFF:  No, sir.

09:48:40   4                THE COURT:  And would it prevent you from being a

09:48:42   5    fair and impartial juror in this case?

09:48:44   6                JUROR NEFF:  No, sir.

09:48:45   7                THE COURT:  And would it prevent you from rendering a

09:48:47   8    verdict based solely on the evidence presented in the courtroom

09:48:49   9    and the instructions that I give you?

09:48:50  10                JUROR NEFF:  No, sir.

09:48:51  11                THE COURT:  Thank you.  Anyone else?

09:48:53  12         (No response)

09:48:56  13                THE COURT:  Now, members of the panel who have served

09:48:58  14    on juries before are already aware that, once selected as a

09:49:02  15    juror, you become the judge of the facts in this case, the

09:49:07  16    judge of the credibility of the witnesses, and the judge of the

09:49:11  17    weight to be given the testimony of the witnesses.

09:49:17  18                It is your prerogative as a juror to believe all of

09:49:21  19    the testimony of a witness or only a part of a witness's

09:49:23  20    testimony or you may totally disbelieve a witness's testimony.

09:49:28  21    This is completely up to you.  As jurors you are the exclusive

09:49:33  22    judges of the facts, the credibility of the witnesses, and the

09:49:37  23    weight to be given the witness's testimony.

09:49:41  24                Now, whereas the jury is the exclusive judge of

09:49:44  25    facts, the Court, which is represented by me, is the sole judge

| | | |
|---|---|---|
| 09:49:52 | 1 | of the law applicable in this case.  At the conclusion of all |
| 09:49:55 | 2 | of the testimony and after the lawyers for both sides have |
| 09:49:58 | 3 | presented their summary of the case to you and their closing |
| 09:50:04 | 4 | arguments, the Court will explain the law controlling the |
| 09:50:07 | 5 | issues involved in this lawsuit. |
| 09:50:09 | 6 | You are to be governed by the Court's explanation of |
| 09:50:12 | 7 | the applicable law which will be set out in what is termed the |
| 09:50:16 | 8 | Court's Instructions and Charge.  If you are selected to sit as |
| 09:50:21 | 9 | a juror in this case, will you be able and willing to render a |
| 09:50:26 | 10 | verdict based solely on the evidence presented at the trial and |
| 09:50:29 | 11 | the law as I give it to you in my instructions, disregarding |
| 09:50:35 | 12 | any other ideas, notions, or beliefs about the law you may have |
| 09:50:40 | 13 | encountered in reaching your verdict? |
| 09:50:42 | 14 | If you are unable or unwilling to render a verdict |
| 09:50:47 | 15 | based solely on the evidence presented at the trial and the law |
| 09:50:49 | 16 | as I give it to you in my instructions, please raise your hand |
| 09:50:52 | 17 | at this time. |
| 09:50:59 | 18 | JUROR SHELDON:  I feel like I might be impartial |
| 09:51:01 | 19 | here.  My husband was a sheriff's deputy for Coryell County for |
| 09:51:06 | 20 | many years and worked on-call hours and was never compensated |
| 09:51:10 | 21 | for that.  We did contact TMPA about a possible lawsuit about |
| 09:51:12 | 22 | twelve years ago.  We were told there was no reasonable -- |
| 09:51:15 | 23 | there was no way we could win a lawsuit for that.  I don't know |
| 09:51:18 | 24 | if that -- I mean, that may make me impartial.  I don't know. |
| 09:51:24 | 25 | THE COURT:  All right.  Thank you.  Anyone else? |

| | | |
|---|---|---|
| 09:51:31 | 1 | JUROR SCHELL:  One of my best friends, actually, we |
| 09:51:36 | 2 | were talking and she actually works in the medical field.  She |
| 09:51:42 | 3 | is actually a supervisor.  She oversees a department that |
| 09:51:47 | 4 | people who actually work within in the health care.  She |
| 09:51:51 | 5 | oversees it.  Every once in a while she has to step in.  She is |
| 09:51:54 | 6 | a salaried employee, and we do discuss her having to work |
| 09:51:58 | 7 | overtime and not being compensated because she's a salaried |
| 09:52:01 | 8 | employee.  So I think I would be actually impartial.  I really |
| 09:52:08 | 9 | do feel I would be, as we've been talking. |
| 09:52:10 | 10 | THE COURT:  All right.  Thank you. |
| 09:52:11 | 11 | JUROR SCHELL:  My name is Alma Schell, and I am seat |
| 09:52:16 | 12 | six. |
| 09:52:17 | 13 | JUROR PARSLEY:  Sorry, Judge -- I'm Don Parsley, |
| 09:52:21 | 14 | seat 8 -- I hope I'm not out of line with this.  But I'm a |
| 09:52:26 | 15 | salaried employee.  Always have been.  I work 50, 60 hours a |
| 09:52:30 | 16 | week.  I always have.  And I'm exempt from overtime pay.  And I |
| 09:52:34 | 17 | don't have a lot of patience for folks who are opportunistic in |
| 09:52:40 | 18 | rectifying that after they get their positions. |
| 09:52:44 | 19 | THE COURT:  All right.  Thank you. |
| 09:52:48 | 20 | JUROR NEFF:  Brad Neff, 17.  This actually pertains |
| 09:52:54 | 21 | back to one of the names on the plaintiffs' side.  I don't |
| 09:52:57 | 22 | believe I know this person, but one of the last names sounded |
| 09:53:01 | 23 | vaguely familiar, and I just couldn't quite place it and I |
| 09:53:04 | 24 | still can't.  But I just wanted to bring that up. |
| 09:53:07 | 25 | THE COURT:  All right.  And what name was that? |

```
09:53:09   1              JUROR NEFF:  I believe it was one of first ones,
09:53:17   2   Benavides.
09:53:18   3              THE COURT:  All right.
09:53:18   4              MR. DEATS:  Your Honor, one of the plaintiffs' the
09:53:19   5   first named one, is Mike Benavides.
09:53:22   6              JUROR NEFF:  Again, I can't place it, but it just
09:53:25   7   sounds vaguely familiar.
09:53:26   8              THE COURT:  All right.  That's very good.  Thank you
09:53:28   9   for sharing that with us.
09:53:30  10              Anyone else at this point?
09:53:32  11         (No response)
09:53:33  12              THE COURT:  All right.  Now, this is a civil case.
09:53:38  13   Generally, the plaintiff in a civil case has the burden of
09:53:41  14   proving its claims by what is called a preponderance of the
09:53:45  15   evidence.  However, under the Fair Labor Standards Act, once a
09:53:51  16   plaintiff has established a claim for overtime pay, the
09:53:54  17   defendant bears the burden to prove that the plaintiff is not
09:53:58  18   entitled to such pay because the plaintiff performs the type of
09:54:02  19   work that is exempt from federal overtime law.
09:54:05  20              Those of you who have served on criminal juries are
09:54:09  21   familiar with the requirement of proof called beyond a
09:54:12  22   reasonable doubt.  Please bear in mind that in civil cases the
09:54:18  23   proof standard is not beyond a reasonable doubt, as in criminal
09:54:25  24   cases, but, rather, the City must prove that the plaintiffs are
09:54:30  25   exempt from federal overtime law by a preponderance of the
```

09:54:32  1   evidence.

09:54:35  2           This means that the City has to produce evidence

09:54:38  3   which, when considered in the light of all of the facts, leads

09:54:42  4   you to believe that what the City claims is more likely true

09:54:47  5   than not true.  "Preponderance of the evidence" has been termed

09:54:53  6   the greater weight of the credible evidence.

09:54:55  7           Is there anyone among you who would be unable to

09:54:59  8   require the City to prove Plaintiffs are exempt from federal

09:55:03  9   overtime law by a preponderance of the evidence as I have just

09:55:07  10  explained it to you?

09:55:09  11      (No response)

09:55:11  12          THE COURT:  Is there anyone among you who would hold

09:55:14  13  the City to a greater or lesser standard of proof than a

09:55:19  14  preponderance of the evidence as I have just explained it to

09:55:22  15  you?

09:55:23  16      (No response)

09:55:24  17          THE COURT:  Thank you.  Now, have you, a member of

09:55:29  18  your family or any close friend known to you ever been employed

09:55:34  19  in a supervisory or managerial position?  If so, please raise

09:55:39  20  your hand.

09:55:42  21          All right.  And state your name and your seat number

09:55:44  22  and what your position is or was and whether you were

09:55:49  23  self-employed at the time or who your employer was.

09:55:52  24          JUROR MATIC:  Milan Matic, seat two.  I have been a

09:55:56  25  manager.  I worked at an electronics manufacturing facility.

09:56:02  1  My wife has been a supervisor in a cardiac cath lab at a

09:56:07  2  hospital here in town.

09:56:10  3          THE COURT:  All right.  Thank you.  We'll just

09:56:12  4  proceed down the row.  Anybody that has had managerial or

09:56:16  5  supervisory positions.

09:56:17  6          JUROR SCHELL:  Yes.  I was actually a supervisor or

09:56:20  7  manager at The Gap.  This was 20 years ago, but I was in

09:56:25  8  management.  Thank you.

09:56:26  9          Oh.  Alma Schell, seat six.

09:56:29  10          THE COURT:  Thank you.

09:56:30  11          JUROR PARSLEY:  Don Parsley, seat eight.  I'm in the

09:56:34  12  printing business.  I've been a manager of exempt and un-exempt

09:56:38  13  employees for 20, 25 years.

09:56:44  14          THE COURT:  In the back row to my right.

09:56:46  15          JUROR WALKER:  Charles Walker, seat 21.  I've been a

09:56:51  16  manager for 31 years when I was self-employed and then with the

09:56:59  17  Lower Colorado Authority and now with National Instruments

09:57:02  18  Corporation.

09:57:05  19          JUROR TALKINGTON:  Scott Talkington, seat nine.  I'm

09:57:10  20  the owner/operator of a restaurant and manager.

09:57:13  21          THE COURT:  All right.

09:57:14  22          JUROR SPIKES:  Brent Spikes, number 10.  I've been a

09:57:20  23  manager for about 10 years with the State of Texas, exempt and

09:57:26  24  nonexempt employees.

09:57:28  25          THE COURT:  Thank you.

| | | |
|---|---|---|
| 09:57:29 | 1 | JUROR QUIJANO:  Margil Quijano, seat 11.  I used to |
| 09:57:35 | 2 | be an exempt district manager for a large company for seven |
| 09:57:39 | 3 | years. |
| 09:57:40 | 4 | THE COURT:  Okay. |
| 09:57:41 | 5 | JUROR LAUNIUS:  Bob Launius, number 12.  I am a |
| 09:57:46 | 6 | business owner in Austin, a CPA by trade, and I run the |
| 09:57:53 | 7 | operations of the business.  We have about 25 employees, and I |
| 09:57:58 | 8 | do the payroll and the benefits and virtually everything |
| 09:58:03 | 9 | associated with those employees. |
| 09:58:06 | 10 | JUROR COCHRAN:  Denise Cochran, seat 13.  I'm |
| 09:58:10 | 11 | administrator for Round Rock Administrative School District. |
| 09:58:15 | 12 | JUROR ONTIBEROS:  Esperanza Ontiberos, seat 14. |
| 09:58:19 | 13 | Owner/operator of my own business for about five years. |
| 09:58:22 | 14 | JUROR PETIT:  Andrea Petit, seat 15.  I was a |
| 09:58:25 | 15 | supervisor for five years for a counseling department. |
| 09:58:31 | 16 | JUROR KOEHN:  Jody Koehn, seat 26.  I was a managing |
| 09:58:37 | 17 | attorney for the Child Support Division of the Attorney |
| 09:58:39 | 18 | General's office for about seven years.  Of course, I've been |
| 09:58:42 | 19 | in private practice so I've managed my own secretaries.  I also |
| 09:58:48 | 20 | owned a bar for two years, and I managed the staff there, too. |
| 09:58:52 | 21 | THE COURT:  Thank you.  Anyone else? |
| 09:58:56 | 22 | JUROR JAMES:  I'm Warren James, seat 19.  I'm a |
| 09:59:00 | 23 | business owner of several businesses. |
| 09:59:05 | 24 | THE COURT:  All right.  Thank you.  Anyone else? |
| 09:59:07 | 25 | (No response) |

| | | |
|---|---|---|
| 09:59:08 | 1 | THE COURT:  All right.  Now, other than what you have |
| 09:59:11 | 2 | already stated -- because some of these questions kind of |
| 09:59:14 | 3 | overlap.  So if you've already given what I'm going to ask you |
| 09:59:17 | 4 | in some of the following questions in a previous answer, you |
| 09:59:21 | 5 | don't have to repeat it.  But other than what has already been |
| 09:59:24 | 6 | stated, have any or any family member or close friend known to |
| 09:59:27 | 7 | you ever been employed in a personnel or human resources |
| 09:59:29 | 8 | department for an employer?  If so, please raise your hand. |
| 09:59:41 | 9 | JUROR FLORES:  Arnulfo Flores, seat four.  My sister |
| 09:59:42 | 10 | works in the HR department for a private company here in |
| 09:59:45 | 11 | Austin. |
| 09:59:46 | 12 | THE COURT:  Thank you. |
| 09:59:49 | 13 | JUROR SCHELL:  Alma Schell, seat six.  As I stated |
| 09:59:51 | 14 | earlier, one of my dearest friends is actually -- she does a |
| 09:59:56 | 15 | lot of the hiring for -- I guess in the health care. |
| 10:00:01 | 16 | THE COURT:  Thank you. |
| 10:00:08 | 17 | JUROR NEFF:  Brad Neff, seat 17.  I believe my wife |
| 10:00:12 | 18 | used to work in the HR department of a law firm here in Austin. |
| 10:00:16 | 19 | THE COURT:  All right. |
| 10:00:21 | 20 | JUROR POPOV:  Allison Popov, seat 25.  I'm not sure |
| 10:00:25 | 21 | if this totally pertains, but my sister is a lawyer -- |
| 10:00:28 | 22 | practicing lawyer working in the health care industry in Oregon |
| 10:00:32 | 23 | and she mostly deals with HIPAA. |
| 10:00:35 | 24 | THE COURT:  Thank you. |
| 10:00:43 | 25 | JUROR CALERO:  Maria Calero, 16.  And I worked for |

| | | |
|---|---|---|
| 10:00:47 | 1 | the YMCA as assistant personnel director.  I did this for seven |
| 10:00:53 | 2 | years.  I was in charge of three branches and 17 day care |
| 10:00:57 | 3 | centers and all the employees, the firing and the hiring. |
| 10:00:59 | 4 | THE COURT:  Thank you.  Anyone else who has worked in |
| 10:01:02 | 5 | a Human Resources Department or employer personnel department? |
| 10:01:11 | 6 | (No response) |
| 10:01:11 | 7 | THE COURT:  Have any of you or any member of your |
| 10:01:13 | 8 | family or close personal friend, known to you, ever had an |
| 10:01:21 | 9 | employment complaint filed against you?  In other words, has an |
| 10:01:26 | 10 | employee complained about you? |
| 10:01:29 | 11 | JUROR ONTIBEROS:  Esperanza Ontiberos, seat 14.  When |
| 10:01:35 | 12 | I was owner/operator, yes, we had complaints filed against us. |
| 10:01:38 | 13 | THE COURT:  Okay.  Thank you. |
| 10:01:45 | 14 | JUROR KOEHN:  Jody Koehn, seat 26.  When I was a |
| 10:01:47 | 15 | managing attorney for the Corpus Christi office, we fired one |
| 10:01:50 | 16 | of the attorneys.  And so I don't think I was -- I don't |
| 10:01:53 | 17 | remember being named personally in the suit, but I was involved |
| 10:01:55 | 18 | in the discrimination suit she filed in federal court. |
| 10:01:58 | 19 | THE COURT:  Thank you. |
| 10:02:06 | 20 | JUROR BASINGER:  Shirley Basinger, seat three.  I was |
| 10:02:10 | 21 | laid off and went to draw employment, and my former employer |
| 10:02:14 | 22 | took me to court because I cashed a vacation check. |
| 10:02:22 | 23 | THE COURT:  All right.  Thank you.  Anyone else? |
| 10:02:24 | 24 | (No response) |
| 10:02:26 | 25 | THE COURT:  Now the other side of that, have you or |

```
10:02:29   1   any member of your family, known to you, or close friend ever
10:02:32   2   filed a complaint or a grievance against an employer?  If so,
10:02:36   3   please raise your hand.
10:02:37   4           JUROR ASHBROOK:  Shirley Ashbrook, seat one.  We had
10:02:42   5   a group of employees that filed a grievance against a
10:02:46   6   supervisor.
10:02:47   7           THE COURT:  All right.  Thank you.  Anyone else?
10:02:49   8       (No response)
10:02:51   9           THE COURT:  Have you or a member of your family,
10:02:59  10   known to you, or any close friend ever filed a claim,
10:03:02  11   complaint, lawsuit, or grievance claiming that you were not
10:03:06  12   paid overtime wages other than what you've already expressed.
10:03:10  13           Again, a lot of these questions overlap.
10:03:14  14           JUROR POPOV:  Allison Popov, seat 25.  My husband --
10:03:20  15   I'm not sure if he -- I think he was compensated for it, but
10:03:24  16   I'm not totally positive.  He works for a very large software
10:03:28  17   company, and there was something having to do with overtime and
10:03:35  18   salaried employees.  And so they ended up switching whichever
10:03:38  19   one it was, and he might have been compensated for that.
10:03:41  20           THE COURT:  Thank you.  Anyone else who's filed a
10:03:44  21   claim?
10:03:48  22           JUROR QUIJANO:  Margil Quijano, seat 11.  I filed a
10:03:52  23   complaint against a company about not paying overtime.  It was
10:03:59  24   six years ago.
10:04:00  25           THE COURT:  All right.  Thank you.  Anyone else?
```

| | | |
|---|---|---|
| 10:04:03 | 1 | (No response) |
| 10:04:04 | 2 | THE COURT:  Have you or a member of your family or |
| 10:04:09 | 3 | close friend, known to you, filed a claim, complaint, lawsuit, |
| 10:04:12 | 4 | or grievance complaining about the City of Austin or any of its |
| 10:04:16 | 5 | employees?  Any complaints against the City? |
| 10:04:20 | 6 | (No response) |
| 10:04:21 | 7 | THE COURT:  Have any of you or any member of your |
| 10:04:24 | 8 | family or any close friend known to you ever sued a government |
| 10:04:27 | 9 | or governmental entity such as a county, a city, a state, or |
| 10:04:33 | 10 | the federal government? |
| 10:04:42 | 11 | Pardon me.  See, I'm the old blind one, so you've got |
| 10:04:44 | 12 | to stick your hand way up in the air. |
| 10:04:46 | 13 | JUROR MATIC:  Milan Matic, seat two.  The case I |
| 10:04:49 | 14 | mentioned when I was a plaintiff 15 years ago.  It was in a |
| 10:04:52 | 15 | different state, South Carolina, but it was against the highway |
| 10:04:56 | 16 | department. |
| 10:04:57 | 17 | THE COURT:  All right.  And what was the nature of |
| 10:04:58 | 18 | that case? |
| 10:04:59 | 19 | JUROR MATIC:  My mom was killed in a car accident. |
| 10:05:01 | 20 | And my stepfather -- I was a minor at the time, so my |
| 10:05:05 | 21 | stepfather took them to court.  And I was part of the suit |
| 10:05:09 | 22 | because I was -- it was my mom.  So ... |
| 10:05:11 | 23 | THE COURT:  And was there awarded compensation and |
| 10:05:15 | 24 | money made as a result of that case? |
| 10:05:17 | 25 | JUROR MATIC:  Yes. |

| | | |
|---|---|---|
| 10:05:18 | 1 | THE COURT:  All right.  Thank you.  Anyone else? |
| 10:05:20 | 2 | (No response) |
| 10:05:21 | 3 | THE COURT:  Is anyone here a paramedic, police |
| 10:05:25 | 4 | officer, or firefighter? |
| 10:05:27 | 5 | (No response) |
| 10:05:29 | 6 | THE COURT:  And do you have any close family members |
| 10:05:31 | 7 | or friends who are paramedics, police officers, or |
| 10:05:35 | 8 | firefighters? |
| 10:05:36 | 9 | JUROR BASINGER:  Shirley Basinger, seat three.  My |
| 10:05:40 | 10 | brother-in-law is a police officer. |
| 10:05:42 | 11 | THE COURT:  All right.  And where is that? |
| 10:05:43 | 12 | JUROR BASINGER:  Travis County. |
| 10:05:45 | 13 | THE COURT:  All right.  Thank you. |
| 10:05:49 | 14 | JUROR NEFF:  Brad Neff, 17.  A couple of friends who |
| 10:05:52 | 15 | are firefighters here in Austin. |
| 10:05:54 | 16 | THE COURT:  Thank you. |
| 10:05:57 | 17 | JUROR BEST:  Norman Best, seat 18.  My grandson is a |
| 10:06:03 | 18 | police officer. |
| 10:06:03 | 19 | THE COURT:  Where is that? |
| 10:06:04 | 20 | JUROR BEST:  Coryell County. |
| 10:06:06 | 21 | THE COURT:  Thank you. |
| 10:06:08 | 22 | JUROR ROWE:  Angela Rowe, seat number five.  I have |
| 10:06:15 | 23 | some in-law -- a couple of in-laws that are highway patrol. |
| 10:06:19 | 24 | And my uncle is retired fire department. |
| 10:06:22 | 25 | THE COURT:  Thank you. |

| | | |
|---|---|---|
| 10:06:24 | 1 | JUROR SCHELL:  Alma Schell, seat six.  My first |
| 10:06:28 | 2 | cousin is a police officer in Dallas. |
| 10:06:35 | 3 | JUROR OVERBY:  Connor Overby, seat 20.  My |
| 10:06:41 | 4 | brother-in-law is a firefighter and a paramedic, and we have a |
| 10:06:46 | 5 | family friend who is both a firefighter and paramedic also. |
| 10:06:51 | 6 | JUROR PRYOR:  Mark Pryor, number 23.  My brother is a |
| 10:06:59 | 7 | police officer in Aspen, Colorado.  And I work with -- as a |
| 10:07:05 | 8 | prosecutor, I work with police and EMS and firefighters off and |
| 10:07:09 | 9 | on. |
| 10:07:09 | 10 | THE COURT:  Thank you. |
| 10:07:11 | 11 | JUROR SHELDON:  Tonya Sheldon, number 24.  My |
| 10:07:16 | 12 | brother, brother-in-law, husband, and cousin are all police |
| 10:07:19 | 13 | officers. |
| 10:07:20 | 14 | THE COURT:  Thank you. |
| 10:07:23 | 15 | JUROR KOEHN:  Jody Koehn, 26.  My brother is a police |
| 10:07:29 | 16 | lieutenant with the Plano Police Department. |
| 10:07:33 | 17 | JUROR COCHRAN:  Denise Cochran, seat number 13.  I |
| 10:07:36 | 18 | have a dear friend that's an instructor for EMS right now. |
| 10:07:41 | 19 | JUROR CALERO:  Maria Calero, 16.  My brother, my |
| 10:07:46 | 20 | cousins and -- I have like six or seven cousins that are police |
| 10:07:51 | 21 | officers in El Paso, Texas.  One of them is the chief of |
| 10:07:54 | 22 | police.  Also I have several cousins that are CIA and FBI.  I |
| 10:08:01 | 23 | also have two real good friends here in Austin that are police |
| 10:08:05 | 24 | officers, and two of my best friends are EMS. |
| 10:08:08 | 25 | THE COURT:  Anyone else? |

```
10:08:11   1      (No response)
10:08:13   2           THE COURT:  Is there anyone here who is employed in
10:08:16   3   the medical field or have family members or close friends who
10:08:20   4   are employed in the medical field other than has already
10:08:23   5   expressed, again, including emergency medical service
10:08:28   6   personnel?
10:08:31   7           JUROR ONTIBEROS:  Esperanza Ontiberos, seat 14.  My
10:08:35   8   sister's a nurse, and my daughter's in the medical field also.
10:08:38   9           THE COURT:  Thank you.
10:08:40  10           JUROR COCHRAN:  Denise Cochran, seat number 13.  My
10:08:43  11   husband works for the Seton Health Network here in Austin.
10:08:51  12           JUROR SCHELL:  Alma Schell, seat six.  My brother is
10:08:54  13   a doctor, and any sister-in-law is a doctor as well.
10:08:58  14           JUROR BASINGER:  Shirley Basinger, seat three.  I
10:09:05  15   work for Seton.
10:09:06  16           THE COURT:  All right.
10:09:07  17           JUROR MATIC:  Milan Matic, seat two.  So in addition
10:09:12  18   to my wife, I have a lot of friends that are nurses and techs
10:09:16  19   in various fields in the medical profession.
10:09:19  20           THE COURT:  Anyone else?
10:09:27  21      (No response)
10:09:27  22           THE COURT:  Is there any one of you or any family
10:09:31  23   member of yours or any close, personal friends that you know of
10:09:33  24   who's ever been treated by a paramedic or EMS worker in the
10:09:37  25   nature of emergency treatment?
```

```
10:09:38   1              JUROR BASINGER:  Shirley Basinger, seat three.  I was
10:09:41   2   taken to the emergency room.
10:09:45   3              THE COURT:  Thank you.
10:09:46   4              JUROR MATIC:  Milan Matic, seat two.  I was in a bad
10:09:52   5   car accident probably about 15 -- about 12 years ago, I guess.
10:09:57   6   And I was taken to the hospital in an ambulance.
10:10:03   7              JUROR SCHELL:  Alma Schell, seat six.  I have -- my
10:10:07   8   youngest child has epilepsy and has been taken twice by EMS to
10:10:14   9   the hospital.
10:10:18  10              JUROR PRYOR:  Mark Pryor, 23.  About five years ago I
10:10:22  11   went to a hospital in an ambulance.
10:10:26  12              JUROR POPOV:  Allison Popov, seat 25.  I had a lot of
10:10:31  13   elderly relatives that my parents and I helped care for for
10:10:35  14   many years, and they were taken many, many times by EMS to the
10:10:41  15   hospital.
10:10:42  16              JUROR SPIKES:  Brent Spikes, number 10.  I've been
10:10:48  17   taken, my wife, and my son.  Myself it was a car wreck.  Wife,
10:10:53  18   medical issues.  And my son was an appendectomy -- subsequent
10:11:03  19   problem with a botched appendectomy.
10:11:07  20              JUROR LAUNIUS:  Bob Launius, number 12.  I have four
10:11:11  21   children, and we've had several trips via ambulance during
10:11:19  22   their upbringing.
10:11:21  23              JUROR COCHRAN:  Denise Cochran, seat 13.  When my
10:11:25  24   child was an infant and my father.
10:11:28  25              JUROR ONTIBEROS:  Esperanza Ontiberos, seat 14.
```

10:11:33 1    Father, brother, cousins, niece, and nephew.

10:11:38 2            JUROR PETIT:  Andrea Petit, seat 15.  My father was

10:11:41 3    taken in an ambulance.

10:11:45 4            JUROR CALERO:  Maria Calero, 16.  I'm a diabetic, and

10:11:50 5    before my sugar was controlled, EMS lived at my home.

10:11:59 6            JUROR POPOV:  Sorry.  Allison Popov, 25.  I also

10:12:03 7    forgot my mother was taken by ambulance a pretty long distance,

10:12:07 8    from San Marcos back to Austin.

10:12:10 9            JUROR ASHBROOK:  Shirley Ashbrook, seat one.  My

10:12:17 10   parents have been taken by EMS to the hospital.

10:12:22 11           THE COURT:  Anyone else?

10:12:23 12       (No response)

10:12:24 13           THE COURT:  Now, I have given you a little bit of a

10:12:28 14   rundown on the facts of this case and what it's about.  Do any

10:12:31 15   of you know any facts or are familiar with any other case that

10:12:36 16   might have been similar to this case?

10:12:41 17       (No response)

10:12:42 18           THE COURT:  Does anyone have any specialized legal

10:12:45 19   knowledge involving the Fair Labor Standards Act?  That is the

10:12:49 20   federal law that governs wages and overtime that we've

10:12:54 21   discussed somewhat this morning.

10:12:56 22       (No response)

10:12:58 23           THE COURT:  Is there any one of you a member of an

10:13:02 24   organization that is focused on labor issues or workers'

10:13:06 25   rights?  If so, please raise your hand.

| 10:13:08 | 1 | (No response) |
| 10:13:09 | 2 | THE COURT:  And have any of you ever held an elected |
| 10:13:14 | 3 | office for any government at any level -- city, county, state, |
| 10:13:20 | 4 | or federal? |
| 10:13:21 | 5 | (No response) |
| 10:13:22 | 6 | THE COURT:  All right.  Now, ladies and gentlemen, I |
| 10:13:24 | 7 | have given the lawyers an opportunity to ask some questions to |
| 10:13:30 | 8 | you at this time.  I was a lawyer on their side of the bench |
| 10:13:36 | 9 | for 28 and a half years, so I've limited their time so we won't |
| 10:13:39 | 10 | be here the rest of your lives while they ask you questions.  I |
| 10:13:43 | 11 | know how that can be.  So if I interrupt one of them and say, |
| 10:13:47 | 12 | "Thank you," they haven't done anything wrong.  They've just |
| 10:13:50 | 13 | come to the end of their time. |
| 10:13:54 | 14 | Please remember during the lawyers' questions, as I |
| 10:13:57 | 15 | stated earlier, that some of their questions may seem intrusive |
| 10:14:00 | 16 | to you, as have mine, I feel certain.  I assure you that the |
| 10:14:04 | 17 | lawyers have no desire to pry into your backgrounds |
| 10:14:08 | 18 | unnecessarily, but, rather, are doing it to ensure that each of |
| 10:14:12 | 19 | you can act independently and without bias in serving as a |
| 10:14:17 | 20 | juror in this case. |
| 10:14:17 | 21 | Further, the lawyers are given certain preemptory |
| 10:14:22 | 22 | strikes which they can exercise and their questions will give |
| 10:14:26 | 23 | them information on which to base those strikes. |
| 10:14:28 | 24 | Please remember that if any time you do not want to |
| 10:14:33 | 25 | publicly answer a question, you may approach the bench and |

10:14:37  1   answer the question with only the judge and the lawyers

10:14:41  2   present.

10:14:41  3           Mr. Deats, you may proceed.

10:14:47  4           MR. DEATS:  Your Honor, with your permission, I'm

10:14:49  5   going to ask my legal assistant to hand out some numbered

10:14:54  6   cards.  I'm going to ask the juror some scaled questions.

10:14:56  7           THE COURT:  And what are you going to do with the

10:14:58  8   cards?

10:14:58  9           MR. DEATS:  Your Honor, we're going to ask them to

10:15:00  10  hold them up in response to the questions.  It's a way of

10:15:03  11  quickly getting information about the entire pool.

10:15:05  12          THE COURT:  That would fine.  Any objection from the

10:15:07  13  City, though?

10:15:08  14          MR. COPPOLA:  No objection, Your Honor.

10:15:13  15          MR. DEATS:  Thank you very much.

10:15:14  16          While she's doing that, let me tell you a little bit

10:15:18  17  about what we're going to do.  Again, as the Judge indicated to

10:15:21  18  you, we're trying to learn if you have any biases that would

10:15:24  19  make maybe not as fair a juror as some other juror might be.

10:15:28  20  And we're really not trying to pry, so please don't hold that

10:15:35  21  against us.

10:15:36  22          I'm going to ask you a series of questions now, and

10:15:38  23  my legal assistant is providing you numbered cards that

10:15:41  24  hopefully correspond to your juror number.  When I ask you

10:15:45  25  these questions -- and we will show it to you on the chart as

| | | |
|---|---|---|
| 10:15:47 | 1 | well.  I'm going to ask each of you to vote by holding up your |
| 10:15:51 | 2 | card when you get to the appropriate answer.  As I read the |
| 10:15:53 | 3 | statement for each question, hold up the card at the |
| 10:15:57 | 4 | appropriate time, stating whether you strongly agree, slightly |
| 10:16:01 | 5 | agree, slightly disagree, or strongly disagree. |
| 10:16:04 | 6 | THE COURT:  Now, let me say something right here. |
| 10:16:06 | 7 | You're going to have to place those charts where both the Court |
| 10:16:10 | 8 | and the City of Austin's attorneys can see it.  It's a little |
| 10:16:15 | 9 | difficult in this courtroom, but you're going to have to work |
| 10:16:17 | 10 | it out to where everybody can see what's going on here. |
| 10:16:19 | 11 | MR. DEATS:  Very good, Your Honor. |
| 10:16:21 | 12 | And as you vote, vote according to your immediate |
| 10:16:25 | 13 | reaction.  Vote according to how you feel.  Don't vote on what |
| 10:16:30 | 14 | you think the law is or what you think the law should be. |
| 10:16:33 | 15 | Don't vote according to what you think is politically correct. |
| 10:16:37 | 16 | When you raise your card to vote, please hold it in the air |
| 10:16:40 | 17 | until I call your number. |
| 10:16:42 | 18 | So does anybody feel uncomfortable about voting with |
| 10:16:46 | 19 | regards to these questions? |
| 10:16:48 | 20 | (No response) |
| 10:16:49 | 21 | MR. DEATS:  Okay.  Let's take question number one. |
| 10:16:50 | 22 | Employees who make $80,000 a year should not worry about |
| 10:16:54 | 23 | whether they get paid overtime.  Employees who make 80,000 a |
| 10:16:58 | 24 | year should not worry about whether they get paid overtime. |
| 10:17:03 | 25 | Who strongly agrees with that statement?  Please hold |

| | | |
|---|---|---|
| 10:17:05 | 1 | up your cards. |
| 10:17:07 | 2 | Who slightly agrees with that statement? |
| 10:17:13 | 3 | I see juror 5, juror 8, juror 19, juror 21, juror 25, |
| 10:17:20 | 4 | juror 26.  Thank you. |
| 10:17:22 | 5 | Who slightly disagrees with that statement? |
| 10:17:26 | 6 | I see juror 1, 2, 3, 4, 20, 22, 23, 24, 9, 10, 12, |
| 10:17:36 | 7 | 13, 15 in that back row. |
| 10:17:39 | 8 | And who strongly disagrees with that statement? |
| 10:17:43 | 9 | I see juror 6, 7, 11, 14, 16, 17. |
| 10:17:49 | 10 | Thank you very much. |
| 10:17:50 | 11 | Let's go to the second question.  Government |
| 10:17:54 | 12 | employees are paid too much or get too many benefits that |
| 10:17:58 | 13 | private sector employees do not get.  Government employees are |
| 10:18:02 | 14 | paid too much or get too many benefits that private sector |
| 10:18:05 | 15 | employees do not get. |
| 10:18:07 | 16 | Who strongly agrees with that statement? |
| 10:18:11 | 17 | MR. DEATS:  Juror number 8.  Anybody else? |
| 10:18:13 | 18 | Who slightly agrees with that statement? |
| 10:18:16 | 19 | Juror number 11. |
| 10:18:17 | 20 | Thank you very much. |
| 10:18:19 | 21 | Who slightly disagrees with that statement? |
| 10:18:23 | 22 | Juror 2, 17, 20, 21, 24, 9, and 12.  Oh.  And 16. |
| 10:18:33 | 23 | Excuse me. |
| 10:18:33 | 24 | And who strongly disagrees with that statement? |
| 10:18:37 | 25 | One, 3, 4, 5, 6, 7, 19, 22, 23, 10, 25, 26, 13, 14, |

| | | |
|---|---|---|
| 10:18:47 | 1 | 15. |
| 10:18:50 | 2 | Let's go to our third question:  In this economic |
| 10:18:55 | 3 | climate, people should just be happy to have a job and should |
| 10:18:58 | 4 | not worry too much about whether their pay is being properly |
| 10:19:01 | 5 | calculated.  In this economic climate, people should just be |
| 10:19:05 | 6 | happy to have a job and should not worry too much about whether |
| 10:19:08 | 7 | their pay is being properly calculated. |
| 10:19:11 | 8 | Who strongly agrees with that statement?  Please hold |
| 10:19:15 | 9 | up your card. |
| 10:19:16 | 10 | No one. |
| 10:19:17 | 11 | Who slightly agrees with that statement? |
| 10:19:19 | 12 | Juror number 8. |
| 10:19:21 | 13 | Who slightly disagrees with that? |
| 10:19:23 | 14 | Juror 2, 5. |
| 10:19:27 | 15 | And who strongly disagrees with that? |
| 10:19:29 | 16 | And that would be everybody else. |
| 10:19:35 | 17 | Let's go to the last of these questions:  If a |
| 10:19:42 | 18 | decision about whether an employee should get overtime is |
| 10:19:43 | 19 | complicated, the employer should be given the benefit of the |
| 10:19:47 | 20 | doubt.  If a decision about whether an employee should get |
| 10:19:50 | 21 | overtime is complicated, the employer should be given the |
| 10:19:53 | 22 | benefit of the doubt. |
| 10:19:54 | 23 | Who strongly agrees with that statement? |
| 10:19:57 | 24 | Who slightly agrees with that statement? |
| 10:20:00 | 25 | Who slightly disagrees with that statement? |

```
10:20:03   1              Juror 3, 5, 8, 9, 10.
10:20:10   2              And who strongly disagrees with that statement?
10:20:13   3              And that would be, 1, 2, 4, 6, 7, 17, 18, 19, 20, 21,
10:20:18   4    22, 23, 24, 25, 26, 11, 12, 13, 14, 15, 16.
10:20:27   5              Okay.  Thank you very much.
10:20:31   6              Now, ladies and gentlemen, that's the end of the
10:20:34   7    scale questions, and I appreciate that.  I hope you understand
10:20:37   8    that's an opportunity to get some quick information about
10:20:40   9    everybody on the panel that sometimes we don't get very easily.
10:20:45  10              Now, I want to talk about a couple of other matters
10:20:49  11    that may affect this case.  First off I want to point out to
10:20:52  12    you that the City may represent a former Department of Labor
10:20:55  13    employer to testify as to her opinion about how the DOL would
10:21:00  14    look at whether the overtime laws apply to a given employee.
10:21:03  15              Do any of you feel, even slightly, that you have to
10:21:07  16    give more weight to a person's testimony just because they may
10:21:10  17    be labeled an expert witness?  And this is an important
10:21:14  18    question from our point.  Does anybody feel, even slightly,
10:21:18  19    that you might want to give more weight to a person's opinion
10:21:23  20    because they're labeled an expert than somebody else who is a
10:21:29  21    layperson?  Anybody over here in the front row who feels that
10:21:31  22    way?  Yes, sir.  Number 8.
10:21:33  23              JUROR PARSLEY:  Yeah.  I think that's why they call
10:21:35  24    them experts.  Don Parsley, seat 8.  That's why they call them
10:21:39  25    experts.  So they carry a little more weight in their
```

10:21:42  1  testimony.

10:21:43  2          MR. DEATS:  Okay.  Thank you.  Did I see another

10:21:45  3  juror here?  Juror 24.

10:21:46  4          JUROR SHELDON:  I think they have more knowledge than

10:21:50  5  just the layperson.

10:21:51  6          MR. DEATS:  Okay.  And, of course, you understand

10:21:54  7  that using an expert makes sense.  For example, when you need

10:21:57  8  to know about medical matters, a doctor might be able to

10:22:00  9  explain that, right?  But here you're asked to decide a dispute

10:22:05  10  about the facts, what the primary duties of these paramedics

10:22:08  11  are, how they get paid, those sorts of things.  Now, the Judge

10:22:12  12  will instruct you on how to apply the law to determine the

10:22:15  13  facts.  Obviously, the Judge instructs you on matters of the

10:22:18  14  law.

10:22:19  15          But do any of you feel like an expert in this sort of

10:22:22  16  situation, applying these facts, do any of you feel like you

10:22:26  17  might nonetheless want to give more weight to their testimony

10:22:28  18  than, say, people who do the job and talk about how they do

10:22:32  19  it?

10:22:36  20          Yes, sir.  Juror number 10.

10:22:37  21          JUROR SPIKES:  Ben Spikes, number 10.  Again, like I

10:22:40  22  said before, an expert is an expert.

10:22:44  23          MR. DEATS:  Okay.  So you feel in this situation that

10:22:46  24  if an expert testifies, you have to give more weight to the

10:22:51  25  expert's testimony just because they are delineated an expert?

| | | |
|---|---|---|
| 10:22:54 | 1 | JUROR SPIKES:  Yes. |
| 10:22:55 | 2 | THE COURT:  Okay.  Thank you very much.  And I |
| 10:22:57 | 3 | appreciate that kind of feedback, y'all.  That's really |
| 10:23:00 | 4 | important to me, to get that kind of feedback about how you |
| 10:23:02 | 5 | might think or how you might weigh the evidence.  Is there |
| 10:23:06 | 6 | anybody else that feels like juror 10? |
| 10:23:07 | 7 | Yes, sir.  Number 12. |
| 10:23:09 | 8 | JUROR LAUNIUS:  Bob Launius, number 12.  Yes.  I |
| 10:23:14 | 9 | believe I would give more credence to an expert if it applies |
| 10:23:19 | 10 | to -- to the item being discussed. |
| 10:23:21 | 11 | MR. DEATS:  Okay.  Thank you.  That's very good.  I |
| 10:23:24 | 12 | really appreciate that feedback. |
| 10:23:26 | 13 | Anybody else feel that same way?  Juror number 17? |
| 10:23:30 | 14 | JUROR NEFF:  Brad Neff, 17.  Basically just echoing |
| 10:23:36 | 15 | their comments. |
| 10:23:38 | 16 | MR. DEATS:  Okay.  Yes, ma'am.  Number 5? |
| 10:23:41 | 17 | JUROR ROWE:  Same as everybody else.  An expert is an |
| 10:23:45 | 18 | expert.  If he's an expert, then I feel like it should be more |
| 10:23:51 | 19 | weighted. |
| 10:23:51 | 20 | MR. DEATS:  Now, I think what the Judge is going |
| 10:23:53 | 21 | to -- or may instruct you.  Of course, the Judge will decide |
| 10:23:56 | 22 | what the Judge instructs you.  But is going to instruct you |
| 10:23:59 | 23 | that you have the right to listen to an expert witness just |
| 10:24:02 | 24 | like anybody else, believe or disbelieve him, consider |
| 10:24:05 | 25 | potential biases they have. |

10:24:06  1              But, still, there's that troubling word, "expert."
10:24:08  2    Anybody else that would be troubled and tend to give more
10:24:12  3    weight to a person's opinion in a situation like this where
10:24:15  4    we're talking about how people do their jobs?  Anybody else who
10:24:18  5    hasn't spoken already?  And, again, there's no right or wrong
10:24:22  6    answer here.  It's just how you feel, and you're helping us
10:24:25  7    with that.  Yes, sir.  Number 20?

10:24:27  8              JUROR OVERBY:  Connor Overby, number 20.  I feel that
10:24:33  9    an expert witness could interpret facts differently than a
10:24:37 10    lay-witness.  The facts can be -- anybody can read facts, but
10:24:40 11    it's the way the facts are interpreted that's most important.

10:24:45 12              MR. DEATS:  Okay.  Okay.  Thank you very much.  I
10:24:48 13    appreciate those comments.

10:24:50 14              Anybody else?  Anybody else over here on this side?
10:24:53 15    Number 25.

10:24:55 16              JUROR POPOV:  Allison Popov, number 25.  I think that
10:25:01 17    if it's a fact, it's a fact.  But if it's about something going
10:25:05 18    on, like a personal -- like the way that somebody is doing
10:25:09 19    their job versus an expert -- I'm not wording what I'm thinking
10:25:15 20    very well.  But an expert who is thinking like the way it's
10:25:19 21    supposed to be and then the person who is actually experiencing
10:25:23 22    it could be totally two different things.  But I do agree an
10:25:27 23    expert has knowledge that another person may not have.

10:25:29 24              MR. DEATS:  And do you feel that because of that, you
10:25:31 25    might give more weight to an expert's testimony just because

| 10:25:34 | 1 | they may be labeled as an expert witness? |
| 10:25:36 | 2 | JUROR POPOV:  I would have to hear it.  To be |
| 10:25:39 | 3 | perfectly honest, I would have to hear whatever it was. |
| 10:25:42 | 4 | MR. DEATS:  Sure.  Of course, you understand that |
| 10:25:43 | 5 | people are generally pretty much experts at, you know, what |
| 10:25:46 | 6 | they do in their job.  I mean, they know about that.  And we're |
| 10:25:49 | 7 | are going to have a lot of testimony, I think, about the way |
| 10:25:53 | 8 | people do their jobs and how they spend their days.  And that's |
| 10:25:57 | 9 | going to be important information, I believe, for the jury to |
| 10:26:01 | 10 | receive.  And so when you consider all of it -- and I've heard |
| 10:26:05 | 11 | from several of you now -- but the ones who haven't talked to |
| 10:26:08 | 12 | me yet, can you -- are you telling me, then, that you feel like |
| 10:26:12 | 13 | you can listen and weigh the testimony and you won't be swayed |
| 10:26:15 | 14 | necessarily by the label that a witness has, but you're willing |
| 10:26:19 | 15 | to look at the testimony and decide, does this really makes |
| 10:26:22 | 16 | sense to you or does this really, you know, mean something to |
| 10:26:25 | 17 | you and decide how to weigh it?  Can you -- can you agree to do |
| 10:26:30 | 18 | that with me?  Is there anybody that feels like they can't do |
| 10:26:34 | 19 | that and labels are important, labels matter?  Anybody at all? |
| 10:26:39 | 20 | Anybody that hasn't spoken?  Just has to be a feeling. |
| 10:26:42 | 21 | Something like that. |
| 10:26:43 | 22 | (No response) |
| 10:26:45 | 23 | MR. DEATS:  Okay.  Well, thank you very much.  I |
| 10:26:47 | 24 | appreciate that feedback, and it's very helpful information for |
| 10:26:50 | 25 | me. |

```
10:26:50   1            Now, I want to talk to you about another matter, and
10:26:53   2   that is job descriptions.  You know, again, we're talking about
10:27:01   3   the way people do their jobs, right, and what they do and how
10:27:05   4   they spend most of their day.  And that's going to be a very
10:27:09   5   important factor in this case.  But, at the same time, probably
10:27:12   6   all of us in our lives at some point have seen job descriptions
10:27:15   7   or we have had a job description given to us that says Here's
10:27:20   8   what you do in your job.  And sometimes those are accurate, and
10:27:23   9   sometimes they're not.  And sometimes you have personnel
10:27:26  10   policies, and those personnel policies are followed or they're
10:27:30  11   not.
10:27:31  12            But some people, you know, really feel like, man,
10:27:33  13   that means something more to me than even somebody talking
10:27:39  14   about what they do in their job individually during the day.
10:27:42  15   You know, if somebody talks about it, well, here's this piece
10:27:45  16   of paper that says something different and I think I'm going to
10:27:48  17   go with that because that's in writing.
10:27:51  18            Now, is there anybody -- and, again, I'm not asking
10:27:55  19   you about right ways or wrong ways to feel.  I'm asking you
10:27:59  20   just about feelings that you have for whatever reason.  Is
10:28:02  21   there anybody that feels like, well, I saw it on paper.  I'm
10:28:05  22   going to give more credence to that than I am going to give to
10:28:09  23   somebody talking about how they actually do their job.  Is
10:28:13  24   there anybody that feels that way even ever so slightly.
10:28:17  25            I mean, I know some of you indicated you have HR
```

10:28:21  1  experience and you probably helped write job descriptions.  And

10:28:24  2  job descriptions are written for a number of reasons.  But is

10:28:27  3  there anybody who feels ever so slightly that if I see it on

10:28:30  4  paper, that is going to affect my opinion more than maybe

10:28:33  5  somebody testifying about how they may actually spend their

10:28:37  6  day?  Anybody at all?  Yes, sir.  Juror number 8?

10:28:40  7          JUROR PARSLEY:  Don Parsley, number 8.  In the

10:28:43  8  context of an employment -- an employee manual that lays out

10:28:50  9  company policies that's acknowledged by the employee prior to

10:28:53  10  employment, I'm going to go with the writing.

10:28:56  11          MR. DEATS:  Okay.  Very good.

10:28:57  12          Yes, sir.  Juror number 10?

10:28:59  13          JUROR SPIKES:  Brent spikes, number 10.  I guess it

10:29:01  14  would depend on the evidence to support the statement.  Just

10:29:04  15  because someone says that they do things, a lot of times

10:29:07  16  there's not necessarily the evidence to support their

10:29:09  17  statements.

10:29:10  18          MR. DEATS:  Okay.  And so if you saw on paper

10:29:13  19  something different than what the people were saying that they

10:29:15  20  do, you think that that might have an impact on you in terms of

10:29:19  21  evaluating their testimony?

10:29:21  22          JUROR SPIKES:  It does with my annual reviews for

10:29:24  23  staff.  I mean, there's other duties assigned.  But, again,

10:29:27  24  what they say and their -- if it's not supported by factual --

10:29:33  25  or fact, then, again, perception.

| | | |
|---|---|---|
| 10:29:37 | 1 | MR. DEATS:  Okay.  Okay.  This is very good feedback |
| 10:29:40 | 2 | that I'm getting, and I appreciate your comments very much. |
| 10:29:43 | 3 | But is there anybody else that feels the same way?  Sometimes |
| 10:29:46 | 4 | you hear another juror talk about it, and maybe it resonates |
| 10:29:51 | 5 | with you.  Juror number 12? |
| 10:29:53 | 6 | JUROR LAUNIUS:  Bob Launius, number 12.  From the |
| 10:29:56 | 7 | perspective of job descriptions, I view them as -- as not |
| 10:30:01 | 8 | all-inclusive.  They can't -- they can't possibly pick up on |
| 10:30:04 | 9 | everything that individuals do.  But as it relates to |
| 10:30:08 | 10 | compensation, in my experience, I go back to employment |
| 10:30:12 | 11 | agreements and what was originally laid out, what the |
| 10:30:16 | 12 | expectation was on the front end of the engagement, and that's |
| 10:30:20 | 13 | probably where I land. |
| 10:30:23 | 14 | MR. DEATS:  Okay.  Very good.  And so you feel |
| 10:30:26 | 15 | because of that, that when you see something that's in that job |
| 10:30:29 | 16 | description, that even if people are testifying and saying, you |
| 10:30:32 | 17 | know, that's not really how it works, that you give some |
| 10:30:36 | 18 | credence to that job description anyway. |
| 10:30:38 | 19 | JUROR LAUNIUS:  I think I would.  From a compensation |
| 10:30:41 | 20 | standpoint and overtime is related, I would look back probably |
| 10:30:45 | 21 | at what the original offer was, what the employment agreement |
| 10:30:49 | 22 | stated. |
| 10:30:49 | 23 | MR. DEATS:  Okay.  Very good.  Thank you very much. |
| 10:30:52 | 24 | Yes, ma'am.  I think you're juror number 13? |
| 10:30:55 | 25 | JUROR COCHRAN:  Yes.  I'm probably not going to state |

10:30:58   1   this clearly, but I'm an administrator and a teacher, so I work
10:31:01   2   both sides of the fence.  And I just don't know that it's ever
10:31:04   3   completely stated in the job description everything we do.  You
10:31:08   4   know, as teacher I'm in the trenches, and as an administrator
10:31:11   5   I'm supervising the ones in the trenches.  So I don't know that
10:31:15   6   it ever clearly states everything.  So I do have a problem with
10:31:18   7   just the statement, I guess, if that's clearly said.
10:31:22   8          MR. DEATS:  And what if the employee testified, you
10:31:24   9   know, here's the statement and job description, but it really
10:31:26  10   leaves out some really important things that we do and things
10:31:29  11   that we're expected to do.  I mean, would you feel like, Well,
10:31:33  12   no.  Here's the job description, and it doesn't say you're
10:31:35  13   expected to do that.  So I don't think you really do that.
10:31:38  14   Would you feel that way ever?
10:31:40  15          JUROR COCHRAN:  I would answer that by saying, in my
10:31:43  16   own opinion, in my own experience, there are many things that
10:31:46  17   are done that are not stated.  If that ...
10:31:50  18          MR. DEATS:  And so if you feel employees testify that
10:31:53  19   they did things a certain way, that you could give credence to
10:31:56  20   that even if it wasn't in their job description?
10:31:59  21          JUROR COCHRAN:  Yes.  Because I witness that every
10:32:01  22   day.
10:32:01  23          MR. DEATS:  And, you know, because I believe you
10:32:03  24   said, as a teacher, you know of situations where, you know, a
10:32:06  25   job description may be a bare bones description of something.

| | | |
|---|---|---|
| 10:32:09 | 1 | But then when you really get into how people spend their day |
| 10:32:13 | 2 | and do their duties, there's a lot more to it than that. |
| 10:32:15 | 3 | JUROR COCHRAN:  Absolutely. |
| 10:32:18 | 4 | MR. DEATS:  Yes, ma'am. |
| 10:32:19 | 5 | JUROR POPOV:  Allison Popov, number 25.  I'm also a |
| 10:32:22 | 6 | teacher, and have to agree with all of that.  We do a lot of |
| 10:32:25 | 7 | things that aren't necessarily put down on paper. |
| 10:32:28 | 8 | MR. DEATS:  And are some of those things really |
| 10:32:31 | 9 | important parts of your job? |
| 10:32:31 | 10 | JUROR POPOV:  Very much so. |
| 10:32:33 | 11 | MR. DEATS:  All right.  Thank you very much.  Let me |
| 10:32:35 | 12 | go to one other topic real quick because I see my time is about |
| 10:32:40 | 13 | to run out.  There's often a lot of confusion what the overtime |
| 10:32:44 | 14 | laws require, and, you know, people have all sorts of opinions |
| 10:32:46 | 15 | about that.  And there's a lot of people that believe that |
| 10:32:48 | 16 | supervisors are barred from getting overtime pay. |
| 10:32:52 | 17 | But if the Court were to instruct you that first |
| 10:32:55 | 18 | responders, people like EMS, police, firefighters, those sorts |
| 10:33:00 | 19 | of first responders who respond to emergencies can get overtime |
| 10:33:04 | 20 | regardless of their rank or title, is there anyone who couldn't |
| 10:33:08 | 21 | follow the law on that?  Is there anyone who feels like, well, |
| 10:33:11 | 22 | supervisors -- you know, I understand that supervisors don't |
| 10:33:14 | 23 | get overtime.  So if they established that they have |
| 10:33:16 | 24 | supervisory duties, then I can't follow the law on that.  I |
| 10:33:20 | 25 | can't give them overtime pay if I decide that they are first |

| | | |
|---|---|---|
| 10:33:24 | 1 | responders -- that their duties are first response duties. |
| 10:33:27 | 2 | Anybody on this first row who would have trouble with |
| 10:33:30 | 3 | giving overtime to a supervisor who has first time -- first |
| 10:33:34 | 4 | responder duties if the Judge instructs you that that's the |
| 10:33:38 | 5 | law?  Anybody on this first row. |
| 10:33:41 | 6 | (No response) |
| 10:33:41 | 7 | MR. DEATS:  Anybody on this second row that would |
| 10:33:43 | 8 | have trouble with that? |
| 10:33:47 | 9 | (No response) |
| 10:33:47 | 10 | MR. DEATS:  So it won't bother you if you hear they |
| 10:33:50 | 11 | have supervisory duties, but they also have first response |
| 10:33:54 | 12 | duties and they are, in your opinion, based on the evidence, |
| 10:33:55 | 13 | first responders?  You could feel comfortable doing that? |
| 10:33:59 | 14 | Anybody over here on this row?  This is an important question. |
| 10:34:02 | 15 | Anybody that feels like, well, if they have supervisor duties, |
| 10:34:05 | 16 | that just kind of seals the book for me.  I've always |
| 10:34:08 | 17 | understood that supervisors don't get overtime?  Anybody? |
| 10:34:12 | 18 | Juror 13, you just smiled a little bit, and I wonder |
| 10:34:15 | 19 | is there some kind of -- something in the back of your mind |
| 10:34:19 | 20 | about that? |
| 10:34:19 | 21 | JUROR COCHRAN:  No.  It's my life. |
| 10:34:25 | 22 | MR. DEATS:  You are in supervisory position, right? |
| 10:34:28 | 23 | I understand that.  And so at the same time, though, if the |
| 10:34:34 | 24 | Judge were to instruct you that there's a rule that |
| 10:34:36 | 25 | specifically pertains to first responders, if it's first |

10:34:39  1  response work they do, they can get overtime despite
10:34:43  2  supervisory duties.  Is there anybody that feels like they
10:34:45  3  couldn't follow the law on that?
10:34:48  4       (No response)
10:34:48  5            MR. DEATS:  Anybody in these last few rows here?
10:34:51  6       (No response)
10:34:51  7            MR. DEATS:  I believe, Judge, that my time is about
10:34:53  8  to expire.  And so with that I will stop my questioning.
10:34:57  9            I thank you very much for your time and attention,
10:34:59 10  and I -- on behalf of all the plaintiffs, we very much
10:35:03 11  appreciate your jury service.  Thank you.
10:35:06 12            THE COURT:  Mr. Coppola?  You have to share the
10:35:15 13  microphone, Mr. Deats.
10:35:17 14            MR. COPPOLA:  Good morning, ladies and gentlemen.
10:35:19 15  Again, my name is Chris Coppola.  I am an attorney for the City
10:35:22 16  of Austin, and just let me say that I'm thankful for you all to
10:35:25 17  be here and serving in this capacity this morning.
10:35:28 18            And I'd like to also say I'm very proud to be
10:35:31 19  representing the City here this morning.  I know a number of
10:35:34 20  you mentioned earlier in response to a question from
10:35:37 21  Judge Yeakel that a number of you have friends and family who
10:35:41 22  are involved in first response and a number of you also
10:35:45 23  mentioned that you have friends and family and yourselves, of
10:35:48 24  course as well, who have been -- had their lives sort of
10:35:52 25  affected directly by emergency medical personnel.

| | | |
|---|---|---|
| 10:35:55 | 1 | And I guess I'm just wondering, first of all, if any |
| 10:35:58 | 2 | of those -- if any of those connections in your lives, if any |
| 10:36:02 | 3 | of those things, you know, tend to make you more sympathetic |
| 10:36:06 | 4 | towards people who are involved as first responders and who do |
| 10:36:10 | 5 | that work?  Anybody here in the first row who feels that way, |
| 10:36:15 | 6 | who's had very positive experiences with those people. |
| 10:36:18 | 7 | Yes.  Juror number 6? |
| 10:36:21 | 8 | JUROR SCHELL:  Your question is? |
| 10:36:24 | 9 | MR. COPPOLA:  Would those experiences or having those |
| 10:36:26 | 10 | friends and family members, would that tend to make you more |
| 10:36:29 | 11 | sympathetic to those people involved in that type of work? |
| 10:36:32 | 12 | JUROR SCHELL:  Yes.  Absolutely. |
| 10:36:35 | 13 | MR. COPPOLA:  Thank you very much.  I appreciate |
| 10:36:36 | 14 | that.  Is there anybody else who feels the same as Ms. Schell? |
| 10:36:37 | 15 | JUROR SHELDON:  Yes.  My husband.  So I'm very dear |
| 10:36:43 | 16 | to that. |
| 10:36:45 | 17 | MR. COPPOLA:  Juror number 14.  Yes, ma'am? |
| 10:36:47 | 18 | JUROR ONTIBEROS:  Absolutely.  EMS saves lives all |
| 10:36:51 | 19 | the time. |
| 10:36:52 | 20 | MR. COPPOLA:  Okay.  Thank you.  I appreciate that. |
| 10:37:00 | 21 | JUROR NEFF:  I completely agree.  I'm very |
| 10:37:02 | 22 | sympathetic to that as well. |
| 10:37:07 | 23 | MR. COPPOLA:  And juror number 16? |
| 10:37:09 | 24 | JUROR CALERO:  Uh-huh. |
| 10:37:10 | 25 | MR. COPPOLA:  Do you feel the same way? |

| | | |
|---|---|---|
| 10:37:15 | 1 | JUROR CALERO:  Yes.  Very much so.  Very much so. |
| 10:37:18 | 2 | Very, very, very sympathetic.  I believe that these people are |
| 10:37:23 | 3 | very hard workers and they're awesome.  That's all I can say. |
| 10:37:26 | 4 | MR. COPPOLA:  Those sound like strong feelings, and I |
| 10:37:29 | 5 | appreciate that.  I agree that, obviously, first responders do |
| 10:37:33 | 6 | amazing work.  Do any of you in terms of those sympathies, |
| 10:37:38 | 7 | would you have difficulty putting those aside and hearing this |
| 10:37:42 | 8 | case when you're hearing sometimes these people, these district |
| 10:37:45 | 9 | commanders, that do first response, would you have a hard time |
| 10:37:49 | 10 | putting that aside when you're considering the facts in this |
| 10:37:52 | 11 | case? |
| 10:37:55 | 12 | Does anybody feel the same way as these two, |
| 10:37:59 | 13 | number 14 and number 16?  Would you have a hard time putting |
| 10:38:03 | 14 | those sympathies aside? |
| 10:38:05 | 15 | Thank you.  Anybody else that feels that way?  I |
| 10:38:08 | 16 | appreciate that feedback.  Thank you. |
| 10:38:10 | 17 | One of the things you're -- I think you're going to |
| 10:38:13 | 18 | hear in this case is that the plaintiffs who are, again, |
| 10:38:16 | 19 | district commanders and EMS, is that they don't have the direct |
| 10:38:20 | 20 | authority to hire and to fire or promote the personnel they |
| 10:38:25 | 21 | supervise. |
| 10:38:27 | 22 | If the Judge were to instruct you that the law is |
| 10:38:31 | 23 | that people can be exempt executives and exempt managers even |
| 10:38:37 | 24 | if they don't have that direct authority, would any of you have |
| 10:38:40 | 25 | a hard time still seeing their job as being managers or |

10:38:46   1   executives, even if they don't have the ability to directly

10:38:49   2   hire and fire and promote the people that they supervise.

10:38:55   3          Anybody feel that way?  Anybody here in the first

10:38:58   4   row.

10:38:59   5      (No response)

10:39:00   6          MR. COPPOLA:  Thank you.  Sometimes -- I think you're

10:39:05   7   going to hear testimony as well today that sometimes people,

10:39:08   8   the plaintiffs, the district commanders, they are required to

10:39:11   9   respond as -- to dispatched medical calls and they are all

10:39:18   10  licensed paramedics.  And sometimes they do provide direct

10:39:24   11  patient care to patients.  Because of this fact, is there

10:39:26   12  anyone here who would not be able to find that they are exempt

10:39:30   13  managers or supervisors or exempt administrative employees no

10:39:35   14  matter what the Judge instructs you -- instructs you on the

10:39:39   15  law?

10:39:40   16         Is there anybody who feels that because they do

10:39:42   17  sometimes provide direct patient care, that it doesn't matter

10:39:46   18  what the Judge instructs you, you are not going to find that

10:39:49   19  they are exempt employees?

10:39:53   20         MR. COPPOLA:  Yes, Ms. Schell.

10:39:55   21         JUROR SCHELL:  I think so.  Because even if they

10:39:58   22  don't on -- you know, one time don't have to, perhaps, they

10:40:03   23  always have to be ready and prepared.  So that doesn't exempt

10:40:06   24  them in my mind.

10:40:07   25         MR. COPPOLA:  Okay.  Is there anybody that feels that

| | | |
|---|---|---|
| 10:40:09 | 1 | way?  Did everybody hear what Ms. Schell had to say?  Is there |
| 10:40:14 | 2 | anybody else who feels that way? |
| 10:40:17 | 3 | Okay.  Thank you.  I'd like to ask you a couple of |
| 10:40:24 | 4 | individual questions.  Ms. Ashbrook, is it, juror number 1? |
| 10:40:28 | 5 | JUROR ASHBROOK:  Yes. |
| 10:40:28 | 6 | MR. COPPOLA:  I think you mentioned earlier in |
| 10:40:31 | 7 | response to one of Judge Yeakel's questions that you filed a |
| 10:40:34 | 8 | complaint against a supervisor before; is that correct? |
| 10:40:37 | 9 | JUROR ASHBROOK:  Yes, sir. |
| 10:40:38 | 10 | MR. COPPOLA:  Can you tell me what that was about? |
| 10:40:40 | 11 | JUROR ASHBROOK:  It was discrimination against the |
| 10:40:43 | 12 | employees -- there were about five of us -- and the way we were |
| 10:40:45 | 13 | treated in the workplace. |
| 10:40:46 | 14 | MR. COPPOLA:  And how did you feel that complaint was |
| 10:40:48 | 15 | handled by your employer. |
| 10:40:50 | 16 | JUROR ASHBROOK:  It was done really great.  And, I |
| 10:40:52 | 17 | mean, they did a good job and they heard everybody's testimony |
| 10:40:56 | 18 | and everything worked out fine. |
| 10:40:58 | 19 | MR. COPPOLA:  Was there any lawsuit involving those |
| 10:41:01 | 20 | complaints. |
| 10:41:01 | 21 | JUROR ASHBROOK:  Only within the business.  It was a |
| 10:41:06 | 22 | State grievance. |
| 10:41:07 | 23 | MR. COPPOLA:  It was state.  Were you working for the |
| 10:41:09 | 24 | State at that time? |
| 10:41:10 | 25 | JUROR ASHBROOK:  Yes. |

| | | |
|---|---|---|
| 10:41:11 | 1 | MR. COPPOLA:  What were you doing for the State? |
| 10:41:12 | 2 | JUROR ASHBROOK:  I was in the consulting contract |
| 10:41:14 | 3 | office. |
| 10:41:14 | 4 | MR. COPPOLA:  Okay. |
| 10:41:16 | 5 | JUROR ASHBROOK:  Hiring consultants. |
| 10:41:17 | 6 | MR. COPPOLA:  And do you work -- do you work with the |
| 10:41:20 | 7 | State now? |
| 10:41:20 | 8 | JUROR ASHBROOK:  Yes.  Thirty years in February. |
| 10:41:22 | 9 | MR. COPPOLA:  What do you do? |
| 10:41:23 | 10 | JUROR ASHBROOK:  I am a project program manager for |
| 10:41:26 | 11 | TxDOT. |
| 10:41:27 | 12 | MR. COPPOLA:  Do you supervise any employees in that |
| 10:41:28 | 13 | capacity? |
| 10:41:29 | 14 | JUROR ASHBROOK:  No.  I oversee about 15 federal |
| 10:41:34 | 15 | grants. |
| 10:41:35 | 16 | MR. COPPOLA:  Okay.  Thank you. |
| 10:41:37 | 17 | Juror number 3, Ms. Basinger? |
| 10:41:40 | 18 | JUROR BASINGER:  Yes. |
| 10:41:42 | 19 | MR. COPPOLA:  Hi.  I think you mentioned earlier that |
| 10:41:44 | 20 | you're an executive assistant for Seton.  Is that -- |
| 10:41:48 | 21 | JUROR BASINGER:  I didn't mention that, but I am. |
| 10:41:50 | 22 | MR. COPPOLA:  Oh, I'm sorry.  I thought I heard you |
| 10:41:51 | 23 | mention -- |
| 10:41:51 | 24 | JUROR BASINGER:  No.  I work for Seton. |
| 10:41:52 | 25 | MR. COPPOLA:  I may have seen it on a juror |

10:41:55  1  information form.  Can you tell me what kind of work -- who do

10:41:59  2  you work for at Seton?  Who are you an executive for?

10:42:02  3          JUROR BASINGER:  I work for the vice president and

10:42:05  4  COO of Seton Shoal Creek Hospital and the DON, the Director of

10:42:11  5  Nursing.

10:42:12  6          MR. COPPOLA:  Okay.  Do you supervise any employees

10:42:13  7  yourself in that job?

10:42:14  8          JUROR BASINGER:  I do not.

10:42:16  9          MR. COPPOLA:  Okay.  Have you ever supervised

10:42:17  10 employees?

10:42:17  11         JUROR BASINGER:  I have not.

10:42:18  12         MR. COPPOLA:  And are you paid overtime when you have

10:42:21  13 to work more than 40 hours a week?

10:42:23  14         JUROR BASINGER:  No.

10:42:24  15         MR. COPPOLA:  Thank you.  I appreciate your answers.

10:42:33  16         Mr. Flores, I saw in your juror information form that

10:42:35  17 your a graphic designer; is that right?

10:42:37  18         JUROR FLORES:  That's right.

10:42:38  19         MR. COPPOLA:  Can you describe what you do on a

10:42:40  20 regular basis.

10:42:41  21         JUROR FLORES:  I create illustrations for Online --

10:42:46  22 educational Online textbooks or eBooks for Online learning.

10:42:53  23         MR. COPPOLA:  Do you work for a large employer, or

10:42:56  24 are you kind of on your own?

10:42:58  25         JUROR FLORES:  I work for a private company here in

```
10:43:01   1   town.  It's, I want to say, about 50 or 60 employees.
10:43:05   2           MR. COPPOLA:  Okay.  Do you supervise any other
10:43:07   3   employees?
10:43:07   4           JUROR FLORES:  No.
10:43:08   5           MR. COPPOLA:  Do you receive overtime, sir?
10:43:10   6           JUROR FLORES:  No, I don't.
10:43:11   7           MR. COPPOLA:  Okay.  Thank you.
10:43:15   8           Ms. Rowe, I think you mentioned early you're a
10:43:17   9   paralegal?
10:43:18  10           JUROR ROWE:  Yes, I am.
10:43:19  11           MR. COPPOLA:  Are you currently working for a law
10:43:20  12   firm?
10:43:21  13           JUROR ROWE:  No.  Not right now.  I went in-house.  I
10:43:24  14   work for a medical device company.
10:43:25  15           MR. COPPOLA:  When you worked for Baker Botts, did
10:43:28  16   you primarily work on defense cases?
10:43:31  17           JUROR ROWE:  Intellectual property law.
10:43:33  18           MR. COPPOLA:  Intellectual property law.  Very good.
10:43:35  19   Thank you.
10:43:42  20           Juror number 11, Mr. Quijano?
10:43:51  21           JUROR QUIJANO:  Yes.
10:43:51  22           MR. COPPOLA:  I think you mentioned earlier that you
10:43:53  23   had previously filed a complaint against one of your employers
10:43:56  24   for not receiving overtime.  Did you say that?
10:43:59  25           JUROR QUIJANO:  Right.
```

10:43:59  1          MR. COPPOLA:  Can you tell me what the circumstances

10:44:01  2  were of that compliant?

10:44:03  3          JUROR QUIJANO:  Because we were told we were exempt

10:44:05  4  because we were in sales.  So we were working 50 hours a week,

10:44:09  5  and we were making salary.

10:44:12  6          MR. COPPOLA:  Yes, sir.

10:44:14  7          JUROR QUIJANO:  And we decided to fight the company.

10:44:17  8          MR. COPPOLA:  Did you file it internally, or did you

10:44:22  9  file a lawsuit?

10:44:23  10          JUROR QUIJANO:  No.  It was a lawsuit.

10:44:24  11          MR. COPPOLA:  A lawsuit.  And what was the outcome of

10:44:27  12  that lawsuit?

10:44:27  13          JUROR QUIJANO:  We got paid.

10:44:29  14          MR. COPPOLA:  You got paid.  Is there anything about

10:44:30  15  that experience -- and that sounds like it was -- was it a

10:44:35  16  difficult experience for you to undergo?

10:44:37  17          JUROR QUIJANO:  Yes.  I think for all parties, for

10:44:39  18  the company and for us.

10:44:40  19          MR. COPPOLA:  You know, having that experience, would

10:44:42  20  that tend to make you more sympathetic to the plaintiffs here

10:44:46  21  who are also requesting that they be paid overtime?

10:44:50  22          JUROR QUIJANO:  Correct.

10:44:51  23          MR. COPPOLA:  That would make you more sympathetic?

10:44:53  24          JUROR QUIJANO:  Correct.

10:44:54  25          MR. COPPOLA:  Would you have a hard time putting

```
10:44:56   1   those feelings aside when you're looking at the evidence in
10:44:59   2   this case.
10:44:59   3               JUROR QUIJANO:  Yeah.  When you put it that way, yes.
10:45:02   4               MR. COPPOLA:  Okay.  Thank you, sir.
10:45:07   5               Ms. Petit, I think I saw on your juror information
10:45:12   6   form that you were a case manager; is that right?
10:45:14   7               JUROR PETIT:  Uh-huh.
10:45:14   8               MR. COPPOLA:  Can you tell me who you work for?
10:45:15   9               JUROR PETIT:  I work for a nonprofit, LifeWorks, and
10:45:18  10   I work in their foster care department.
10:45:20  11               MR. COPPOLA:  Okay.  Do you supervise other employees
10:45:22  12   in that capacity?
10:45:23  13               JUROR PETIT:  Not at this time, no.
10:45:25  14               MR. COPPOLA:  Okay.  What sort of work do you do on a
10:45:27  15   regular basis.
10:45:28  16               JUROR PETIT:  I work with 18-year-olds that are
10:45:32  17   coming out of Austin Care, and we just manage them for three
10:45:35  18   years.
10:45:36  19               MR. COPPOLA:  Thank you very much.  I appreciate
10:45:38  20   that.
10:45:52  21               Mr. Deats asked you a couple of questions about how
10:45:55  22   you would consider expert testimony, and some of you expressed
10:46:01  23   the opinion that just hearing that somebody was an expert would
10:46:08  24   cause you to maybe give their testimony a little more credence
10:46:10  25               I'm wondering, though -- and I think -- Ms. Popov, I
```

| | | |
|---|---|---|
| 10:46:13 | 1 | think you mentioned -- juror number 25 -- that you have to wait |
| 10:46:17 | 2 | to hear the testimony before you can assign any weight to it, |
| 10:46:20 | 3 | whether you could decide whether it was credible or not |
| 10:46:22 | 4 | credible and how much weight to assign to the testimony. |
| 10:46:25 | 5 | Does anybody else feel that way, that they would have |
| 10:46:28 | 6 | to wait to hear the testimony before they could decide how |
| 10:46:31 | 7 | much -- how much credence to give to it? |
| 10:46:36 | 8 | Juror number 14. |
| 10:46:37 | 9 | JUROR ONTIBEROS:  Absolutely.  Because sometimes life |
| 10:46:40 | 10 | teaches you better than an expert. |
| 10:46:43 | 11 | MR. COPPOLA:  Okay.  Everybody that feels that same |
| 10:46:46 | 12 | way, raise your numbers up.  I would appreciate that.  She said |
| 10:46:53 | 13 | that sometimes people -- |
| 10:46:55 | 14 | JUROR ONTIBEROS:  Life experience teaches more than |
| 10:46:57 | 15 | what an expert can teach. |
| 10:47:02 | 16 | MR. COPPOLA:  Life experience teaches you more than |
| 10:47:04 | 17 | what an expert can teach you. |
| 10:47:09 | 18 | Can you just hold those up for another moment, |
| 10:47:12 | 19 | please.  Thank you very much.  I appreciate it. |
| 10:47:14 | 20 | Mr. Pryor? |
| 10:47:20 | 21 | JUROR PRYOR:  Yeah.  I think she said sometimes. |
| 10:47:23 | 22 | MR. COPPOLA:  Sometimes.  I'm sorry.  I agree with |
| 10:47:25 | 23 | that statement.  I appreciate that.  Thank you, sir |
| 10:47:37 | 24 | I think I have just one last question.  Mr. Deats |
| 10:47:41 | 25 | asked you a little bit about, you know, whether you would |

```
10:47:45   1   give -- tend to give more credence to the written job
10:47:48   2   description over what people say they do on a regular basis.
10:47:54   3   I'm wondering if -- you know, if just because people are going
10:47:57   4   to testify about what they do on a regular basis, I'm wondering
10:48:01   5   if you would be more likely to agree with them no matter what
10:48:05   6   the other evidence shows you in the case.
10:48:07   7           Does anybody feel that way, that just because
10:48:09   8   somebody gets up and testifies about what they do on regular
10:48:15   9   basis, they would be more likely to agree with that no matter
10:48:18  10   what the other evidence -- the written evidence shows in the
10:48:22  11   case?
10:48:23  12           Juror number 24?
10:48:25  13           JUROR SHELDON:  Well, I believe when you're talking
10:48:32  14   about emergency personnel, there's no way you could have
10:48:34  15   written procedures and policies.  Each thing is a case-by-case
10:48:37  16   and it's at the officer's discretion.  I just don't feel like a
10:48:40  17   written policy in terms of an emergency personnel could ever be
10:48:44  18   complete.
10:48:46  19           MR. COPPOLA:  Okay.  Thank you.  Does anybody else
10:48:48  20   agree with Ms. Sheldon?  Ms. Popov?  Okay.  Anybody else feel
10:48:54  21   that way?  Did everybody hear that?
10:48:58  22           JUROR SCHELL:  Number 6.
10:48:59  23           MR. COPPOLA:  Number 6 as well?  I'm sorry.  Thank
10:49:01  24   you, Ms. Schell.
10:49:02  25           Thank you very much for your time.  I appreciate it.
```

10:49:04    1    And for your services.  Thank you.

10:49:08    2             THE COURT:  Ladies and gentlemen, I just have a few

10:49:16    3    final questions for you at this time, and then we will commence

10:49:22    4    selecting the jury.

10:49:23    5             Do any of you know of any reason why you may be

10:49:29    6    prejudiced for or against any of the parties because of this

10:49:33    7    lawsuit or any other reason that you have not already disclosed

10:49:38    8    in answer to either my questions or questions by the lawyers.

10:49:44    9        (No response)

10:49:45   10             THE COURT:  And if you were one of the parties in

10:49:47   11    this case, do you know of any reason why you would not be

10:49:52   12    content to have the case tried by someone in your frame of

10:49:56   13    mind?  In other words, if you were sitting where the plaintiffs

10:50:00   14    or the defendant sits and had heard what you have heard today,

10:50:05   15    do you know of any reason why you wouldn't be content to have

10:50:09   16    the case tried by someone in your frame of mind?

10:50:12   17        (No response)

10:50:13   18             THE COURT:  Now, can you think of any other matters

10:50:16   19    not yet touched upon which you should call to the Court's

10:50:19   20    attention that may have some bearing on your qualifications as

10:50:24   21    a juror or which may prevent you from rendering a fair and

10:50:29   22    impartial verdict in this case?

10:50:34   23             (No response)

10:50:36   24             THE COURT:  All right.  Let me see lawyers at the

10:50:38   25    bench, please.

```
10:50:38   1        (At the bench, on the record)
10:51:06   2             THE COURT:  All right.  Now, what I'm getting ready
10:51:10   3   to do is recess the panel so we can strike the list.  Is there
10:51:15   4   any juror that you are contemplating a peremptory challenge for
10:51:21   5   that you would like held back because there may be one or two
10:51:26   6   questions -- not a lot of questions -- that we want to take up
10:51:29   7   with them before you make your challenge for cause?
10:51:31   8             Mr. Deats, I start with you.
10:51:33   9             MR. DEATS:  Judge, I'm sorry.  Can you repeat what --
10:51:36  10             THE COURT:  All right.  You're going to have a chance
10:51:38  11   to challenge for cause.
10:51:40  12             MR. DEATS:  Yeah.  I understand that.
10:51:41  13             THE COURT:  You've heard what the jurors have said
10:51:43  14   that you may be contemplating challenging for cause.  Is there
10:51:47  15   any of those jurors that you're contemplating challenging for
10:51:51  16   cause that you would like to have held back for a couple of
10:51:54  17   more brief questions before you make your challenge or are you
10:51:57  18   content with what they've already said?
10:51:59  19             MR. DEATS:  Your Honor, I would like juror number 5
10:52:02  20   held back and juror number 10.  Held back.
10:52:05  21             THE COURT:  All right.  Juror number 5 is Ms. Rowe.
10:52:09  22             MR. DEATS:  Yes, sir.
10:52:09  23             THE COURT:  And juror number 10 is Mr. Spikes; is
10:52:13  24   that correct?
10:52:14  25             MR. DEATS:  That's correct, Your Honor.
```

| | | |
|---|---|---|
| 10:52:15 | 1 | THE COURT:  All right.  Does the City have anyone |
| 10:52:17 | 2 | they want held back at this time? |
| 10:52:19 | 3 | MR. COPPOLA:  I think juror number 8, Your Honor. |
| 10:52:25 | 4 | THE COURT:  Mr. Parsley? |
| 10:52:26 | 5 | MR. COPPOLA:  Yes, Your Honor. |
| 10:52:26 | 6 | THE COURT:  All right.  Any others? |
| 10:52:29 | 7 | MR. COPPOLA:  I don't believe so, Your Honor. |
| 10:52:45 | 8 | THE COURT:  All right.  Here's what's going to |
| 10:52:47 | 9 | happen.  I'm going to let everybody go but those three.  And |
| 10:52:50 | 10 | then we'll bring them to the bench one at a time.  And as we |
| 10:52:53 | 11 | finish with them, I'll let them go.  Then you'll have your |
| 10:52:56 | 12 | chance to make your challenges for cause, and I'll rule on |
| 10:52:58 | 13 | them.  And then I will take up, as I said, anyone that might be |
| 10:53:04 | 14 | questionable.  And if you both agree, those persons can be |
| 10:53:08 | 15 | cut.  But you have to agree on them. |
| 10:53:11 | 16 | All right.  Thank you. |
| 10:53:12 | 17 | (Open Court, prospective jury panel present) |
| 10:53:23 | 18 | THE COURT:  Ladies and gentlemen of the jury panel, |
| 10:53:25 | 19 | at this time I'm going to give you a recess while we take up |
| 10:53:28 | 20 | things with the lawyers which involve selecting the eight of |
| 10:53:32 | 21 | you that will ultimately try this case.  Now, when I give you a |
| 10:53:36 | 22 | recess, it's going to be until 11:30.  So you'll have a little |
| 10:53:43 | 23 | time.  So you can wander around a little bit.  But be back out |
| 10:53:45 | 24 | in the hallway in front of this courtroom a little before |
| 10:53:50 | 25 | 11:30.  Don't come into the courtroom until you're invited in |

```
10:53:54   1   by either one of the clerk's personnel or by the court security
10:53:58   2   officer.  So just gather in the hallway a couple of minutes
10:54:02   3   before 11:30.
10:54:03   4          Now, it's like school.  Look to your right; look to
10:54:07   5   your left; know who your neighbor is, because you need to be
10:54:11   6   seated when you come back in in the same seats you are now.  So
10:54:16   7   if you haven't already gotten to know your neighbor this
10:54:19   8   morning, know them now, because when you come back in, sit
10:54:23   9   where you are now.
10:54:24  10          Now, there are three of you that need to remain
10:54:27  11   briefly before you get your recess, but it won't be long:
10:54:32  12   Juror number 5, Ms. Rowe; juror number 8, Mr. Parsley; and
10:54:38  13   juror number 10, Mr. Spikes, if you would stay in your seats
10:54:41  14   for a short period of time.  The rest of you are in recess
10:54:45  15   until 11:30.
10:54:47  16       (Open Court, no jury)
10:55:29  17          THE COURT:  Now, y'all didn't do anything wrong.  We
10:55:31  18   just have a couple of extra questions for you.  So let me see
10:55:35  19   the lawyers at the bench.  And, Ms. Rowe, will you come forward
10:55:39  20   to the side of the bench also at this time.
10:55:41  21       (At the bench, on the record)
10:55:54  22          THE COURT:  Now, while you are up here, you're going
10:55:56  23   to have to speak right into this microphone here.
10:55:59  24          All right, Mr. Deats, do you have additional
10:56:02  25   questions of this juror?  And you need to speak into the
```

| | | |
|---|---|---|
| 10:56:05 | 1 | microphone, too. |
| 10:56:06 | 2 | MR. DEATS:  Yeah.  Ms. Rowe, I'm sorry to pry a |
| 10:56:09 | 3 | little bit like this.  But did you make a contact to one of the |
| 10:56:13 | 4 | defendant's attorney's last night via LinkedIn? |
| 10:56:20 | 5 | JUROR ROWE:  No. |
| 10:56:21 | 6 | MS. KNEELAND:  I received -- I don't know if it was |
| 10:56:23 | 7 | last night or over the weekend a friend request from an |
| 10:56:26 | 8 | Angela Rowe. |
| 10:56:28 | 9 | JUROR ROWE:  Oh, that's weird.  I'm not even on |
| 10:56:30 | 10 | LinkedIn. |
| 10:56:30 | 11 | MS. KNEELAND:  Okay.  It was just in an abundance of |
| 10:56:32 | 12 | caution, I felt the need to tell.  I assume your name is not |
| 10:56:36 | 13 | the most uncommon name in the world. |
| 10:56:38 | 14 | JUROR ROWE:  No.  It is not the most uncommon. |
| 10:56:40 | 15 | THE COURT:  All right.  Very good.  Any other |
| 10:56:41 | 16 | questions? |
| 10:56:41 | 17 | MR. DEATS:  No, Your Honor. |
| 10:56:42 | 18 | THE COURT:  Any other from the City? |
| 10:56:43 | 19 | MR. COPPOLA:  No, Your Honor. |
| 10:56:43 | 20 | THE COURT:  All right.  Ms. Rowe, you may be in |
| 10:56:47 | 21 | recess until 11:30. |
| 10:56:49 | 22 | JUROR ROWE:  Okay.  Thank you. |
| 10:56:50 | 23 | THE COURT:  Mr. Parsley, please come forward. |
| 10:56:52 | 24 | This is kind of interesting.  Now, if you'd gotten |
| 10:56:56 | 25 | one from a Lee Yeakel, you would have known.  There's none |

| | | |
|---|---|---|
| 10:56:59 | 1 | other of us around. |
| 10:57:01 | 2 | MS. KNEELAND:  Me too.  So ... |
| 10:57:05 | 3 | THE COURT:  All right.  Come forward, Mr. Parsley, |
| 10:57:06 | 4 | and you need to speak right into this microphone. |
| 10:57:12 | 5 | Mr. Coppola? |
| 10:57:12 | 6 | MR. COPPOLA:  Mr. Parsley, I'm wondering, based on |
| 10:57:15 | 7 | what you've heard today and the questions that have been asked |
| 10:57:18 | 8 | of you and your responses, is there any reason that you can't |
| 10:57:20 | 9 | be an impartial juror in this case? |
| 10:57:23 | 10 | JUROR PARSLEY:  I honestly cannot be impartial in |
| 10:57:25 | 11 | this case.  I feel very strongly about sticking to your |
| 10:57:28 | 12 | original agreements. |
| 10:57:30 | 13 | THE COURT:  All right.  Mr. Deats? |
| 10:57:31 | 14 | MR. DEATS:  I don't have anything further, |
| 10:57:32 | 15 | Your Honor. |
| 10:57:33 | 16 | THE COURT:  All right.  You may be in recess until |
| 10:57:35 | 17 | 11:30. |
| 10:57:37 | 18 | JUROR PARSLEY:  Okay. |
| 10:57:37 | 19 | THE COURT:  And Mr. Spikes? |
| 10:57:51 | 20 | JUROR SPIKES:  Yes, sir. |
| 10:57:52 | 21 | THE COURT:  All right.  Mr. Deats, do you have any |
| 10:57:53 | 22 | further questions of this -- and you're going to have to speak |
| 10:57:57 | 23 | into this microphone. |
| 10:57:57 | 24 | JUROR SPIKES:  Okay. |
| 10:57:59 | 25 | MR. DEATS:  Mr. Spikes, during my voir dire, you |

10:58:01  1  spoke up on a couple of matters, I believe, specifically with

10:58:04  2  regards to expert witnesses.  And I think you also talked some

10:58:07  3  about giving more credence to documentary evidence, perhaps.

10:58:11  4          Given the way that you feel about these things, do

10:58:14  5  you feel that it might affect your ability to be fair and

10:58:17  6  impartial to the plaintiffs in this case because you feel the

10:58:21  7  way you feel?

10:58:22  8          JUROR SPIKES:  No.

10:58:23  9          MR. DEATS:  Okay.  Are you sure -- do you feel

10:58:25  10 confident, then, that you can be fair and impartial to the

10:58:28  11 plaintiffs and that you won't, for example, give more credence

10:58:33  12 to the testimony just because it comes from an expert rather

10:58:36  13 than a plaintiff or something like that.

10:58:37  14         JUROR SPIKES:  Well, yes.  I would give an expert

10:58:40  15 more credence.  Yes.

10:58:41  16         THE COURT:  Well, let me ask you this question:  I'm

10:58:45  17 going to instruct you that you are to weigh an expert's

10:58:49  18 testimony as you would any other witness's testimony with

10:58:53  19 regard to the expert's credibility and demeanor and with what

10:58:58  20 the expert says.

10:59:00  21         An expert is merely someone who is allowed to draw

10:59:04  22 conclusions because they have a particular area of expertise.

10:59:07  23 A juror is not bound to follow the testimony of an expert any

10:59:11  24 more than a juror is bound to follow the testimony of anyone

10:59:14  25 else.  What you are required to do as a juror is to weigh that

10:59:20   1   testimony in the same manner you would weigh any other

10:59:22   2   testimony.

10:59:23   3           Would you be able to do that, or would your position

10:59:26   4   be, merely because I have allowed a person to testify as an

10:59:30   5   expert, you automatically give that person's testimony more

10:59:35   6   weight and would give it more weight before you even hear it

10:59:39   7   and weigh it than you would the testimony of somebody else?

10:59:42   8   That's where the issue is.

10:59:44   9           JUROR SPIKES:  I guess it depends on the topic at

10:59:50  10   hand.  If we're talking about the law, then I would be looking

10:59:53  11   at a lawyer to give me, you know, an expert response in regards

10:59:58  12   to the law.  But in regards to a person's personal opinion on

11:00:02  13   things, as I've dealt with as a manager, I'm usually going to

11:00:06  14   give -- only give that -- their statement credence if they can

11:00:12  15   support it with fact.  I guess it depends on how it's being

11:00:16  16   applied.

11:00:17  17           THE COURT:  The crux of the matter is you would have

11:00:22  18   to base your decision as a juror solely on what you hear in the

11:00:25  19   courtroom based on the exhibits and the testimony and what

11:00:31  20   weight you give that.  If one party or the other called an

11:00:39  21   expert, would that party be ahead or behind in your eyes before

11:00:44  22   you ever hear the expert's testimony?

11:00:46  23           JUROR SPIKES:  No, sir.  If facts were provided in

11:00:47  24   support of other things in contradiction to that, then no.

11:00:51  25           THE COURT:  So other testimony could offset an

```
11:00:53   1   expert's testimony in your mind if -- if it was justified?

11:00:57   2          JUROR SPIKES:  Yes.

11:00:58   3          THE COURT:  Mr. Coppola?

11:00:59   4          MR. COPPOLA:  I don't have any questions, Your Honor.

11:01:00   5          THE COURT:  Mr. Deats, anything further?

11:01:02   6          MR. DEATS:  But the judge's question -- I want to

11:01:05   7   make sure that you understood this.  When the expert takes the

11:01:09   8   stand, because they are labeled an expert, do you automatically

11:01:12   9   give more credence to that testimony than you would to someone

11:01:15  10   who is just testifying as a lay witness?

11:01:20  11          JUROR SPIKES:  Yes.

11:01:21  12          MR. DEATS:  Okay.

11:01:25  13          THE COURT:  Anything further?

11:01:26  14          MR. COPPOLA:  Mr. Spikes, would you be able to follow

11:01:28  15   the judge's instructions on how you should to evaluate the

11:01:32  16   expert's testimony?

11:01:32  17          JUROR SPIKES:  Yes.

11:01:33  18          THE COURT:  All right.  Now, this is important, if

11:01:34  19   you would follow my instructions.  And here is what I'm going

11:01:42  20   to ask you:  The moment the party, the expert takes the stand,

11:01:45  21   before you have heard any evidence or looked at that expert and

11:01:50  22   determined whether he was telling the truth or she was telling

11:01:53  23   the truth or whether she knew what he was talking about or

11:01:56  24   anything of that nature, would that person have more

11:02:00  25   credibility than just any other witness?
```

| | | |
|---|---|---|
| 11:02:05 | 1 | JUROR SPIKES:  Credibility?  Based on being an |
| 11:02:09 | 2 | expert, probably.  But, again, it would be based upon, you |
| 11:02:14 | 3 | know, the substantive facts at the hand and also your guidance |
| 11:02:18 | 4 | to the jury. |
| 11:02:20 | 5 | THE COURT:  All right.  Anything further? |
| 11:02:21 | 6 | MR. COPPOLA:  Nothing. |
| 11:02:23 | 7 | THE COURT:  Anything further? |
| 11:02:24 | 8 | MR. DEATS:  No, Your Honor. |
| 11:02:24 | 9 | THE COURT:  All right.  You may be in recess until |
| 11:02:27 | 10 | 11:30. |
| 11:02:51 | 11 | (Open Court, no jury) |
| 11:02:51 | 12 | THE COURT:  All right.  I will start with the |
| 11:02:52 | 13 | plaintiff.  Mr. Deats, do you have any challenges for cause? |
| 11:02:55 | 14 | MR. DEATS:  Your Honor, I'm going to challenge juror |
| 11:02:57 | 15 | number 8, Donald Parsley, for cause.  I believe he's indicated |
| 11:03:01 | 16 | quite clearly that he cannot be unbiased and he brings some |
| 11:03:06 | 17 | prejudices into the case.  And I believe he should be stuck for |
| 11:03:08 | 18 | cause. |
| 11:03:09 | 19 | THE COURT:  Mr. Coppola? |
| 11:03:10 | 20 | MR. COPPOLA:  I don't have any objection, Your Honor. |
| 11:03:11 | 21 | THE COURT:  All right.  Then juror number 8, |
| 11:03:20 | 22 | Mr. Parsley, the challenge for cause is granted.  Now, |
| 11:03:22 | 23 | Mr. Parsley will come back in with the rest of the jurors.  He |
| 11:03:25 | 24 | will just not be in your strike range.  That will be true of |
| 11:03:28 | 25 | all of the ones.  I'm not going to bring them in and tell them |

```
11:03:31   1   they're gone and, therefore, create a whole lot of questions

11:03:34   2   with other jurors.  So all right.  Mr. Deats, anyone else to

11:03:37   3   challenge for cause?

11:03:38   4            MR. DEATS:  Your Honor, I also move to strike juror

11:03:41   5   number 10, Brent Spikes, for cause.  I believe that he's

11:03:44   6   indicated fairly clearly now that an expert's testimony will be

11:03:47   7   given more weight in his opinion than testimony of other

11:03:51   8   persons and that they automatically get a leg up by being

11:03:54   9   labeled an expert.  And I believe he should be struck for cause

11:03:57  10   on that basis.

11:03:58  11            THE COURT:  Mr. Coppola?

11:03:59  12            MR. COPPOLA:  Your Honor, I think Mr. Spikes

11:04:01  13   indicated pretty clearly as well he would be able to follow

11:04:04  14   your instructions on the matter and that he would in fact

11:04:07  15   consider all of the facts that the expert presents to determine

11:04:10  16   whether or not that expert's testimony should be given credence

11:04:15  17   or should be -- the weight to assign to the expert's testimony.

11:04:18  18            THE COURT:  Mr. Deats, your challenge.  You get the

11:04:21  19   last word.

11:04:22  20            MR. DEATS:  Your Honor, again, he made those

11:04:26  21   statements.  But then when given the opportunity to backtrack,

11:04:29  22   he clearly backtracked on that and said that at the moment they

11:04:32  23   take the stand, they have more credence simply because they are

11:04:35  24   an expert.  I do believe he disqualified himself.

11:04:38  25            THE COURT:  I agree with the plaintiffs on this one.
```

| | | |
|---|---|---|
| 11:04:40 | 1 | The challenge for cause as to juror number 10, Mr. Spikes, is |
| 11:04:43 | 2 | sustained.  Mr. Deats, anything further? |
| 11:04:47 | 3 | MR. DEATS:  Your Honor, I believe that that is all of |
| 11:04:50 | 4 | the challenges that we have for cause. |
| 11:04:52 | 5 | THE COURT:  All right.  Mr. Coppola was -- tell me, |
| 11:04:56 | 6 | is it *Coe-pola* or *Cau-pola*? |
| 11:04:56 | 7 | MR. COPPOLA:  *Coe-pola*, Your Honor. |
| 11:04:58 | 8 | THE COURT:  Coppola.  Okay.  You make the wine. |
| 11:05:00 | 9 | MR. COPPOLA:  Yes, Your Honor.  That's right.  Movies |
| 11:05:03 | 10 | and the wine. |
| 11:05:03 | 11 | THE COURT:  That's good.  We'll make sure we get this |
| 11:05:05 | 12 | wrong.  I apologize if I butchered your name.  Being the victim |
| 11:05:09 | 13 | of that often, I have great sympathy for it. |
| 11:05:12 | 14 | Does the City have any challenges for cause? |
| 11:05:14 | 15 | MR. COPPOLA:  Ms. Kneeland is going to make them, if |
| 11:05:16 | 16 | that's okay, Your Honor. |
| 11:05:17 | 17 | THE COURT:  Yes.  That's fine. |
| 11:05:19 | 18 | MS. KNEELAND:  Yes.  Judge *Yee-kel*, Ms. *Ka-nee-land* |
| 11:05:23 | 19 | here. |
| 11:05:24 | 20 | We would like to challenge -- the City would like to |
| 11:05:25 | 21 | challenge juror 11, Mr. Quijano.  He was pretty clear that he |
| 11:05:29 | 22 | had filed his lawsuit against his employer, wasn't paid |
| 11:05:33 | 23 | overtime, and absolutely could not be fair in an overtime |
| 11:05:36 | 24 | issue. |
| 11:05:38 | 25 | THE COURT:  Mr. Deats? |

| | | |
|---|---|---|
| 11:05:42 | 1 | MR. DEATS:  Your Honor, regretfully, I have to |
| 11:05:45 | 2 | agree.  I think he did indicate that. |
| 11:05:47 | 3 | THE COURT:  All right.  The challenge is sustained. |
| 11:05:53 | 4 | Juror number 11, Mr. Quijano, will not be in your strike range. |
| 11:05:56 | 5 | MS. KNEELAND:  Also the City moves to strike juror 7, |
| 11:05:59 | 6 | Maria Calero.  She testified -- or she voir dired -- |
| 11:06:04 | 7 | THE COURT:  What was her seat number?  Juror |
| 11:06:07 | 8 | number 16. |
| 11:06:09 | 9 | MS. KNEELAND:  Sorry.  Number 16.  I looked at the |
| 11:06:11 | 10 | wrong number.  She testified that she has a lot of very |
| 11:06:15 | 11 | positive experiences with EMS, that they practically lived at |
| 11:06:19 | 12 | her house for some time, and that she would not be able to set |
| 11:06:21 | 13 | aside her sympathies with the people who worked on her and who |
| 11:06:24 | 14 | worked with them. |
| 11:06:25 | 15 | THE COURT:  Mr. Deats? |
| 11:06:26 | 16 | MR. DEATS:  Your Honor, I do tend to disagree with |
| 11:06:30 | 17 | that one.  I think that she did indicate she had a lot of |
| 11:06:33 | 18 | sympathy for EMS employees.  I think that that tends to cut |
| 11:06:36 | 19 | both ways.  I think she has a good impression about the EMS |
| 11:06:38 | 20 | generally and the service they provide.  I did not hear any |
| 11:06:41 | 21 | testimony that indicated that she could not be fair and |
| 11:06:44 | 22 | impartial in terms of evaluating the evidence. |
| 11:06:47 | 23 | THE COURT:  You have no concern that she's an |
| 11:06:49 | 24 | employee of the City? |
| 11:06:52 | 25 | MR. DEATS:  Your Honor, if we're talking about juror |

| 11:06:56 | 1 | number 16, I believe that she said she was a former employee of |
| 11:06:58 | 2 | the City. |
| 11:06:59 | 3 | THE COURT:  Well, that's right.  She was formerly |
| 11:07:01 | 4 | employed by the City. |
| 11:07:02 | 5 | MR. DEATS:  Yes, sir.  And no, sir.  I do not have a |
| 11:07:04 | 6 | concern about that. |
| 11:07:09 | 7 | MS. KNEELAND:  She also did say that they are, quote, |
| 11:07:13 | 8 | awesome.  I just think she has a substantial amount of |
| 11:07:18 | 9 | prejudice in favor of the EMS employees. |
| 11:07:21 | 10 | THE COURT:  I will overrule the challenge for cause |
| 11:07:24 | 11 | on Ms. Calero.  She does have sympathy, but I think she |
| 11:07:29 | 12 | indicated she would listen to the evidence and decide on that |
| 11:07:32 | 13 | basis.  So the objection on challenge for cause on juror |
| 11:07:37 | 14 | number 7 is denied. |
| 11:07:40 | 15 | MR. DEATS:  Your Honor, I'm sorry to interrupt, but I |
| 11:07:42 | 16 | think you're talking about juror number 16. |
| 11:07:45 | 17 | THE COURT:  Juror number 16.  You got me saying it. |
| 11:07:48 | 18 | You dragged me into it now. |
| 11:07:50 | 19 | MS. KNEELAND:  Hopefully it will be the only thing |
| 11:07:52 | 20 | that I will drag you into, Your Honor. |
| 11:07:55 | 21 | THE COURT:  Oh, we've got a long way to go. |
| 11:07:57 | 22 | MS. KNEELAND:  The City would also like to challenge |
| 11:07:59 | 23 | juror number 6, Alma Schell.  She testified -- or she |
| 11:08:05 | 24 | voir dired that she has had positive experiences with EMS. |
| 11:08:12 | 25 | She's very sympathetic to them.  She also says that she |

11:08:17  1  believes that they cannot ever be supervisors if they, quote,

11:08:23  2  always have to be ready and prepared.  And that's going to be a

11:08:27  3  pretty prejudicial point of view from the City's perspective.

11:08:31  4          THE COURT:  Mr. Deats.

11:08:32  5          MR. DEATS:  Your Honor, with regards to Ms. Schell, I

11:08:34  6  mean, that -- that's an issue in contention between the

11:08:37  7  parties, you know, whether the fact that they have to be on

11:08:40  8  call 24 hours a day is an important factor.  The fact that she

11:08:43  9  feels that it is, I don't think means that she's necessarily

11:08:47  10 bias.  And so we would oppose the strike.

11:08:50  11         THE COURT:  Ms. Kneeland.

11:08:51  12         MS. KNEELAND:  I forgot.  She also said that she was

11:08:54  13 talking about this with one of her best friends, and she

11:08:58  14 believed that she can't be fair.  That was in response to one

11:09:01  15 of your very first questions.

11:09:03  16         THE COURT:  I studied Ms. Schell carefully.  She gave

11:09:06  17 numerous answers to numerous questions by the Court, by the

11:09:10  18 plaintiff, by the defendant which indicate to me that she has a

11:09:15  19 very strong opinion about this case.  I do not find she can be

11:09:21  20 fair and impartial.  I sustain the challenge for cause on

11:09:24  21 Ms. Schell.

11:09:31  22         MS. KNEELAND:  The City also challenges the juror in

11:09:33  23 seat 24, Ms. Sheldon.  She is a clerk of the Court -- for JP

11:09:38  24 Courts 1 and 2, Coryell County.  She said that she didn't think

11:09:42  25 she could be fair because of prior experience she had because

| | | |
|---|---|---|
| 11:09:45 | 1 | her husband is a police officer and there's no way that a job |
| 11:09:49 | 2 | description or policies and procedures could in any way |
| 11:09:55 | 3 | encompass all of the job duties that he has to do.  And so I |
| 11:09:59 | 4 | think she would not be able to be fair in this case. |
| 11:10:03 | 5 | THE COURT:  Ms. Demmings, did we satisfy ourselves |
| 11:10:06 | 6 | that Ms. Sheldon resides in our district? |
| 11:10:09 | 7 | THE CLERK:  Oh, yes. |
| 11:10:10 | 8 | THE COURT:  Even though she's a clerk in Coryell |
| 11:10:12 | 9 | County?  Because Coryell County is not in the Austin Division. |
| 11:10:16 | 10 | THE CLERK:  It is. |
| 11:10:16 | 11 | THE COURT:  Coryell is not Austin.  Coryell is in the |
| 11:10:19 | 12 | Waco Division. |
| 11:10:20 | 13 | THE CLERK:  Oh. |
| 11:10:20 | 14 | MS. KNEELAND:  Her juror questionnaire indicates that |
| 11:10:22 | 15 | she resides in Lampasas County where her husband is a police |
| 11:10:26 | 16 | officer. |
| 11:10:26 | 17 | THE CLERK:  Yes.  That's right. |
| 11:10:27 | 18 | THE COURT:  Mr. Deats, response to Ms. Sheldon? |
| 11:10:29 | 19 | MR. DEATS:  Your Honor, I don't think we oppose that |
| 11:10:31 | 20 | one. |
| 11:10:31 | 21 | THE COURT:  All right.  Then the challenge for cause |
| 11:10:33 | 22 | as to Ms. Sheldon is sustained.  Anything further, |
| 11:10:36 | 23 | Ms. Kneeland. |
| 11:10:41 | 24 | MS. KNEELAND:  If I could read my writing, I think I |
| 11:10:43 | 25 | do have something further.  Let me just compare for a moment, |

11:10:47   1   Your Honor, please.

11:11:03   2          We also -- the City would also challenge the juror in

11:11:06   3   seat number 3, Ms. Basinger.  She had a claim against her

11:11:10   4   employer for unemployment and they wouldn't pay her.  I think

11:11:14   5   she would not be disposed to be fair toward employers and

11:11:18   6   nonpayment of any kind.

11:11:21   7          THE COURT:  Mr. Deats?

11:11:22   8          MR. DEATS:  Your Honor, we do oppose that.  I don't

11:11:24   9   believe she testified in any way that she would be unfair and

11:11:27  10   impartial in this case.  The simple fact that she had a prior

11:11:30  11   claim against an employer years ago doesn't make her an unfair

11:11:34  12   or partial juror towards the plaintiffs, and we would oppose

11:11:37  13   that strike.

11:11:38  14          THE COURT:  Ms. Kneeland, you get the last word.

11:11:47  15          MS. KNEELAND:  That's all I have on that one.

11:11:48  16          THE COURT:  All right.  The challenge for cause will

11:11:51  17   be denied.  Even though she had that in her background, she did

11:11:55  18   not indicate at any time that she could not put it behind her

11:12:00  19   and reach a fair and impartial decision in this case.

11:12:04  20          Any other challenges for cause from the City?

11:12:08  21          MS. KNEELAND:  The city also challenges the juror in

11:12:16  22   seat 26 for cause.  She is a TWC worker.  She does unemployment

11:12:28  23   claims.  She has an awful lot of legal experience.  Despite the

11:12:31  24   fact that she said she could put her experiences behind her,

11:12:35  25   she seemed to have her mind made up on an awful lot of things

11:12:39  1  when she was specifically voir dired, and we don't think she

11:12:45  2  can be fair to the City.

11:12:46  3         THE COURT:  Mr. Deats?

11:12:47  4         MR. DEATS:  Your Honor, I did hear her testify that

11:12:48  5  she had a lot of legal experience.  I don't know how much this

11:12:51  6  matters because it doesn't look like we're going to get down

11:12:53  7  that far in the panel, given that we each have three

11:12:57  8  peremptories.  But I don't think I heard anything that

11:12:58  9  indicated she could be less than fair and impartial.

11:13:02  10         THE COURT:  Ms. Kneeland?

11:13:04  11         MS. KNEELAND:  I rest on what I have there.

11:13:06  12         THE COURT:  All right.  The challenge will be

11:13:08  13  denied.  I did not hear her -- even though she is a lawyer,

11:13:13  14  even though she has a legal background, even though she has

11:13:16  15  knowledge of legal issues which could involve this case, she

11:13:19  16  indicated no prejudice.  And lawyers are not barred by law from

11:13:23  17  serving on juries.  Any other challenges for cause?

11:13:28  18         MS. KNEELAND:  One last.  The juror in seat 14,

11:13:32  19  Ms. Ontiberos.  She indicated that she would be partial to

11:13:37  20  EMS.  She said specifically the word "partial."  She also slept

11:13:43  21  through about a third of the selection, so I don't think she

11:13:45  22  would be a fair juror for either party.

11:13:48  23         THE COURT:  Mr. Deats?

11:13:50  24         MR. DEATS:  Your Honor, I'm looking at my notes real

11:13:53  25  hastily.  I see that she's the owner of her own business.

| | | |
|---|---|---|
| 11:13:55 | 1 | She's had complaints filed against her.  Her sister is a |
| 11:13:59 | 2 | nurse.  She did say that EMS saves lives.  But I didn't hear |
| 11:14:03 | 3 | her say anything in that that would cut more towards the |
| 11:14:05 | 4 | plaintiffs than the employer, EMS.  And so I would ask that |
| 11:14:10 | 5 | this challenge be denied. |
| 11:14:11 | 6 | THE COURT:  Ms. Kneeland? |
| 11:14:12 | 7 | MS. KNEELAND:  She specifically said the word, that |
| 11:14:14 | 8 | she would be partial to EMS. |
| 11:14:17 | 9 | THE COURT:  Yes, she did.  And I will sustain the |
| 11:14:27 | 10 | challenge for cause as to juror number 14, Ms. Ontiberos. |
| 11:14:35 | 11 | MS. KNEELAND:  Since I said that would be my last |
| 11:14:37 | 12 | one, I'll stick to my word, Your Honor. |
| 11:14:38 | 13 | THE COURT:  That's good.  That's a good precedent to |
| 11:14:41 | 14 | start in a trial. |
| 11:14:42 | 15 | All right.  I really did not note anyone that we have |
| 11:14:52 | 16 | not already talked about that I thought indicated that they |
| 11:14:54 | 17 | were going to have a hard time serving on this jury or that I |
| 11:14:59 | 18 | thought might become a loose cannon.  Mr. Deats, I start with |
| 11:15:03 | 19 | you.  Do you have anybody so noted that you would like to bring |
| 11:15:09 | 20 | up? |
| 11:15:09 | 21 | MR. DEATS:  No, Your Honor.  I think we've covered |
| 11:15:11 | 22 | the ones that -- we're still on the ... |
| 11:15:14 | 23 | THE COURT:  Well, this is just the voluntary thing. |
| 11:15:17 | 24 | We're through with challenges for cause. |
| 11:15:18 | 25 | MR. DEATS:  Yes, sir. |

| | | |
|---|---|---|
| 11:15:20 | 1 | MR. COPPOLA:  No, Your Honor.  I don't think there's |
| 11:15:21 | 2 | anybody else that falls into that category. |
| 11:15:23 | 3 | THE COURT:  All right.  Then if I have counted |
| 11:15:38 | 4 | correctly -- and check me on this -- the last juror on your |
| 11:15:41 | 5 | strike range would be Warren James, seat 19.  Mr. Deats, do you |
| 11:15:47 | 6 | concur? |
| 11:15:48 | 7 | MR. DEATS:  Yes, Your Honor.  That's my count as |
| 11:15:50 | 8 | well. |
| 11:15:51 | 9 | THE COURT:  And, Mr. Coppola, Ms. Kneeland, do you |
| 11:15:53 | 10 | concur? |
| 11:15:53 | 11 | MR. COPPOLA:  Yes, Your Honor.  That matches our |
| 11:15:55 | 12 | count. |
| 11:15:55 | 13 | THE COURT:  All right.  Then don't strike anybody |
| 11:15:58 | 14 | beyond that.  I think you should be able to get your strikes |
| 11:16:06 | 15 | made in 15 minutes.  So I'll be back at 11:30.  We'll still |
| 11:16:09 | 16 | have the jurors out.  Ms. Demmings, don't bring them in until I |
| 11:16:13 | 17 | am.  When you've stricken your list, give them to Ms. Jones, |
| 11:16:16 | 18 | who will bring them to me.  And then we'll be in about 11:30, |
| 11:16:21 | 19 | get the jury in the box and give them preliminary instructions, |
| 11:16:25 | 20 | and then we will recess for the noon hour.  So Court's in |
| 11:16:29 | 21 | recess. |
| 11:16:30 | 22 | (Recess) |
| 11:32:26 | 23 | (Open Court, no jury) |
| 11:32:26 | 24 | THE COURT:  Let the record reflect it's now about |
| 11:32:28 | 25 | 11:33.  All of the jury panel, the prospective jurors, are |

| | | |
|---|---|---|
| 11:32:38 | 1 | absent from the courtroom.  Have the lawyers had an opportunity |
| 11:32:41 | 2 | to review one another's strike list? |
| 11:32:42 | 3 | MR. COPPOLA:  Yes, Your Honor. |
| 11:32:43 | 4 | MR. DEATS:  Yes, Your Honor. |
| 11:32:44 | 5 | THE COURT:  All right.  Are you satisfied as to who |
| 11:32:46 | 6 | the six are who will comprise your jury? |
| 11:32:48 | 7 | MR. DEATS:  I'm sorry.  You mean the eight, |
| 11:32:49 | 8 | Your Honor? |
| 11:32:49 | 9 | THE COURT:  The eight.  I'm sorry. |
| 11:32:52 | 10 | MR. DEATS:  Yes, sir. |
| 11:32:53 | 11 | MR. COPPOLA:  Yes, Your Honor. |
| 11:32:54 | 12 | THE COURT:  All right.  Do we have any other |
| 11:33:03 | 13 | questions or challenges before the jury is brought in and |
| 11:33:06 | 14 | seated?  Any *Batson* challenges or anything of that nature? |
| 11:33:10 | 15 | MR. DEATS:  Your Honor, I have no *Batson* challenges. |
| 11:33:12 | 16 | MR. COPPOLA:  No, Your Honor. |
| 11:33:13 | 17 | THE COURT:  All right.  Thing bring in the jury |
| 11:33:15 | 18 | panel, please. |
| 11:34:11 | 19 | (Open Court, prospective jury panel present) |
| 11:34:11 | 20 | THE COURT:  All right.  Ladies and gentlemen of the |
| 11:34:20 | 21 | jury panel, welcome back.  We have completed our work. |
| 11:34:24 | 22 | Ms. Jones, would you please read the names of those to be |
| 11:34:29 | 23 | impaneled as jurors here this morning.  And as your name is |
| 11:34:34 | 24 | called, will you come through the gate and through the well of |
| 11:34:37 | 25 | the courtroom and around over here to my left, where |

| | | |
|---|---|---|
| 11:34:39 | 1 | Mr. Menefee, the court security officer, is and he will seat |
| 11:34:42 | 2 | you. |
| 11:34:43 | 3 | Ms. Jones? |
| 11:34:44 | 4 | THE CLERK:  The first juror is Ashley -- I mean, |
| 11:34:47 | 5 | Shirley Ashbrook.  Number 2 is Milan Matic.  Number 3 is |
| 11:34:57 | 6 | Arnulfo Flores.  Number 4 is Mark Ferguson.  Number 5 is |
| 11:35:05 | 7 | Scott Talkington. |
| 11:35:07 | 8 | THE COURT:  Come on.  All of you look happy about |
| 11:35:09 | 9 | this.  Quit looking so glum when your names are called.  The |
| 11:35:12 | 10 | rest of you don't look so received when somebody next to you |
| 11:35:16 | 11 | gets up. |
| 11:35:17 | 12 | THE CLERK:  Number 6, Andrea Petit.  Number 7, |
| 11:35:23 | 13 | Thomas Neff.  And, number 8, Warren James. |
| 11:35:33 | 14 | THE COURT:  For the remaining members of the jury |
| 11:35:51 | 15 | panel this morning:  Let me once again thank you for being here |
| 11:35:54 | 16 | and being present today.  Your role, even though you were not |
| 11:35:59 | 17 | selected for the jury, is every bit as important as those -- |
| 11:36:03 | 18 | that of those persons who were selected for the jury because |
| 11:36:07 | 19 | only if we call more jurors than we need are we able to get a |
| 11:36:16 | 20 | jury that is satisfactory to both parties and, under our |
| 11:36:20 | 21 | system, a jury of their peers.  And I know I speak for the |
| 11:36:23 | 22 | parties and their attorneys when I thank you for your time and |
| 11:36:26 | 23 | patience today. |
| 11:36:32 | 24 | With that, you are excused.  If your service is |
| 11:36:35 | 25 | needed during this term of court, the clerk's office will |

| | | |
|---|---|---|
| 11:36:38 | 1 | contact you.  So you're not totally free, and you might get |
| 11:36:41 | 2 | recalled.  If you have not voted, please vote this afternoon or |
| 11:36:45 | 3 | tomorrow.  Again, thank you for your service, and you are |
| 11:36:47 | 4 | excused. |
| 11:37:18 | 5 | (Prospective jurors excused) |
| 11:37:18 | 6 | THE COURT:  Will the members of the jury please stand |
| 11:37:19 | 7 | and raise your right hands.  And, Ms. Jones, would you please |
| 11:37:23 | 8 | administer the oath as jurors. |
| 11:37:26 | 9 | (Jury panel sworn) |
| 11:37:47 | 10 | THE COURT:  Please be seated. |
| 11:37:53 | 11 | Members of the jury, now that you have been sworn, I |
| 11:37:56 | 12 | will give you some preliminary instructions to guide you in |
| 11:37:59 | 13 | your participation in the trial.  It will be your duty to find |
| 11:38:03 | 14 | from the evidence what the facts are you.  You and you alone |
| 11:38:08 | 15 | are the judges of the facts.  You will then have to apply those |
| 11:38:13 | 16 | facts to the law as the Court will give it to you.  You must |
| 11:38:17 | 17 | follow the law whether you agree with it or not. |
| 11:38:21 | 18 | Nothing the Court may say or do during the course of |
| 11:38:24 | 19 | the trial is intended to indicate, nor should it be taken by |
| 11:38:29 | 20 | you as indicating, what your verdict should be. |
| 11:38:33 | 21 | The evidence from which you will find the facts will |
| 11:38:36 | 22 | consist of, one, the testimony of witnesses; two, written |
| 11:38:40 | 23 | documents and other things received into the record as |
| 11:38:44 | 24 | exhibits; three, any facts the lawyers agree or stipulate to or |
| 11:38:49 | 25 | that the Court may instruct you to find; and, four, any |

11:38:53  1  applicable presumptions.

11:38:56  2        Certain things are not evidence and must not be

11:38:59  3  considered by you.  I will list them for you now.

11:39:03  4        One, statements, arguments, and questions by lawyers

11:39:06  5  are not evidence;

11:39:08  6        Two, objections to questions are not evidence.

11:39:12  7  Lawyers have an obligation to their client to make an objection

11:39:19  8  when they believe evidence that being offered is improper under

11:39:22  9  rules of evidence.  You should not be influenced by the

11:39:25  10  objection or by the Court's ruling on it.  If the objection is

11:39:28  11  sustained, ignore the question.  If the objection is overruled,

11:39:32  12  treat the answer like any other.  If you are instructed that

11:39:36  13  some item of evidence is received for a limited purpose only,

11:39:40  14  you must follow that instruction, whatever it may be;

11:39:44  15        Three, testimony that the Court has excluded or told

11:39:48  16  you to disregard is not evidence and must not be considered;

11:39:52  17        Four, anything you may have seen or heard outside the

11:39:56  18  courtroom is not evidence and must be disregarded.  You are to

11:40:01  19  decide the case solely on the evidence presented here in this

11:40:04  20  courtroom.

11:40:05  21        There are two kinds of evidence, direct and

11:40:12  22  circumstantial.  Direct evidence is direct proof of a fact,

11:40:14  23  such as the testimony of an eyewitness.  Circumstantial

11:40:18  24  evidence is proof of facts from which you may infer or conclude

11:40:22  25  that other facts exist.  I will give you further instructions

| | | |
|---|---|---|
| 11:40:27 | 1 | on these as well as other matters at the end of the case, but |
| 11:40:31 | 2 | have in mind that you may consider both kinds of evidence; that |
| 11:40:34 | 3 | is, both direct and circumstantial evidence. |
| 11:40:40 | 4 | It is up to you to decide which witnesses to believe, |
| 11:40:43 | 5 | which witnesses not to believe, and how much of any witness's |
| 11:40:46 | 6 | testimony to accept or reject.  I will give you some guidelines |
| 11:40:53 | 7 | for determining the credibility of witnesses at the end of the |
| 11:40:55 | 8 | case. |
| 11:40:56 | 9 | Now, a few words to you about your conduct as |
| 11:40:58 | 10 | jurors.  Keep an open mind during the trial and give careful |
| 11:41:03 | 11 | attention to the testimony and evidence presented for your |
| 11:41:09 | 12 | consideration during the trial.  Although exhibits which I |
| 11:41:11 | 13 | admit into evidence during the course of the trial will be |
| 11:41:14 | 14 | available to you for your inspection and review during your |
| 11:41:18 | 15 | deliberations on the verdict, under normal circumstances, no |
| 11:41:21 | 16 | written transcript of the testimony of witnesses can be made |
| 11:41:26 | 17 | available to you for your review during your deliberations. |
| 11:41:30 | 18 | Nor under normal circumstances can all or any significant |
| 11:41:35 | 19 | portion of a witness's testimony be read to you once you |
| 11:41:38 | 20 | commence your deliberations. |
| 11:41:40 | 21 | It is therefore very important that you pay strict |
| 11:41:42 | 22 | attention to the testimony given by each witness during the |
| 11:41:46 | 23 | trial of the case.  Do not decide any fact or form or express |
| 11:41:53 | 24 | any opinion about the case one way or the other until you have |
| 11:41:57 | 25 | heard all of the evidence and have had the benefit of the |

11:42:01   1   closing arguments of the lawyers and my instructions on the

11:42:05   2   applicable law.

11:42:06   3          During the trial you must not discuss the case in any

11:42:10   4   manner among yourselves or with anyone else, and you must not

11:42:14   5   permit anyone to attempt to discuss it with you or in your

11:42:18   6   presence.  And, insofar as the lawyers are concerned, as well

11:42:21   7   as others within whom you may come in contact or with whom you

11:42:26   8   may recognize as having some connection with the case, you are

11:42:29   9   instructed that in order to avoid even the appearance of

11:42:33   10  impropriety, you should have no conversation, whatever, with

11:42:37   11  those persons while you are serving on the jury.

11:42:40   12         After you retire to deliberate, you may begin

11:42:44   13  discussing the case with your fellow jurors, but you cannot

11:42:48   14  discuss the case with anyone else until you have returned a

11:42:52   15  verdict and the case is at an end.

11:42:54   16         I hope that for all of you this case is interesting

11:42:57   17  and noteworthy.  I know that many of you use cell phones,

11:43:02   18  Blackberries, the Internet, and other tools of technology.  You

11:43:07   19  must not talk to anyone about this case or use these tools to

11:43:11   20  communicate electronically with anyone about the case.  This

11:43:15   21  includes your family and friends.

11:43:18   22         You may not communicate with anyone about the case on

11:43:21   23  your cell phone, your E-mail, Blackberry, iPhone, text

11:43:26   24  messaging or on Twitter or any blog or Web site, any Internet

11:43:31   25  chat room, or by way of any social networking Web sites,

11:43:35 1  including Facebook, Myspace, LinkedIn, and YouTube.

11:43:40 2          Now, Mr. Menefee is our court security officer, whom

11:43:44 3  you will get to know during this case.  He looks like a nice

11:43:47 4  man.  Do not be fooled.  If he sees you trying to communicate

11:43:51 5  with anyone on any of the devices I have mentioned about this

11:43:54 6  case, he will take it from you in your presence and throw it to

11:43:58 7  the ground and stop it into small pieces.  He will do that

11:44:02 8  because I have instructed him to do that.

11:44:04 9          There are problems around the country with people

11:44:06 10 trying to communicate about a case when they are on juries.  We

11:44:10 11 have not had a problem here, and we do not want to have a

11:44:13 12 problem.  So understand that.

11:44:15 13         Nor may you attempt to conduct any independent

11:44:19 14 investigation concerning this case.  You must avoid reading any

11:44:23 15 newspaper articles that might be published about the case now

11:44:26 16 that the trial is in progress, and you must avoid listening to

11:44:30 17 or observing any broadcast news program on either television or

11:44:35 18 radio because of the possibility that mention might be made of

11:44:39 19 this case during such a broadcast.

11:44:41 20         You may not consult dictionaries or reference

11:44:44 21 materials, search the Internet, Web sites, blogs or use any

11:44:49 22 electronic tool to obtain information about the case or to help

11:44:53 23 you to decide the case.  Please do not try to find out

11:44:56 24 information from any source outside the confines of this

11:45:00 25 courtroom.

11:45:01  1         Now, the reason for this caution, of course, lies in

11:45:04  2  the fact that it will be your duty to decide the case solely on

11:45:08  3  the basis of the testimony and evidence presented here during

11:45:12  4  the trial, without consideration of any other matters

11:45:16  5  whatsoever.

11:45:19  6         From time to time during the trial, I may be called

11:45:22  7  upon to make rulings of law on motions or objections made by

11:45:25  8  lawyers.  You should not infer or conclude from any ruling I

11:45:30  9  may make that I have any opinions on the merits of the case

11:45:34  10 favoring one side or the other.  And if I sustain an objection

11:45:38  11 to a question that goes unanswered by the witness, you should

11:45:44  12 not speculate on what the answer might -- on what answer might

11:45:47  13 have been given, nor should you draw any inferences or

11:45:50  14 conclusions from the question itself.

11:45:53  15        During the trial it may be necessary for me to confer

11:45:56  16 with the lawyers from time to time out of your hearing

11:46:00  17 concerning questions of law or procedure that require

11:46:03  18 consideration by the Court alone.  On some occasions you may be

11:46:09  19 excused from the courtroom as a convenience to you and to us

11:46:13  20 while I discuss such matters with the lawyers.  We will try to

11:46:16  21 limit such interruptions as much as possible, but you should

11:46:19  22 remember at all times the importance of the matter you are here

11:46:22  23 to determine and you should be patient even though the case may

11:46:33  24 seem to go slowly.

11:46:35  25        Before we commence the trial, we will break for

11:46:38  1  lunch.  But let me tell you what will occur when we come back.

11:46:41  2  The lawyers for each side will be given an opportunity to make

11:46:44  3  an opening statement in which they may explain the issues of

11:46:47  4  the case and summarize the facts they expect the evidence will

11:46:50  5  show.

11:46:50  6        First the attorney for the plaintiffs will make an

11:46:53  7  opening statement which, again, is simply an outline to help

11:46:57  8  you understand the evidence that the plaintiffs' attorneys

11:47:02  9  expects to introduce.  Next the attorney for the defendant will

11:47:05  10  make an opening statement.

11:47:07  11       The plaintiffs will then present their witnesses, and

11:47:10  12  the lawyers for the defendant may cross-examine those

11:47:13  13  witnesses.

11:47:17  14       Following the plaintiff's case, the defendant may

11:47:19  15  present witnesses and the plaintiffs will have the opportunity

11:47:21  16  to cross-examine them.

11:47:23  17       Subsequently, rebuttal witnesses may be presented.

11:47:27  18       After all of the testimony and evidence has been

11:47:29  19  presented, the lawyers will then be given another opportunity

11:47:32  20  to address you and make summations, or final arguments, in the

11:47:36  21  case.

11:47:38  22       The statements the lawyers make at the beginning of

11:47:41  23  this case as well as the arguments they present at the end of

11:47:45  24  the trial are not to be considered by you either as evidence in

11:47:49  25  the case, which comes only from the witnesses and exhibits, or

| 11:47:54 | 1 | as your instruction on the law, which will come only from me. |
| 11:47:58 | 2 | Nevertheless, these statements and arguments are |
| 11:48:02 | 3 | intended to help you determine the issues and the evidence as |
| 11:48:04 | 4 | it comes in as well as the positions taken by both sides. |
| 11:48:09 | 5 | Now, before I recess you for lunch, let me tell you a |
| 11:48:13 | 6 | few things about our work schedule so you may notify employers |
| 11:48:17 | 7 | or family members.  We are going to recess today until 1:30 for |
| 11:48:22 | 8 | lunch.  You should be back in your jury room a little before |
| 11:48:26 | 9 | 1:30.  And Mr. Menefee is going to show you where your jury |
| 11:48:29 | 10 | room is, and that is to where you will report each time. |
| 11:48:34 | 11 | We will work today until 5 o'clock, or as close to |
| 11:48:37 | 12 | 5 o'clock as there is a reasonable stopping place in the |
| 11:48:41 | 13 | evidence.  It might be a little before 5:00; it might be a |
| 11:48:46 | 14 | little after 5:00.  But we will generally stop at about |
| 11:48:48 | 15 | 5 o'clock. |
| 11:48:50 | 16 | And then for the remaining days of the trial, you |
| 11:48:53 | 17 | should be in your jury room a little before 9 o'clock because |
| 11:48:58 | 18 | we will start at 9:00, we will work until noon or as close to |
| 11:49:02 | 19 | noon as there is a convenient stopping point in the evidence, |
| 11:49:06 | 20 | and we will try to return each day at 1:30. |
| 11:49:09 | 21 | Although, as I mentioned during the voir dire |
| 11:49:14 | 22 | examination, all of the other cases I have do not stop because |
| 11:49:17 | 23 | I'm trying this one.  So there may be times when I will have to |
| 11:49:20 | 24 | take up matters over the noon hour, and I may not have you back |
| 11:49:24 | 25 | until 2:00.  But you will know when you recess at noon whether |

11:49:28   1   you're coming back at 1:30 or 2:00, and it will -- we're going

11:49:31   2   to shoot for 1:30 every day.  And then we will work until

11:49:34   3   5 o'clock or around 5 o'clock, where there is a convenient

11:49:41   4   stopping place in the evidence.

11:49:42   5          We will take a mid-morning recess of 15 minutes and a

11:49:46   6   mid-afternoon recess of 15 minutes.  There will not ever be a

11:49:51   7   time when you will require -- be required to be seated in your

11:49:54   8   jury box for more than two hours.  And so that's the schedule I

11:49:59   9   want to keep.  So try to gauge what you drink to where you can

11:50:03  10   sit there for two hours.

11:50:04  11          As you may have noticed, the temperature in this

11:50:06  12   76-year-old courtroom does not stay constant.  There are times

11:50:10  13   when we will start the case when you need to be in a heavy

11:50:14  14   coat.  And by the middle of the afternoon, you will need to be

11:50:17  15   wearing shorts, and vice versa.  It may start hot and end up

11:50:21  16   cold.  We are hopeful that that will be one of things we get in

11:50:25  17   the new courthouse.  So you might want to bring various

11:50:29  18   articles of clothing because I don't know what you're going to

11:50:32  19   need because, believe me, the powers of a federal judge are

11:50:36  20   greatly overrated.  I cannot control the temperature in this

11:50:39  21   courtroom.  That is your General Services Administration.  So

11:50:43  22   you're going to have to deal appropriately with that.

11:50:47  23          The reason we will not generally start before 9:00 or

11:50:52  24   go after 5:00 is because I realize we have traffic problems in

11:50:57  25   Austin and some of you have distances to drive.  If you're

| | | |
|---|---|---|
| 11:51:01 | 1 | getting tied up in traffic or something happens and you have a |
| 11:51:04 | 2 | cell phone, please try to contact the clerk's office and let us |
| 11:51:08 | 3 | know.  Otherwise, we will be patient and wait for you to get |
| 11:51:12 | 4 | here.  But try to be here a little before 9:00, and then we're |
| 11:51:15 | 5 | going to try to get you out of here by 5:00. |
| 11:51:17 | 6 | Now, before we recess, let me give you instructions |
| 11:51:20 | 7 | that you will hear a lot of as we go along.  Well, let me say |
| 11:51:24 | 8 | one other thing because I knew this this morning.  Friday will |
| 11:51:28 | 9 | be different.  We will work until noon, and then we will recess |
| 11:51:32 | 10 | at noon on Friday and will not come back until 9 o'clock on |
| 11:51:35 | 11 | Tuesday because, as I said earlier, I have another matter I |
| 11:51:38 | 12 | have to attend to Friday afternoon that I couldn't reschedule |
| 11:51:43 | 13 | because of this trial and Monday is a federal holiday. |
| 11:51:47 | 14 | Now, I wouldn't mind working the lawyers on Monday |
| 11:51:50 | 15 | because they're getting paid for what they do.  I wouldn't mind |
| 11:51:53 | 16 | working for me because I'm appointed for life.  You get the |
| 11:51:57 | 17 | grand sum of whatever we pay you, so I wouldn't mind working |
| 11:52:01 | 18 | you.  But the employees of this building do not get paid any |
| 11:52:07 | 19 | overtime.  And so they cherish, as I do, these random federal |
| 11:52:11 | 20 | holidays, so that is why we will not work on Monday. |
| 11:52:15 | 21 | But that will give you a three and a half-day weekend |
| 11:52:17 | 22 | to try to catch up on the family matters or your business |
| 11:52:21 | 23 | matters because I know it is an imposition for you to serve on |
| 11:52:25 | 24 | a jury, and we are grateful. |
| 11:52:27 | 25 | Now, as we take our first break during the trial, let |

11:52:30  1  me remind you of the instructions I just gave you.  Until the

11:52:34  2  trial is over, do not discuss this case with anyone, including

11:52:38  3  your fellow jurors, members of your family, people involved in

11:52:41  4  the trial, or anyone else.  If anyone approaches you and tries

11:52:45  5  to talk to you about the case, do not tell your fellow jurors,

11:52:49  6  but advise me about it immediately.  And you may do that by

11:52:53  7  letting the court security officer, Mr. Menefee, know.

11:52:56  8          Do not read or listen to any news reports of the

11:52:59  9  trial.  Do not observe any television broadcasts that may

11:53:03  10  contain information about this trial.  Do not use any

11:53:07  11  electronic device whatsoever to gain information about this

11:53:11  12  case or transmit information about this case.  And, finally,

11:53:15  13  remember to keep an open mind until all the evidence has been

11:53:18  14  received and you have heard the views of your fellow jurors.

11:53:21  15          If you need to speak with me about anything, simply

11:53:25  16  give a signed note to the court security officer to give to

11:53:31  17  me.  Now, I may not repeat these things to you before every

11:53:35  18  break that we take, although I will try to.  But keep all of

11:53:38  19  them in mind throughout the trial and act in accordance with

11:53:40  20  them during any breaks.

11:53:42  21          At this time your in recess until 1:30.  Be back in

11:53:45  22  your jury room a little bit before 1:30.

11:53:48  23      (Open Court, no jury)

11:54:12  24          THE COURT:  All right.  Ladies and gentlemen, what

11:54:14  25  we'll do when we come back at 1:30, we'll have the open

```
11:54:17   1   statements by the lawyers.  You'll recall that we worked out
11:54:23   2   that you will each have 20 minutes to the side to open.
11:54:29   3   Immediately after the opening statements, I will read to the
11:54:33   4   jury your stipulated facts, and I will admit into evidence the
11:54:37   5   exhibits that you've agreed and have no objections to
11:54:41   6   admissibility.  So when you commence your part of the trial,
11:54:45   7   you can presume those stipulated facts and exhibits are in
11:54:50   8   evidence.
11:54:51   9            Is there anything further that we need to take up at
11:54:56  10   this time before we recess?
11:54:58  11            MR. COPPOLA:  Your Honor, in terms of reading
11:55:00  12   stipulations, the defendant has an exhibit, Exhibit 57, which
11:55:04  13   is a request -- Plaintiffs' answer to a request for admission,
11:55:08  14   which we would ask the Court to read to the jury as well.
11:55:12  15            THE COURT:  Mr. Deats?
11:55:15  16            MR. DEATS:  Your Honor, I -- that's rather unusual,
11:55:18  17   but I guess it's the -- is it the deal with the salary basis
11:55:23  18   issue?
11:55:24  19            MR. COPPOLA:  Yes.
11:55:24  20            MR. DEATS:  Okay.
11:55:25  21            THE COURT:  All right.  So that is exhibit -- let me
11:55:29  22   just make sure we're all on the same page -- Defendant's
11:55:35  23   Exhibit 57?
11:55:37  24            MR. COPPOLA:  Yes, Your Honor.  It's request for
11:55:38  25   admission number one.
```

| | | |
|---|---|---|
| 11:55:44 | 1 | THE COURT:  You want me to read number one, or do you |
| 11:55:47 | 2 | want me to read the five admissions? |
| 11:55:49 | 3 | MR. COPPOLA:  I want you to read the admission to |
| 11:55:51 | 4 | request for admission number one, Your Honor. |
| 11:55:53 | 5 | THE COURT:  All right.  Mr. Deats, it is an |
| 11:56:00 | 6 | admission, with -- do you have objection to my reading it? |
| 11:56:03 | 7 | MR. DEATS:  You're talking about request for |
| 11:56:05 | 8 | admission number one, Your Honor? |
| 11:56:07 | 9 | THE COURT:  Yes. |
| 11:56:07 | 10 | MR. DEATS:  And request -- any other requests? |
| 11:56:09 | 11 | MR. COPPOLA:  No. |
| 11:56:10 | 12 | THE COURT:  Only number one Mr. Coppola has |
| 11:56:15 | 13 | mentioned. |
| 11:56:15 | 14 | MR. DEATS:  Your Honor, no, I don't have any |
| 11:56:17 | 15 | objection. |
| 11:56:17 | 16 | THE COURT:  All right.  Then I will read the |
| 11:56:19 | 17 | stipulated facts and the request for admission number one and |
| 11:56:22 | 18 | the response. |
| 11:56:22 | 19 | MR. COPPOLA:  And, Your Honor, the only -- the only |
| 11:56:25 | 20 | other thing I'd ask is that in the request itself, there is a |
| 11:56:28 | 21 | misstatement.  I wrote "division commander" instead of |
| 11:56:32 | 22 | "district commander."  I think the plaintiffs would agree it |
| 11:56:35 | 23 | should be "district commander." |
| 11:56:36 | 24 | THE COURT:  All right.  We will take that up when we |
| 11:56:38 | 25 | get back to including that in the charge.  So call that to my |

| | | |
|---|---|---|
| 11:56:41 | 1 | attention again. |
| 11:56:42 | 2 | MR. COPPOLA:  Okay. |
| 11:56:43 | 3 | THE COURT:  I am sure that the statements of your |
| 11:56:46 | 4 | parts of the case have now long been forgotten by the jury. |
| 11:56:51 | 5 | And when they come back, we're going to have to do that |
| 11:56:53 | 6 | anyway.  So I don't think we're in any danger with that at this |
| 11:56:56 | 7 | point.  But be sure to bring that up when we're going over the |
| 11:56:59 | 8 | charge. |
| 11:56:59 | 9 | MR. COPPOLA:  Okay.  Thank you, Your Honor. |
| 11:57:01 | 10 | THE COURT:  Anything further? |
| 11:57:02 | 11 | MR. COPPOLA:  Not at this time, Your Honor. |
| 11:57:03 | 12 | MR. DEATS:  Your Honor, I question the need for it as |
| 11:57:05 | 13 | an exhibit if in fact it's going to be read in as part of the |
| 11:57:09 | 14 | stipulations.  But ... |
| 11:57:10 | 15 | THE COURT:  Well, I'll take that up as we -- well, if |
| 11:57:13 | 16 | it's -- if there's not an objection to it, the admissions can |
| 11:57:17 | 17 | be brought in.  It's a little redundant, but it won't take |
| 11:57:22 | 18 | long.  So I will -- if it's an exhibit, I'll take it up as I |
| 11:57:27 | 19 | would any exhibits.  Anything further, Mr. Deats? |
| 11:57:30 | 20 | MR. DEATS:  Nothing further at this time, Your Honor. |
| 11:57:32 | 21 | THE COURT:  All right.  Let me remind you to stay in |
| 11:57:34 | 22 | close contact during this trial on which witnesses are |
| 11:57:38 | 23 | upcoming.  I reiterate I don't want to create any gaps in |
| 11:57:43 | 24 | testimony.  I don't want anybody requesting that we recess |
| 11:57:46 | 25 | early.  We need to get this done.  If I didn't have enough |

| | | |
|---|---|---|
| 11:57:49 | 1 | problems in November, this is the month we move to the new |
| 11:57:52 | 2 | courthouse.  So we're going to be involved in packing stuff |
| 11:57:56 | 3 | up.  I'm not going to have access to everything that I need. |
| 11:57:59 | 4 | So I need to get this case done on the calendar and |
| 11:58:05 | 5 | on the basis that we talked about in the final pretrial |
| 11:58:11 | 6 | conference.  So even if that means you agreeing to taking a |
| 11:58:15 | 7 | witness out of order, we can do that and work with that.  But |
| 11:58:18 | 8 | keep in touch and know who's coming and have your witnesses |
| 11:58:22 | 9 | lined up. |
| 11:58:22 | 10 | MR. DEATS:  Your Honor, I'm sorry.  I did have one |
| 11:58:24 | 11 | more matter I wanted to mention.  Of course going to invoke the |
| 11:58:28 | 12 | Rule with regards to the witnesses.  But several of my clients |
| 11:58:33 | 13 | are plaintiffs, so I would think they would not be under the |
| 11:58:35 | 14 | Rule.  And I just wanted to be absolutely clear about that |
| 11:58:39 | 15 | before.  And I assume there will be a City representative |
| 11:58:42 | 16 | obviously that would not be under the rule as well. |
| 11:58:44 | 17 | THE COURT:  That's right.  Y'all talk about that over |
| 11:58:47 | 18 | the noon recess.  And before Mr. Menefee brings the jury in |
| 11:58:52 | 19 | when we come back at 1:30, I'll ask if you have anything else |
| 11:58:54 | 20 | we need to take up and you may -- we'll discuss the Rule then |
| 11:58:57 | 21 | and invoking the Rule then and see who is to be exempted from |
| 11:59:00 | 22 | the Rule and who is not to be exempted from the Rule.  So |
| 11:59:03 | 23 | everyone will know what the situation is. |
| 11:59:06 | 24 | MR. DEATS:  Very good, Your Honor. |
| 11:59:07 | 25 | MR. COPPOLA:  Thank you, Your Honor. |

| | | |
|---|---|---|
| 11:59:08 | 1 | THE COURT: All right. Well, if there is nothing |
| 11:59:09 | 2 | else, the Court will be in recess until 1:30. |
| 11:59:15 | 3 | (Recess) |
| 11:59:15 | 4 | (Open Court, no jury) |
| 13:33:43 | 5 | THE COURT: Good afternoon, the record will reflect |
| 13:33:47 | 6 | that the jury is out of the room. Did y'all have an |
| 13:33:49 | 7 | opportunity to discuss the question on invoking the Rule over |
| 13:33:55 | 8 | the noon hour? |
| 13:33:56 | 9 | MR. DEATS: Your Honor, we did not discuss that. |
| 13:33:58 | 10 | However, I think it would apply normally that everybody should |
| 13:34:01 | 11 | be excluded except the City representative and the plaintiff |
| 13:34:06 | 12 | employees. |
| 13:34:06 | 13 | THE COURT: Mr. Coppola? |
| 13:34:07 | 14 | MR. COPPOLA: I agree with Mr. Deats. We don't -- |
| 13:34:09 | 15 | you know, anybody who is not a party should be excluded. |
| 13:34:13 | 16 | THE COURT: All right. Then the Rule has been |
| 13:34:17 | 17 | invoked. What that means is, if there is anyone in the |
| 13:34:24 | 18 | courtroom who is not a named party in the lawsuit or the |
| 13:34:30 | 19 | representative of the City of Austin, you will need to leave |
| 13:34:36 | 20 | the courtroom during the testimony of all other witnesses. |
| 13:34:41 | 21 | You may not discuss this case or anything about it |
| 13:34:45 | 22 | with anyone else other than the lawyers from this point forward |
| 13:34:50 | 23 | or unless excused by the Court. If there are -- are there |
| 13:34:56 | 24 | anyone that fall into that category? Any witnesses here that |
| 13:34:59 | 25 | are not parties or party representatives? |

| | | |
|---|---|---|
| 13:35:03 | 1 | All right.  Then you will need to leave the courtroom |
| 13:35:05 | 2 | while the other witnesses are testifying.  Now, I expect the |
| 13:35:11 | 3 | lawyers to explain the Rule to all of their witnesses, those |
| 13:35:15 | 4 | who are present and who aren't present.  So the Rule is |
| 13:35:19 | 5 | invoked. |
| 13:35:20 | 6 | Anything else that we need to take up before we are |
| 13:35:26 | 7 | ready to proceed? |
| 13:35:28 | 8 | MR. DEATS:  I don't believe so, Your Honor. |
| 13:35:30 | 9 | MR. COPPOLA:  No, Your Honor. |
| 13:35:31 | 10 | THE COURT:  All right.  You may bring the jury in, |
| 13:35:51 | 11 | Mr. Menefee. |
| 13:35:51 | 12 | (Open Court, jury present) |
| 13:36:15 | 13 | THE COURT:  Mr. Deats, are you ready to present your |
| 13:36:19 | 14 | opening statement. |
| 13:36:20 | 15 | MR. DEATS:  Your Honor, I am.  I had understood the |
| 13:36:22 | 16 | Court to say it was going to read a short joint stipulation of |
| 13:36:27 | 17 | facts prior to my doing that. |
| 13:36:28 | 18 | THE COURT:  Well, I thought I was going to do it |
| 13:36:30 | 19 | after that, when we got to the evidence phase. |
| 13:36:32 | 20 | MR. DEATS:  Very good, Your Honor. |
| 13:36:44 | 21 | THE COURT:  You may proceed. |
| 13:36:45 | 22 | **PLAINTIFFS' OPENING STATEMENT** |
| 13:36:45 | 23 | MR. DEATS:  May it please the Court, ladies and |
| 13:36:50 | 24 | gentlemen of the jury: |
| 13:36:50 | 25 | Again, my name is Craig Deats.  I represent the |

| 13:36:53 | 1 | plaintiffs who are some 25 present or former district |
| 13:36:56 | 2 | commanders employed by the Austin-Travis County Emergency |
| 13:37:00 | 3 | Medical Services Department.  For ease of reference, I think |
| 13:37:03 | 4 | we're going to refer to them just as the EMS, if that's okay |
| 13:37:08 | 5 | with you-all. |
| 13:37:08 | 6 | With me and helping me, Manuel Quinto-Pozos is an |
| 13:37:11 | 7 | attorney in my law firm, and Alex Kaufman again is our legal |
| 13:37:15 | 8 | assistant. |
| 13:37:15 | 9 | I want to thank you for your jury service.  You've |
| 13:37:17 | 10 | already been thanked a couple of times by the Court and has |
| 13:37:21 | 11 | noted the importance of jury service.  I do believe that while |
| 13:37:25 | 12 | voting is a true hallmark of democratic government, that jury |
| 13:37:28 | 13 | service is equally as important.  The ability to have a dispute |
| 13:37:34 | 14 | settled in a court of law by a jury of one's peers is a |
| 13:37:37 | 15 | privilege that few country enjoy like we do, a privilege that |
| 13:37:43 | 16 | we have fought for over the years, a privilege that was |
| 13:37:47 | 17 | ensconced into the Constitution of the United States by its |
| 13:37:50 | 18 | framers.  And I thank you for serving in this important and |
| 13:37:53 | 19 | venerable institution. |
| 13:37:53 | 20 | Now, this case arises under the Fair Labor Standards |
| 13:37:58 | 21 | Act, a federal pay statute that generally requires overtime pay |
| 13:38:01 | 22 | when an employee works more 40 hours a week.  Some types of |
| 13:38:08 | 23 | employees are exempt from the overtime requirements if the |
| 13:38:12 | 24 | employer can show that they fall into certain exempt |
| 13:38:16 | 25 | categories.  The burden is on the employer to prove that the |

13:38:19  1  employee falls within the exemption.

13:38:21  2          Here Austin claims that its district commanders are

13:38:25  3  exempt as so-called executive or administrative employees under

13:38:29  4  the Act's so-called white collar exemption.  However, neither

13:38:36  5  of these exceptions apply to police, fire and EMS employees,

13:38:39  6  so-called first responders, regardless of the rank that they

13:38:44  7  hold if their most important duty is their first response work,

13:38:48  8  i.e., response to emergency situations.

13:38:52  9          Likewise, these exemptions do not play -- do not

13:38:56  10  apply to an employee unless the employer can establish that

13:39:00  11  they are employed on a salary basis.  And it's a little

13:39:04  12  different to say that they have a salary of such and such and

13:39:07  13  to say, on the other hand, as the FLSA uses the term, that they

13:39:11  14  are paid on a salary basis.  And we will get back to that.  So

13:39:16  15  can the City establish that the plaintiffs are exempt

13:39:19  16  administrative or executive employees rather than first

13:39:26  17  respondents?

13:39:26  18          Now, by agreement of the parties, we're going to use

13:39:29  19  representative plaintiffs to present testimony on the nature of

13:39:32  20  their duties.  I don't think you really want to hear from 25

13:39:36  21  people, all testifying about the same stuff and how they spend

13:39:39  22  their day.  So to streamline it, we've agreed to use

13:39:43  23  representative plaintiffs.  And I hope that you won't think bad

13:39:47  24  about if we don't put all 25 plaintiffs on.  Even so, you may

13:39:51  25  even find that some of the testimony is a bit repetitive.

13:39:55  1          We do think that the facts -- that the evidence will

13:39:57  2  show the following facts:  The EMS provides emergency medical

13:40:01  3  response service for Austin and all of Travis County.  It's a

13:40:06  4  quasi-military organization.  This is an around-the-clock

13:40:11  5  service.  Twenty-four hours a day, 365 days a year, EMS like

13:40:15  6  the police and firefighters never stop responding to calls.

13:40:20  7  There's never an off day.  By far the largest division within

13:40:25  8  the EMS is its Operations Division, the employees who actually

13:40:30  9  respond to medical and other emergencies.

13:40:33  10          Now, all but one of our plaintiffs are so-called

13:40:36  11  field commanders in the Operations Division.  Each of them is

13:40:41  12  routinely dispatched to medical and to other emergencies.

13:40:46  13  There are other EMS divisions; for example, Training,

13:40:50  14  Communications, that supplement the work of the Operations

13:40:53  15  Division which of course is the heart of what EMS is there to

13:40:57  16  provide.

13:40:58  17          One of our plaintiffs, Scott Lindsley, is a district

13:41:01  18  commander in one of these, the Fleet and Facilities Division.

13:41:05  19  In that job he is tasked with assisting in maintenance, repair,

13:41:09  20  and acquisition of EMS vehicles and facilities.  However, he

13:41:14  21  too is dispatched to emergencies when there are issues with

13:41:17  22  vehicles and sometimes is required to provide emergency patient

13:41:21  23  care.  Importantly, he also works additional shifts as a field

13:41:26  24  commander in Operations.

13:41:29  25          So until this year the rank structure in Operations

13:41:33 1  had six levels.  Top to bottom you start with the director of

13:41:37 2  the department.  Then you have the assistant chief or the chief

13:41:40 3  of staff.  That's followed -- the next rank -- excuse me -- the

13:41:45 4  next rung down is the division chiefs, followed by the district

13:41:49 5  commanders.  Those are our plaintiffs.  Finally, you have the

13:41:52 6  clinical specialists, sometimes referred to as captains, and

13:41:56 7  paramedics.  Just this year the EMS added EMTs as a new level

13:42:02 8  below paramedics.  With the exception of the director,

13:42:05 9  employees at all of these levels must be EMT certified.

13:42:09 10         The EMTs, the paramedics, the captains, they all

13:42:13 11 staff ambulances.  We often refer to them as "the medics"

13:42:16 12 because they all perform essentially that same function.

13:42:21 13 Obviously, a paramedic is higher level than EMT.  Captain is

13:42:25 14 higher than paramedics.  But, again, they're all medics.  They

13:42:30 15 all staff ambulances.

13:42:31 16         Now, looking at the schedule and how medics operate,

13:42:34 17 the Operations Division is divided into six geographic

13:42:38 18 districts.  Each district has several stations within it.  The

13:42:41 19 medics are assigned to ambulances and to stations.  An

13:42:45 20 ambulance is staffed by two persons in one of those three

13:42:49 21 ranks.  The ambulance personnel generally work a 48-hour

13:42:52 22 workweek, either in 12- or 24-hour shifts.  That means that

13:42:56 23 when they work a week, they get eight hours of regularly

13:42:59 24 scheduled overtime pay.  All of them are considered by the City

13:43:03 25 to be nonexempt for overtime purposes.

| | | |
|---|---|---|
| 13:43:07 | 1 | Their ambulances are so-called ALS-equipped |
| 13:43:12 | 2 | vehicles.  "ALS" stands for Advanced Life Support.  They |
| 13:43:16 | 3 | respond to medical emergencies, to accidents, to rescues, to |
| 13:43:19 | 4 | fire scenes, to crime scenes, wherever medical emergency care |
| 13:43:24 | 5 | might be needed.  Calls are assigned to priority one to five, |
| 13:43:28 | 6 | depending on the severity of the call, one being the most |
| 13:43:32 | 7 | severe.  Certain cases, like cardiac or shortness of breath |
| 13:43:35 | 8 | cases or death pronouncements are given special attention and |
| 13:43:39 | 9 | aren't necessarily assigned a category. |
| 13:43:40 | 10 | There's a computer-aided dispatch system that keeps |
| 13:43:44 | 11 | track of the medics, the ambulances, at all times.  It knows |
| 13:43:48 | 12 | when they're responding to calls.  It knows when they're |
| 13:43:51 | 13 | available for assignment.  It knows who is closest to a |
| 13:43:54 | 14 | reported emergency. |
| 13:43:55 | 15 | Within Operations, there are also special operations |
| 13:43:58 | 16 | sections comprised of certain special teams.  There's a |
| 13:44:01 | 17 | hazardous material team, a rescue team, even a boat team. The |
| 13:44:06 | 18 | people on these teams sometimes are called to respond to |
| 13:44:09 | 19 | specialized emergency situations. |
| 13:44:11 | 20 | So let's compare them to the field commanders, and we |
| 13:44:14 | 21 | think the facts will show these:  The field commanders -- |
| 13:44:17 | 22 | again, all of our plaintiffs but one -- also do shift work. |
| 13:44:20 | 23 | They work 48 hours a week in two 24-hour shifts.  However, they |
| 13:44:24 | 24 | are not paid overtime. |
| 13:44:27 | 25 | Each field commander is assigned to supervise a |

13:44:30   1   district during his or her shift.  The commanders are also

13:44:32   2   assigned a group of subordinates for mentoring and evaluative

13:44:37   3   purposes.  They're assigned to command vehicles that, like

13:44:40   4   ambulances, are fully equipped ALS vehicles.  They carry

13:44:44   5   everything that an ambulance carries except a stretcher.  They

13:44:48   6   even carry some things that ambulances do not; for example,

13:44:51   7   carbon monoxide monitors.

13:44:54   8          Like ambulances, the CAD system tracks command

13:44:57   9   vehicles during their shifts and knows if they are available

13:45:00   10  and closest to an emergency.  CAD considers the command

13:45:04   11  vehicles available resources for response to emergency calls.

13:45:09   12  Commanders, like their subordinates, are in fact dispatched to

13:45:12   13  medical and other emergencies.  They're not automatically

13:45:16   14  dispatched to all calls, but to the more serious calls; for

13:45:19   15  example cardiac, shortness of breath, priority one and two

13:45:23   16  calls.

13:45:25   17         They are dispatched to those calls if they're the

13:45:28   18  closest available unit by a certain amount of time.  They are

13:45:31   19  dispatched to specialized calls -- vehicle pin-ins carbon

13:45:34   20  monoxide, wilderness rescues, et cetera.  EMS even stations

13:45:40   21  commanders at locations within their districts to extend or

13:45:44   22  redistribute the coverage of available units.

13:45:45   23         Commanders can also self-assign to other calls.  Now,

13:45:49   24  we believe that the EMS will tell you that's so they can

13:45:52   25  monitor and evaluate their personnel.  We think the evidence

13:45:55  1  will show that they self-assign for variety of reasons -- to

13:45:58  2  observe their subordinates, sure enough, but also to help in

13:46:03  3  difficult-sounding calls or because they realize they're

13:46:07  4  closest to the call, or the system is getting slammed and a lot

13:46:09  5  of people are busy at that point.

13:46:13  6         Some self-assigned calls are recorded in the system,

13:46:14  7  and others are not.  What commanders do on calls may be a

13:46:18  8  subject of debate between the parties.  The commander, we

13:46:21  9  posit, are in the best position to know what they do.  We'll

13:46:24  10 have a representative sampling of commanders testify that they

13:46:27  11 provide direct hands-on patient care just like that provided by

13:46:31  12 the paramedics.  The commanders are, in fact, among the best

13:46:35  13 paramedics available and often called upon to perform the most

13:46:39  14 difficult procedures.

13:46:40  15        The division chiefs and above, they are assigned a

13:46:44  16 traditional Monday through Friday 40-hour workweek.  Unlike the

13:46:48  17 commanders, they are not part of the CAD's dispatch matrix.

13:46:51  18 They are not dispatched routinely to medical and other

13:46:54  19 emergencies.  Their vehicles are not ALS vehicles.  They don't

13:46:58  20 carry all the supplies and equipment that ambulances do.  They

13:47:02  21 rarely, if ever, perform actual hands-on medical care.  Simply

13:47:06  22 put, they're part of the group that leads the band, but not the

13:47:10  23 part of the band that actually plays.

13:47:13  24        Now, why does Austin contend that commanders belong

13:47:17  25 in this group of people that should be exempt?  If the field

13:47:21   1   commanders are a part of the band that plays, then Austin

13:47:25   2   claims, nonetheless, that the most important part of the

13:47:27   3   commander's job is their supervisory or administrative duties.

13:47:31   4   Austin contends that the commanders, even in the field, are in

13:47:34   5   a supervisory capacity and that is their most important

13:47:39   6   function.

13:47:39   7          Austin we expect will produce several witnesses,

13:47:42   8   including someone designated as an expert, to testify about the

13:47:46   9   supervisory administrative duties of commanders and their

13:47:50  10   relative importance.  In response we contend that the City

13:47:54  11   simply misses the mark.  We have never denied that the

13:47:57  12   commanders perform supervisory and perhaps some administrative

13:48:01  13   duties.  However, the exemption is labeled the executive

13:48:04  14   exemption, not the supervisory exemption.

13:48:07  15          Of course, only the Judge can instruct you on the

13:48:09  16   law, but we believe the law makes a distinction between

13:48:12  17   supervisory work that's performed in the field while you're

13:48:16  18   working alongside the troops and that performed in an office

13:48:20  19   environment.

13:48:21  20          There will be conflicting testimony about what is the

13:48:24  21   nature of the commanders' supervisory work and how important it

13:48:27  22   is compared to the first response work.  Austin will tell you

13:48:31  23   that commanders only respond to 5 percent of the total calls

13:48:34  24   and, often, in a supervisory capacity.  Their expert witness

13:48:38  25   found this significant.  However, our commanders only make up 6

13:48:43  1  to 7 percent of the response workforce.  We'll show you

13:48:50  2  statistics that show that they respond to a third as many calls

13:48:52  3  as do their subordinates.  And this is documented calls.

13:48:56  4  You'll hear that documented calls do not in fact represent all

13:48:59  5  the calls that they make.

13:49:01  6         Further, you'll hear from a representative group of

13:49:04  7  our commanders that they do the same work as paramedics when

13:49:07  8  they respond to calls.  They do chest compressions, they

13:49:10  9  intubate patients, they administer medicines, they take vitals

13:49:15  10  they call the hospital to let them know what to expect, all of

13:49:18  11  these types of things.

13:49:20  12         As you hear the evidence, listen to who it is that

13:49:24  13  tells you what commanders do.  What do they actually do?

13:49:27  14  You'll find that the City has changed the job description over

13:49:29  15  the years.  In fact, you'll find that the job description has

13:49:32  16  been changed about four times over the last four years, but the

13:49:35  17  job of the commander has not changed.  Before all those job

13:49:40  18  description changes started, they were engaging in patient

13:49:43  19  care.  We think the evidence will show you that that's even

13:49:45  20  more true today than ever before.

13:49:48  21         Now, let's talk about Plaintiff Scott Lindsley.  As

13:49:52  22  mentioned, he's the only plaintiff who's not a field

13:49:55  23  commander.  He's in charge of fleet and facilities.  However,

13:49:59  24  he is assigned an ALS-equipped vehicle, and he's dispatched to

13:50:03  25  calls involving accidents of EMS vehicles.  In fact, when he's

13:50:07  1  out in the field in his vehicle, he becomes part of the

13:50:10  2  dispatch matrix and may be dispatched if he's the nearest

13:50:13  3  available vehicle.

13:50:14  4         You'll also hear him testify that medical response is

13:50:18  5  the most important part of his job.  Like the field commanders,

13:50:21  6  you'll hear them all testify:  Medical response, the most

13:50:26  7  important part of my job.

13:50:27  8         You'll also hear Scott Lindsley testify that he works

13:50:31  9  a lot of extra shifts as a field commander in Operations.  Why,

13:50:36  10  then, would he be treated differently than others in the same

13:50:39  11  job title?

13:50:40  12         Ladies and gentlemen of the jury, in employment you

13:50:44  13  have executives, and you have employees and sometimes a job has

13:50:49  14  aspects of both types of work.  There was a movie that I think

13:50:54  15  many of you probably saw.  If you didn't see it at the theater,

13:50:57  16  it's been on television a million times since.  It's called

13:51:00  17  "Saving Private Ryan."

13:51:03  18         In "Saving Private Ryan" you saw scenes of generals

13:51:06  19  sitting in offices, making decisions to get a soldier home to

13:51:10  20  his mother because he was the sole surviving brother of four

13:51:14  21  brothers who had served in our armed forces.  To accomplish

13:51:18  22  that, to get that man back from behind enemy lines, they

13:51:22  23  assigned Captain John Miller and his company to find

13:51:27  24  Private Ryan and bring him home.

13:51:29  25         Now, there's no doubt in that movie that Captain Ryan

13:51:33  1   is a supervisor.  He's a captain, but he's a company

13:51:37  2   commander.  There likewise is no doubt that he's in the field

13:51:42  3   doing the same job, taking the same risks as the soldiers that

13:51:47  4   he leads.  He is, in fact, both a leader and a doer.  Make no

13:51:52  5   mistake about it.  His leadership is important, but he goes

13:51:56  6   where his company goes.  He does what they do.  He takes the

13:52:00  7   risks that they take.  And that is the most important thing

13:52:05  8   that he does.  He is not sitting in some office simply

13:52:09  9   directing others.  His leadership is in the doing, in the

13:52:14 10   example that he sets, in his willingness to share with his

13:52:18 11   troops, taking the same risks and enduring the same conditions.

13:52:21 12          In the same manner, the commanders in this case,

13:52:25 13   while admittedly leaders, while admittedly supervisors, are

13:52:30 14   also the doers.  They do not sit in an office simply directing

13:52:36 15   the work of others.  You're going to hear testimony that they

13:52:39 16   spend the majority of their day in the field, sometimes

13:52:45 17   directing, sometimes participating in emergency medical work.

13:52:48 18   They do what paramedics do.  They're part of the response team

13:52:53 19   that the EMS relies upon to make sure that they have someone

13:52:58 20   available when that emergency call comes in.  In short, they

13:53:03 21   are first responders.

13:53:05 22          We believe that the evidence will convince you the

13:53:09 23   primary duty of the commanders is their role as first

13:53:11 24   responder.  And because of that, under the law, we feel,

13:53:17 25   executive and administrative exemptions simply do not apply to

| | | |
|---|---|---|
| 13:53:21 | 1 | them. |
| 13:53:21 | 2 | Thank you. |
| 13:53:23 | 3 | THE COURT:  Thank you. |
| 13:53:32 | 4 | Ms. Kneeland? |
| 13:53:33 | 5 | MS. KNEELAND:  Good afternoon.  Do you mind if I turn |
| 13:53:36 | 6 | off the blue screen?  I find it distracting. |
| 13:53:40 | 7 | THE COURT:  No.  I don't mind at all. |
| 13:53:42 | 8 | **DEFENDANT'S OPENING STATEMENT** |
| 13:53:42 | 9 | MS. KNEELAND:  Thank you.  A medic joins the |
| 13:53:44 | 10 | Austin-Travis County EMS and goes to the academy.  After |
| 13:53:48 | 11 | training as a cadet, he becomes a paramedic, one of two people |
| 13:53:53 | 12 | who works on an ambulance.  He works 48 hours a week, usually |
| 13:53:57 | 13 | in two shifts.  Of the over 110,000 calls that EMS responds to |
| 13:54:03 | 14 | every year, an ambulance responds to almost every single one of |
| 13:54:08 | 15 | those calls.  The medic and his partner are on the ambulance |
| 13:54:13 | 16 | being sent to calls where people are hurt or injured, caring |
| 13:54:17 | 17 | for those patients, taking them to the hospital shift after |
| 13:54:21 | 18 | shift after shift. |
| 13:54:24 | 19 | As the medic gains more experience, he adds another |
| 13:54:28 | 20 | job:  Giving on-the-job training to cadets.  He becomes what's |
| 13:54:34 | 21 | called a clinical training officer or a captain, and he works |
| 13:54:38 | 22 | side by side in the ambulance with those cadets.  He teaches |
| 13:54:42 | 23 | them the ropes of patient care side by side.  But, still, he's |
| 13:54:47 | 24 | on ambulance, answering calls for assistance and caring for |
| 13:54:52 | 25 | patients shift after shift after shift. |

| | | |
|---|---|---|
| 13:54:57 | 1 | As he gets more experience and learns more about how |
| 13:55:01 | 2 | EMS runs, he sees a posting for promotion to Operations |
| 13:55:06 | 3 | Supervisor.  It's a promotion to the rank of commander.  The |
| 13:55:12 | 4 | job's different than what he's been doing.  Commanders join |
| 13:55:16 | 5 | EMS's command staff and they wear gold badges, not the silver |
| 13:55:22 | 6 | ones that medics wear.  They go to monthly meetings that are |
| 13:55:26 | 7 | held only for them and their superiors. |
| 13:55:30 | 8 | As we've heard, some commanders work in the field and |
| 13:55:33 | 9 | some work in the offices in headquarters.  But that -- the |
| 13:55:36 | 10 | posting that this medic has his eye on, it's in the field. |
| 13:55:40 | 11 | It's what we call a field commander.  As you'll hear, the job |
| 13:55:45 | 12 | of field commander has not changed much over the years.  What |
| 13:55:50 | 13 | does the job description say that a field commander does, and |
| 13:55:53 | 14 | what does EMS rely on the field commanders to do shift after |
| 13:55:58 | 15 | shift after shift? |
| 13:55:59 | 16 | Field commanders are also scheduled to work 48 hours |
| 13:56:03 | 17 | a day [sic], but that's to line them up with the way the crews |
| 13:56:07 | 18 | work.  Their salary takes those 48 hours into account.  Field |
| 13:56:14 | 19 | commanders are the highest ranking EMS officers on their shift |
| 13:56:17 | 20 | in any given district during the day and, more importantly, |
| 13:56:22 | 21 | during the evenings. |
| 13:56:24 | 22 | Field commanders don't have partners anymore.  They |
| 13:56:28 | 23 | ride alone in a command truck.  Field commanders are sent to |
| 13:56:33 | 24 | only 2 1/2 percent of the over 110,000 calls that EMS responds |
| 13:56:40 | 25 | to every year.  Field commanders are responsible for |

13:56:46   1   supervising five to seven crews, meaning five to seven

13:56:49   2   ambulances with two to three people on them, in their district

13:56:53   3   on the ambulances in each shift they work.  They make sure they

13:56:58   4   comply with EMS policies and procedures.  They counsel them,

13:57:02   5   and they discipline them.

13:57:05   6        Field commanders are also mentors to approximately 12

13:57:08   7   medics, helping them with their career paths and goals and

13:57:11   8   providing them feedback on their operational tasks.

13:57:16   9        When a medic does something that seems wrong, it's

13:57:19   10  the field commander who looks into it.  He does the first

13:57:22   11  investigation.  If the field -- if the medic didn't do anything

13:57:27   12  wrong, the field commander doesn't have to do anything at all

13:57:31   13  or the field commander can use his experience to determine how

13:57:35   14  bad the infraction is.  Maybe he -- the medic will get a little

13:57:39   15  counseling informally.  Maybe he'll need to be written up.  If

13:57:45   16  he needs to be written up, the field commander will take the

13:57:48   17  role in doing that.  He will have to get approval from his

13:57:52   18  supervisor, which is given a lot of weight and generally

13:57:55   19  approved.

13:57:56   20       The field commander may also recommend termination,

13:57:59   21  and you'll hear that by City of Austin policy, the only person

13:58:02   22  who can terminate any employee in EMS is the director.  But the

13:58:08   23  director will tell you that he gives a lot of weight to the

13:58:11   24  people who are in the field, who are the eyes and ears of

13:58:14   25  management for EMS.

```
13:58:17   1            Field commanders document the feedback that they give
13:58:21   2   to their medics, both the formal and the informal.  Those
13:58:25   3   records are held to use -- are used to help determine if
13:58:29   4   someone will get a promotion or if they'll make it onto a
13:58:32   5   special team that they've applied to be on.  In fact, when a
13:58:37   6   captain applies to be a commander, recommendations from
13:58:41   7   commanders are important in that process.  Captains have to
13:58:45   8   solicit them from the commanders they've worked with so that
13:58:48   9   the promotion board or panel can decide whether or not this
13:58:51  10   person who's applying will be a good commander.
13:58:56  11            Field commanders are the only members of EMS's
13:58:59  12   command staff who see the ambulance crews on a daily basis.
13:59:03  13   They serve as EMS's eyes and ears in the field.  They also
13:59:09  14   serve as first-line human resources for the captains and
13:59:13  15   paramedics.  They answer questions about policies, help people
13:59:17  16   with paperwork on their benefits or their medical leave
13:59:21  17   requests, and they do intake for on-the-job injuries.
13:59:24  18            Field commanders help employees resolve any
13:59:27  19   grievances they have, whether they're with the higher-ups or
13:59:30  20   with their partner or other people in their stations.
13:59:35  21            Field commanders are responsible for enforcing the
13:59:38  22   laws and regulations, including important ones related to
13:59:41  23   narcotics that are handled on the ambulance, to ensure the
13:59:44  24   safety of crews, equipment, facilities, and the public they
13:59:49  25   serve.
```

```
13:59:53   1          Field commanders interface with police and fire on
13:59:56   2   larger scenes.  They coordinate EMS's resources.  Field
14:00:00   3   commanders also investigate and resolve customer service
14:00:04   4   issues.  It's very important that the public trust EMS so that
14:00:09   5   it will call EMS, for example, if they feel they're having a
14:00:13   6   heart attack.  Field commanders make key decisions about their
14:00:18   7   districts, including when to send an employee home or whether
14:00:20   8   to take an ambulance out of service on a day-to-day basis.
14:00:25   9          In short, field commanders draw on their experience
14:00:30  10   and the available information on what's going on in the entire
14:00:33  11   EMS system to exercise their independent judgment and have wide
14:00:38  12   discretion to make sure that their district runs smoothly,
14:00:42  13   safely, and provides the best possible service to its
14:00:45  14   customers.
14:00:47  15          The medic sees the posting, thinks about it, knows
14:00:51  16   that she -- he meets the qualifications, thinks he can do the
14:00:55  17   job, and so he applies.  He puts in a letter of intent.  In
14:01:00  18   that letter he highlights the supervisory experience he's had
14:01:04  19   as a captain.  He gets the recommendations from the commanders
14:01:08  20   he's worked with.  He goes through interviews.  One day he
14:01:16  21   finds out he's going to get promoted.
14:01:18  22          But before he does that, he has to go through special
14:01:22  23   training -- training on management and leadership, on the
14:01:25  24   City's personnel and Human Resources policies, on problem
14:01:27  25   solving and on advanced incident management that we require of
```

14:01:30  1  everyone who works at a certain level in public safety.  Then

14:01:34  2  he's ready.

14:01:35  3          As he gets dressed to report for his first day as a

14:01:39  4  commander, he leaves behind the white shirt and silver badge

14:01:42  5  and he buttons up his dark blue commander uniform and puts on

14:01:47  6  his gold badge.  He assumes his command role.  He gives up

14:01:52  7  overtime pay, but he gets the stability of salary in exchange,

14:01:56  8  a salary higher than the medics and the captains make.  He has

14:02:00  9  joined EMS's management and taken on the responsibilities that

14:02:06  10  go with the promotion that he competed for.

14:02:09  11          He still sometimes provides patient care, just like a

14:02:16  12  store manager might still man the register when the store is

14:02:20  13  busy.  But he's no longer on an ambulance that is dispatched to

14:02:24  14  call after call after call.  For the most part he gets to

14:02:28  15  organize his day the way he wants to, determining whether it's

14:02:31  16  time to do paperwork, look on reports, visit with crews,

14:02:36  17  counsel them.  That's entirely within his discretion as he

14:02:40  18  figures out his day.  He is on call, and he does get

14:02:44  19  dispatched, but not with the frequency that an ambulance does.

14:02:47  20          He isn't woken up as frequently as when he was a

14:02:50  21  medic when he gets the chance to sleep.  He gets the

14:02:53  22  opportunity to sit on policy committees that help form what EMS

14:02:59  23  is going to do, and that is a chance that medics don't get.

14:03:02  24          He spends more than half his time managing and

14:03:06  25  monitoring both the employees on his shift and the employees

14:03:10    1    who he's assigned to mentor.  He's doing work that's important

14:03:18    2    to the patient care of EMS.  Nobody denies that.  But the most

14:03:23    3    important thing he does for EMS is not patient care.

14:03:26    4          The field commanders that you'll hear from took the

14:03:29    5    opportunity to compete for that promotion.  They knew the

14:03:36    6    consequences and made a deal.  They traded care of patients for

14:03:39    7    care of paramedics.  They took on the benefits and the

14:03:44    8    responsibilities.

14:03:45    9          But now they ask you to find that their promotion

14:03:47   10    didn't really change their jobs.  Their primary duty is giving

14:03:51   11    patient care.  In a way, they're asking to have their cake and

14:04:00   12    eat it, too -- to be free from the day-in-and-day-out job of an

14:04:03   13    ambulance crew but be paid on an hourly basis like an ambulance

14:04:06   14    crew.  This isn't fair to EMS, which specifically promoted the

14:04:09   15    field commanders so that they could apply their Operations

14:04:13   16    experience and skills to managing the medics and system.

14:04:16   17          There's one other plaintiff, plaintiff Eric Scott

14:04:21   18    Lindsley.  He doesn't work in the field, but at headquarters.

14:04:25   19    Commander Lindsley is responsible for an important part of

14:04:29   20    EMS's resources.  It's over 100 vehicles, and it's more than

14:04:32   21    40 stations.  He does the budget estimates, interacts with

14:04:37   22    contractors, prioritizes repairs and upgrades, designs

14:04:41   23    specifications for both buildings and ambulances, decides

14:04:46   24    whether a contractor or vendor should be paid for the work

14:04:50   25    they've done.

14:04:50  1        On a day-to-day basis, Commander Lindsley does all of

14:04:55  2   this with little or no input from his superiors.  In many

14:04:58  3   cases, he's the one person from EMS who's authorized to change

14:05:01  4   specifications or change what contracts -- excuse me -- change

14:05:08  5   specifications to contracts or to the specific ambulances or

14:05:11  6   buildings.

14:05:12  7        His specialized knowledge of this part of EMS is

14:05:16  8   crucial to EMS's Operations.  Even though he has these very

14:05:20  9   significant and substantial responsibilities, Commander

14:05:24  10  Lindsley, like the field commanders, also asks that you find

14:05:27  11  that he doesn't have the impact that he has on fleet and

14:05:30  12  facilities.  He wants you to find that his job is routine.  He

14:05:37  13  also wants you to find that the shifts he voluntarily accepts

14:05:40  14  as a field commander should be paid overtime.

14:05:42  15       What responsibilities do the commanders have that

14:05:51  16  have the greatest impact on EMS?  Are they primarily a

14:05:55  17  front-line patient care resource or is their primary value to

14:05:59  18  EMS and patients different?  That is what this case is about,

14:06:02  19  the responsibilities of the field commanders and Commander

14:06:06  20  Lindsley assumed when they got promoted.

14:06:08  21       After you've heard the evidence, you'll see that the

14:06:12  22  commanders are trying to back out of the deal they made when

14:06:14  23  they put on their dark blue uniforms and their gold badges and

14:06:19  24  we will ask you to find that EMS has proven that the commanders

14:06:22  25  are not entitled to overtime pay and to return a verdict in

| | | |
|---|---|---|
| 14:06:25 | 1 | EMS's favor. |
| 14:06:26 | 2 | Thank you. |
| 14:06:28 | 3 | THE COURT:  Thank you. |
| 14:06:29 | 4 | Ladies and gentlemen, in just a moment the plaintiff |
| 14:06:37 | 5 | will call the plaintiffs' first witness and the testimony in |
| 14:06:39 | 6 | this case will start. |
| 14:06:41 | 7 | But as you'll recall when I gave you earlier |
| 14:06:44 | 8 | instructions, I told you part of the evidence that you will |
| 14:06:48 | 9 | consider are stipulations of the parties and exhibits that are |
| 14:06:54 | 10 | introduced.  The parties have entered into certain stipulations |
| 14:06:57 | 11 | of fact which I will read to you now.  You are to accept what I |
| 14:07:02 | 12 | read to you as if it were proved by a witness or presented by |
| 14:07:10 | 13 | the witness or presented by an exhibit and consider it in the |
| 14:07:15 | 14 | same light and give it the same weight as you would any other |
| 14:07:19 | 15 | evidence. |
| 14:07:19 | 16 | The stipulations of the parties are: |
| 14:07:21 | 17 | One, the relevant period as used for purposes of this |
| 14:07:24 | 18 | lawsuit is April the 26th, 2009 and continuing thereafter; |
| 14:07:30 | 19 | Two, all of the plaintiffs are current or former |
| 14:07:34 | 20 | employees of the City of Austin; |
| 14:07:36 | 21 | Three, the City of Austin has been governed during |
| 14:07:40 | 22 | the relevant time period by the Fair Labor Standards Act, Title |
| 14:07:44 | 23 | 29 of the United States Code, Section 201 and the sections |
| 14:07:48 | 24 | following; |
| 14:07:50 | 25 | Four, except for Peter DiDonoto, Gary Wadham, and |

```
14:07:55  1   Glenn Anderson, each of the plaintiffs is or was for some part
14:07:59  2   of the relevant period employed by the City as a district
14:08:02  3   commander or operations supervisor in the Austin-Travis County
14:08:08  4   emergency medical services department;
14:08:12  5           Five, the workweek for plaintiffs during the relevant
14:08:15  6   period is a seven-day workweek, commencing on Sunday at 7 a.m.
14:08:20  7   and concluding the following Sunday at 6:59 a.m.;
14:08:25  8           Six, each of the plaintiffs who served as a field
14:08:30  9   district commander during the relative period was scheduled to
14:08:33 10   work and did work more than 40 hours per week during some or
14:08:37 11   all weeks during that time;
14:08:41 12           Seven, the City does not pay plaintiffs one and
14:08:44 13   one-half times their regular rate of pay for hours in excess of
14:08:49 14   40 worked each week during the relevant period;
14:08:52 15           Eight, each of the plaintiffs earned more than
14:08:55 16   $455 per week during the relevant period;
14:08:59 17           Nine, each of the plaintiffs during the time that
14:09:02 18   plaintiff served as a field commander customarily and regularly
14:09:07 19   directed the work of two or more employees;
14:09:10 20           Ten, all uniformed employees of the Austin-Travis
14:09:15 21   County EMS Department, except the director, are required to
14:09:19 22   maintain state EMT paramedic certification.
14:09:24 23           In addition, the following request for admission was
14:09:29 24   submitted by the plaintiff -- by the defendant to the
14:09:34 25   plaintiff:
```

14:09:35  1          Plaintiff was asked:  Admit that you earn or earned

14:09:40  2   at least $455 per week in salary from your employment as an

14:09:45  3   operations supervisor or division commander with the City of

14:09:49  4   Austin between April 27th, 2008 and the present.

14:09:54  5          And the response was:  Plaintiffs deny that their

14:09:58  6   jobs carried the title of division commander.  Their jobs

14:10:02  7   during the relevant period were referred to as operations

14:10:06  8   supervisor or district commander.  Plaintiff Victoria Branning

14:10:11  9   denies this request as to a leave period during the three or

14:10:15  10  four months in the summer of 2008.  Plaintiff Landon Willhoite

14:10:21  11  denies this request as to a period covered by military

14:10:25  12  deployment orders.  Otherwise, Plaintiffs admit this request.

14:10:29  13          You are to take those admissions with their

14:10:32  14  stipulations as proved.

14:10:35  15          Additionally, the parties have agreed that certain

14:10:40  16  exhibits are admissible into evidence.  So at this time the

14:10:45  17  Court admits for all purposes Plaintiffs' Exhibits 4 through

14:10:51  18  10, inclusive; 12 through 23, inclusive, 26 through 29;

14:10:57  19  inclusive; 31; and 38 through 46, inclusive.

14:11:05  20          The plaintiffs do not object to the admissibility of

14:11:09  21  the following defendant's exhibits, so at this time the Court

14:11:12  22  admits into evidence the following Defendant's Exhibits:

14:11:17  23  Defendant's Exhibits 1 through 8, inclusive; Defendant's

14:11:20  24  Exhibits 12 through 39, inclusive; Defendant's Exhibits 41

14:11:26  25  through 49; inclusive, and Defendant's Exhibit 53 through 57,

FITZPATRICK - DIRECT

14:11:39   1  inclusive.

14:11:40   2          I noticed an anomaly in what your agreement was, and

14:11:44   3  I am uncertain whether Plaintiffs' Exhibit 33 was meant to be

14:11:47   4  admitted or not.  It is referred to once as admissible and once

14:11:55   5  as admissible only with regard to the issue of good faith

14:11:59   6  later.  So do you desire -- is your agreement to admit

14:12:03   7  Plaintiffs' Number 33 now or not now?

14:12:07   8          MR. COPPOLA:  Your Honor, I think it's to be admitted

14:12:09   9  only for the issue of good faith.

14:12:13  10          THE COURT:  All right.  So the ones I have admitted

14:12:20  11  are admitted.  At this time the plaintiff may call its first

14:12:23  12  witness.  Any person who I have previously placed under the

14:12:26  13  Rule must leave the courtroom at this time.

14:12:31  14          MR. DEATS:  Your Honor, at this time the plaintiffs

14:12:33  15  would call Plaintiff Bryan Fitzpatrick to the stand.

14:13:21  16      (Witness sworn)

14:13:21  17                          **BRYAN FITZPATRICK,**

14:13:21  18  having been first duly sworn, testified as follows:

14:13:21  19                       **DIRECT EXAMINATION**

14:13:21  20  **BY MR. DEATS:**

14:13:21  21  Q.   Would you please state your name.

14:13:22  22  A.   Bryan Fitzpatrick.

14:13:24  23  Q.   Mr. Fitzpatrick, are you currently employed?

14:13:26  24  A.   Yes, I am.

14:13:27  25  Q.   Who is your employer?

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 14:13:28 | 1 | A.   Employed by the City of Austin. |
| 14:13:30 | 2 | Q.   And what position do you hold with the City of Austin? |
| 14:13:32 | 3 | A.   I'm an operations supervisor, which is also the rank of |
| 14:13:36 | 4 | district commander. |
| 14:13:37 | 5 | Q.   So the official title is operations supervisor, but you're |
| 14:13:40 | 6 | generally referred to as district commanders? |
| 14:13:42 | 7 | A.   Yes. |
| 14:13:42 | 8 | Q.   And we'll refer to you as district commander today.  Okay? |
| 14:13:46 | 9 | A.   Yes. |
| 14:13:46 | 10 | Q.   Let's talk about your employment history with EMS.  When |
| 14:13:50 | 11 | did you first join the EMS? |
| 14:13:52 | 12 | A.   I was hired to work for EMS as an EMT in 1993 -- November |
| 14:13:58 | 13 | of '93. |
| 14:14:00 | 14 | Q.   And how long did you remain as an EMT? |
| 14:14:02 | 15 | A.   I was EMT through 1997. |
| 14:14:05 | 16 | Q.   And what happened in '97? |
| 14:14:07 | 17 | A.   I was promoted to intermediate. |
| 14:14:10 | 18 | Q.   Intermediate EMT? |
| 14:14:12 | 19 | A.   Intermediate EMT, yes.  It's the next rank above EMT. |
| 14:14:16 | 20 | Q.   Okay.  And did something else happen in 1997? |
| 14:14:18 | 21 | A.   Yes.  I was also promoted later in 1997 to paramedic. |
| 14:14:22 | 22 | Q.   Okay.  And how long did you remain as a paramedic |
| 14:14:25 | 23 | thereafter? |
| 14:14:26 | 24 | A.   I was a paramedic in the Operations Section from 1997 |
| 14:14:30 | 25 | until approximately middle of 2000, where I received promotion |

FITZPATRICK – DIRECT

14:14:34  1  to training captain.

14:14:35  2  Q.   And what exactly did a training captain do at that time?

14:14:39  3  A.   As training captain I was removed from my field duties in

14:14:43  4  the street, and I actually went to our headquarters where I

14:14:47  5  coordinated training plans and did evaluations on employees

14:14:50  6  specifically in our rescue section.

14:14:51  7  Q.   And how long did you remain in that position?

14:14:54  8  A.   I was a training captain from 2000 until late 2001.

14:15:01  9  Q.   And what happened at that point?

14:15:03  10  A.   In 2001 I had gone through a training academy to become a

14:15:08  11  commander, and I was made an acting district commander in

14:15:10  12  December of 2001.

14:15:11  13  Q.   And how long did you remain as an acting district

14:15:14  14  commander?

14:15:14  15  A.   Until October of 2002.

14:15:17  16  Q.   And have you remained a district commander at all times

14:15:21  17  since that point?

14:15:21  18  A.   Yes.  I received promotion in 2002 to district commander,

14:15:25  19  no longer acting, and I've been a commander since then.

14:15:29  20  Q.   Okay.  And as commander, do you hold any other titles

14:15:32  21  besides district commander?

14:15:33  22  A.   Yes.  I'm the Special Operations Section of our

14:15:36  23  department.

14:15:36  24  Q.   Okay.  And so what sort of special operations are you

14:15:39  25  involved in?  What does that entail?

                         FITZPATRICK – DIRECT

14:15:41   1   A.   The Special Operations Section of EMS is charged with

14:15:45   2   responding to calls over and above the traditional and medical

14:15:49   3   and traumatic calls.  Things along the nature of wilderness

14:15:53   4   rescues, water rescues, hazardous materials responses, tactical

14:15:58   5   missions with SWAT team.  Things of that nature.

14:16:00   6   Q.   And when you formed special teams for that purpose, how do

14:16:04   7   the teams work?  If there's, say, a swift water rescue, what

14:16:06   8   would happen?

14:16:07   9   A.   For the swift water rescue, specific ambulances and

14:16:10   10  command vehicles are designated with Special Operations

14:16:12   11  personnel on them.  Through or CAD system, it recognizes these

14:16:16   12  specific units and sends them to these calls.

14:16:19   13  Q.   Okay.  Now within the EMS, are you assigned to any

14:16:22   14  specific division?

14:16:23   15  A.   Yes.  I'm in the Operations Division.

14:16:27   16  Q.   And what is the Operations Division?

14:16:31   17  A.   It's the largest portion of our EMS organization.  It's

14:16:35   18  what we traditionally think of as EMS.  It's the ambulances and

14:16:39   19  response vehicles which are out in the street.

14:16:41   20  Q.   Okay.  And what portion of the day does the Operations

14:16:43   21  Division provide service?

14:16:45   22  A.   It's a 24-hour-a-day operation.

14:16:47   23  Q.   24 hours a day, how many days a year?

14:16:50   24  A.   Seven days a week, 365 days a year.

14:16:54   25  Q.   So you're essentially always in operation, correct?

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 14:16:57 | 1 | A.    Yes. |
| 14:16:57 | 2 | Q.    And to handle that continuous, around-the-clock operation, |
| 14:17:01 | 3 | do you operate in shifts? |
| 14:17:03 | 4 | A.    Yes, we do. |
| 14:17:03 | 5 | Q.    Now, what sort of emergency medical services do you |
| 14:17:06 | 6 | provide, and what sort of situations will the Operations |
| 14:17:09 | 7 | Division be sent out? |
| 14:17:11 | 8 | A.    The Operations Division responds to any and all medical |
| 14:17:15 | 9 | calls and requests through 9-1-1, any medical or traumatic |
| 14:17:20 | 10 | event that is designated having potential patients involved. |
| 14:17:24 | 11 | Someone requiring care or transport to the hospital, we're |
| 14:17:27 | 12 | dispatched to that. |
| 14:17:27 | 13 | Q.    Do you recall whether or not that would involve situations |
| 14:17:30 | 14 | that involve fire scenes, for example? |
| 14:17:32 | 15 | A.    Yes. |
| 14:17:32 | 16 | Q.    Do you respond to situations that involve crime scenes or |
| 14:17:36 | 17 | crime victims? |
| 14:17:37 | 18 | A.    Yes. |
| 14:17:37 | 19 | Q.    What about rescues?  You mentioned that a couple of |
| 14:17:40 | 20 | times.  Would that be a type of situation in which EMS might be |
| 14:17:44 | 21 | called? |
| 14:17:45 | 22 | A.    Yes. |
| 14:17:45 | 23 | Q.    What about car accidents?  Any involvement there? |
| 14:17:47 | 24 | A.    Yes. |
| 14:17:48 | 25 | Q.    What type of involvement in the car accident situation? |

FITZPATRICK - DIRECT

14:17:52  1  A.   Again, it depends on the situation and the specifics of

14:17:55  2  the accident.  Minor accidents maybe get an ambulance and

14:17:58  3  response to -- a single ambulance response.  Or if it was

14:18:01  4  something as complicated as multiple ambulances and commanders

14:18:05  5  responding to something like a pin-in collision, where a victim

14:18:09  6  is trapped in a vehicle and unable to get out on their own

14:18:13  7  power.

14:18:13  8  Q.   All right.  Let's talk about the hierarchy within the

14:18:16  9  Operations Division.  Who is at the top of the pyramid in terms

14:18:20  10  of the Operations Group?

14:18:21  11  A.   The top of the Operations Group would be my operation

14:18:25  12  chief or division chief.

14:18:26  13  Q.   Okay.  But, of course, you have a department director, do

14:18:30  14  you not?

14:18:30  15  A.   He's at the top of all EMS, yes.  The department director.

14:18:34  16  Q.   And so going down from the department director, in chain

14:18:37  17  of command for Operations, who's next?

14:18:39  18  A.   It would be the assistant chief or chief of staff.

14:18:41  19  Q.   Okay.  And I believe that that is who at present?

14:18:44  20  A.   It's Chief James Shamard.

14:18:46  21  Q.   And he is the City representative here today?

14:18:48  22  A.   Yes, he is.

14:18:49  23  Q.   Okay.  And beneath the chief of staff or the assistant

14:18:53  24  chief, Mr. Shamard, who is next in the chain of command?

14:18:57  25  A.   There are six division chiefs.

| | | |
|---|---|---|
| 14:18:59 | 1 | Q.   Are they sometimes referred to as operations managers? |
| 14:19:02 | 2 | A.   Yes, they are. |
| 14:19:03 | 3 | Q.   But more commonly you call them division chiefs? |
| 14:19:06 | 4 | A.   Yes. |
| 14:19:06 | 5 | Q.   And beneath the division chiefs, who is next in the chain |
| 14:19:10 | 6 | of command? |
| 14:19:11 | 7 | A.   Below the division chiefs come the operations supervisor |
| 14:19:15 | 8 | or district commanders. |
| 14:19:16 | 9 | Q.   And that's the rank that you hold? |
| 14:19:18 | 10 | A.   Yes, it is. |
| 14:19:19 | 11 | Q.   And that's the rank that we are talking about here today |
| 14:19:21 | 12 | in this lawsuit? |
| 14:19:22 | 13 | A.   Yes. |
| 14:19:22 | 14 | Q.   And then beneath the district commanders you have the |
| 14:19:25 | 15 | medics, and they're actually in three separate categories, |
| 14:19:29 | 16 | aren't they? |
| 14:19:29 | 17 | A.   Yes, they are. |
| 14:19:30 | 18 | Q.   And what are those categories? |
| 14:19:32 | 19 | A.   The rank immediately below district commander is captain, |
| 14:19:35 | 20 | which is also referred to as clinical specialist.  Below that |
| 14:19:40 | 21 | is the paramedic, which is also referred to as the Medic II. |
| 14:19:42 | 22 | And then below that is the EMT, which is also referred to as |
| 14:19:47 | 23 | the Medic I. |
| 14:19:48 | 24 | Q.   Okay.  Now, of course, you've been with EMS since 1993.  A |
| 14:19:52 | 25 | couple of those positions, the captains, the EMTs, they're |

14:19:56   1   relatively new, aren't they?

14:19:58   2   A.   Yes, they are.

14:19:59   3   Q.   Now, I know that you said -- testified earlier you came on

14:20:02   4   as an EMT.  Has the EMT rank been a part of EMS throughout the

14:20:08   5   entirety of your career?

14:20:08   6   A.   It's transitioned.  When I first started here in 1993, our

14:20:12   7   organization was tiered.  It had an ALS level and a BLS level.

14:20:16   8   The ALS was the advanced life support ambulances, and BLS was

14:20:21   9   the basic life support ambulances.  They were divided up based

14:20:25  10   on the severity of the call.

14:20:26  11   Q.   Okay.

14:20:27  12   A.   That transitioned in the late 1990s, early 2000s, to an

14:20:31  13   all-advanced life support system, where everyone was a

14:20:35  14   paramedic and all the ambulances were equal.

14:20:38  15   Q.   So did they abandon the EMT ranking at that time?

14:20:41  16   A.   It was no longer applicable.  You had to be a paramedic to

14:20:43  17   work here.

14:20:43  18   Q.   And when did they bring back the EMT rank that you just

14:20:46  19   talked about a minute ago?

14:20:48  20   A.   Within the last year.

14:20:49  21   Q.   So there was a period, I guess, then, of ten, eleven years

14:20:52  22   where you didn't even have EMTs.  It was just paramedics?

14:20:55  23   A.   Correct.

14:20:55  24   Q.   Let's talk about the captains or clinical -- excuse me --

14:20:58  25   the clinical specialists.  Did you have clinical specialists

14:21:03   1    throughout your career?

14:21:04   2    A.    No, we did not.

14:21:05   3    Q.    When did you start having clinical specialists?

14:21:07   4    A.    The rank of clinical specialist came out as a side product

14:21:12   5    of our bargaining -- contract bargaining in 2008.

14:21:15   6    Q.    Okay.  And so now you have the three tiers, but at times

14:21:19   7    you only had the one tier of paramedic, right?

14:21:21   8    A.    Yes.

14:21:22   9    Q.    Okay.  Now, let's talk about the districts of the EMS

14:21:26  10    Operations Group.  Is -- how do you handle servicing all of

14:21:31  11    Travis County with the Operations Division?

14:21:34  12    A.    The Operations Division is divided into six geographic

14:21:39  13    districts.  Each of those districts has a number of ambulances

14:21:42  14    and one district commander who is responsible for each one of

14:21:45  15    the geographic areas.

14:21:46  16    Q.    So we have one station? two stations? several stations?

14:21:52  17    How many in a district?

14:21:53  18    A.    It varies from district to district.  You could have

14:21:57  19    anywhere from four or five, up to six, seven, or eight.

14:21:59  20    Q.    And Operations employees, how are they assigned to spots

14:22:03  21    within the district?

14:22:04  22    A.    They -- the paramedics and clinical specialists are

14:22:07  23    assigned via a shift bid based on seniority.  Every six months

14:22:13  24    they're allowed the opportunity, based on their seniority, pick

14:22:16  25    a station or assignment, days of the week, and location that

FITZPATRICK – DIRECT

14:22:19   1  they choose.

14:22:20   2  Q.   And what about the district commanders?  How are they

14:22:24   3  assigned?

14:22:24   4  A.   We do the same thing.  We're allowed to pick every six

14:22:27   5  months the location of our assignment based on our availability

14:22:31   6  and our qualifications to be in that area.

14:22:34   7  Q.   Now, you mentioned Special Operations personnel.  Are they

14:22:37   8  housed within the same district, or how are they handled?

14:22:40   9  A.   Yes, they are.  They are specifically under the two

14:22:42  10  district commanders, the Special Operations District 4 and

14:22:46  11  District 6.  There are two Special Operations commanders that

14:22:50  12  are two of the six on duty at all times.

14:22:52  13  Q.   Okay.  So each -- how many commanders will be on duty at

14:22:56  14  any one time, given the six districts?

14:22:58  15  A.   There's usually six of us on duty any given day.

14:23:02  16  Q.   And then, of course, I guess there will be personnel

14:23:05  17  assigned to all of the ambulances in all of the districts as

14:23:08  18  well?

14:23:08  19  A.   Yes.

14:23:09  20  Q.   So numbers-wise, I guess there are quit a few more

14:23:12  21  paramedics, medics, et cetera, than there are commanders?

14:23:16  22  A.   Yes, there are.

14:23:17  23  Q.   Now, if you know, are EMS employees -- you mentioned it

14:23:20  24  earlier -- are they represented by a union?

14:23:22  25  A.   Yes we are.

14:23:23  1              MR. COPPOLA:  Objection, Your Honor.  Relevance.

14:23:25  2              THE COURT:  What's the relevance, Mr. Deats?

14:23:27  3              MR. DEATS:  Your Honor, we're going to show that the

14:23:29  4  union bargains for the wages and benefit of district commanders

14:23:33  5  and below, but not for the division chiefs and above.  We think

14:23:36  6  it's another factor that shows the nature of their work.

14:23:45  7              THE COURT:  Mr. Coppola?

14:23:46  8              MR. COPPOLA:  Your Honor, the fact that district

14:23:48  9  commanders are part of the union or not part of the union has

14:23:53  10  absolutely no bearing on whether or not they're exempt

14:23:56  11  employees.  It's simply not a consideration.

14:23:58  12              THE COURT:  I'm going to sustain the objection to

14:24:00  13  relevance at this time, although, Mr. Deats, you may come back

14:24:03  14  to it at a later time if it becomes more relevant.  I think

14:24:06  15  that is not relevant at this time to what the commanders do,

14:24:11  16  but you're welcome to try to convince me later.

14:24:16  17              MR. DEATS:  Okay.  Your Honor.  I would also add that

14:24:18  18  to regard with salary and how their salaries are determined,

14:24:21  19  bargaining has something to do with that as well.

14:24:24  20              MR. COPPOLA:  Your Honor, I believe there's an

14:24:27  21  admission on this point, and I don't believe that the

14:24:30  22  plaintiffs are entitled to introduce any evidence to contradict

14:24:33  23  their admission.  And with respect to how they bargained for

14:24:37  24  their salary, again, I think is irrelevant to the issue of

14:24:42  25  whether they're exempt or not.

FITZPATRICK - DIRECT

14:24:43  1         THE COURT:  I don't think the Fair Labor Standards

14:24:44  2  Act directs in itself to whether a salary is derived through a

14:24:54  3  bargaining arrangement or otherwise.  So I want you to restrict

14:24:59  4  yourself to the elements of the Fair Labor Standards Act.

14:25:02  5         MR. DEATS:  Very good, Your Honor.

14:25:03  6         THE COURT:  All right.

14:25:04  7  Q.  (BY MR. DEATS) Now, if I could, I'd like to turn to --

14:25:16  8  start with Defendant's Exhibit 36.

14:25:28  9         MR. DEATS:  And, Your Honor, I believe this is among

14:25:30 10  the admitted ones, so I ask that we have permission to go ahead

14:25:34 11  and publish it to the jury.

14:25:44 12         THE COURT:  Defendant's Exhibit No. 36 is in

14:25:49 13  evidence.

14:25:49 14  Q.  (BY MR. DEATS) And I want to direct your attention to the

14:26:00 15  fourth page of the exhibit.  Do you see a pay table there?

14:26:08 16  A.  Yes, I do.

14:26:09 17  Q.  Okay.  And at the top, what is the heading --

14:26:12 18         THE COURT:  Just a moment.  I want to make sure that

14:26:14 19  this record is clear.  Anyone who looks at it later, all of the

14:26:20 20  pages are numbered one of one.  So when you say "fourth page,"

14:26:25 21  it's not immediately apparent what we're talking about.  Why

14:26:28 22  don't you further identify it by the Bates stamp in the lower

14:26:32 23  right-hand corner so the record will be clear.

14:26:35 24         MR. DEATS:  The Bates stamp, Your Honor, would be

14:26:37 25  COA-35403.

| | | |
|---|---|---|
| 14:26:40 | 1 | THE COURT:  All right.  You may proceed. |
| 14:26:43 | 2 | Q.   (BY MR. DEATS) Do you recognize this as the City of Austin |
| 14:26:46 | 3 | EMS pay schedule for meet and confer FY 2011-2012? |
| 14:26:51 | 4 | A.   Yes, I do. |
| 14:26:53 | 5 | Q.   And this does list the wages of the various ranks listed |
| 14:27:00 | 6 | on an hourly basis, does it not? |
| 14:27:03 | 7 | A.   Yes, it does. |
| 14:27:04 | 8 | Q.   And it does include the wages for the EMS operations |
| 14:27:13 | 9 | supervisor, correct? |
| 14:27:15 | 10 | A.   Yes. |
| 14:27:15 | 11 | Q.   And again, operations supervisor is another name that we |
| 14:27:19 | 12 | use for the district commander position? |
| 14:27:21 | 13 | A.   Yes. |
| 14:27:21 | 14 | Q.   Can you explain to me why there seems to be different |
| 14:27:24 | 15 | operations supervisors listing?  I see an operations |
| 14:27:29 | 16 | supervisor, operations supervisor 42, and operations supervisor |
| 14:27:35 | 17 | 48? |
| 14:27:35 | 18 | A.   The differences are based on the workweek.  Under the |
| 14:27:38 | 19 | column WW, it's either 40, 42, or 48 based on that assignment. |
| 14:27:43 | 20 | Some people that hold the rank of district commander are on |
| 14:27:46 | 21 | 40-hour workweeks, some are on 42, and some like myself are on |
| 14:27:51 | 22 | 48s. |
| 14:27:51 | 23 | Q.   And it does list the wages on an hourly basis, does it |
| 14:27:55 | 24 | not? |
| 14:27:55 | 25 | A.   Yes, it does. |

FITZPATRICK - DIRECT

14:27:56  1  Q.   And I see that wage increases as you gain experience with

14:27:59  2  the department?

14:28:01  3  A.   Yes.

14:28:01  4  Q.   Some sort of form of seniority pay or something like that?

14:28:05  5  A.   Yes.

14:28:05  6  Q.   Okay.  Now, you -- have you been told in the past that

14:28:09  7  you're paid a yearly salary?

14:28:11  8  A.   Yes, I have.

14:28:12  9  Q.   And do you know how that -- has that been explained to you

14:28:15  10  how that salary is broken down to produce this hourly rate?

14:28:19  11  A.   Yes.

14:28:19  12  Q.   And what's your understanding of that?

14:28:21  13  A.   My understanding is I receive a certain -- what's called a

14:28:26  14  salary, and it is broken down based on the number of hours I'm

14:28:30  15  assigned per year.  So I get an hourly -- a total compensation

14:28:35  16  for the year, and it's broken down to an hourly rate based on

14:28:40  17  my 48-hour workweek and 52 weeks a year.

14:28:44  18  Q.   And once it's broken down into a 48-hour workweek, is that

14:28:48  19  then the salary you receive for the hours that you work?

14:28:51  20  A.   For the hours that I work, yes.

14:28:52  21  Q.   And if you're asked to work an extra 24-hour shift in a

14:28:56  22  given week, do you receive an extra 24 hours pay?

14:28:59  23  A.   Yes, I do.

14:28:59  24  Q.   Now, of course, you understand that the medics -- the

14:29:02  25  clinical specialists, the paramedics, the EMTs -- they're paid

FITZPATRICK - DIRECT

14:29:07  1  on an hourly basis under this same pay scale, aren't they?

14:29:11  2  A.   Yes, they are.

14:29:12  3  Q.   Now -- but they're not considered exempt from overtime

14:29:15  4  under the FLSA by the City are they?

14:29:17  5  A.   No, they're not.

14:29:18  6  Q.   So when they work a 48-hour schedule, let's say, do you

14:29:22  7  know whether or not they get paid overtime for hours over 40?

14:29:25  8  A.   They do.

14:29:26  9  Q.   And so in a week in which they work their entire 48-hour

14:29:30  10 shift, would they get paid time and a half for the last eight

14:29:33  11 hours of work?

14:29:34  12 A.   Yes, they do.

14:29:35  13 Q.   Now, just looking at this same page, COA-35403, I see

14:29:42  14 that -- do you see that the 48-hour clinical specialists -- and

14:29:47  15 that's the captain, right?

14:29:49  16 A.   Yes.

14:29:49  17 Q.   They are on an hourly rate of $26.13, correct?

14:29:56  18 A.   Yes.

14:29:56  19 Q.   So -- and then if we look down, we see the EMS operations

14:29:59  20 supervisor, 48.  That would be you, right?

14:30:02  21 A.   Yes.

14:30:02  22 Q.   And then we see that you earn an hourly rate, if you're in

14:30:06  23 the same experience zone, of $30.70, correct?

14:30:09  24 A.   Correct.

14:30:10  25 Q.   Okay.  So that last eight hours of the week in which the

FITZPATRICK – DIRECT

14:30:16  1  clinical specialist works, they get time and a half, $26, that

14:30:19  2  would be in the $39 range, right?

14:30:23  3  A.   Correct.

14:30:23  4  Q.   So they actually get paid more than you for the last eight

14:30:26  5  hours of work each week, don't they?

14:30:28  6  A.   Yes.

14:30:29  7  Q.   Now, let's do the same thing with the EMS paramedic 48.

14:30:32  8  They show a salary –– and I'm looking at zone four –– or

14:30:36  9  $21.77, correct?

14:30:39  10  A.   Yes.

14:30:39  11  Q.   Now, again, if they got time and a half pay, do they get

14:30:43  12  paid more than you do for the last eight hours that you work?

14:30:46  13  A.   Yes, they do.

14:30:47  14  Q.   And if they work a shift on overtime, do they get paid

14:30:53  15  more for working a shift as a paramedic than you get paid

14:30:57  16  working a shift of overtime at straight time for the operations

14:30:59  17  supervisor position?

14:31:01  18  A.   Yes, they would.

14:31:02  19  Q.   And is that also true of the clinical specialist?

14:31:05  20  A.   Yes.

14:31:06  21  Q.   By the way, division chiefs, the next rank above you, are

14:31:10  22  they reflected on this chart?

14:31:11  23  A.   I don't see them.  They would be listed as EMS Operations

14:31:16  24  Manager.  It's not listed on this chart.

14:31:18  25  Q.   Okay.  Let's talk about the medics –– the EMTs, the

FITZPATRICK - DIRECT

14:31:25   1   paramedics, and the captains -- a little bit and how their

14:31:29   2   schedule plays out.  You supervise crews of paramedics, don't

14:31:33   3   you?

14:31:33   4   A.   Yes, I do.

14:31:34   5   Q.   And if I use the terms "medics," you'll understand I'm

14:31:37   6   talking about all three of those ranks.  Okay?

14:31:40   7   A.   Okay.

14:31:40   8   Q.   Now, we've already talked about that they're nonexempt.

14:31:44   9   What sorts of shifts do they work?

14:31:46  10   A.   The clinical specialists, paramedics, and medics work a

14:31:51  11   variety of shifts.  They all work 48-hour shifts in the field.

14:31:54  12   They'll work a variety of 12-hour shifts and 24-hour shifts,

14:31:59  13   something that will make up 48 hours in an entire week.

14:32:03  14   Q.   So a medic may work two 24-hour shifts, a 24 and two 12s,

14:32:08  15   but it always adds up to 48, correct?

14:32:10  16   A.   Yes.

14:32:11  17   Q.   And as we talked about, they get paid overtime for their

14:32:14  18   hours in excess of 40?

14:32:16  19   A.   Yes.

14:32:16  20   Q.   There's a lot of overtime in EMS, isn't there?

14:32:19  21   A.   Yes, there is.

14:32:20  22   Q.   And when they work an extra shift --

14:32:22  23        And that happens pretty regularly, doesn't it?

14:32:26  24   A.   Yes.

14:32:26  25   Q.   -- they get paid overtime for that?

FITZPATRICK – DIRECT

14:32:29   1    A.    Yes.

14:32:29   2    Q.    Now, we've talked about the fact that they're assigned to

14:32:32   3    district stations and ambulances, right?

14:32:34   4    A.    Yes.

14:32:35   5    Q.    And those assignments are awarded through a bidding

14:32:37   6    process, are they not?

14:32:38   7    A.    Correct.

14:32:39   8    Q.    And if I could direct your attention to Plaintiffs'

14:32:41   9    Exhibit 15, you'll see that book ahead of you.  Excuse me one

14:32:47  10    second.  And I believe we can publish this as being admitted.

14:32:56  11         We're looking at a -- a policy and procedure.  This

14:33:11  12    is Plaintiffs' Exhibit 15.  Okay.  We're looking at policy

14:33:17  13    number A10-D, correct?

14:33:20  14    A.    Yes.

14:33:20  15    Q.    And is that the policy for the shift bidding process?

14:33:24  16    A.    Yes, it is.

14:33:24  17    Q.    Now, do commanders control in any way who gets what shift?

14:33:28  18    A.    No, we do not.

14:33:29  19    Q.    Okay.  Are commanders in fact subject to this same shift

14:33:33  20    bidding process?

14:33:33  21    A.    Yes, we are.

14:33:35  22    Q.    Now, when does a shift generally start?  If you're working

14:33:39  23    a 24-hour shift, what hour of the day does the shift change

14:33:43  24    take place?

14:33:43  25    A.    A 24-hour shift -- the overwhelming majority of our shifts

FITZPATRICK - DIRECT

14:33:49  1  start at 7 a.m.

14:33:50  2  Q.   Okay.  And for 12-hour shifts, it would be 7 a.m. and

14:33:53  3  7 p.m.?

14:33:53  4  A.   Correct.

14:33:54  5  Q.   And there are a few shifts that start an hour early or

14:33:57  6  something like that, correct?

14:33:58  7  A.   At 6 a.m. and 6 p.m., yes.

14:34:00  8  Q.   And why is the difference for the ambulances?

14:34:03  9  A.   Because shift change requires personnel to come on and off

14:34:06  10  the ambulance.  We have a staggered shift change so that we

14:34:09  11  don't have all our ambulances simultaneously doing shift change

14:34:14  12  and potentially delaying a response.  So we kind of stagger it

14:34:18  13  across that hour period.

14:34:19  14  Q.   And how do the paramedics start their shift?  What's the

14:34:22  15  first thing they're required to do?

14:34:24  16  A.   The oncoming paramedic will report to the station and meet

14:34:29  17  the off-going crew member.  He'll receive equipment from

14:34:33  18  them -- the pagers, the keys, the radio, the narcotics for the

14:34:38  19  ambulance.  They'll do an exchange.  They'll get information as

14:34:41  20  to any deficiencies the vehicle had, any equipment

14:34:44  21  deficiencies.  And then they'll go out and check their

14:34:49  22  apparatus and make sure the apparatus is functioning properly

14:34:53  23  and all the medical equipment is functioning properly.

14:34:56  24  Q.   And once they get all their gear stored and everything --

14:34:59  25  and by the way, they're expected to be ready to go by 7 a.m. if

FITZPATRICK - DIRECT

14:35:02   1   they have a 7 a.m. start, aren't they?

14:35:04   2   A.   That's correct.

14:35:04   3   Q.   All that stuff you just talked about, that's supposed to

14:35:07   4   happen and so they're ready to go by 7 a.m., correct?

14:35:11   5   A.   That's correct.

14:35:11   6   Q.   And if a medic is on 24-hour shift, what's the rule, if

14:35:15   7   any, with regards to sleeping during that 24-hour shift?

14:35:19   8   A.   It's an EMS.  We kind of do it -- they sleep when they

14:35:24   9   can.

14:35:24  10   Q.   So hopefully they will get a sleeping period, but they're

14:35:28  11   always subject to call --

14:35:29  12   A.   That's correct.

14:35:30  13   Q.   -- twenty-four hours a day?

14:35:32  14          Now, let's talk about the vehicles that they use.

14:35:36  15   What sort of vehicles do the medics ride in?

14:35:40  16   A.   We use -- all our medics use transport ambulances.

14:35:43  17   They're advanced life support ambulances.  Some of the ones

14:35:47  18   with the introduction of the Medic I's are paramedic and EMTs

14:35:52  19   riding on an ambulance, but they're all capable of advanced

14:35:56  20   life support.

14:35:56  21   Q.   And, generally, they run with two-member crews?

14:35:59  22   A.   As a minimum, yes.

14:36:00  23   Q.   Sometimes there's three for training purposes?

14:36:03  24   A.   Yes.  There's a cadet, possibly.

14:36:05  25   Q.   And if there is a training situation, who generally

```
14:36:08   1   conducts that training?

14:36:09   2   A.   It's the clinical specialist or captain.

14:36:12   3   Q.   Now, you have a CADS dispatch system, don't you?

14:36:15   4   A.   Yes, we do.

14:36:16   5   Q.   CADS is an acronym.  What does it stand for if you know?

14:36:20   6   A.   It stands for Computer-Aided Dispatch System.

14:36:21   7   Q.   Okay.  And what does the CADS do with regard to the

14:36:26   8   ambulances?  How, if at all, does it monitor them during their

14:36:29   9   shift?

14:36:30  10   A.   Each one of our response apparatus in the Operations

14:36:33  11   Section is equipped with something called an AVL, an Automatic

14:36:37  12   Vehicle Locator.  So basically via GPS, the CAD knows where all

14:36:42  13   our ambulances and all our supervisor vehicles are.

14:36:45  14            Based on that information, as a medical emergency

14:36:47  15   pops up, the CAD system will recognize the closest appropriate

14:36:52  16   unit to send, ambulances and command vehicles, and send them to

14:36:56  17   the emergency.

14:36:56  18   Q.   Now, are you familiar with something called the dispatch

14:36:59  19   matrix?

14:36:59  20   A.   Yes, I am.

14:37:00  21   Q.   What is the dispatch matrix?

14:37:02  22   A.   The dispatch matrix specifically is what our CAD system

14:37:07  23   uses to determine which ambulances, the number and type of

14:37:11  24   ambulance, or if an ambulance supervisor vehicle is sent to

14:37:14  25   certain medical emergencies.
```

FITZPATRICK – DIRECT

| | | |
|---|---|---|
| 14:37:17 | 1 | Q.   Are the ambulances considered part of the vehicles that |
| 14:37:21 | 2 | are tracked under the dispatch matrix? |
| 14:37:23 | 3 | A.   Yes, they are. |
| 14:37:24 | 4 | Q.   And they're tracked for what purpose? |
| 14:37:26 | 5 | A.   They're tracked to see, one, where they are.  If they're |
| 14:37:30 | 6 | the closest to an emergency, but also to check their |
| 14:37:33 | 7 | availability status.  If they're already assigned to a call, |
| 14:37:36 | 8 | they can't be assigned to another call.  So it checks their |
| 14:37:39 | 9 | availability. |
| 14:37:40 | 10 | Q.   So does CADS understand the ambulances, then, to be part |
| 14:37:43 | 11 | of emergency response that's available? |
| 14:37:45 | 12 | A.   Yes, they do. |
| 14:37:46 | 13 | Q.   EMTs, paramedics, all of the medics, do they have the same |
| 14:37:51 | 14 | basic responsibilities during their shifts? |
| 14:37:53 | 15 | A.   Yes, they do. |
| 14:37:54 | 16 | Q.   I guess clinical specialists or captains have some |
| 14:37:57 | 17 | additional training responsibilities at times, correct? |
| 14:38:00 | 18 | A.   Correct. |
| 14:38:01 | 19 | Q.   Now, looking at those captains for a moment, can they |
| 14:38:07 | 20 | sometimes substitute for commanders like yourself? |
| 14:38:10 | 21 | A.   Yes.  They work a higher class and are able to fill in for |
| 14:38:13 | 22 | the commander if there's a vacancy. |
| 14:38:15 | 23 | Q.   You mentioned earlier that you at one point took a |
| 14:38:17 | 24 | position as an acting commander back in the day, right? |
| 14:38:21 | 25 | A.   Yes. |

14:38:21  1   Q.   Is a captain in some way sort of considered like an acting

14:38:25  2   commander?

14:38:26  3   A.   It's similar.

14:38:27  4   Q.   Let's talk about field commanders then.  And that would be

14:38:31  5   people like yourself, correct?

14:38:32  6   A.   Yes.

14:38:32  7   Q.   Now, you're a spec ops commander.  But, of course, we're

14:38:37  8   talking here about all of the field commanders, both spec ops

14:38:40  9   and regular field commanders.  Okay?

14:38:42  10  A.   Okay.

14:38:42  11  Q.   Now, commanders, of course, are treated as exempt for

14:38:46  12  overtime purposes, correct?

14:38:47  13  A.   Yes.

14:38:48  14  Q.   And they're paid an hourly rate for all their hours

14:38:52  15  worked?

14:38:53  16  A.   Yes, we are.

14:38:53  17          MR. COPPOLA:  Objection, Your Honor.  Leading.

14:38:55  18          THE COURT:  Sustained.

14:38:56  19          MR. DEATS:  I'll rephrase.

14:38:57  20  Q.   (BY MR. DEATS) What's your understanding of how the

14:38:59  21  commanders are paid for the hours that they work?

14:39:01  22  A.   Commanders are paid our straight regular rate hourly rate

14:39:07  23  for all hours worked in Operations.

14:39:09  24  Q.   And when we looked at Defendant's Exhibit 36 a moment ago,

14:39:13  25  that had the hourly rates listed for the various positions,

14:39:16  1  including your own, correct?

14:39:18  2  A.   Yes, it did.

14:39:19  3  Q.   So if we want to know that hourly rate, we can go right to

14:39:23  4  the pay table which is Defendant's Exhibit 36?

14:39:25  5  A.   Yes.

14:39:25  6  Q.   Now, I want to ask you:  Are you guaranteed a certain

14:39:34  7  salary without regard to the quantity or quality of your work?

14:39:38  8           MR. COPPOLA:  Objection, Your Honor.  Again, I think

14:39:40  9  this is trying to contradict the admission, and I object.

14:39:45  10  They're not allowed to do that.

14:39:47  11           THE COURT:  Well, you're going to have to show me the

14:39:50  12  admission because the admissions are not in evidence.

14:39:52  13           MR. COPPOLA:  Admission number one, Your Honor.

14:39:54  14           THE COURT:  The admission number one that we read?

14:39:57  15           MR. COPPOLA:  Yes, sir.  It's Defendant's Exhibit 57.

14:40:11  16           THE COURT:  All right.  Now, how do you contend that

14:40:14  17  he is giving testimony that is different from the answer to the

14:40:20  18  admission.

14:40:21  19           MR. COPPOLA:  I believe that the plaintiff is trying

14:40:23  20  to give testimony that he's not paid a salary, Your Honor, that

14:40:30  21  he's paid on an hourly basis.  And the admission clearly states

14:40:33  22  that they are paid a salary.

14:40:35  23           THE COURT:  Well, the admission is:  Admit that you

14:40:38  24  earn or earned at least $455 per week in salary.

14:40:43  25           I'm going to overrule the objection and allow

FITZPATRICK - DIRECT

14:40:46   1    Mr. Deats to explore that.  And you can revisit it on

14:40:49   2    cross-examination.

14:40:51   3              MR. COPPOLA:  Thank you.

14:40:52   4    Q.   (BY MR. DEATS) So back to the question:  Are you

14:40:59   5    guaranteed a certain set salary each week without regards to

14:41:04   6    the number of hours that you work?

14:41:06   7    A.   No, I am not.

14:41:07   8    Q.   Okay.  Has anyone ever told you that you're guaranteed a

14:41:11   9    certain salary without regards to the number of hours that you

14:41:14   10   work?

14:41:14   11   A.   No, they have not.

14:41:15   12   Q.   What happens if, for example, a district commander is late

14:41:18   13   to work for an hour and so only works 47 hours in a week?  What

14:41:22   14   would you expect to happen based on your experience?

14:41:25   15   A.   I would get docked an hour of pay.

14:41:27   16   Q.   Is there in fact a term for that the EMS uses?

14:41:30   17   A.   The term is "absent without leave," yes.

14:41:33   18   Q.   Okay.  Have you also heard of a term of called "zero

14:41:36   19   time"?

14:41:36   20   A.   Zero time, yes.

14:41:37   21   Q.   And so would you expect that a commander in fact would get

14:41:41   22   zero time for something like that?

14:41:42   23   A.   Yes.

14:41:43   24              MR. COPPOLA:  Objection, Your Honor.  Calls for

14:41:44   25   speculation.

FITZPATRICK - DIRECT

14:41:45    1            THE COURT:  I'll sustain.  You can restate the

14:41:48    2    question.

14:41:48    3            MR. DEATS:  Okay.

14:41:49    4    Q.   (BY MR. DEATS) I want to direct your attention -- and

14:42:06    5    let's not publish this yet -- to Plaintiffs' Exhibit 51.  Do

14:42:30    6    you have before you what looks to be a Policy and Procedure of

14:42:34    7    Austin-Travis County EMS?

14:42:36    8    A.   Yes, I do.

14:42:36    9    Q.   Do you recognize this procedure?

14:42:38   10    A.   Yes, I do.

14:42:39   11    Q.   Could you describe it, please.

14:42:39   12    A.   It's the procedure that governs light duty assignments?

14:42:43   13    Q.   For personnel that, for example, are injured?

14:42:47   14    A.   For any and all EMS personnel, yes.

14:42:49   15    Q.   And does this appear to be a true and correct copy of the

14:42:52   16    actual policy and procedure?

14:42:54   17    A.   Yes, it does.

14:42:55   18            MR. DEATS:  Your Honor, at this time I ask that this

14:42:57   19    be admitted into evidence as Plaintiffs' Exhibit 51.

14:43:05   20            MR. COPPOLA:  Your Honor, once again I object on the

14:43:07   21    basis that the plaintiff is attempting to introduce this

14:43:10   22    particular exhibit to contradict their clearly admitted

14:43:13   23    statement that they're paid a salary.  That's what this exhibit

14:43:17   24    is intended for, and I'm objecting on that basis.

14:43:20   25            THE COURT:  Mr. Deats?

14:43:20  1          MR. DEATS:  Your Honor, we're not at all trying to

14:43:22  2   contradict the fact that we receive a salary of more than $455

14:43:27  3   a week.  However, there is an issue between the parties of

14:43:30  4   whether or not these plaintiffs are paid on a salary basis.

14:43:34  5   That is a term of art.  Under the FLSA it means that you're

14:43:39  6   guaranteed a certain set amount each week that you work without

14:43:42  7   regard to the quality or quantity of work that is actually

14:43:46  8   performed.  This testimony goes directly to that issue of

14:43:48  9   whether or not district commanders are guaranteed a weekly

14:43:51 10   salary that does not change because of quantity or quality of

14:43:56 11   work performed.

14:43:58 12          MR. COPPOLA:  Your Honor, number one, I believe

14:44:00 13   Mr. Deats misstates the law with respect to public employees.

14:44:04 14   They –– they do not need to be guaranteed a salary if there's a

14:44:08 15   system of leave in place.  And, number two, once again, there

14:44:10 16   was no objection to the admission, that it was unclear or that

14:44:13 17   it was vague.  Plaintiffs clearly admitted that they are paid a

14:44:17 18   salary.

14:44:19 19          THE COURT:  No.  I'm going to overrule the

14:44:22 20   objection.  I'm going to allow, again, as I said earlier,

14:44:26 21   Plaintiffs to prove the component parts of the admission to

14:44:32 22   admission number one, and you may cross-examine him on it.  So

14:44:36 23   the objection is overruled.

14:44:37 24          Plaintiff's Exhibit No. 51 is admitted.

14:44:43 25   Q.   (BY MR. DEATS) Okay.  I'd like to ask you to turn your

FITZPATRICK - DIRECT

14:44:45   1   attention now to page 2 of Exhibit 51.  And we can go ahead and

14:44:49   2   publish this for the jury.

14:44:50   3        And I'm directing you towards the bottom half of the

14:44:58   4   page, the paragraph that starts with:  "The employee who is

14:45:00   5   offered a light duty assignment may have the following

14:45:02   6   options."  And if we could highlight that.

14:45:11   7        Under the policy, what's your understanding of what

14:45:13   8   happens to a 48-hour employee who gets a light duty assignment

14:45:17   9   that's a 40-hour office job?

14:45:19  10   A.   If you're a 48-hour workweek employee and assigned to a

14:45:24  11   40-hour office job, you have the opportunity to either work 48

14:45:28  12   hours that week to make your salary or you're allowed to use

14:45:31  13   benefit time to make up the additional hours.

14:45:34  14   Q.   And if you don't do either of those two things, if you

14:45:38  15   look at the last bullet there, what happens to that employee

14:45:43  16   that has a 48-hour job but gets a light duty assignment that

14:45:48  17   covers only a 40-hour office a week?

14:45:51  18   A.   The employee would receive leave without pay for those

14:45:54  19   remaining hours.

14:45:55  20   Q.   Okay.  Does this policy, if you know, apply to district

14:45:59  21   commanders?

14:45:59  22   A.   Yes, it does.

14:46:00  23   Q.   So if a district commander is hurt and is given a light

14:46:06  24   duty job in the office, 40 hours, there's a chance they won't

14:46:09  25   be paid for the full 48 unless they use leave.  Correct?

14:46:12  1          MR. COPPOLA:  Objection, Your Honor.  This calls for

14:46:14  2  speculation and leading.

14:46:15  3          THE COURT:  Well, I'll sustain as to leading.

14:46:18  4  Q.   (BY MR. DEATS) Well, in fact, do you know whether or not

14:46:34  5  this has been put into place for employees who are district

14:46:38  6  commanders?

14:46:38  7  A.   Yes, it has.

14:46:40  8  Q.   I'll ask you to turn your attention to Plaintiffs'

14:46:43  9  Exhibit 54.  And let's not publish that.

14:47:01  10         Let's talk about another situation.  Now, we talked

14:47:03  11  about getting shifts under the shift bidding procedure, did we

14:47:07  12  not?

14:47:07  13  A.   Yes, we did.

14:47:07  14  Q.   And how often do you get to bid for a new shift, a new

14:47:11  15  duty station, a new time, et cetera?

14:47:13  16  A.   Approximately every six months.

14:47:15  17  Q.   And do you know whether or not it occurs that when you

14:47:19  18  change from one shift to another, that it affects the number of

14:47:22  19  hours that you work in a week?

14:47:23  20  A.   It can.

14:47:24  21  Q.   And how -- can it affect it so that you may have fewer

14:47:28  22  than 48 hours that you're scheduled to work in a week because

14:47:31  23  of the change in your shift?

14:47:32  24  A.   Yes.

14:47:33  25  Q.   And do you know what -- and, of course, you indicated that

FITZPATRICK – DIRECT

14:47:39   1   both district commanders and employees under them are subject

14:47:42   2   to this shift bidding process, correct?

14:47:44   3   A.   Yes, we are.

14:47:45   4   Q.   If a commander, because of a change in their bid, works

14:47:48   5   fewer than 48 hours in a week during that shift change, what

14:47:52   6   happens?  Are they nonetheless paid for the 48 hours of work?

14:47:56   7   A.   No, they are not.

14:47:57   8   Q.   What is your understanding of what occurs?

14:47:59   9   A.   My understanding is you are allowed to make up the

14:48:02  10   difference with benefit time or subject to not being paid for

14:48:08  11   those hours that you are missing.

14:48:10  12   Q.   And if we look at Plaintiffs' Exhibit 54 -- and let's not

14:48:15  13   publish that yet -- do you recognize this as a document that

14:48:20  14   relates to one of these situations?

14:48:22  15   A.   Yes, it is.

14:48:22  16   Q.   And did you come into possession of this document

14:48:25  17   recently?

14:48:26  18   A.   Yes.

14:48:26  19   Q.   And could you describe it for me.

14:48:28  20   A.   It's an E-mail from our scheduling supervisor to one of

14:48:31  21   the district commanders, also including a CC to the division

14:48:36  22   chief over that specific division.  This is the exact situation

14:48:42  23   that, because she moved from one schedule to another, it puts

14:48:47  24   her in a shift conflict which would result in her not being

14:48:51  25   paid the full 48 hours that week.

| | | |
|---|---|---|
| 14:48:54 | 1 | Q.   Okay.  And does this appear to be a true and correct copy |
| 14:48:57 | 2 | of the document you received recently reflecting this E-mail |
| 14:49:00 | 3 | exchange? |
| 14:49:01 | 4 | A.   Yes, it is. |
| 14:49:02 | 5 | MR. DEATS:  Your Honor, I ask that this be admitted |
| 14:49:04 | 6 | as Plaintiffs' Exhibit 54. |
| 14:49:06 | 7 | MR. COPPOLA:  Your Honor, I have the same objection |
| 14:49:07 | 8 | with respect to the admission, and I also object that this |
| 14:49:11 | 9 | document was not produced during the discovery period. |
| 14:49:15 | 10 | MR. DEATS:  Your Honor, with regard to the latter |
| 14:49:17 | 11 | part of the objection, I think the Court will notice that this |
| 14:49:20 | 12 | document was sent on October 17th, 2012, so the document wasn't |
| 14:49:26 | 13 | created until after the discovery period had run.  You'll |
| 14:49:30 | 14 | notice that we did promptly put a Bates label on it and provide |
| 14:49:33 | 15 | it to the defendants at that time.  So I don't think that's a |
| 14:49:38 | 16 | fair objection. |
| 14:49:38 | 17 | THE COURT:  Mr. Coppola, when did you receive a copy |
| 14:49:41 | 18 | of the exhibit? |
| 14:49:42 | 19 | MR. COPPOLA:  I believe about a week ago, Your Honor. |
| 14:49:45 | 20 | THE COURT:  All right.  And Mr. Deats, how do you |
| 14:49:49 | 21 | respond to the first part of the objection? |
| 14:49:51 | 22 | MR. DEATS:  Your Honor, with regards to first part of |
| 14:49:54 | 23 | the objection, I believe that the admission does not constitute |
| 14:49:57 | 24 | an admission that the employees are paid on a salary basis for |
| 14:50:01 | 25 | the same reason that I stated earlier.  That is a term of art |

14:50:05  1   under the FLSA.  Although Mr. Coppola and I may disagree about

14:50:09  2   what it means, it certainly is not an admission that he wants

14:50:13  3   to make it into.

14:50:14  4          THE COURT:  Well, again, I'm going to deny the

14:50:17  5   objection with regard to whether it's a conflict with the

14:50:20  6   admissions.  I think it's part of building up to what was

14:50:25  7   admitted, and the City can cross-examine on it.  I will also

14:50:31  8   overrule the objection to the late disclosure.  I find that it

14:50:35  9   was disclosed as soon as it was available and there is no

14:50:41 10   question as to its authenticity.  And so I will overrule the

14:50:48 11   objection.

14:50:48 12          Plaintiff's Exhibit No. 54 is admitted.

14:50:54 13          MR. DEATS:  And let's go ahead and publish that to

14:50:57 14   the jury, then.

14:50:57 15   Q.   (BY MR. DEATS) And I'm looking at the first page of the

14:51:00 16   exhibit.  It's P-2853.  Do you see that?

14:51:04 17   A.   Yes, I do.

14:51:04 18   Q.   And this is a situation in which the employee was given

14:51:08 19   four options when she had fewer than 48 hours in a week due to

14:51:12 20   a shift change?

14:51:13 21   A.   That's correct.

14:51:14 22   Q.   And one of those options was no pay for the hours that she

14:51:23 23   would miss because of that?

14:51:24 24   A.   That's correct.

14:51:30 25   Q.   And, of course, commanders do get a straight hourly rate

FITZPATRICK - DIRECT

14:51:33  1  for all the hours that they work over 40, correct?

14:51:36  2  A.   Yes, we do.

14:51:36  3  Q.   The same hourly rate that you get for hours under 40 in a

14:51:41  4  week?

14:51:41  5  A.   Correct.

14:51:41  6  Q.   And if you work an extra shift, you do get paid straight

14:51:45  7  time, do you not?

14:51:45  8  A.   Yes, we do.

14:51:46  9  Q.   Let's talk about field commander work schedules.  What

14:51:51  10  sort of a work schedule do you keep?

14:51:53  11  A.   I'm currently assigned two 24-hour shifts a week.

14:51:57  12  Q.   Is the same true for all of the district commanders?

14:52:00  13  A.   All the field district commanders, yes.

14:52:02  14  Q.   And we are talking about just the field commanders right

14:52:05  15  now.  And, of course, that's all the plaintiffs except one of

14:52:07  16  them in this case, is it not?

14:52:09  17  A.   Correct.

14:52:09  18  Q.   Now, you don't have this sort of 12-hour shift thing, but

14:52:14  19  you all do work 48 hours a week, then?

14:52:16  20  A.   Yes.

14:52:17  21  Q.   Now, what about assignment commanders?  You've indicated

14:52:29  22  they're assigned to a district, right?

14:52:29  23  A.   Yes.

14:52:29  24  Q.   Six on duty at any one time to cover the six districts?

14:52:32  25  A.   Correct.

14:52:32   1   Q.   And what sort of a vehicle are you assigned?

14:52:35   2   A.   We're in ALS first response vehicle.

14:52:38   3   Q.   Sometimes referred to as a command vehicle?

14:52:40   4   A.   Correct.

14:52:40   5   Q.   And what about your location?  Where are you stationed?

14:52:46   6   A.   Our command districts are stationed around Travis County.

14:52:50   7   It's 1100 square miles for us to cover, so we're geographically

14:52:54   8   placed so that we can cover the various parts of it with some

14:52:57   9   degree of certainty.

14:52:58   10   Q.   Okay.  So you're housed in a station rather than the

14:53:02   11   headquarters office, for example?

14:53:02   12   A.   That's correct.  We're housed usually at EMS stations or

14:53:05   13   fire stations with an ambulance.

14:53:06   14   Q.   When you say you're housed in EMS stations, is it

14:53:09   15   sometimes that you're stationed in a station along with a

14:53:12   16   paramedic crew?

14:53:13   17   A.   Yes.

14:53:14   18   Q.   And your 24-hour shifts, when do they start?

14:53:24   19   A.   At 7 a.m.

14:53:25   20   Q.   And how do you start your shift each day?  You talked

14:53:28   21   about how the medics start their shift.  How do you start your

14:53:32   22   shift?

14:53:32   23   A.   It's very similar.  I arrive on duty.  I meet the oncoming

14:53:36   24   district -- the off-going district commander.  I receive

14:53:41   25   radios, pagers, keys, narcotics, a shift report from them about

FITZPATRICK - DIRECT

186

14:53:46   1   what happened during their shift, deficiencies of my vehicle,

14:53:50   2   equipment problems that I may have from my vehicle.  I remove

14:53:54   3   their gear from the truck.  I place my response gear on there.

14:53:56   4   I check out my apparatus to make sure the medical equipment is

14:54:01   5   functioning properly and present.  I check the apparatus to

14:54:04   6   make sure it functions properly and present.

14:54:07   7   Q.   And you mentioned that your command vehicle is an advanced

14:54:09   8   life support vehicle, correct?

14:54:10   9   A.   That's correct.

14:54:11   10  Q.   And how, if at all, does it differ from the ambulances

14:54:15   11  that the medics use?

14:54:16   12  A.   It carries all the same equipment as the ambulance except

14:54:21   13  for the stretcher.  We don't transport people to the hospital

14:54:23   14  in a command vehicle.

14:54:24   15  Q.   Does that mean you don't ever assist in transports, then?

14:54:28   16  A.   No, it does not.

14:54:29   17  Q.   And we'll get to that a little bit later.  Now, given that

14:54:32   18  you don't carry a stretcher, do you recall whether or not you

14:54:35   19  carry any equipment an ambulance doesn't carry?

14:54:39   20  A.   Yes, we do.

14:54:40   21  Q.   What types of equipment might you have that an ambulance

14:54:43   22  does not?

14:54:43   23  A.   We carry certain monitors like a carbon monoxide detector

14:54:48   24  which allow us to level blood levels of carbon monoxide when

14:54:48   25  people are exposed to that.  We also carry a Stokes basket,

FITZPATRICK - DIRECT

14:54:52  1    which is kind of rescue litter that we can go ahead and place

14:54:56  2    patients in that are in wilderness environments, on cliff

14:55:00  3    sides, or things of that nature.

14:55:02  4    Q.    Somebody falls off of Mount Bonnell, for example, you

14:55:04  5    might use a Stokes basket?

14:55:05  6    A.    That's correct.

14:55:06  7    Q.    And that has happened on occasion?

14:55:08  8    A.    Yes, it has.  More than once.

14:55:10  9    Q.    What about a cyanide antidote kit?

14:55:14  10   A.    Yes.  We carry that as well.

14:55:16  11   Q.    Okay.  Where might that prove useful.

14:55:18  12   A.    In industry around here, chemicals that are used sometimes

14:55:22  13   are toxic along that nature.  And cyanide antidote kits are --

14:55:26  14   within minutes, someone can die from cyanide poisoning.  And to

14:55:30  15   have that available is necessary.

14:55:31  16   Q.    Is that sometimes a consideration at fire scenes?

14:55:34  17   A.    Yes, it is.

14:55:34  18   Q.    So might that be another place where you would use a

14:55:38  19   cyanide antidote kit?

14:55:40  20   A.    Possibly.

14:55:40  21   Q.    Any other types of equipment that you carry that the

14:55:43  22   ambulance doesn't that you can think of?

14:55:45  23   A.    I carry an AED, Automatic External Defibrillator, the

14:55:52  24   ambulances don't routinely carry.

14:55:55  25   Q.    Do they have equipment that they can use sometimes for the

14:55:57  1   same purpose?

14:55:58  2   A.   Yes, they do.

14:55:59  3   Q.   Okay.  And what would that be?

14:56:00  4   A.   They have a cardiac monitor which performs basically the

14:56:02  5   same function as my AED does.

14:56:04  6   Q.   Okay.  And do you also have a cardiac monitor?

14:56:06  7   A.   Yes, I do.

14:56:07  8   Q.   Now, this extra equipment that you carry, does that

14:56:12  9   require your dispatch to certain types of calls?

14:56:16  10  A.   Yes, it does.

14:56:17  11  Q.   Because you have the equipment that the ambulance does

14:56:20  12  not?

14:56:21  13  A.   That's correct.

14:56:21  14  Q.   Now, we talked about the dispatch matrix.  Are command

14:56:25  15  vehicles carried in the dispatch matrix?

14:56:27  16  A.   Yes.

14:56:28  17  Q.   And what does that mean?  Are you considered part of the

14:56:30  18  vehicles ready and able to assist in medical emergencies?

14:56:33  19  A.   Yes.  The CAD system tracks us just like it does the

14:56:36  20  ambulances.  It realizes we don't transport people to the

14:56:40  21  hospital, but it knows our capabilities.

14:56:42  22  Q.   And besides the ambulances and your vehicles, are there

14:56:47  23  other vehicles that the dispatch matrix keeps track of as part

14:56:51  24  of the emergency response team?

14:56:54  25  A.   Not routinely, no.

FITZPATRICK - DIRECT

14:56:55   1   Q.   Okay.  Let's talk about the division chiefs and above.

14:56:58   2   You're supervised by a division chief, are you not?

14:57:00   3   A.   Yes, I am.

14:57:01   4   Q.   And there are two divisions chiefs over Operations?

14:57:07   5   A.   That's correct.

14:57:07   6   Q.   And they're considered exempt for overtime purposes?

14:57:10   7   A.   Yes, they are.

14:57:11   8   Q.   What sort of workweek do they work?

14:57:13   9   A.   They work 40-hour weeks at headquarters.

14:57:18   10  Q.   I may have misheard.  They work what hours?

14:57:20   11  A.   They work 40-hour weeks.

14:57:21   12  Q.   Forty hours a week?

14:57:23   13  A.   Yes.  Forty.

14:57:24   14  Q.   Okay.  And sort of a Monday through Friday assignment?

14:57:26   15  A.   Generally, yes.

14:57:28   16  Q.   Are they assigned to a station?  Where do they report to

14:57:32   17  work?

14:57:32   18  A.   They report to work at our headquarters.

14:57:35   19  Q.   They obviously don't do shift work if they work a 40-hour

14:57:39   20  a week, do they?

14:57:40   21  A.   No, they do not.

14:57:41   22  Q.   Their vehicles, what sort of vehicles are they given?

14:57:44   23  A.   They have Tahoes that they use.

14:57:47   24  Q.   Okay.  And are they considered ALS response vehicles?

14:57:50   25  A.   No, they are not.

FITZPATRICK - DIRECT

14:57:52    1    Q.    Are they routinely dispatched to calls?

14:57:57    2    A.    Not routinely, no.

14:57:59    3    Q.    And does CADS keep track of their whereabouts for purposes

14:58:03    4    of dispatch to medical emergencies?

14:58:05    5    A.    Not routinely, no.

14:58:06    6    Q.    Are they considered an available resource for response to

14:58:10    7    medical emergencies?

14:58:12    8    A.    Not routinely.

14:58:13    9    Q.    I want to take a moment now and talk a little bit about

14:58:16   10    the history of this dispute.  And I'm going to take you back to

14:58:22   11    the year 2006.  You heard the testimony that you may -- you

14:58:26   12    heard the opening statements, didn't you?

14:58:29   13    A.    Yes, I did.

14:58:29   14    Q.    Okay.  Kind of made a deal, and now you're not living up

14:58:33   15    to it?

14:58:34   16    A.    Yes, I did.

14:58:35   17    Q.    Let's talk about 2006.  Did anything happen in 2006 --

14:58:39   18    A.    Yes.

14:58:39   19    Q.    -- that made you question your status?

14:58:41   20    A.    Yes, it did.

14:58:41   21    Q.    And what was that?

14:58:42   22    A.    In 2006 there was a change in our workweek.  We went from

14:58:51   23    being on 24 on, 48 off shifts, which was an average of a

14:58:55   24    56-hour workweek to 48-hour workweek.

14:58:58   25    Q.    And in the context of that, did you learn anything about

14:59:03  1   the job of a -- excuse me -- of a district commander as a first

14:59:10  2   responder?

14:59:11  3   A.   Yes.

14:59:12  4   Q.   Okay.  And what do you recall finding out in 2006?

14:59:17  5   A.   In 2006 the changes that were being made, we questioned

14:59:26  6   how we were being compensated at that point.

14:59:29  7   Q.   And in the context of that, did you learn that there had

14:59:32  8   been some new rulings or regulations that had come down from

14:59:34  9   the Department of Labor?

14:59:36  10          MR. COPPOLA:  Your Honor, I'm just going to object to

14:59:37  11  relevance in terms of issues that are before the jury.

14:59:41  12          THE COURT:  Mr. Deats?

14:59:42  13          MR. DEATS:  Your Honor, these -- this goes to two

14:59:45  14  issues.  Of course, it goes to the issue of good faith.  But it

14:59:48  15  also goes to the issue of the consistency of the EMS position

14:59:54  16  over the years as it regards to this subject and also to the

14:59:58  17  credibility of their witnesses to some extent.

15:00:01  18          THE COURT:  They haven't called any witnesses yet.

15:00:04  19          MR. DEATS:  They haven't, Your Honor, and of course I

15:00:05  20  am anticipating some testimony here.  But, you know, the

15:00:08  21  parties have engaged in quite a bit of discovery, and I know

15:00:11  22  the position they're taking.  And so while I've got this

15:00:15  23  witness on the stand, I'm trying to get all the evidence he has

15:00:17  24  that relate to all of the subjects.

15:00:19  25          THE COURT:  I will overrule the objection.

FITZPATRICK – DIRECT

15:00:22  1  Q.    (BY MR. DEATS) Now, let's back up for a moment and let's

15:00:26  2  talk about the job description that was in effect in 2006.

15:00:31  3           I'll ask you, if you would, to turn your attention to

15:00:34  4  Plaintiffs' Exhibit 1.  Do you recognize that document?

15:00:46  5  A.    Yes, I do.

15:00:46  6  Q.    Could you describe it?

15:00:48  7  A.    It's an EMS district commander job description dated --

15:00:52  8  approved December 1st, 2001.  I'm sorry.  2000.  It says last

15:00:58  9  revised April 23rd, 2001.

15:01:01  10  Q.    And it's a multipage document.  And, of course, you were

15:01:04  11  employed when this job description was in effect, were you not?

15:01:07  12  A.    Yes, I was.

15:01:08  13  Q.    And does this appear to you to be a true and correct copy

15:01:11  14  of the job description?

15:01:12  15  A.    Yes, it does.

15:01:12  16           MR. DEATS:  Your Honor, I ask that this be admitted

15:01:14  17  as Plaintiffs' Exhibit 1

15:01:17  18           THE COURT:  Mr. Coppola?

15:01:18  19           MR. COPPOLA:  Your Honor, I object to the relevance

15:01:19  20  of this exhibit.  The parties have stipulated that the relevant

15:01:22  21  period in this case is about April 2009 to the present.  This

15:01:26  22  job -- this job description went out of effect in 2008.

15:01:30  23           THE COURT:  Mr. Deats, it's pretty remote.

15:01:32  24           MR. DEATS:  Your Honor, we -- this wasn't in effect

15:01:37  25  until 2008.  But if allowed to proceed, I think he's going to

FITZPATRICK - DIRECT

15:01:40 1  testify that this job description is in fact the job

15:01:42 2  description that most accurately talks about what the district

15:01:46 3  commanders actually do today.

15:01:48 4          THE COURT:  Well, I'm going to sustain the objection

15:01:51 5  to the exhibit.  You may ask him questions about what the

15:01:57 6  commanders do today.  And then my ruling is without prejudice

15:02:02 7  to your re-offering it if you can link it up to an issue that

15:02:07 8  is relevant in this case.

15:02:09 9          MR. DEATS:  Okay.  Your Honor, may I allow the

15:02:19 10 witness to refer to this exhibit?

15:02:20 11         THE COURT:  He may refer to the exhibit to refresh

15:02:22 12 his memory, but he can't testify from the exhibit.

15:02:25 13         MR. DEATS:  Very good, Your Honor.

15:02:26 14 Q.  (BY MR. DEATS) Okay.  I'll ask you, if you could, to look

15:02:31 15 at pages 2 through 3 of the exhibit.  Read those to yourself

15:02:36 16 quickly and indicate to me when you've finished?

15:02:40 17 A.  (Reviews document)

15:03:02 18         Okay.

15:03:02 19 Q.  Now, do you recall whether or not today -- and I'm talking

15:03:05 20 about today, right now.  Okay?

15:03:08 21         When you respond to emergency calls, do you respond

15:03:10 22 to provide medical care in support of the system?

15:03:13 23 A.  Yes, I do.

15:03:13 24 Q.  Do you recall whether or not you respond to emergency

15:03:16 25 calls as required to provide medical incident command?

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 15:03:19 | 1 | A.    Yes, I do. |
| 15:03:20 | 2 | Q.    Do you recall whether or not you're required to check the |
| 15:03:24 | 3 | condition of your vehicle, to make sure that it's ready to go |
| 15:03:26 | 4 | and that it meets all the specifications needed to engage in |
| 15:03:29 | 5 | emergency response? |
| 15:03:30 | 6 | A.    Yes, I do. |
| 15:03:31 | 7 | Q.    Are you required to respond to requests for assistance, |
| 15:03:36 | 8 | specifically requests for medical assistance? |
| 15:03:38 | 9 | A.    Yes, I am. |
| 15:03:39 | 10 | Q.    Things like responding to scenes of illness or injury? |
| 15:03:42 | 11 | A.    Yes. |
| 15:03:42 | 12 | Q.    Things like determining situational needs and providing |
| 15:03:47 | 13 | scene safety at an emergency site? |
| 15:03:50 | 14 | A.    Yes. |
| 15:03:50 | 15 | Q.    Locate all victims involved in an emergency.  Is that part |
| 15:03:54 | 16 | of your job? |
| 15:03:54 | 17 | A.    Yes, is. |
| 15:03:55 | 18 | Q.    Do you know whether or not you coordinate and direct the |
| 15:03:57 | 19 | activities of other public safety personnel at times? |
| 15:04:01 | 20 | MR. COPPOLA:  Your Honor, he's simply leading the |
| 15:04:03 | 21 | witness through the exhibit.  He's testifying -- |
| 15:04:04 | 22 | THE COURT:  Sustained as to leading.  Ask him the |
| 15:04:09 | 23 | questions. |
| 15:04:10 | 24 | MR. DEATS:  Very good, Your Honor. |
| 15:04:11 | 25 | Q.    (BY MR. DEATS) What -- what, if anything, do you do with |

FITZPATRICK - DIRECT

15:04:13   1   regard to patient assessment when you make a call?

15:04:17   2   A.   I do what any other paramedic would do on a patient

15:04:21   3   assessment.  I perform primary and secondary surveys, vital

15:04:25   4   signs, place them on a cardiac monitor if necessary to do a

15:04:28   5   full thorough assessment of the patient, medical or trauma

15:04:31   6   patient, to determine best course of treatment.

15:04:33   7   Q.   Okay.  And are these things, if you know -- and we'll

15:04:37   8   cover them in a moment -- but are these things that are

15:04:39   9   reflected in your current job description, all these things

15:04:42   10  that you just described?

15:04:44   11  A.   No, they are not.

15:04:45   12  Q.   Okay.  But they were in this job description that was in

15:04:48   13  effect in 2006 when this controversy arose, correct?

15:04:52   14           MR. COPPOLA:  Your Honor, again, I have to object to

15:04:54   15  the leading question.  And, again, he's just testifying.  He

15:04:56   16  just testified for the jury what's in the exhibit.

15:05:00   17           THE COURT:  Well, it is leading.  It's my ruling that

15:05:02   18  the 2000 job description is not relevant to what we're

15:05:08   19  discussing here and you haven't tied it to something that's

15:05:11   20  relevant at this point.  I'm going to sustain the objection.

15:05:20   21           MR. DEATS:  Okay.  Very good, Your Honor.

15:05:23   22  Q.   (BY MR. DEATS) Let me ask it this way:  Has your job with

15:05:26   23  regards to patient care changed since you became commander in

15:05:32   24  2002?

15:05:33   25  A.   Yes.

15:05:33   1  Q.   In what way?

15:05:35   2  A.   We've become more active in patient care.  We're required

15:05:37   3  to do more patient care, run a higher number of calls, run more

15:05:42   4  severe calls in the system.

15:05:45   5  Q.   And back to 2006 -- you mentioned a moment ago that you

15:05:53   6  became aware of a regulation in 2006.  What do you recall

15:05:58   7  becoming aware of at that point in time?

15:06:00   8  A.   In 2006 we became aware of a regulation that was an FLSA

15:06:04   9  ruling on first responders and basically their classification.

15:06:10  10  Q.   Okay.  And whether or not they were entitled to overtime

15:06:14  11  pay?

15:06:14  12  A.   That's correct.

15:06:15  13  Q.   And what, if anything, did you do when you became aware of

15:06:18  14  this regulation?

15:06:19  15  A.   Initially we brought this information to our department

15:06:22  16  director.

15:06:23  17  Q.   And who was the department director at the time?

15:06:26  18  A.   At the time it was Richard Herrington.

15:06:29  19  Q.   And what, if anything, did Mr. Herrington direct you to

15:06:33  20  do?

15:06:33  21  A.   At the time Mr. Herrington said that he would look into it

15:06:37  22  and send it to our Human Resources Department.

15:06:41  23  Q.   And do you recall whether or not you ended up having

15:06:45  24  discussions with the HR department?

15:06:46  25  A.   Yes, we did.

FITZPATRICK - DIRECT

15:06:47  1   Q.   And do you recall who you spoke to in HR?

15:06:49  2   A.   Yes, I do.

15:06:50  3   Q.   Who was that?

15:06:51  4   A.   It was Sylvia Gonzalez, and there were some

15:06:53  5   representatives from the City.  I believe one of the City

15:06:56  6   attorneys, Robin Sanders, was there as well.

15:06:58  7   Q.   Now, you mentioned Sylvia Gonzalez.  Is she today known as

15:07:02  8   Sylvia Flores?

15:07:03  9   A.   Yes, she is.

15:07:07  10  Q.   And at that point in time, when you had this discussion

15:07:10  11  with them, did you tell them about this new regulation you were

15:07:13  12  aware of?

15:07:13  13  A.   Yes, we did.

15:07:14  14  Q.   And what, if anything, did they tell you they would do in

15:07:18  15  response?

15:07:18  16  A.   They told us again that they would look into our claim;

15:07:22  17  that this was a fairly new ruling as far as they knew; and that

15:07:25  18  they would get back to us.

15:07:26  19  Q.   Okay.  And then if I could direct your attention to

15:07:29  20  Plaintiffs' Exhibit 2.

15:07:32  21         Now, the conversation with Ms. Flores, at that -- do

15:07:35  22  you recall when about that occurred?

15:07:38  23  A.   It was in the fall of 2006.  I don't know the exact date.

15:07:46  24  Q.   Okay.  Early fall?  Late fall?  Do you recall?

15:07:49  25  A.   Early fall.  Sometime around probably August or September.

FITZPATRICK – DIRECT

15:07:52  1  Q.   Okay.  And then turning your attention to Plaintiffs'

15:07:54  2  Exhibit 2, do you recognize this document?

15:07:57  3  A.   Yes, I do.

15:07:57  4  Q.   Could you describe it for me?

15:07:59  5  A.   It's an E-mail that was forwarded to me -- actually, it

15:08:04  6  was an E-mail from the division chief at the time regarding a

15:08:08  7  draft of the district commander job description.

15:08:10  8  Q.   And what's the date on this memorandum?

15:08:13  9  A.   Friday, October 20th, of 2006.

15:08:19 10  Q.   And did you receive a copy of this?

15:08:21 11  A.   I was forwarded a copy of this, yes.

15:08:24 12  Q.   And then if I could direct your attention to Plaintiffs'

15:08:26 13  Exhibit 3, was there an attachment to that E-mail?

15:08:29 14  A.   Yes, there was.

15:08:30 15  Q.   And what was in the attachment?

15:08:32 16  A.   It was a draft job description -- district commander job

15:08:37 17  description.

15:08:38 18  Q.   And does this appear to be a true and correct copy of the

15:08:41 19  draft that you received on or about October 20th, of 2006?

15:08:45 20  A.   Yes, it is.

15:08:46 21           MR. DEATS:  Your Honor, at this time I ask that

15:08:47 22  Plaintiffs' Exhibit 2 and 3 be admitted.

15:08:51 23           MR. COPPOLA:  Your Honor, I -- both of these --

15:08:54 24  neither of these exhibits are relevant to the issues at hand.

15:08:59 25  The 2006 draft job description, number one, I don't believe

15:09:02  1  ever went into effect and, number two, again, is outside the

15:09:06  2  relevant period.  And the connection Mr. Deats is trying to

15:09:10  3  make here between the complaints raised by district commanders

15:09:14  4  in late 2006 and the promulgation of this draft job description

15:09:20  5  is nothing but speculation, that they're somehow connected in

15:09:24  6  some way.

15:09:24  7          THE COURT:  Mr. Deats?

15:09:25  8          MR. DEATS:  Your Honor, although the relevant period

15:09:27  9  for back pay purposes commences in 2009, this is a dispute with

15:09:33  10  a long-standing history that dates back to 2006.  It goes both

15:09:37  11  to the issue of the City's good faith, which the Court will

15:09:41  12  have to rule upon.  It also goes just to the changing position

15:09:44  13  of the City over time.  We do think it's important to our case

15:09:48  14  that both of these things be provided.  It clearly is relevant

15:09:53  15  to those issues, and we would ask that it be admitted for that

15:09:57  16  reason.

15:09:57  17          THE COURT:  Did the 2006 policy described in

15:10:00  18  Plaintiffs' Exhibit Number 3 ever take effect?

15:10:04  19          MR. DEATS:  Your Honor, it was ultimately replaced by

15:10:07  20  another policy in 2008.  So, no, it never went into effect.

15:10:12  21          THE COURT:  But there was a policy in 2008 that went

15:10:15  22  into effect?

15:10:16  23          MR. DEATS:  Your Honor, there was a policy that went

15:10:18  24  into effect in 2008.

15:10:21  25          THE COURT:  Then I'm going to sustain the objection.

FITZPATRICK – DIRECT

| | | |
|---|---|---|
| 15:10:23 | 1 | I think it's clear that there was a dispute beginning in 2006, |
| 15:10:28 | 2 | but I'm not going to admit policies that did not take effect. |
| 15:10:33 | 3 | So the objection is sustained to Plaintiffs' Exhibits 2 and 3. |
| 15:10:38 | 4 | MR. DEATS:  Okay. |
| 15:10:45 | 5 | Q.   (BY MR. DEATS) So to recap, then, had a discussion with |
| 15:10:49 | 6 | Sylvia Flores in August or September of 2006, correct? |
| 15:10:51 | 7 | A.   Yes. |
| 15:10:52 | 8 | Q.   And then October 2006 you received a memorandum about |
| 15:10:56 | 9 | changing your job description? |
| 15:10:57 | 10 | A.   Yes. |
| 15:10:58 | 11 | Q.   And as we just covered, that draft job description never |
| 15:11:03 | 12 | in fact went into effect? |
| 15:11:05 | 13 | A.   That's correct. |
| 15:11:15 | 14 | Q.   So moving on to 2006, there were no changes to your |
| 15:11:19 | 15 | status, I take it, in 2006 with regards to overtime, correct? |
| 15:11:23 | 16 | A.   Correct. |
| 15:11:23 | 17 | Q.   At some point in time, did you seek outside assistance? |
| 15:11:26 | 18 | A.   Yes, we did. |
| 15:11:26 | 19 | Q.   What type of assistance did you seek? |
| 15:11:29 | 20 | A.   My colleagues and I retained an attorney through our union |
| 15:11:32 | 21 | and brought this information forward. |
| 15:11:33 | 22 | Q.   And just so it's absolutely clear, that attorney was not |
| 15:11:37 | 23 | me, was it? |
| 15:11:38 | 24 | A.   No, it was not. |
| 15:11:38 | 25 | Q.   And who was that attorney, if you recall? |

15:11:40  1  A.   That attorney was Tom Stribling.

15:11:44  2  Q.   And what, if anything, did Mr. Stribling, your union

15:11:48  3  attorney, do for you?

15:11:49  4  A.   At that point he drafted a letter to our director

15:11:53  5  explaining our situation and that he believed that our

15:11:57  6  department was in violation of the Fair Labor Standards Act's

15:12:01  7  recent ruling on first responders and advised them to look into

15:12:05  8  it and correct it.

15:12:06  9  Q.   Okay.  And then do you recall whether or not your

15:12:11  10  department director took any action in response to that request

15:12:14  11  by Mr. Stribling?

15:12:16  12  A.   Yes, he did.

15:12:17  13  Q.   What, if anything, do you recall him doing?

15:12:19  14  A.   Shortly after that, a letter was received by our

15:12:22  15  department director that our Human Resources Department -- the

15:12:25  16  City's Human Resources Department conducted a series of desk

15:12:29  17  audits of the district commanders' job positions.

15:12:32  18  Q.   And I'll ask you to turn your attention to Plaintiffs'

15:12:34  19  Exhibit 34.

15:12:46  20  A.   Okay.

15:12:47  21  Q.   Now, do you recognize this document?

15:12:49  22  A.   Yes, I do.

15:12:49  23  Q.   What is it?

15:12:50  24  A.   It is an E-mail from then-director Richard Herrington to

15:12:55  25  all the district commanders entitled Desk Audit Legal Review of

FITZPATRICK – DIRECT

15:12:58   1   FLSA Issues.

15:13:00   2   Q.   And what's the date on the document?

15:13:02   3   A.   It's dated Monday, December the 11th, 2006.

15:13:05   4   Q.   And it went to whom?

15:13:07   5   A.   It went to all of the EMS district commanders, all of the

15:13:11   6   EMS division commanders, Ernesto Rodriguez and Chris Callsen.

15:13:15   7   Q.   And do you recall receiving a copy of this?

15:13:17   8   A.   Yes, I did.

15:13:18   9   Q.   Does this appear to be a true and correct copy of the

15:13:21  10   original?

15:13:21  11   A.   Yes, it is.

15:13:22  12        MR. DEATS:  I ask that this be admitted as

15:13:24  13   Plaintiffs' Exhibit 34.

15:13:26  14        MR. COPPOLA:  Your Honor, I don't have any objection

15:13:28  15   to this exhibit being admitted for the limited purpose of the

15:13:31  16   Court determining the good faith issue.  I don't believe it's

15:13:35  17   relevant to the ultimate questions to be decided by the jury in

15:13:39  18   this case as to whether commanders are exempt or nonexempt or

15:13:42  19   the questions they'll be asked to decide.

15:13:44  20        THE COURT:  Mr. Deats?

15:13:45  21        MR. DEATS:  Your Honor, I do believe it has some

15:13:48  22   relevance there.  The City, as you know, is going to put on an

15:13:51  23   expert witness who became involved actually in the case at this

15:13:54  24   point.  And this is all the lead-up to that.  It's background

15:13:57  25   information that I think is important for the jury to know in

15:14:00  1    evaluating her testimony.

15:14:03  2            THE COURT:  Mr. Coppola, anything further?

15:14:08  3            MR. COPPOLA:  Your Honor, if it's somehow relevant to

15:14:11  4    the testimony of Ms. Dulaney Smith, then perhaps Mr. Deats can

15:14:15  5    offer it at that time.  But I think it's at least premature to

15:14:19  6    offer it now.  I don't have any objection, again, to the Court

15:14:22  7    considering it for good faith, but I have an objection to the

15:14:25  8    jury considering it at this time.

15:14:26  9            THE COURT:  Well, Mr. Deats, I'm going to give you a

15:14:28  10   little leeway, but not a lot, on anticipating what somebody

15:14:32  11   else is going to say.  That really is what rebuttal is for and

15:14:35  12   why the plaintiff gets rebuttal.  So I'm not going admit this

15:14:39  13   exhibit at this time as in any way testimony in opposition to

15:14:50  14   the proposed expert by the defendant, if the defendant does in

15:14:55  15   fact call an expert.

15:14:58  16           I will admit it for the limited purpose of showing

15:15:03  17   that this is likely when the dispute that I have before me got

15:15:09  18   started, but not at this time for the truth of anything that is

15:15:13  19   set forth in the exhibit.

15:15:14  20           MR. DEATS:  Very good, Your Honor.

15:15:15  21           May we publish it, Your Honor?

15:15:17  22           THE COURT:  You may.

15:15:27  23           MR. DEATS:  And if we could blow up the text.

15:15:38  24   Q.   (BY MR. DEATS) Now, I'm looking at the paragraph marked

15:15:41  25   "First."  And this is talking about the desk audit that you

FITZPATRICK – DIRECT

| | | |
|---|---|---|
| 15:15:44 | 1 | referred to a moment ago, correct, that HR said they were going |
| 15:15:48 | 2 | to do? |
| 15:15:48 | 3 | A.   Yes, it is. |
| 15:15:49 | 4 | Q.   And were told that it would be your chance -- the last |
| 15:15:52 | 5 | sentence of that paragraph, "Your chance to convey to them what |
| 15:15:55 | 6 | you really do versus what others might think you do"? |
| 15:15:58 | 7 | A.   That's correct. |
| 15:15:59 | 8 | Q.   And then that paragraph, "Second," down there, he talks |
| 15:16:03 | 9 | about "After meeting with Kurt Brown and Michael Wright."  Who |
| 15:16:07 | 10 | are Kurt Brown and Michael Wright? |
| 15:16:09 | 11 | A.   They are also district commanders. |
| 15:16:12 | 12 | Q.   And he said he "passed along the documents that they |
| 15:16:14 | 13 | shared with Ernie."  That would be Ernie Rodriguez, correct? |
| 15:16:18 | 14 | A.   That's correct. |
| 15:16:19 | 15 | Q.   And "I to City Legal."  If you know, what documents were |
| 15:16:24 | 16 | passed to Mr. Herrington? |
| 15:16:26 | 17 | A.   At that point it was, I believe, the same document we |
| 15:16:29 | 18 | produced before for Mr. Herrington, the 2004 FLSA ruling |
| 15:16:35 | 19 | regarding first responders and their status. |
| 15:16:39 | 20 | Q.   Now, I want to direct your attention, if I could, to |
| 15:16:45 | 21 | Plaintiffs' Exhibit 36.  This purports to be a memorandum to |
| 15:17:00 | 22 | district commanders from Richard Herrington.  Do you recognize |
| 15:17:03 | 23 | it? |
| 15:17:03 | 24 | A.   Yes, I do. |
| 15:17:04 | 25 | Q.   Could you describe it? |

15:17:05  1  A.    It's a memo from the director, Richard Herrington, to all

15:17:09  2  the ATC EMS district commanders regarding our job duties, yes.

15:17:12  3  Q.    And it is dated when?

15:17:13  4  A.    January 26th, 2007.

15:17:16  5  Q.    And it's directed to district commanders.  Did you receive

15:17:21  6  a copy?

15:17:21  7  A.    Yes, I did.

15:17:22  8  Q.    Does this appear to be a true and correct copy?

15:17:25  9  A.    Yes, it is.

15:17:26  10          MR. DEATS:  I ask that this be admitted as

15:17:28  11  Plaintiffs' Exhibit 36.

15:17:29  12          MR. COPPOLA:  I have no objection to this exhibit

15:17:31  13  being admitted for the good faith issue.  Again, I don't think

15:17:35  14  it's relevant to the issues the jury has to decide.

15:17:38  15          THE COURT:  Well, we've jumped back again from 2009

15:17:41  16  and to 2007, Mr. Deats.  What's the relevance in this

15:17:45  17  particular exhibit?

15:17:45  18          MR. DEATS:  Your Honor, the City has in fact offered

15:17:47  19  into evidence an Exhibit 40 that is 2007 letter drafted by

15:17:51  20  Ms. Dulaney Smith.  This is pertinent to that letter, and it's

15:17:56  21  pertinent to the case that they are putting on in their case in

15:18:00  22  chief.  And it goes both to the good faith issue, obviously,

15:18:04  23  and also goes to the issue of the position that the City has

15:18:07  24  taken over the years.

15:18:11  25          THE COURT:  How does that assist the jury in

15:18:14  1   determining that any relevant fact in this case is more likely

15:18:21  2   or less likely to be true?

15:18:24  3        MR. DEATS:  Your Honor, I think it's very important

15:18:26  4   for the jury to understand the genesis of the testimony -- the

15:18:30  5   testimony and the documents that have been produced in

15:18:34  6   discovery by Ms. Dulaney Smith and the things that she was

15:18:38  7   hired to do and whether or not she did them.  It goes clearly

15:18:41  8   to the issue of good faith, and it also goes to the issue of

15:18:45  9   the credibility of her testimony in making certain conclusions.

15:18:49  10       THE COURT:  But she hasn't given any testimony yet,

15:18:52  11  and I'm not going to allow her to be impeached until she gives

15:18:57  12  testimony.  So I'm going to sustain the objection at this time,

15:19:00  13  but you may offer it again in rebuttal or you may question

15:19:05  14  about it once I have the testimony of Ms. Smith in the record.

15:19:09  15       MR. DEATS:  Very good, Your Honor.

15:19:15  16       But I don't think that they objected to it for the

15:19:17  17  good faith purpose.  And so if it is admitted for that limited

15:19:20  18  purposes, may I publish it to the jury?

15:19:22  19       MR. COPPOLA:  Your Honor, I mean, once again, I don't

15:19:25  20  understand what the relevance of it is in terms of being

15:19:28  21  published to the jury.  It doesn't inform the jury one way --

15:19:31  22  genesis --

15:19:32  23       THE COURT:  I sustain the objection.  We're getting

15:19:40  24  the cart before the horse here.  You need to establish what

15:19:43  25  you're going to establish, Mr. Deats, and then we'll have the

15:19:45   1   City put on their case and you can come back and rebut.

15:19:48   2           MR. DEATS:  Very good, Your Honor.

15:19:50   3   Q.   (BY MR. DEATS) Okay.  I want to direct your attention, if

15:20:08   4   I can, to Plaintiffs' Exhibit 37 and ask you to look at that

15:20:15   5   document and tell me if you recognize it.

15:20:19   6   A.   Yes, I do.

15:20:21   7   Q.   Could you describe it for me, please.

15:20:23   8   A.   It's a memorandum from then-Acting Director

15:20:28   9   Ernie Rodriguez to all the district commander personnel

15:20:31  10   regarding pay conversion for nonexempt status.

15:20:34  11   Q.   It's stated 12/10/2007?

15:20:37  12   A.   That's correct.

15:20:38  13   Q.   After this dispute had started and you had retained an

15:20:41  14   attorney?

15:20:41  15   A.   That's correct.

15:20:42  16           MR. DEATS:  Your Honor, I ask that this be admitted

15:20:44  17   as Plaintiffs' Exhibit 37.

15:20:46  18           MR. COPPOLA:  Your Honor, I have the same objections

15:20:50  19   I've had to the other exhibits.  It's not relevant to the

15:20:52  20   issues in front of the jury.  It's relevant only, if anything,

15:20:56  21   to good faith.

15:20:58  22           THE COURT:  Again, Mr. Deats, we seem to be taking a

15:21:04  23   long time getting to the policy that is objected to by the

15:21:12  24   plaintiffs and how the plaintiffs are not in fact supervisory

15:21:17  25   personnel.  I still have a hard time in understanding why

15:21:28  1  previous discussions or negotiations shed any light on the

15:21:35  2  issue of what the City is doing now and has during the relevant

15:21:41  3  dates in this case compared to what federal law requires the

15:21:46  4  City to do.

15:21:47  5          MR. DEATS:  Your Honor, again, it also goes to the

15:21:50  6  good faith issue that is before the Court.  It clearly is

15:21:53  7  relevant to that.  And this is an indication of a position

15:21:57  8  being taken by the City itself.

15:21:59  9          THE COURT:  But good faith is an issue for the Court

15:22:01  10  to decide.

15:22:02  11          MR. DEATS:  That's correct, Your Honor.  And it was

15:22:04  12  not my understanding that the Court was going to have us put --

15:22:08  13  provide testimony with regards to good faith separate and apart

15:22:12  14  from this trial itself.  Where we're also trying to the jury

15:22:16  15  the issue of the status.

15:22:17  16          THE COURT:  Well, but I have to be careful in the

15:22:20  17  offering of exhibits as to whether or not they may be

15:22:25  18  misconstrued for issues other than what this Court will

15:22:29  19  determine.  That does not mean over the course of this trial

15:22:39  20  these exhibits will all not come into evidence.  But some of

15:22:42  21  them come into evidence for the Court to review and some of

15:22:45  22  them will come into evidence for the jury to review.  And the

15:22:48  23  jury will make their decision on the fact issues that are in

15:22:50  24  the province of the jury and the Court will make its decision

15:22:55  25  on the issues that are in the province of the Court.

15:22:56   1            MR. DEATS:  That's correct, Your Honor.  But, of

15:22:58   2    course, I feel that it's my duty to put on my evidence

15:23:01   3    regarding the good faith issue during our case in chief and not

15:23:05   4    simply wait until rebuttal and provide that evidence at that

15:23:08   5    time, you know, in rebuttal to whatever good faith evidence

15:23:12   6    they may put on.  And for that reason I feel like it is an

15:23:16   7    appropriate subject of inquiry.

15:23:18   8            THE COURT:  I will sustain the objection at this

15:23:20   9    time.

15:23:20  10            MR. DEATS:  Very good, Your Honor.

15:23:30  11    Q.   (BY MR. DEATS) Okay.  If I could, I'd like to turn your

15:23:36  12    attention to Plaintiffs' Exhibit 4.  Do you recognize this

15:23:53  13    document?

15:23:54  14    A.   Yes, I do.

15:23:54  15    Q.   And could you describe it, please.

15:24:06  16    A.   Yes.  It's a memo from then-Director Ernie Rodriguez to

15:24:12  17    all EMS personnel announcing departmental reorganization.

15:24:16  18    Q.   And I want to direct your attention to page 2 of the

15:24:19  19    exhibit.  And I'm looking at the paragraph "Five Key Functions

15:24:26  20    of a Commander Operations Supervisor."  This is where they talk

15:24:38  21    about changing out the old job description for a new job

15:24:42  22    description.  Correct?

15:24:43  23    A.   That's correct.

15:24:44  24    Q.   And they indicate that the old 13-page job description was

15:24:52  25    replaced with a new job description, focusing on five key

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 15:24:55 | 1 | functions. |
| 15:24:56 | 2 | A.   That's correct. |
| 15:24:56 | 3 | Q.   And then he goes on to name those key functions, correct? |
| 15:25:00 | 4 | A.   That's correct. |
| 15:25:00 | 5 | Q.   And do you see anything in there about delivery of patient |
| 15:25:04 | 6 | care? |
| 15:25:06 | 7 | A.   Not specifically, no. |
| 15:25:07 | 8 | Q.   There is something about filling ICS command roles as |
| 15:25:11 | 9 | needed, correct? |
| 15:25:12 | 10 | A.   Yes. |
| 15:25:12 | 11 | Q.   ICS refers to what, if you know? |
| 15:25:14 | 12 | A.   Refers to incident command structure or incident command |
| 15:25:18 | 13 | system. |
| 15:25:19 | 14 | Q.   But it leaves out any real mention of providing direct |
| 15:25:24 | 15 | patient care, doesn't it? |
| 15:25:25 | 16 | A.   That's correct. |
| 15:25:26 | 17 | Q.   And, if you know, did you continue to provide direct |
| 15:25:29 | 18 | patient care? |
| 15:25:30 | 19 | A.   Yes, I have. |
| 15:25:30 | 20 | Q.   Did you continue to respond -- excuse me -- to respond to |
| 15:25:34 | 21 | incidents as you had in the past? |
| 15:25:36 | 22 | A.   Yes, I did. |
| 15:25:37 | 23 | Q.   Did anything about your actual job change at this time? |
| 15:25:40 | 24 | A.   No, it did not. |
| 15:25:41 | 25 | Q.   If I could direct your attention to Plaintiffs' |

FITZPATRICK - DIRECT                                   211

```
15:25:49   1  Exhibit 7.  Now, this is a document that relates to the
15:26:03   2  functional job expectations that we just covered in the last
15:26:06   3  exhibit, right?
15:26:07   4  A.   That's correct.
15:26:08   5  Q.   And I want to direct your attention specifically to item
15:26:11   6  number three down the middle half of the page.  This is the one
15:26:20   7  that talks about incident response and performance evaluation
15:26:24   8  feedback, correct?
15:26:25   9  A.   That's correct.
15:26:26  10  Q.   And it indicates that you'll function as the front-line
15:26:31  11  resource for personnel?
15:26:33  12  A.   Yes.
15:26:33  13  Q.   And it goes on to describe some things.  But it definitely
15:26:37  14  mentions incident response, does it not?
15:26:39  15  A.   Yes, it does.
15:26:40  16  Q.   And then if we look back at Plaintiffs' Exhibit 6, this is
15:26:57  17  a slightly later version of that same operations supervisor job
15:27:02  18  expectations, correct?
15:27:03  19  A.   Yes, it is.
15:27:04  20  Q.   And looking at that same item number three, it changed it
15:27:08  21  slightly, did it not?
15:27:09  22  A.   Yes, it did.
15:27:10  23  Q.   How did it change it?
15:27:12  24  A.   It doesn't mention the specifics to incident response
15:27:16  25  roles any longer.
```

FITZPATRICK - DIRECT

15:27:17  1   Q.   Well, whereas the last exhibit said "incident response and
15:27:21  2   performance evaluation feedback," what does this one say?
15:27:25  3   A.   This one says "incident response to provide performance
15:27:29  4   evaluation feedback."
15:27:30  5   Q.   So they made a subtle change there.  It says incident
15:27:34  6   response for a specific purpose, correct?
15:27:36  7   A.   Yes.
15:27:36  8   Q.   Did you continue to be part of the dispatch matrix?
15:27:39  9   A.   Yes, I did.
15:27:41  10  Q.   Did you continue to be an available resource for response
15:27:45  11  to emergency calls?
15:27:46  12  A.   Yes, I did.
15:27:58  13         THE COURT:  Ladies and gentlemen, I think this is as
15:28:00  14  good a time as any to take our afternoon recess.  We'll be in
15:28:04  15  recess for 15 minutes.
15:28:36  16     (Open Court, no jury)
15:28:36  17         THE COURT:  Let the record reflect that the jury is
15:28:38  18  out of the room.  Mr. Deats, I'm not suggesting to you that you
15:28:41  19  wait until your rebuttal to put on your good faith exhibits.
15:28:44  20  It's just that they're not appropriate to go to the jury, since
15:28:47  21  I will make the decision on good faith.
15:28:51  22         According to what I have in front of me and the
15:28:53  23  plaintiff has, Exhibits 33 through 37 that go to good faith and
15:28:59  24  defendant has Exhibits 37 through 46 that go to good faith.
15:29:04  25  They can be offered at any time on the good faith issue.

15:29:07  1   They're just not to be offered to the jury or considered by the

15:29:10  2   jury unless they're relevant to some other issue.

15:29:14  3         MR. DEATS:  Your Honor, I think they are relevant to

15:29:16  4   another issue.  I mean, they're not offering -- they're not

15:29:19  5   offering Defense 40 just as evidence of their good faith.  In

15:29:23  6   fact, in a report that she wrote in March of 2012, Ms. Dulaney

15:29:28  7   Smith indicated that a bunch of her report was based on stuff

15:29:34  8   she did back in 2007.

15:29:36  9         THE COURT:  Then when that comes in and it's in

15:29:38  10  context, then I will reconsider my rulings for other purposes.

15:29:44  11  It's just that you can't anticipate.  You know, you had an

15:29:47  12  opportunity to let the defendant go first.  The defendant

15:29:51  13  indicated that the defendant would be happy to go first.  It

15:29:55  14  wanted to go first.  You resisted that, and I supported your

15:30:02  15  resistance to it.  So you don't get it both ways.

15:30:05  16        If you're going first, you've got to put your case on

15:30:09  17  and then let the defendant put on its case.  And then you can

15:30:12  18  come back and rebut or you can cross-examine.  And it's

15:30:15  19  possible you may be able to offer and get admitted exhibits

15:30:19  20  during cross-examination.  But I'm not going to stand by my

15:30:24  21  previous ruling, which was to let you go first, and then let

15:30:28  22  you anticipate their case.

15:30:30  23        The City could change its trial strategy after it

15:30:34  24  hears your case.  It may not urge certain defenses or may not

15:30:39  25  put on testimony about that.  So that's the reason I'm

15:30:43  1  overruling -- I mean, I'm sustaining the objections at this

15:30:46  2  time.  It does not put you out of the hunt.

15:30:49  3        But if you're going to present your case in chief

15:30:51  4  first, you need to produce your case in chief, and then you can

15:30:54  5  react to the defense of the defendant.

15:30:57  6        MR. DEATS:  I understand what you're saying,

15:30:59  7  Your Honor.  You know, it's a little bit disconcerting only in

15:31:03  8  the sense that I'm not sure if the Court is expecting me to put

15:31:07  9  on testimony outside the presence of the jury with regard to

15:31:10 10  the good faith issue or if the Court is expecting me to put on

15:31:13 11  this evidence in rebuttal or to wait and put on my good faith

15:31:19 12  evidence in rebuttal.

15:31:20 13        THE COURT:  You have to put it on sometime.  You

15:31:25 14  might not need to do it during the trial.  I'll leave that up

15:31:28 15  to you.  We're going to submit certain issues to the jury, and

15:31:32 16  we're going to get a jury verdict.  And then we're going to see

15:31:35 17  what's left in this case and what the Court has to determine.

15:31:40 18  We know, if the verdict supports damages, we're going to have a

15:31:46 19  bench trial on the damages because we previously agreed on

15:31:51 20  that.

15:31:51 21        It's possible -- and you-all may discuss this, what

15:31:55 22  you think is the best way to proceed -- that we put on all but

15:31:59 23  good faith and get the jury verdict and then put on the good

15:32:02 24  faith and damages because that's a defensive issue.

15:32:05 25        If the Court's going to take up the defensive issue,

15:32:10   1   that's only relevant after we see what the jury is going to do

15:32:17   2   with regard to the other.  But if it's an issue that the Court

15:32:21   3   is going to take up, you don't need to put it on in front of

15:32:24   4   the jury.

15:32:26   5            MR. DEATS:  Okay, Your Honor.  Maybe we do need --

15:32:30   6   maybe the parties do need to visit about this whole good faith

15:32:33   7   matter.  I just don't want to be put in the position where I'm

15:32:36   8   not sure exactly when and how I'm supposed to get it on.

15:32:40   9            THE COURT:  I am not going to put you in that

15:32:42  10   position.  But don't -- you also don't need to guess.  If I'm

15:32:45  11   not going to submit an issue and question to the jury on good

15:32:51  12   faith, then the jury doesn't need evidence of good faith.  It

15:32:55  13   seems to me -- and I'm not locked into this -- that we put the

15:33:02  14   questions to the jury that go to the jury and then we determine

15:33:05  15   what we have left.  The trial is not over when we get a jury

15:33:09  16   verdict.  The good faith issue largely goes to, if the City

15:33:15  17   prevails on it, damages anyway.  So if the jury were to decide

15:33:22  18   that the City had no liability on anything, then that's all

15:33:28  19   moot.

15:33:28  20            So y'all work out how best to get this in.  I'm not

15:33:32  21   going to talk anybody out of their record.  I'm going to let

15:33:35  22   you make whatever record you need to make, but we need to make

15:33:38  23   it in the appropriate sequence as to what should be put on

15:33:41  24   before the jury and what should be put on before the Court.

15:33:44  25            We've got a long way to go with this case right now,

FITZPATRICK - DIRECT

15:33:48   1   so y'all have plenty of time to work out these things.  But

15:33:52   2   work out what's easiest for both of you and the Court that gets

15:33:55   3   your record made the way it needs to be made.

15:33:58   4          MR. DEATS:  Very good, Your Honor.

15:33:58   5          THE COURT:  Court's in recess.

15:34:00   6      (Recess)

15:46:50   7      THE COURT:  Mr. Deats, you may continue your direct

15:46:52   8   examination of Mr. Fitzpatrick.

15:46:54   9          MR. DEATS:  Thank you, Your Honor.

15:46:58   10  Q.  (BY MR. DEATS) Mr. Fitzpatrick, I believe when we left we

15:47:00   11  were talking about Plaintiffs' Exhibit 5.  And this is the new

15:47:19   12  one-page job description that came out in July of 2008, is it

15:47:24   13  not.

15:47:24   14  A.  That's correct.

15:47:25   15  Q.  Okay.  And if we could show that to the jury.

15:47:28   16          And I'm looking under "Duties, Functions, and

15:47:30   17  Responsibilities," item number four.  It does talk about

15:47:39   18  responding to emergencies, doesn't it?

15:47:41   19  A.  Yes, it does.

15:47:42   20  Q.  But it doesn't really talk about -- except for

15:47:46   21  coordinating and directing the activities of personnel, do you

15:47:50   22  see anywhere where it talks about actually providing patient

15:47:55   23  care?

15:47:55   24  A.  No, it does not.

15:47:56   25  Q.  In your opinion and based on your experience in the field,

15:47:56   1   does this accurately represent the job that you're doing?

15:47:58   2   A.   No, it does not.

15:47:59   3   Q.   In what way does it not?

15:48:00   4   A.   It completely omits the fact that we provide front-line

15:48:04   5   medical care to the sick and injured.

15:48:06   6   Q.   Okay.  And then if we could look at Plaintiffs'

15:48:08   7   Exhibit 8.  This is another job description that took effect in

15:48:18   8   December of 2009?

15:48:20   9   A.   That's correct.

15:48:21  10   Q.   And looking at item four under "Duties, Functions, and

15:48:24  11   Responsibilities," did the language of that change in any

15:48:27  12   meaningful way?

15:48:28  13   A.   No, it did not.

15:48:31  14   Q.   Did your job change in any way after the issuance of this

15:48:36  15   new job description?

15:48:37  16   A.   No, it did not.

15:48:38  17   Q.   You continued to provide patient care?

15:48:41  18   A.   Yes, I did.

15:48:42  19   Q.   And I ask you to look at Plaintiffs' Exhibit 9.  Yet

15:48:48  20   another job description issued in 2011.  Again, looking at item

15:48:52  21   four under "Duties, Functions, and Responsibilities," it

15:48:57  22   continues to have the same language?

15:49:00  23   A.   Yes, it does.

15:49:01  24   Q.   But has your job changed?

15:49:03  25   A.   No, it has not.

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 15:49:04 | 1 | Q.   You've continued to provide direct patient care? |
| 15:49:06 | 2 | A.   Yes. |
| 15:49:07 | 3 | Q.   Let's talk a moment -- let's break away from that, and |
| 15:49:17 | 4 | let's talk about the supervisory duties of a commander.  You |
| 15:49:21 | 5 | admit that you supervise a group of paramedics, don't you? |
| 15:49:25 | 6 | A.   Yes, I do. |
| 15:49:26 | 7 | Q.   And like what sort of group of paramedics are you assigned |
| 15:49:30 | 8 | to supervise? |
| 15:49:30 | 9 | A.   In my district, which is district six, I supervise one |
| 15:49:33 | 10 | ambulance which has rescue paramedics and six other ambulances |
| 15:49:38 | 11 | that have field providers on them. |
| 15:49:40 | 12 | Q.   And I guess during the time that you're actually on duty |
| 15:49:46 | 13 | on a shift, you supervise the paramedics in that district, do |
| 15:49:49 | 14 | you not? |
| 15:49:50 | 15 | A.   That's correct. |
| 15:49:50 | 16 | Q.   Now, that's a different group, though, isn't it? |
| 15:49:53 | 17 | A.   Yes, it is. |
| 15:49:54 | 18 | Q.   Do the paramedics that you supervise for mentoring |
| 15:49:57 | 19 | purposes, do they actually work on the same shift as you? |
| 15:50:01 | 20 | A.   Not always. |
| 15:50:01 | 21 | Q.   And is that because of the shift bid process? |
| 15:50:04 | 22 | A.   That's correct. |
| 15:50:05 | 23 | Q.   Now, you mentioned this earlier.  But, in your absence, |
| 15:50:08 | 24 | can a -- let's say you have to miss a shift for some reason. |
| 15:50:12 | 25 | Can a captain or a clinical specialist do your job in your |

FITZPATRICK – DIRECT

15:50:16  1  place?

15:50:16  2  A.    Yes, they can.

15:50:17  3  Q.    Are there some things that they don't allow a captain to

15:50:21  4  do, though?

15:50:22  5  A.    Yes.

15:50:22  6  Q.    Like what?

15:50:23  7  A.    They are specifically not allowed to do investigations for

15:50:29  8  employee misconduct.  But other than that, the job

15:50:35  9  responsibilities are almost exactly the same.

15:50:38  10  Q.    Let's talk about some typical type of management

15:50:41  11  responsibilities.  Specifically, let's focus on hiring.  What

15:50:46  12  participation do you have in the hiring process, if any?

15:50:48  13  A.    I personally don't participate in the hiring process.

15:50:52  14  Q.    Okay.  Do you know whether or not some field commanders do

15:50:55  15  participate in the hiring process?

15:50:56  16  A.    Some do.

15:50:57  17  Q.    And so is it required? voluntary? what?

15:51:00  18  A.    It's voluntary.

15:51:01  19  Q.    And what sort of participation do those who choose to do

15:51:06  20  so make in the hiring process?

15:51:07  21  A.    District commanders who choose to participate in the

15:51:10  22  hiring process are part of the panel.

15:51:11  23  Q.    And what's the purpose of that panel?

15:51:13  24  A.    That panel interviews prospective employees and makes a

15:51:18  25  collective recommendation to our executive leadership of

FITZPATRICK – DIRECT

| | | |
|---|---|---|
| 15:51:26 | 1 | whether that candidate should be hired. |
| 15:51:27 | 2 | Q.   And who participates in these panels? |
| 15:51:30 | 3 | A.   There are paramedics, there are clinical specialists and |
| 15:51:34 | 4 | district commanders, and representatives from Human Resources. |
| 15:51:37 | 5 | Q.   And paramedics and clinical specialists, of course, |
| 15:51:41 | 6 | they're nonexempt employees, right? |
| 15:51:43 | 7 | A.   That's correct. |
| 15:51:44 | 8 | Q.   And do they -- is their participation required or |
| 15:51:47 | 9 | voluntary?  Do you know? |
| 15:51:48 | 10 | A.   It's voluntary as well. |
| 15:51:50 | 11 | Q.   Do district commanders have any more input into that |
| 15:51:55 | 12 | process than do the paramedics who participate? |
| 15:51:59 | 13 |         MR. COPPOLA:  Objection.  Calls for speculation.  The |
| 15:52:00 | 14 | witness has testified he doesn't participate in this process. |
| 15:52:03 | 15 |         THE COURT:  All right.  Sustained at this point.  Lay |
| 15:52:05 | 16 | the predicate.  And if he has knowledge how that happens, he |
| 15:52:10 | 17 | can testify about it. |
| 15:52:10 | 18 | Q.   (BY MR. DEATS) You have participated in the past, have you |
| 15:52:12 | 19 | not? |
| 15:52:12 | 20 | A.   In the past, yes. |
| 15:52:13 | 21 | Q.   Okay.  And during the time that you participated, was |
| 15:52:16 | 22 | the -- was there any difference given to the -- consideration |
| 15:52:19 | 23 | given to a paramedic's recommendation as opposed to a district |
| 15:52:22 | 24 | commander's? |
| 15:52:23 | 25 | A.   The district commander's recommendation was taken as part |

FITZPATRICK – DIRECT

| 15:52:27 | 1 | of the panel's recommendation.  Everybody had input into it, |
| 15:52:31 | 2 | and a score was amassed.  But the whole group agreed upon it. |
| 15:52:38 | 3 | Q.   Let's talk about training of employees.  How is the |
| 15:52:41 | 4 | training of the medics accomplished? |
| 15:52:44 | 5 | A.   Our new employees are sent through an academy of varying |
| 15:52:49 | 6 | length.  It's 12 weeks now, I believe.  And they're trained by |
| 15:52:53 | 7 | the clinical specialists.  They are the ones in charge of |
| 15:52:58 | 8 | training other folks. |
| 15:52:59 | 9 | Q.   Okay.  And that involves both classroom training and then |
| 15:53:03 | 10 | also some training in the field? |
| 15:53:04 | 11 | A.   That's correct.  They're also sent out to clinical |
| 15:53:07 | 12 | specialists in the field for field training. |
| 15:53:09 | 13 | Q.   And, of course, the clinical specialists are nonexempt |
| 15:53:12 | 14 | employees, right? |
| 15:53:18 | 15 | A.   That's correct. |
| 15:53:19 | 16 | Q.   Now, do the field commanders, do they have any |
| 15:53:21 | 17 | responsibility in the training academy or in the field training |
| 15:53:25 | 18 | that's conducted by the clinical specialists? |
| 15:53:28 | 19 | A.   The field commanders don't necessarily have direct |
| 15:53:31 | 20 | training and responsibilities.  We oversee the clinical |
| 15:53:35 | 21 | specialists in their training of the other folks. |
| 15:53:37 | 22 | Q.   Okay.  Now, do you play any role in setting or adjusting |
| 15:53:45 | 23 | pay rates? |
| 15:53:46 | 24 | A.   No, I do not. |
| 15:53:48 | 25 | Q.   What about directing the work of employees?  Do you direct |

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 15:53:51 | 1 | the work of employees? |
| 15:53:52 | 2 | A.   Not specifically.  Our paramedics and clinical specialists |
| 15:53:58 | 3 | working on an ambulance, some of them very far removed from me |
| 15:54:03 | 4 | at any given time.  They're fairly autonomous. |
| 15:54:07 | 5 | Q.   Now, you heard the City testify that the great majority of |
| 15:54:10 | 6 | calls commanders are not on. |
| 15:54:12 | 7 | A.   Yes. |
| 15:54:12 | 8 | Q.   Now, are you able to supervise the paramedics and the |
| 15:54:16 | 9 | medics in the way they do their work when you're not even |
| 15:54:18 | 10 | there? |
| 15:54:19 | 11 | A.   No, I'm not. |
| 15:54:23 | 12 | Q.   Now, you do upon occasion make calls with paramedics and |
| 15:54:27 | 13 | captains, don't you? |
| 15:54:28 | 14 | A.   Yes, I do. |
| 15:54:29 | 15 | Q.   And when you do, do you direct their operations at that |
| 15:54:33 | 16 | time? |
| 15:54:33 | 17 | A.   Again, they're fairly autonomous.  I don't direct their |
| 15:54:38 | 18 | provision of medical care, no. |
| 15:54:39 | 19 | Q.   In fact, it -- what does really guide paramedics in the |
| 15:54:47 | 20 | way they provide medical care, if you know? |
| 15:54:49 | 21 | A.   Specifically, we have standing orders or clinical |
| 15:54:52 | 22 | operating guidelines.  They're medical policies laid out by our |
| 15:54:57 | 23 | medical director as to how we evaluate sick and injured |
| 15:55:02 | 24 | individuals and then how we treat them. |
| 15:55:03 | 25 | Q.   Okay.  And if we look at Plaintiffs' Exhibit 20, do you |

FITZPATRICK – DIRECT

223

| | | |
|---|---|---|
| 15:55:15 | 1 | recognize this as one of the clinical operating guidelines for |
| 15:55:18 | 2 | the City of Austin? |
| 15:55:20 | 3 | A.   Yes, I do. |
| 15:55:20 | 4 | Q.   Specifically with regards to patient care? |
| 15:55:23 | 5 | A.   Yes. |
| 15:55:23 | 6 | Q.   And I'm looking at item number one under "Application." |
| 15:55:34 | 7 | It talks about, when you have a conflict, who has final |
| 15:55:38 | 8 | authority on scene with regards to delivery of care, right? |
| 15:55:42 | 9 | A.   Yes, it does. |
| 15:55:42 | 10 | Q.   And then item two lists the seniority credentials. |
| 15:55:46 | 11 | A.   Yes, it does. |
| 15:55:47 | 12 | Q.   Are district commanders on that list, per se? |
| 15:55:55 | 13 | A.   Not specifically by name, no. |
| 15:56:00 | 14 | Q.   Okay.  I mean, I do see a part where if there's a |
| 15:56:03 | 15 | paramedic first responder, that could be a district commander, |
| 15:56:06 | 16 | couldn't it? |
| 15:56:07 | 17 | A.   Yes.  It could be. |
| 15:56:08 | 18 | Q.   But, basically -- so if -- if there's on-site care being |
| 15:56:12 | 19 | provided to a patient, can the district commander direct that |
| 15:56:15 | 20 | care in any meaningful fashion? |
| 15:56:17 | 21 | A.   No, he can cannot. |
| 15:56:19 | 22 | Q.   Now, what about maintaining records for supervision or |
| 15:56:23 | 23 | control?  I'm told there is something called the record |
| 15:56:26 | 24 | management system.  Are you familiar with that system? |
| 15:56:28 | 25 | A.   Yes, I am.  RMS. |

FITZPATRICK - DIRECT

15:56:30  1   Q.   Okay.  And what is RMS?

15:56:32  2   A.   RMS is an electronic note-keeping system or a

15:56:36  3   recordkeeping system whereby I can write down or store

15:56:41  4   interactions that I have with employees, conversations that I

15:56:44  5   have, concerns that I have as I go about the day.

15:56:52  6   Q.   And these records are maintained on an automated system,

15:56:57  7   are they not?

15:56:57  8   A.   Yes, they are.

15:56:59  9   Q.   Now, give me another example of a situation in which you

15:57:07  10  might make an entry into the RMS system for an employee.

15:57:11  11  A.   If I have an employee who is late for work, for example, I

15:57:15  12  may have a conversation with that employee and explain -- make

15:57:17  13  them aware of the policy about their tardiness and then

15:57:20  14  document that to RMS.  There's also disciplinary records that

15:57:24  15  wind up in RMS as well.

15:57:25  16  Q.   Now, are district commanders the only person who make

15:57:33  17  entries into the system?

15:57:35  18  A.   No, they are not.

15:57:35  19  Q.   Who are other persons who can make performance or employee

15:57:38  20  performance entries into the system?

15:57:39  21  A.   Clinical specialists can regarding new candidates, and

15:57:42  22  anyone above my rank can.

15:57:47  23  Q.   And do you know whether or not clinical specialists are

15:57:50  24  required, in fact, to make entries into the RMS system?

15:57:54  25  A.   Yes, they are.

15:57:55  1   Q.   Let's talk about the amount of time that you spend making

15:57:58  2   entries into the RMS system.  How much of your day, on average,

15:58:02  3   would you say that takes?

15:58:03  4   A.   On an average day?

15:58:04  5   Q.   Yes, sir.

15:58:05  6   A.   Thirty to 45 minutes.  Less than an hour.

15:58:09  7   Q.   Okay.  And what about disciplining employees?  Do you play

15:58:13  8   any role in disciplining employees?

15:58:14  9   A.   Yes.

15:58:15  10  Q.   And what sort of role do you play?

15:58:16  11  A.   As far as employee discipline goes, the district

15:58:20  12  commanders are responsible for doing the initial investigation,

15:58:23  13  either by report or by observation.  And from there we make a

15:58:28  14  recommendation based on employee history looking at RMS about

15:58:33  15  what sort of discipline might be appropriate, I make that

15:58:36  16  recommendation to my division chief, and then it gets approved

15:58:40  17  from there.

15:58:41  18  Q.   Okay.  And what's your experience with regards to your

15:58:44  19  recommendations?  Are they always followed?

15:58:46  20  A.   Not always.

15:58:46  21  Q.   Can you yourself decide on discipline?

15:58:49  22  A.   Not unilaterally.

15:58:50  23  Q.   If you wanted to do something like a reprimand, can you

15:58:54  24  decide on your own to reprimand an employee?

15:58:56  25  A.   Not something of that severity, no.

15:58:58    1    Q.    These disciplinary investigations events, do they take

15:59:04    2    much of your time?

15:59:05    3    A.    No, they do not.

15:59:07    4    Q.    On average would you say it's a large percentage? small

15:59:13    5    percentage? what?

15:59:13    6    A.    A small percentage.  I don't spend much time each month

15:59:17    7    doing that.  Fortunately, disciplinary investigations are a

15:59:20    8    small portion of what I have to do daily.

15:59:23    9    Q.    Responding to employee complaints, do you have any role in

15:59:26    10   that?

15:59:26    11   A.    Yes.

15:59:26    12   Q.    And what's that role?

15:59:27    13   A.    Again, we do the initial intake of employee complaints.

15:59:30    14   If it's something as simple as clarifying a policy, I can show

15:59:34    15   the employee the policy and have a discussion with them about

15:59:37    16   that.  If it's not to the employee's satisfaction, it goes up

15:59:41    17   to my next level supervisor.

15:59:44    18   Q.    Do you have any real role in planning the work of the

15:59:47    19   medics?

15:59:48    20   A.    No, I do not.

15:59:50    21   Q.    What about the techniques they use during their workday?

15:59:52    22   A.    No, I do not.

15:59:53    23   Q.    What about apportioning work among employees?  Do you have

15:59:57    24   any role in that?

15:59:58    25   A.    No, I do not.

15:59:59  1  Q.    Determining the materials, supplies, and equipment that

16:00:03  2  they're going to use, do you have any role in that regard?

16:00:06  3  A.    Not in determining that, no.

16:00:07  4  Q.    In fact, are there things that govern the types of

16:00:10  5  supplies and things that you -- that the medics use?

16:00:13  6  A.    Yes, there are.

16:00:14  7  Q.    If I could direct your attention to Plaintiffs'

16:00:16  8  Exhibit 19, do you recognize this clinical operating guideline?

16:00:25  9  A.    Yes, I do.

16:00:26  10 Q.    And what -- what is it?

16:00:27  11 A.    It's a clinical operating guideline that establishes the

16:00:31  12 minimum amount of equipment that should be brought to a

16:00:35  13 patient's side.

16:00:36  14 Q.    And so when you're looking to see whether a trick -- a

16:00:41  15 truck is properly equipped or something like that, is this

16:00:45  16 where you go?

16:00:45  17 A.    Yes.

16:00:46  18 Q.    Do you have authority to deviate from what's required

16:00:49  19 here?

16:00:49  20 A.    No, I do not.

16:00:50  21 Q.    Look at Plaintiffs' Exhibit 21, do you recognize this as a

16:00:56  22 Travis County EMS system policy?

16:01:00  23 A.    Yes, it is.

16:01:00  24 Q.    And what is this regarding?

16:01:02  25 A.    It's, again, the guiding principle regarding what medical

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 16:01:07 | 1 | equipment should be brought to a patient's side, specifically |
| 16:01:11 | 2 | in this case for intermediate life support and advanced life |
| 16:01:16 | 3 | support, ILS and ALS. |
| 16:01:19 | 4 | Q.   And so the equipment and supplies that the paramedics use, |
| 16:01:23 | 5 | then, it's pretty much governed by these policies? |
| 16:01:27 | 6 | A.   That's correct. |
| 16:01:28 | 7 | Q.   Now, do you feel like you have any authority in terms of |
| 16:01:32 | 8 | planning and controlling the budget? |
| 16:01:34 | 9 | A.   No, I do not. |
| 16:01:35 | 10 | Q.   What about monitoring compliance measures?  You do keep |
| 16:01:42 | 11 | track of things like slow response times, don't you? |
| 16:01:45 | 12 | A.   Yes, I do. |
| 16:01:46 | 13 | Q.   And can you take some action if you see somebody that |
| 16:01:51 | 14 | has -- when we talk about slow response time, that's time |
| 16:01:54 | 15 | getting out the chute right, getting to an incident? |
| 16:01:57 | 16 | A.   That's out-of-chute time, yes. |
| 16:01:59 | 17 | Q.   If you have slow out-of-chute time, can you do something |
| 16:02:02 | 18 | about it? |
| 16:02:02 | 19 | A.   I contact the employee and notify them of out-of-chute |
| 16:02:06 | 20 | time and see if there were extenuating circumstances -- someone |
| 16:02:09 | 21 | in the bathroom or something like that, which happens.  I then |
| 16:02:12 | 22 | make a report to my chief if they are ones that are outside and |
| 16:02:17 | 23 | don't have a reasonable explanation. |
| 16:02:19 | 24 | Q.   And, again, does that take any significant portion of your |
| 16:02:21 | 25 | time? |

16:02:22   1    A.    Very small portion.

16:02:23   2    Q.    And, finally, evaluations, promotions.  Now, in the past,

16:02:29   3    commanders used to do some kind of evaluation called an SSPR,

16:02:33   4    didn't they?

16:02:33   5    A.    That's correct.

16:02:34   6    Q.    And what's an SSPR?

16:02:36   7    A.    An SSPR is the City's Success Strategy Performance

16:02:41   8    Review.  It's a personnel evaluation.

16:02:43   9    Q.    Okay.  And do you -- since 2007 have you done those types

16:02:47   10   of reviews?

16:02:48   11   A.    Not formally, no.

16:02:49   12   Q.    Okay.  Do you do any type of review of employees?

16:02:52   13   A.    Very informal, yes.

16:02:53   14   Q.    Is it something that you're required to do?

16:02:55   15   A.    Something I should do, yes.

16:02:58   16   Q.    Okay.  And does that take much of your time?

16:03:00   17   A.    Not very much at all, no.

16:03:03   18   Q.    Now, what about promotions?  I heard something in the

16:03:06   19   City's opening about a role that you play in a promotion.

16:03:09   20   What's your understanding of the role you play with regards to

16:03:12   21   promotions in this system?

16:03:13   22   A.    Commanders write not necessarily performance evaluations,

16:03:20   23   but a recommendation.  It's a standard format form that is sent

16:03:26   24   to each one of us if we have -- if we're told we have employees

16:03:30   25   that are eligible for promotion and we're familiar with this

FITZPATRICK - DIRECT

16:03:33  1  employee, to go ahead and fill out one of these forms and

16:03:36  2  submit it on their behalf.

16:03:39  3  Q.   You know, we've talked about several categories here.

16:03:43  4  We've talked about making entries into RMS, doing disciplinary

16:03:47  5  investigations, sometimes making promotion recommendations.  I

16:03:51  6  think you said a few people are on hiring committees.  That

16:03:54  7  type of office work, does that take a significant portion of

16:03:57  8  your day?

16:03:58  9  A.   No, it does not.

16:03:59  10  Q.   On average, of these types of duties that we've talked

16:04:03  11  about, how much of your day would you say is spent doing those

16:04:06  12  sorts of things?

16:04:07  13  A.   Combined in the 24-hour period, somewhere probably around

16:04:12  14  two, maybe three hours.

16:04:14  15  Q.   So in a typical 24-hour shift -- that's a 24-hour period,

16:04:19  16  right?

16:04:19  17  A.   Yes.

16:04:19  18  Q.   So you'll spend, you think, two to three hours performing

16:04:23  19  these types of tasks that we've been talking about?

16:04:25  20  A.   Sometimes.  Sometimes it's a little bit more; sometimes

16:04:29  21  it's a little bit less.

16:04:30  22  Q.   I mean, obviously, it changes from day to day, right?

16:04:33  23  A.   Certainly.

16:04:34  24  Q.   And when you're doing these office tasks, if you get

16:04:37  25  dispatched to a call, what, if anything, are you supposed to do

FITZPATRICK - DIRECT

16:04:39  1  in that situation?

16:04:40  2  A.   I have a duty to respond in that situation.  I'm supposed

16:04:43  3  to stop what I'm doing and go on the call.

16:04:46  4  Q.   Does that happen very frequently?

16:04:47  5  A.   Daily.

16:04:50  6  Q.   Where does most of your supervision of employees actually

16:04:54  7  take place?

16:04:55  8  A.   Most of my supervision of employees takes place while I am

16:05:01  9  basically out in my district with my employees on calls.

16:05:05  10  Q.   And do you -- I mean, you have a command vehicle, right?

16:05:10  11  A.   Yes, I do.

16:05:10  12  Q.   Okay.  Do you use that command vehicle a lot?

16:05:13  13  A.   Yes, I do.

16:05:14  14  Q.   Okay.  Now, you were here in the courtroom, and you heard

16:05:20  15  the City's opening statement read to the jury panel by the

16:05:24  16  Court, did you not?

16:05:25  17  A.   Yes, I did.

16:05:26  18  Q.   And you -- so you heard them say that commanders, quote,

16:05:29  19  provide direct patient care only rarely, close quote.

16:05:33  20       Did you hear that statement?

16:05:34  21  A.   I heard that.

16:05:35  22  Q.   What's your experience?  Does that accord with your

16:05:38  23  experience?

16:05:39  24  A.   No, it does not.

16:05:40  25  Q.   In what way does that not accord with your experience?

FITZPATRICK – DIRECT

16:05:43  1  A.    I provide patient care daily as a supervisor.  It's what

16:05:49  2  EMS does.  It's what we do.

16:05:51  3  Q.    Does a field commander -- during what portion of your

16:05:55  4  24-hour shift is a field commander on call to respond to

16:05:59  5  medical emergencies?

16:06:00  6  A.    We're on call for the duration of our shift, from the time

16:06:03  7  we take over the truck from the off-going person until the time

16:06:08  8  we're relieved of duty.

16:06:09  9  Q.    Is there any duty you consider more important than that

16:06:12  10  duty?

16:06:12  11  A.    No.

16:06:13  12  Q.    Now, you talked a moment ago about the fact that you're

16:06:18  13  part of the dispatch matrix.  And are you actually considered a

16:06:24  14  resource available to go to these calls?

16:06:26  15  A.    Yes, I am.

16:06:27  16  Q.    And, in fact, sometimes are you dispatched?

16:06:31  17  A.    Yes, I am.

16:06:32  18  Q.    When you're dispatched, do you have a choice about whether

16:06:35  19  or not to go on the call?

16:06:36  20  A.    No, I do not.

16:06:37  21  Q.    What's your obligation when you receive a dispatch?

16:06:40  22  A.    My obligation is to, in the most timely manner safely

16:06:43  23  manner possible, get to my apparatus and go respond to the

16:06:47  24  medical incident just like an ambulance would.

16:06:50  25  Q.    Now, of course, you're not dispatched to all of the calls,

FITZPATRICK - DIRECT

16:06:53  1  are you?

16:06:54  2  A.   No, I'm not.

16:06:54  3  Q.   And when I say "you," I'm talking about the field

16:06:57  4  commanders, right?

16:06:59  5  A.   No, we're not.

16:06:59  6  Q.   But there are a number of types of calls that you are

16:07:03  7  dispatched to, aren't there?

16:07:04  8  A.   Yes, there are.

16:07:05  9  Q.   I want to direct your attention to Plaintiffs' Exhibit 12.

16:07:25  10  While we're working on rotating that, if you look at the one in

16:07:29  11  your volume, do you recognize what this is?

16:07:32  12  A.   Yes, I do.

16:07:33  13  Q.   Okay.  We're rotated now.

16:07:35  14       This is something entitled an Urban Response Plan.

16:07:38  15  Can you tell me what's your understanding of what this document

16:07:41  16  represents.

16:07:42  17  A.   Yes.  This basically is the way in which all units that

16:07:46  18  are recognized by our computer-aided dispatch system, our CAD

16:07:51  19  system, are sent on any and all calls.

16:07:53  20  Q.   And when you talk about these response -- or these

16:07:57  21  resources that are sent, you're talking basically about two

16:08:02  22  type of vehicles, aren't you?

16:08:04  23  A.   Yes.

16:08:04  24  Q.   I mean, there's the -- I mean, there are some other

16:08:08  25  vehicles.  You've got a helicopter, don't you?  Or somebody's

16:08:11  1  got a helicopter?

16:08:13  2  A.    Somebody has a helicopter.  Yes, sir.

16:08:16  3  Q.    It's just not you guys.  Well, let's look at this thing.

16:08:20  4  I see that at the top of the page we have medical priority one

16:08:23  5  to five.  Do you see that?

16:08:24  6  A.    Yes, sir.

16:08:25  7  Q.    Now, does dispatch use a priority system in terms of the

16:08:30  8  severity of calls?

16:08:32  9  A.    Yes.

16:08:32  10  Q.    And how does that work?

16:08:33  11  A.    There's a standardized nation-wide recognized system

16:08:37  12  called MPD, or Medical Priority Dispatch.  And the way that

16:08:41  13  works is, based on the information we get from 9-1-1 callers,

16:08:44  14  the call is triaged by the call taker, "one" being the most

16:08:48  15  severe call and "five" being the least severe.  It's

16:08:52  16  significant because, as you get higher up in the medical

16:08:55  17  priorities, ambulances might be diverted from a priority four

16:09:00  18  call, which might be a sprained ankle, to a priority two call

16:09:04  19  which is somebody having a heart attack.  It allows us to send

16:09:08  20  the most appropriate resource in the most timely manner to the

16:09:11  21  patient's side.

16:09:11  22  Q.    Okay.  And if we look at medical priority one, it talks

16:09:16  23  about the closest medic unit.  Is that a term used to refer to

16:09:19  24  an ambulance?

16:09:20  25  A.    Yes.  That's an ambulance.

FITZPATRICK - DIRECT

16:09:22  1    Q.   Okay.  And then it also says, "Respond with ALS resource

16:09:26  2    if there can be 30-second time savings."

16:09:30  3         Now, what does "ALS resource" mean in that?

16:09:32  4    A.   An ALS resource would mean an ALS certified or Advanced

16:09:36  5    Life Support certified responder in the system.

16:09:37  6    Q.   Is a command truck considered an ALS resource?

16:09:41  7    A.   Yes, it is.

16:09:42  8    Q.   So are you automatically dispatched to some type of

16:09:46  9    priority one calls?

16:09:47  10   A.   Yes, I am.

16:09:48  11   Q.   Those are considered the most severe calls in the system?

16:09:51  12   A.   That's correct.

16:09:52  13   Q.   What about priority two?  Same thing there, just a

16:09:54  14   different time savings?

16:09:56  15   A.   That's correct.

16:09:56  16   Q.   Are you sometimes dispatched to respond to priority two

16:10:00  17   calls?

16:10:00  18   A.   Yes, I am.

16:10:01  19   Q.   And then if we look down the page below the five

16:10:06  20   responses, I see a thing called "cardiac arrest."  Now, cardiac

16:10:10  21   arrest, I guess that's a term -- even though most of us think

16:10:13  22   we know what that is, what does "cardiac arrest" mean to you in

16:10:17  23   this grid?

16:10:18  24   A.   Cardiac arrest is a situation when the 9-1-1 or EMS

16:10:25  25   call-taker determined that the patient is not breathing and

FITZPATRICK - DIRECT

16:10:26  1  their heart is no longer beating.  Basically no pulse and no

16:10:31  2  respiration.  So they're clinically dead.  It's the most severe

16:10:36  3  call that we're dispatched to and the most time critical call.

16:10:38  4  Q.  Okay.  And I'm looking at the response that Austin-Travis

16:10:41  5  County EMS sends.  I notice that they send the closest medic

16:10:44  6  unit, and they also send the closest commander; is that

16:10:47  7  correct?

16:10:47  8  A.  That's correct.

16:10:47  9  Q.  So a commander gets dispatched to every cardiac arrest

16:10:52 10  call?

16:10:52 11  A.  That's correct.

16:10:53 12  Q.  Now, are those common?  Are they uncommon?  I mean, how

16:10:55 13  often does it happen?

16:10:57 14  A.  Daily, multiple times.

16:10:58 15  Q.  Have you ever been dispatched to more than one cardiac

16:11:01 16  arrest in one shift?

16:11:03 17  A.  Yes, I have.

16:11:03 18  Q.  What's the most cardiac arrests you recall ever being

16:11:06 19  dispatched to in a day?

16:11:06 20  A.  In a single shift, three.

16:11:10 21  Q.  So do you know other commanders who have been dispatched

16:11:13 22  even more than that?

16:11:14 23  A.  Some have been dispatched four, possibly five, yes.

16:11:16 24  Q.  Okay.  If we look down to "vehicle rescue," now, what's a

16:11:23 25  vehicle rescue in this grid?

FITZPATRICK - DIRECT

16:11:25   1   A.   A vehicle rescue is a traffic accident that results in a

16:11:29   2   patient who is still entrapped in the vehicle because of either

16:11:33   3   the severity of the damage to the vehicle or the fact that the

16:11:36   4   vehicle is actually impinged on the person themselves and

16:11:40   5   they're actually physically stuck in the car.

16:11:42   6   Q.   And I notice that, in addition to the closest medic unit,

16:11:45   7   they will also send the closest commander?

16:11:47   8   A.   That's correct.

16:11:48   9   Q.   So commanders get sent to all vehicle pin-ins?

16:11:53   10  A.   Yes, we do.

16:11:54   11  Q.   Then we have priority one and two rescues -- well, and

16:11:57   12  priority three rescues, for that matter.

16:12:00   13         What are priority one and priority two rescues?

16:12:03   14  A.   Priority one and priority two rescues, the distinction

16:12:07   15  between them only is the helicopter.  But, basically, they are

16:12:12   16  situations where you have an individual who is trapped in flood

16:12:15   17  water, someone who has fallen off Mount Bonnell, someone who is

16:12:20   18  stuck in a confined space, in a hazardous material situation or

16:12:24   19  in a tactical situation where our specialized units --

16:12:28   20  specialized ambulance and command go to their assistance.

16:12:32   21  Q.   And I notice that with regards to those, the closest spec

16:12:35   22  ops commander will be sent?

16:12:37   23  A.   That's correct.

16:12:38   24  Q.   So these are another type of calls in which you guys are

16:12:40   25  automatically dispatched?

FITZPATRICK - DIRECT

16:12:42  1  A.   That's correct.

16:12:43  2  Q.   And I believe you said that you're a spec ops commander,

16:12:47  3  correct?

16:12:47  4  A.   Yes.

16:12:47  5  Q.   So you've been dispatched to these calls as well, haven't

16:12:51  6  you?

16:12:51  7  A.   Yes, sir.

16:12:51  8  Q.   And if we go down, we can look at all of these where

16:12:54  9  you've got, for example, haz medic.  What does haz medic

16:12:58 10  represent?

16:12:58 11  A.   It's a hazardous materials alarm.  Something along the

16:13:03 12  lines of big chlorine leak or something at a manufacturing

16:13:07 13  center where a chemical designed to be kept in a contained

16:13:09 14  space is now leaking out.

16:13:10 15  Q.   Could it be a situation where a truck overturns on a

16:13:13 16  roadway and creates a hazardous materials spill?

16:13:17 17  A.   Yes.

16:13:17 18  Q.   Okay.  And then there's something down there, "alert two"

16:13:19 19  and "alert three."  What are those?

16:13:21 20  A.   Alert two and alert three are aircraft emergencies.  The

16:13:27 21  first one, the alert two, is designated for aircraft that are

16:13:32 22  having mechanical difficulties but still able to make it to the

16:13:36 23  airport.  And the alert threes are ones that either may make it

16:13:39 24  to the airport but are in imminent danger of having a crash.

16:13:43 25  An alert three would basically be an aircraft crash.

FITZPATRICK - DIRECT

16:13:46  1  Q.   And then there's something called "high-rise"?

16:13:48  2  A.   Yes.

16:13:48  3  Q.   And that's high-rise buildings?

16:13:50  4  A.   That's correct.

16:13:51  5  Q.   Okay.  We're getting more and more of those in Austin?

16:13:54  6  A.   Just a few.

16:13:55  7  Q.   And all of these are situations in which a commander is

16:13:59  8  going to be dispatched, correct?

16:14:01  9  A.   That's correct.

16:14:02  10  Q.   It's not -- we're not talking about self-assigned calls

16:14:06  11  here.  We're talking about an actual dispatch, right?

16:14:09  12  A.   Correct.

16:14:09  13  Q.   And do you have any discretion about whether or not to go

16:14:12  14  when that happens?

16:14:13  15  A.   No, I do not.

16:14:14  16  Q.   And then if we look at Plaintiffs' Exhibit 13, that's the

16:14:27  17  same sort of thing, except it's called a Suburban Response

16:14:30  18  Plan, right?

16:14:30  19  A.   That's correct.

16:14:31  20  Q.   And that's the areas of the county that are outside the

16:14:35  21  city perhaps?

16:14:36  22  A.   That's correct.

16:14:37  23  Q.   Okay.  And so then we could go down this list and we see

16:14:40  24  the same types of things and we see a lot of situations in

16:14:44  25  which commanders are required to go?

16:14:45   1  A.   That's correct.

16:14:46   2  Q.   And, again, looking back at Exhibit 12, sometimes you're

16:14:52   3  referred to as commander and sometimes you're just referred to

16:14:56   4  as an ALS resource, correct?

16:14:58   5  A.   That's correct.

16:14:59   6  Q.   But in both situations when you're dispatched you're

16:15:02   7  required to go?

16:15:03   8  A.   That's correct.

16:15:04   9  Q.   Now, let's talk about the reasons that you're dispatched.

16:15:10  10  When you're dispatched to a call, what's your understanding of

16:15:13  11  the expectations that are going to be made of you?

16:15:15  12  A.   I'm a medical responder.  When I'm dispatched to a call,

16:15:19  13  first and foremost, if I arrive first on the scene, it's my job

16:15:23  14  to do what any other first-arriving unit would do.  On a large

16:15:28  15  scene, it's to size up the scene and see what it entails.  If

16:15:31  16  it's a traffic accident with many vehicles involved with

16:15:35  17  multiple patients, my job is to size it up, make sure the scene

16:15:38  18  is safe for other units to enter, and count how many patients

16:15:41  19  there are and do a quick triage.  That's something any

16:15:44  20  paramedic or any ambulance or any firefighter off of a fire

16:15:49  21  truck would do as well.

16:15:50  22         If there is immediate life threats to individuals, my

16:15:54  23  job is to provide immediate medical care to that individual

16:15:56  24  until I'm relieved by someone else.  As incidents evolve,

16:16:01  25  larger incidents, I may fall into a role where I kind of

FITZPATRICK – DIRECT

| | | |
|---|---|---|
| 16:16:04 | 1 | oversee the entire scene. |
| 16:16:05 | 2 | Q.   Now, I want to direct your attention, if I can, to |
| 16:16:08 | 3 | Plaintiffs' Exhibit 23.  This is a document called a "Command |
| 16:16:24 | 4 | Update," correct? |
| 16:16:25 | 5 | A.   Yes. |
| 16:16:25 | 6 | Q.   And I want you to look, and it's dated January 19th, 2011? |
| 16:16:31 | 7 | A.   Yes. |
| 16:16:32 | 8 | Q.   And I want you to look at that first paragraph, the first |
| 16:16:34 | 9 | sentence, in fact.  It says, "The command response has multiple |
| 16:16:40 | 10 | purposes and functions, to include being a designated resource |
| 16:16:43 | 11 | for the system or being self-assigned to evaluate the |
| 16:16:47 | 12 | performance of your crews." |
| 16:16:49 | 13 |       Now, what do you understand that phrase, "designated |
| 16:16:52 | 14 | resource for the system," to mean? |
| 16:16:54 | 15 | A.   I'm a response resource for the system. |
| 16:16:56 | 16 | Q.   Okay.  And when you say a "response resource"? |
| 16:16:59 | 17 | A.   I'm a medical response resource for the system. |
| 16:17:02 | 18 | Q.   Okay.  Now, commanders, you know, does there ever come a |
| 16:17:11 | 19 | point in time when a commander may be moved or repositioned, |
| 16:17:16 | 20 | you know, with an eye towards availability to respond? |
| 16:17:19 | 21 | A.   Yes. |
| 16:17:19 | 22 | Q.   In what sorts of situations does that happen? |
| 16:17:25 | 23 | A.   When our system is getting very busy, which happens |
| 16:17:26 | 24 | more and more frequently, it gets overloaded, our dispatchers |
| 16:17:29 | 25 | in our CAD system make recommendations that the ALS command |

16:17:33   1  vehicle be moved to a location that's more advantageous to help

16:17:37   2  provide medical care.

16:17:38   3  Q.   And you said that seems to be happening more and more?

16:17:41   4  A.   As our call volume increases, yes.

16:17:44   5  Q.   Now, let's talk a minute about calls that you're not

16:17:47   6  dispatched to but that you may self-assign to.  There are the

16:17:50   7  so-called self-assigned calls, are there not?

16:17:53   8  A.   Yes, there are.

16:17:54   9  Q.   And what are self-assigned calls?

16:17:56  10  A.   The command vehicle has a mobile computer in it, and

16:18:00  11  self-assigned calls are ones where I am not automatically

16:18:04  12  dispatched to by protocol but choose to respond to.

16:18:09  13  Q.   And, now, you heard in the opening statement by the City

16:18:13  14  that they say you self-assign so you can observe the

16:18:17  15  performance of your crews, correct?

16:18:19  16  A.   I heard that, yes.

16:18:20  17  Q.   Is that the only reason you self-assign calls?

16:18:23  18  A.   No, it's not.

16:18:24  19  Q.   Is that the most typical reason that you self-assign to

16:18:27  20  calls?

16:18:27  21  A.   No, it's not.

16:18:28  22  Q.   What is the most typical reason that you self-assign to

16:18:31  23  calls?

16:18:32  24  A.   When I self-assign to a call, usually it's to provide

16:18:35  25  medical care.  I realize I'm either closer to the call than the

FITZPATRICK – DIRECT

16:18:39   1    ambulance is and I can get there or it's going be a

16:18:41   2    particularly complicated medical call where an extra set of ALS

16:18:46   3    hands and eyes would make a difference, or even to help provide

16:18:49   4    scene safety on large thoroughfares, like highways, where there

16:18:53   5    may be multiple patients and vehicles going by.

16:18:56   6    Q.   Now, when you say you go to do something like scene

16:18:59   7    safety, is that something in your mind that's unrelated to

16:19:03   8    patient care?

16:19:03   9    A.   No, it's not.

16:19:04   10   Q.   Why do you think it's not unrelated?

16:19:07   11   A.   It's integral to patient care.  As an EMT, one of the

16:19:11   12   first things you're taught is:  Is the scene safe?  It's the

16:19:15   13   first thing you do as any medical provider, is to make sure you

16:19:18   14   have scene safety before you start providing care.  The safety

16:19:21   15   of the citizens and patients and the safety of my providers is

16:19:25   16   paramount.

16:19:25   17   Q.   And, of course, there are places where commanders aren't

16:19:30   18   assigned, right?  I mean, there are a lot of calls that the

16:19:33   19   commanders don't make, correct?

16:19:34   20   A.   That's correct.

16:19:35   21   Q.   Is scene safety still important in those situations?

16:19:37   22   A.   Yes, it is.

16:19:38   23   Q.   Is sizing up the situation, deciding if other resources

16:19:41   24   are needed, is that still important?

16:19:43   25   A.   Yes, it is.

FITZPATRICK – DIRECT

16:19:43  1  Q.   Can other personnel besides commanders do that sort of

16:19:48  2  stuff?

16:19:48  3  A.   Yes.

16:19:48  4  Q.   Now, what about a type of self-assigned call that we'll

16:19:57  5  refer to as the "stealth call"?  Are you familiar with that

16:20:00  6  term?

16:20:01  7  A.   Stealth call, yes.

16:20:02  8  Q.   What are stealth calls?

16:20:04  9  A.   Stealth calls are always where I choose to go but don't

16:20:08  10  actually, via the computer system, assign myself.

16:20:13  11  Q.   And why would you go on a stealth call?

16:20:15  12  A.   When I am in my vehicle and I use my computer to

16:20:18  13  self-assign and I hit the button, it attaches me automatically

16:20:22  14  to that call.  It also notifies my responding units that I've

16:20:26  15  attached myself to that call, so they know I'm going with

16:20:29  16  them.  Sometimes I choose to respond with them in stealth mode

16:20:33  17  to not notify them that I'm coming on the call with them, so,

16:20:37  18  they don't have any preconceived ideas of why I might be

16:20:40  19  coming.

16:20:41  20  Q.   Okay.  And are there any other reasons that you might

16:20:43  21  engage in a stealth call besides -- you know, why you wouldn't

16:20:47  22  hit that self-assign button?

16:20:49  23  A.   A lot of times I will do it because I want to get there to

16:20:54  24  provide assistance with my medics.  I get there and, again,

16:20:59  25  sometimes they have preconceived ideas of what I'm there for.

FITZPATRICK - DIRECT

16:21:02  1  Q.   Okay.  Now, when you hit the self-assign button, do you

16:21:07  2  remain an available resource to the system?

16:21:10  3  A.   When I hit the self-assign button, I'm assigned to that

16:21:13  4  call.  So I'm not available at that point to respond to other

16:21:16  5  calls.

16:21:16  6  Q.   So if you want to respond to a call but remain available

16:21:19  7  to the system, can you do a stealth call?

16:21:22  8  A.   Absolutely.

16:21:23  9  Q.   Okay.  Is that something that you do on occasion?

16:21:25  10  A.   Yes.  That's one of the other reasons I would go in that

16:21:28  11  stealth mode to that call, is to remain available as a resource

16:21:31  12  to the system.

16:21:32  13  Q.   And if we look back at Plaintiffs' Exhibit 23, in fact,

16:21:36  14  EMS itself is trying to develop ways that you can go on these

16:21:40  15  calls -- these self-assigned calls and still remain an

16:21:44  16  available resource to the system, isn't it?

16:21:46  17  A.   That's correct.

16:21:47  18  Q.   And isn't that what this policy is here?  They put a new

16:21:50  19  button on, the AVDL button?

16:21:53  20  A.   That's correct.

16:21:53  21        MR. COPPOLA:  Your Honor, once again, I have to

16:21:55  22  object to leading.

16:21:56  23        MR. DEATS:  I'm sorry, Your Honor.  I'll rephrase the

16:21:58  24  question.

16:21:58  25  Q.   (BY MR. DEATS) Okay.  We're looking at Plaintiffs'

FITZPATRICK - DIRECT

16:22:00  1   Exhibit 23.  Do you see the third paragraph?  It talks about an

16:22:04  2   AVDL button?

16:22:06  3   A.   Yes, I do.

16:22:06  4   Q.   And what's the AVDL button?

16:22:09  5   A.   AVDL stands for Available Delay.  When a commander goes on

16:22:13  6   self-assigns on a call with another unit, we're assigned to

16:22:18  7   that unit and not available for additional dispatch.  If I get

16:22:22  8   on scene and then hit the AVDL button, the CAD system will

16:22:27  9   recognize me as an available resource.  That requires that I

16:22:30  10  don't get completely involved in the call or help -- kind of

16:22:34  11  remain back from the call a little bit and not be the primary

16:22:37  12  caregiver.

16:22:38  13          If there comes a time during that call where I get

16:22:41  14  engaged in patient care, I'm to notify my dispatcher via radio

16:22:46  15  to put me back on scene and remove me from available status so

16:22:50  16  I can continue providing patient care.

16:22:53  17  Q.   And let's go again to the types of care that a commander

16:22:58  18  may do on any of these calls.  What sorts -- you know, I've

16:23:03  19  heard a lot about the fact that you're there primarily to

16:23:06  20  provide incident command and scene safety.  Does that accord

16:23:10  21  with your experience?

16:23:11  22  A.   No, it does not.

16:23:12  23  Q.   What is your experience about the types of things that

16:23:15  24  you're doing when you're making these calls, whether

16:23:18  25  self-assigned or, you know, assigned by dispatch?

16:23:20   1    A.    To some extent, it depends on when I arrive.  If I arrive

16:23:24   2    prior to the ambulance, my job is to provide initial patient

16:23:28   3    care -- scene size-up, scene safety, initial patient care, just

16:23:32   4    like any other paramedic would.  If I arrive after the

16:23:35   5    ambulance does, I become an extra set of hands to them.  I can

16:23:38   6    set up medications for them.  I can go ahead and do medical

16:23:41   7    procedures for them just like they can because I'm credentialed

16:23:46   8    to do the same kind of thing.

16:23:48   9    Q.    Now, you said you can do that?

16:23:50   10   A.    Yes.  I do do that.

16:23:51   11   Q.    How often would you say that you provide direct patient

16:23:55   12   care?

16:23:55   13   A.    Daily.

16:23:56   14   Q.    More than once daily?

16:23:57   15   A.    Well, it depends on the district where I'm working.  Some

16:23:59   16   districts are more geographically spread out and the call

16:24:04   17   volume is lower, so you may not have the opportunity to do it.

16:24:08   18   Other districts where the call volume is higher and more

16:24:11   19   densely packed into a smaller area, you may do it multiple

16:24:14   20   times in a day.

16:24:15   21   Q.    And I take it from when we went over the suburban and the

16:24:20   22   urban response things, there's a lot of types calls that you're

16:24:24   23   called upon to make from time to time, correct?

16:24:26   24   A.    Yes.

16:24:26   25   Q.    I mean, it's not just the pure medical call where somebody

FITZPATRICK - DIRECT

| | | |
|---|---|---|
| 16:24:30 | 1 | calls because they're having chest pains, is it? |
| 16:24:33 | 2 | A.    No. |
| 16:24:34 | 3 | Q.    There's all sort of scenes where you may be called, just |
| 16:24:37 | 4 | like any other paramedic? |
| 16:24:39 | 5 | A.    Certainly. |
| 16:24:39 | 6 | Q.    Now, let's talk about incident command.  Are you familiar |
| 16:24:46 | 7 | with the system known as NIMS? |
| 16:24:49 | 8 | A.    Yes, I am? |
| 16:24:50 | 9 | Q.    And what does that stand for? |
| 16:24:51 | 10 | A.    It stands for the National Incident Management system. |
| 16:24:55 | 11 | Q.    Okay.  And we've sometimes referred to that as the ICS or |
| 16:25:00 | 12 | Incident Command System? |
| 16:25:02 | 13 | A.    Correct. |
| 16:25:02 | 14 | Q.    That's the older, more common term? |
| 16:25:04 | 15 | A.    Yes. |
| 16:25:05 | 16 | Q.    And what is ICS? |
| 16:25:07 | 17 | A.    ICS is a standard protocol that's accepted nationwide as |
| 16:25:15 | 18 | to how incidents should be managed.  Usually it pertains to |
| 16:25:21 | 19 | bigger incidents.  It's not necessarily a single individual who |
| 16:25:23 | 20 | might have called 9-1-1, but bigger -- things like big traffic |
| 16:25:29 | 21 | accidents or a plane crashed into a building. |
| 16:25:32 | 22 | Q.    And sometimes when you report to accidents, you're |
| 16:25:36 | 23 | reporting and doing incident command type events, aren't you? |
| 16:25:40 | 24 | A.    Yes, I am. |
| 16:25:41 | 25 | Q.    Do you consider that to be unrelated to patient care? |

| | | |
|---|---|---|
| 16:25:44 | 1 | A.    It's directly related to patient care. |
| 16:25:47 | 2 | Q.    How is it related to patient care, in your opinion? |
| 16:25:50 | 3 | A.    Everything I do is directly related to patient care.  My |
| 16:25:52 | 4 | job as an EMS provider is integral to patient care. |
| 16:25:57 | 5 | Q.    Now, is incident -- are district commanders the only |
| 16:26:00 | 6 | persons who can establish incident care in the hierarchy of the |
| 16:26:03 | 7 | Operations Division? |
| 16:26:04 | 8 | A.    No, they are not. |
| 16:26:05 | 9 | Q.    Who else can become an incident commander on a scene of an |
| 16:26:09 | 10 | accident or something of that nature? |
| 16:26:11 | 11 | A.    Any first responder that arrives first on scene can go |
| 16:26:14 | 12 | ahead and establish incident command on any incident, whether |
| 16:26:20 | 13 | that's an EMT provider off of a fire engine or a paramedic off |
| 16:26:24 | 14 | of an ambulance or a commander off of a command vehicle. |
| 16:26:26 | 15 | Q.    I guess somebody is in charge of every incident, aren't |
| 16:26:30 | 16 | they? |
| 16:26:30 | 17 | A.    To an extent, yes. |
| 16:26:31 | 18 | Q.    I mean, it's not always an incident command because it's |
| 16:26:35 | 19 | not a big enough event, right? |
| 16:26:36 | 20 | A.    Right. |
| 16:26:36 | 21 | MR. COPPOLA:  Your Honor, I'm going to object as to |
| 16:26:37 | 22 | leading. |
| 16:26:38 | 23 | THE COURT:  Sustained. |
| 16:26:43 | 24 | MR. DEATS:  I'll move on, Your Honor. |
| 16:26:44 | 25 | Q.    (BY MR. DEATS) Tell me some of the things that you think |

16:26:47  1   are patient care.  Obviously, I guess, direct medical care,

16:26:50  2   right?

16:26:50  3   A.   Yes.

16:26:50  4   Q.   What other sorts of things, in your opinion, constitute

16:26:53  5   direct patient care?

16:26:53  6   A.   Direct patient care is comprised of a number of things --

16:26:57  7   interviewing patients and family members to understand what the

16:27:00  8   underlying issue is, initially checking vital signs on

16:27:06  9   patients, patient assessment, checking them for injuries,

16:27:11  10  monitoring blood glucose, application of cardiac monitors,

16:27:16  11  administration of medications or life-saving procedures all

16:27:19  12  constitute patient care.

16:27:20  13  Q.   If you're talking to distraught family members, do you

16:27:24  14  have an opinion about whether or not that relates to patient

16:27:27  15  care?

16:27:27  16  A.   It is part of patient care.

16:27:28  17  Q.   What about if you're holding back a crowd from a scene?

16:27:31  18  Do you have an opinion about whether or not that relates to

16:27:34  19  patient care?

16:27:35  20  A.   That pertains to scene safety for my providers, and that

16:27:38  21  is part of patient care.

16:27:39  22  Q.   What about if you're communicating with dispatch or the

16:27:41  23  hospital about what's going on?

16:27:43  24  A.   Those are all parts of patient care, yes.

16:27:46  25  Q.   Scene control?

FITZPATRICK - DIRECT                                              251

16:27:47   1   A.   Also part of patient care.

16:27:48   2   Q.   Now, in your experience, is the amount of time that you're

16:27:54   3   spending on patient care, is it getting more, is it getting

16:27:56   4   less, is it the same or what?

16:27:58   5   A.   It's increasing.

16:28:00   6   Q.   And, in fact, if I could turn your attention to

16:28:02   7   Plaintiffs' Exhibit 44, do you recognize this as a memorandum

16:28:20   8   that James Hawley sent to the district commanders under his

16:28:23   9   command recently?

16:28:23  10   A.   Yes, I do.

16:28:24  11   Q.   Now, James Hawley is in what rank?

16:28:26  12   A.   He is a division chief.

16:28:28  13   Q.   So he's your boss or was your boss?

16:28:30  14   A.   He is one of the bosses right above me, yes.

16:28:32  15   Q.   Okay.  I understand that he recently moved out of

16:28:35  16   Operations?

16:28:36  17   A.   To another division, yes.

16:28:37  18   Q.   Okay.  Now, did you -- were you one of the ones that got a

16:28:40  19   copy of this memorandum?

16:28:42  20   A.   I was forwarded a copy of this memorandum.

16:28:45  21   Q.   Okay.  And I'm looking at the fourth paragraph.  It starts

16:28:53  22   with "I have asked each ..."

16:28:56  23   A.   Yes.

16:29:03  24   Q.   I'll ask you to read that to yourself and indicate to me

16:29:06  25   when you've finished.

| | | |
|---|---|---|
| 16:29:07 | 1 | A.    (Reviews document) |
| 16:29:17 | 2 |         Okay. |
| 16:29:17 | 3 | Q.    Now, what do you understand him to be saying to you when |
| 16:29:22 | 4 | he wants you to be more cognitive of geographical coverage |
| 16:29:26 | 5 | needs for commanders? |
| 16:29:27 | 6 |         MR. COPPOLA:  Objection.  Calls for speculation, |
| 16:29:30 | 7 | Your Honor. |
| 16:29:30 | 8 |         MR. DEATS:  Your Honor, this was a directive that was |
| 16:29:32 | 9 | given to him for the purpose of advising him in his work.  I'm |
| 16:29:35 | 10 | simply asking him for his understanding. |
| 16:29:37 | 11 |         THE COURT:  Well, lay the predicate for his |
| 16:29:38 | 12 | understanding.  Don't ask him generally. |
| 16:29:41 | 13 |         MR. DEATS:  Okay. |
| 16:29:41 | 14 | Q.    (BY MR. DEATS) Did you -- you received -- you received |
| 16:29:45 | 15 | this memo, and you've read it, right? |
| 16:29:47 | 16 | A.    Yes, I have. |
| 16:29:48 | 17 | Q.    And when you read the memo, did you -- did you form an |
| 16:29:52 | 18 | understanding of what it was that Mr. Hawley was trying to |
| 16:29:55 | 19 | communicate to the commanders about the way they did their |
| 16:29:58 | 20 | jobs? |
| 16:29:58 | 21 | A.    Yes, I did. |
| 16:29:59 | 22 | Q.    And what was your understanding with regards to this |
| 16:30:01 | 23 | paragraph? |
| 16:30:02 | 24 | A.    It was my understanding that Chief Hawley was requesting |
| 16:30:04 | 25 | the district commanders to remain in or about their response |

FITZPATRICK – DIRECT

16:30:08  1  areas and be more cognitive of remaining in and about their

16:30:13  2  response areas to be available for calls.

16:30:15  3  Q.    And I want to look down at item number five at the very

16:30:18  4  bottom of the exhibit.  Did you read this statement as well?

16:30:30  5  A.    Yes, I did.

16:30:31  6  Q.    And what does it mean to you when you hear the system is

16:30:35  7  "getting hammered"?

16:30:36  8  A.    "Getting hammered" in the EMS jargon is when the system is

16:30:42  9  overwhelmingly busy.  And it was the expectation of

16:30:45  10  Chief Hawley that we be out there helping facilitate call

16:30:52  11  volume, helping run medical calls, and giving the ambulances

16:30:55  12  help to run medical calls as well.

16:30:57  13          MR. COPPOLA:  Objection, Your Honor.

16:30:58  14  Mischaracterizes the exhibit.

16:30:59  15          MR. DEATS:  Your Honor, I asked him for his

16:31:01  16  understanding, and I believe he provided it.

16:31:03  17          THE COURT:  The jury will consider the following

16:31:05  18  testimony as only what his understanding is of the exhibit and

16:31:09  19  can draw their own conclusion from what the exhibit says.

16:31:13  20          MR. DEATS:  Okay.

16:31:14  21  Q.    (BY MR. DEATS) Let's talk about the relative importance of

16:31:19  22  your supervisory and your patient care duties.  In your

16:31:23  23  opinion, what's the most important part of your job?

16:31:28  24  A.    The most important part of my job is to be available as a

16:31:33  25  resource to the citizens of Austin and Travis County as a

FITZPATRICK - DIRECT                                                    254

16:31:36   1   medical responder.

16:31:37   2   Q.   Okay.   During what part of your shift are you available as

16:31:40   3   a resource for that purpose?

16:31:41   4   A.   For my entire shift.

16:31:43   5   Q.   And why do you think that's the most important aspect of

16:31:46   6   your job, given all the other supervisory duties that you've

16:31:50   7   talked about?

16:31:50   8   A.   It's what EMS does.   It's what the citizens expect of us

16:31:54   9   and what I expect of my peers and myself as well.

16:31:57   10  Q.   Where is most of your day spent if not in your station?

16:32:01   11  A.   In my vehicle out in the field.

16:32:04   12  Q.   Okay.   And what are you doing in your vehicle out in the

16:32:07   13  field?

16:32:07   14  A.   It's a large geographic district.   It's driving between

16:32:12   15  stations and driving between response areas.   But it's being

16:32:16   16  available to my crews and to visit my crews, to make -- to

16:32:19   17  respond to calls in my district, to respond to calls with my

16:32:23   18  crews, and make sure my crews have what they need to take care

16:32:27   19  of our patients.

16:32:28   20  Q.   Okay.   You talked about the amount of time you spend doing

16:32:31   21  office duties, correct?

16:32:32   22  A.   Yes.

16:32:33   23  Q.   Now, let's talk about some statistics.   Early on in the

16:32:42   24  case the City provided some statistical information that

16:32:44   25  indicated that commanders only respond to about 5 percent or

FITZPATRICK – DIRECT

16:32:47   1   less of the calls made to the system, correct?

16:32:49   2   A.   Yes.

16:32:50   3            MR. COPPOLA:  Objection, Your Honor.  Leading and

16:32:52   4   he's talking about --

16:32:53   5            MR. DEATS:  Your Honor, I'm just laying the predicate

16:32:55   6   for the question I'm really going to ask.

16:32:57   7            THE COURT:  Well, go ahead and ask the question.

16:32:59   8            MR. DEATS:  Okay.

16:32:59   9   Q.   (BY MR. DEATS) Now, you're aware -- at any one time,

16:33:09   10   approximately how many commanders are there in the Field

16:33:12   11   Operations Division?

16:33:15   12   A.   On duty?

16:33:16   13   Q.   Let's talk about right now.  How many commanders do you

16:33:19   14   have in the Field Operations Division?

16:33:21   15   A.   Currently, I believe we have 23 commanders in the Field

16:33:25   16   Operations Division.

16:33:26   17   Q.   And how many paramedics, if you know, do you have in the

16:33:31   18   division?

16:33:33   19   A.   Somewhere around 330.

16:33:35   20   Q.   Okay.  And I guess in 2009, back, you know, the relevant

16:33:40   21   period, those numbers both were a little bit decreased, right?

16:33:44   22   A.   Yes.

16:33:44   23   Q.   And those two groups together comprise the group that's

16:33:48   24   available for response, right?

16:33:50   25   A.   That's correct.

FITZPATRICK – DIRECT

16:33:51  1  Q.   So you have maybe 23 commanders, you said, and 330

16:33:55  2  paramedics?

16:33:56  3  A.   Yes.

16:33:56  4  Q.   So we could do the math and find out what percentage of

16:33:59  5  the total response force commanders make up, couldn't we?

16:34:02  6  A.   Yes.

16:34:03  7  Q.   And do CAD records, by the way, capture all the calls that

16:34:07  8  are made by field commanders?

16:34:09  9  A.   No, they do not.

16:34:10  10  Q.   What calls do they not capture?

16:34:12  11  A.   Those calls that we referred before as stealth calls will

16:34:16  12  not show up as my being assigned to them.

16:34:20  13  Q.   Okay.   Now, you participated in doing a statistical

16:34:24  14  analysis of data provided by the City, did you not?

16:34:28  15  A.   Yes, I did.

16:34:29  16  Q.   And what was the purpose of the analysis that we were

16:34:33  17  doing?

16:34:33  18  A.   The purpose of the analysis was to show a comparison of --

16:34:38  19  by individual and by rank who responded to what percentage of

16:34:43  20  calls.

16:34:43  21  Q.   Okay.   And you helped analyze that data?

16:34:50  22  A.   Yes, I did.

16:34:51  23  Q.   And, of course, there were thousands and thousands of

16:34:53  24  pages, weren't there?

16:34:54  25  A.   Yes.   Thousands.

16:34:55   1   Q.   So we needed the help of a computer, didn't we?

16:34:58   2   A.   Yes.

16:34:58   3   Q.   Now, I want to direct your attention to Plaintiffs'

16:35:01   4   Exhibit 46.  By the way, this data covered a period from 2008

16:35:10   5   and 2011, correct?

16:35:11   6   A.   Yes.

16:35:11   7   Q.   The data that the City gave us covered that period of

16:35:15   8   time?

16:35:15   9   A.   Yes, it did.

16:35:16  10   Q.   And were there any EMTs in the system at that time?

16:35:22  11   A.   No, there were not.

16:35:24  12   Q.   Okay.  EMTs became a classification, I think you said,

16:35:28  13   only this year?

16:35:29  14   A.   Last year, yes.

16:35:30  15   Q.   So in looking at medics, you were just looking at clinical

16:35:34  16   specialists or the captains and looking at the paramedics,

16:35:38  17   right?

16:35:38  18   A.   That's correct.

16:35:39  19   Q.   And you were also looking at the field commanders,

16:35:42  20   correct?

16:35:42  21   A.   Yes.

16:35:42  22   Q.   And you looked at those that worked those entire periods,

16:35:46  23   and you tried to make calculations, did you not?

16:35:49  24   A.   Yes, we did.

16:35:50  25   Q.   And what were the types of calculations you were trying to

FITZPATRICK – DIRECT

16:35:53  1  make?

16:35:53  2  A.   They were trying to establish how many calls commanders

16:35:56  3  actually ran -- dispatched to and also ran as dispatched to and

16:36:05  4  self-assigned to.  And then made a comparison and a ratio

16:36:09  5  between the number of calls that they ran versus number of

16:36:12  6  calls individual crews ran.

16:36:13  7  Q.   Okay.  And we ran those for 2008 and 2011, right?

16:36:18  8  A.   Yes.

16:36:18  9  Q.   And then so we're showing the calls there -- on the first

16:36:22  10  page we're showing the calls there for -- per commander and the

16:36:26  11  calls there per crew, right?

16:36:28  12  A.   Yes.

16:36:28  13  Q.   And a crew is what?

16:36:30  14  A.   A crew consists of two paramedics and an ambulance.

16:36:35  15  Q.   So when an ambulance responds, it's going to have a crew

16:36:38  16  on it, right?

16:36:39  17  A.   Yes.

16:36:39  18  Q.   Okay.  And so -- and then we tried to determine the

16:36:41  19  percentage rate, did we not?

16:36:43  20  A.   Yes.

16:36:43  21  Q.   And if we look at those percentages, what percentage of

16:36:46  22  total calls did commanders do, vis-a-vis crews, in 2008?

16:36:52  23  A.   2008, the total calls was 30.51 percent.

16:36:56  24  Q.   So you responded to 30 percent as many calls as did the

16:37:00  25  crews?

| | | |
|---|---|---|
| 16:37:01 | 1 | A.    Yes. |
| 16:37:01 | 2 | Q.    And then in 2011 how did that percentage change, if at |
| 16:37:05 | 3 | all? |
| 16:37:06 | 4 | A.    It increased to 35.57 percent. |
| 16:37:10 | 5 | Q.    And then if we look at the dispatched calls only, the ones |
| 16:37:13 | 6 | you're actually dispatched to as an available resource, in 2008 |
| 16:37:17 | 7 | what was that percentage? |
| 16:37:18 | 8 | A.    That percentage was 18.53 percent in 2008. |
| 16:37:22 | 9 | Q.    And what was it in 2011? |
| 16:37:24 | 10 | A.    It was 22.83 percent in 2011. |
| 16:37:27 | 11 | Q.    Okay.  And then if we look at the second page of the |
| 16:37:30 | 12 | exhibit, it's just a graphic display of that showing the |
| 16:37:37 | 13 | percentages? |
| 16:37:38 | 14 | A.    That's correct. |
| 16:37:39 | 15 | Q.    Now, of course, what that indicates is you don't respond |
| 16:37:42 | 16 | to as many calls as they do, do you? |
| 16:37:45 | 17 | A.    No, we do not. |
| 16:37:46 | 18 | Q.    But as we covered with Plaintiffs' Exhibit 12, what types |
| 16:37:50 | 19 | of calls typically are you called to run? |
| 16:37:53 | 20 | A.    As commanders we're called to the most serious calls, the |
| 16:37:56 | 21 | priority one and two calls, specifically. |
| 16:37:58 | 22 | Q.    Okay.  And, now, you've got your own experience, don't |
| 16:38:04 | 23 | you? |
| 16:38:04 | 24 | A.    Yes, I do. |
| 16:38:05 | 25 | Q.    And you've been -- you've been both in the busy districts |

| | | |
|---|---|---|
| 16:38:09 | 1 | and you've been in the less busy districts, haven't you? |
| 16:38:12 | 2 | A.   Yes. |
| 16:38:13 | 3 | Q.   Okay.  Let's talk about when you're in a less busy |
| 16:38:16 | 4 | district.  Do you have a sense on average of how many calls you |
| 16:38:19 | 5 | may be dispatched to a shift? |
| 16:38:21 | 6 | A.   In a less busy district, during a 24-hour shift, I might |
| 16:38:24 | 7 | be dispatched to two calls, maybe three calls, sometimes. |
| 16:38:28 | 8 | Q.   Okay.  And what about a paramedic or a clinical specialist |
| 16:38:33 | 9 | on that same -- in that same district?  How many calls on |
| 16:38:37 | 10 | average would you say they're dispatched to? |
| 16:38:39 | 11 | A.   On average, probably four or five. |
| 16:38:44 | 12 | Q.   And then, when you're in a more busy district, how -- what |
| 16:38:50 | 13 | effect does that have on the rate at which you're dispatched? |
| 16:38:53 | 14 | A.   It's greatly increased in the busy districts. |
| 16:38:55 | 15 | Q.   In the busy districts, on average in a 24-hour shift, how |
| 16:39:00 | 16 | many calls would you say you're dispatched on? |
| 16:39:02 | 17 | A.   As commander in a busy district, I'd be dispatched on |
| 16:39:07 | 18 | anywhere from five to seven calls. |
| 16:39:09 | 19 | Q.   And what about your paramedics or clinical specialists? |
| 16:39:13 | 20 | How many calls might they expect on average? |
| 16:39:14 | 21 | A.   On average, it does vary.  But it could be anywhere from |
| 16:39:18 | 22 | eight to 15 calls. |
| 16:39:19 | 23 | Q.   And then, of course, you -- there we're talking about |
| 16:39:26 | 24 | dispatched calls.  There are the self-assigned calls, are there |
| 16:39:30 | 25 | not? |

| | | |
|---|---|---|
| 16:39:31 | 1 | A.   That's correct. |
| 16:39:31 | 2 | Q.   How many self-assigned calls would you say you make on |
| 16:39:35 | 3 | average in a shift? |
| 16:39:35 | 4 | A.   In a slower district, one or two. |
| 16:39:37 | 5 | Q.   Busy district? |
| 16:39:39 | 6 | A.   Three or four. |
| 16:39:40 | 7 | Q.   And those are in addition to the ones that you're |
| 16:39:44 | 8 | dispatched on? |
| 16:39:45 | 9 | A.   That's correct. |
| 16:39:45 | 10 | Q.   Now, I want to ask you, if you could, to turn to |
| 16:39:50 | 11 | Plaintiffs' Exhibit 45.  Do you recognize this document? |
| 16:40:05 | 12 | A.   Yes, I do. |
| 16:40:06 | 13 | Q.   Could you describe it for me? |
| 16:40:11 | 14 | A.   It's the City of Austin's medical release to return to |
| 16:40:15 | 15 | work. |
| 16:40:17 | 16 | Q.   And is this -- if you look at the job title up at the top |
| 16:40:22 | 17 | part of the page, what job title does this cover? |
| 16:40:25 | 18 | A.   This is specific to the EMS district commander and EMS |
| 16:40:29 | 19 | operations supervisor. |
| 16:40:30 | 20 | Q.   Okay.  And, again, those are just two ways of saying the |
| 16:40:33 | 21 | same thing? |
| 16:40:33 | 22 | A.   That's correct. |
| 16:40:34 | 23 | Q.   Okay.  And read that sentence immediately below that. |
| 16:40:38 | 24 | What does that say? |
| 16:40:39 | 25 | A.    It says:  "This position requires the same physical |

16:40:42   1   patient care requirements as an EMS paramedic, but they are not

16:40:47   2   performed as frequently."

16:40:50   3   Q.   And then if we look at subsection A, "Most Frequently

16:40:53   4   Performed Tasks," it lists some tasks there, does it not?

16:40:58   5   A.   Yes, it does.

16:40:59   6   Q.   Is this a document that's currently in use?

16:41:01   7   A.   Yes, it is.

16:41:03   8   Q.   Okay.  And looking at some of these bullet points, let's

16:41:10   9   look at that third bullet point.  What is that talking about?

16:41:15  10   A.   It says, "Lifting 30-pound equipment, aid bags, cardiac

16:41:21  11   monitors, portable suction, et cetera."

16:41:23  12   Q.   What type of equipment is that?

16:41:25  13   A.   That's all the medical equipment that we carry on our

16:41:29  14   ambulances and on our command vehicle.

16:41:31  15   Q.   Is that something you're required to do in your job?

16:41:34  16   A.   Yes.

16:41:34  17   Q.   Look at the next bullet point, "Loading and unloading

16:41:37  18   stretchers."  Is that something that you're asked to do from

16:41:47  19   time to time on your job?

16:41:48  20   A.   Yes.

16:41:48  21   Q.   Looking at lifting patients of all sizes, ranging from

16:41:52  22   children to bariatric patients."  Is that something you're

16:41:55  23   asked to do?

16:41:56  24   A.   Yes.

16:41:56  25   Q.   What types of activities are these?

FITZPATRICK - DIRECT

16:42:02  1  A.    These are medical -- they're medical activities, ones that

16:42:08  2  all paramedics in our system are required to perform.

16:42:11  3  Q.    And this is under the subject heading "Most Frequently

16:42:14  4  Performed Tasks"?

16:42:16  5  A.    Yes.

16:42:16  6  Q.    Okay.  And it also talks about providing care in a moving

16:42:22  7  ambulance.  Now, we talked about how a command vehicle doesn't

16:42:26  8  have a stretcher and can't transport, right?

16:42:29  9  A.    That's correct.

16:42:30  10  Q.    How is it, then, that you could be required to provide

16:42:33  11  care in a moving ambulance?

16:42:34  12  A.    There are times when I do wind up in the back of an

16:42:37  13  ambulance on a call.

16:42:38  14  Q.    How would that happen?

16:42:39  15  A.    Again, we're dispatched to the most severe calls, the ones

16:42:43  16  that are most medically intensive and critical thinking is of

16:42:48  17  vital importance and also the ability to perform these advanced

16:42:51  18  life support tasks.  Sometimes having an extra set of advanced

16:42:54  19  life support hands in the back of that ambulance is essential.

16:42:58  20  There are times where I may be in the back of an ambulance

16:43:00  21  helping out with that.

16:43:02  22        Sometimes when I arrive first on the scene, in order

16:43:05  23  to maintain continuity of patient care, I may continue the

16:43:08  24  patient care all the way to the hospital and have one of the

16:43:09  25  paramedics drive my unit to the hospital behind the ambulance.

FITZPATRICK - DIRECT
264

16:43:12  1  Q.  And if you look at page 2 of the exhibit, up at the very

16:43:17  2  top, item F, physical abilities, it describes some of the

16:43:20  3  physical abilities that a district commander needs?

16:43:23  4  A.  Yes.

16:43:23  5  Q.  It talks about "performing strenuous physical

16:43:29  6  requirements, such as CPR, lifting and moving of equipment and

16:43:33  7  patient's.  Is this something that you're asked to do on your

16:43:36  8  job?

16:43:36  9  A.  Yes.

16:43:37  10  Q.  And when you've been injured or ill for more than five

16:43:40  11  days, is this a form you're required to provide?

16:43:43  12  A.  Yes.

16:43:44  13  Q.  And looking at page 3 of the form, does it have to be

16:43:48  14  signed by anybody other than yourself?

16:43:50  15  A.  It's supposed to be signed by a health care provider.

16:43:55  16  Q.  Okay.  And what's the purpose of the health care

16:43:58  17  provider's signature?

16:43:58  18  A.  To confirm that I am fit for duty.

16:44:00  19  Q.  Okay.  Fit to do all of the things that are in this page?

16:44:03  20  A.  Yes.

16:44:04  21  Q.  So you spend the majority of your day in the field but

16:44:18  22  during what portion of the day are you actually subject to

16:44:23  23  being called to the field?

16:44:24  24  A.  I'm subject to being called to duty in the field all 24

16:44:28  25  hours on my shift.

FITZPATRICK – CROSS

| | | |
|---|---|---|
| 16:44:29 | 1 | Q.   And is there any duty that you have that would take |
| 16:44:33 | 2 | precedence over a page to respond to a call? |
| 16:44:38 | 3 | A.   I can't think of any of my duties -- my supervisor |
| 16:44:42 | 4 | administrative duties that would supersede and take precedence |
| 16:44:46 | 5 | of my duty to respond to that call. |
| 16:44:49 | 6 |            MR. DEATS:  Okay.  Pass the witness. |
| 16:44:52 | 7 |            THE COURT:  Cross-examination? |
| 16:44:59 | 8 |                 **CROSS–EXAMINATION** |
| 16:44:59 | 9 | **BY MR. COPPOLA:** |
| 16:44:59 | 10 | Q.   Good afternoon, Commander Fitzpatrick.  How are you? |
| 16:45:12 | 11 | A.   Good.  How are you? |
| 16:45:14 | 12 | Q.   Now, you agree, Commander Fitzpatrick, that as a field |
| 16:45:22 | 13 | commander in EMS, you have approximately 15 paramedics and |
| 16:45:26 | 14 | captains, field staff, that are subordinate to you in the |
| 16:45:30 | 15 | organization that you supervise; is that correct? |
| 16:45:32 | 16 | A.   Yes. |
| 16:45:33 | 17 | Q.   And you agree that field commanders are the first level of |
| 16:45:37 | 18 | management and supervisors in EMS; is that right? |
| 16:45:41 | 19 | A.   Yes. |
| 16:45:42 | 20 | Q.   And you agree also that paramedics do not manage or |
| 16:45:46 | 21 | supervise other staff.  Isn't that true? |
| 16:45:49 | 22 | A.   That's correct. |
| 16:45:49 | 23 | Q.   And you agree also that captains, unless they happen to be |
| 16:45:53 | 24 | working higher class, are not recognized supervisors and |
| 16:45:57 | 25 | managers in EMS; isn't that right. |

| | | |
|---|---|---|
| 16:46:00 | 1 | A.   No.  Not exclusively, no. |
| 16:46:02 | 2 | Q.   They're not recognized as such; is that correct? |
| 16:46:05 | 3 | A.   That's correct. |
| 16:46:06 | 4 | Q.   They're field training officers; is that right? |
| 16:46:09 | 5 | A.   That's one of their functions, yes. |
| 16:46:10 | 6 | Q.   And you as a commander, you're actually responsible for |
| 16:46:13 | 7 | supervising those captains in their field training officer |
| 16:46:17 | 8 | responsibilities; isn't that right? |
| 16:46:19 | 9 | A.   That's correct. |
| 16:46:20 | 10 | Q.   In fact, ultimately, when there's a cadet under your |
| 16:46:24 | 11 | supervision, you ultimately have to sign off that all the |
| 16:46:27 | 12 | training was done correctly for that cadet; isn't that true? |
| 16:46:30 | 13 | A.   I specifically don't, no. |
| 16:46:31 | 14 | Q.   The field commanders at some point must sign off that |
| 16:46:34 | 15 | their captains have done the appropriate training; isn't that |
| 16:46:37 | 16 | true? |
| 16:46:38 | 17 | A.   That falls to the district commander over training I don't |
| 16:46:41 | 18 | specifically sign off on my cadets ready for duty, no. |
| 16:46:45 | 19 | Q.   But you supervise that training, though, don't you? |
| 16:46:50 | 20 | A.   In so much as I observe the clinical specialists |
| 16:46:55 | 21 | performing the training, yes. |
| 16:46:56 | 22 | Q.   I want to back up a little bit, Commander Fitzpatrick, and |
| 16:46:59 | 23 | talk a little bit about -- and you went over a little bit of |
| 16:47:02 | 24 | this with Mr. Deats -- but I want to talk about some of your |
| 16:47:05 | 25 | time earlier in EMS when you promoted to commander and decided |

16:47:09  1  to become a commander.

16:47:12  2          As I understand it, you first started working towards

16:47:15  3  that goal in 2001-2002; is that right?

16:47:18  4  A.   Yes.

16:47:19  5  Q.   Okay.  And you were selected as part of a competitive

16:47:23  6  process to attend what was called at that time a commander

16:47:26  7  college; is that true?

16:47:27  8  A.   That's correct.

16:47:28  9  Q.   And in that commander college, you, along with other

16:47:34  10  candidates to become commanders, you all received training on

16:47:37  11  management; is that right?

16:47:38  12  A.   Yes.

16:47:38  13  Q.   Training on city policies and procedures.  Is that true?

16:47:43  14  A.   Yes.

16:47:43  15  Q.   You also received training on giving feedback --

16:47:46  16  performance feedback to staff.  Is that true?

16:47:48  17  A.   Yes.

16:47:49  18  Q.   You were also trained in dealing with difficult employees,

16:47:52  19  weren't you?

16:47:53  20  A.   Yes.

16:47:53  21  Q.   And trained in ethics training, leave policies, FMLA,

16:48:00  22  et cetera.  Is that true?

16:48:02  23  A.   Yes.

16:48:02  24  Q.   And it's true -- you agree, don't you, Commander

16:48:05  25  Fitzpatrick, that this commander college was specifically

16:48:09   1   designed to help you become a capable supervisor of paramedics

16:48:15   2   and field staff in EMS, don't you?

16:48:17   3   A.   Yes.

16:48:18   4   Q.   And do you agree that it did a good job in preparing you

16:48:23   5   for that task?

16:48:23   6   A.   I would say so, yes.

16:48:26   7   Q.   And after that you became what was then called an acting

16:48:29   8   district commander.  Is that true?

16:48:31   9   A.   That's correct.

16:48:32   10  Q.   And that position doesn't exist anymore and hasn't existed

16:48:36   11  for some time; is that correct?

16:48:37   12  A.   No.  It doesn't exist anymore.

16:48:39   13  Q.   It hasn't existed for some time.  Is that true?

16:48:41   14  A.   No, it has not.

16:48:43   15  Q.   And when you became -- went to become a full-fledged

16:48:47   16  district commander, you had to undergo yet another competitive

16:48:51   17  process at that point, isn't that right?

16:48:53   18  A.   That's correct.

16:48:53   19  Q.   And you agree that, even today, when a captain or possibly

16:48:56   20  somebody else in the organization is desiring to become a

16:48:59   21  district commander, they have to undergo a competitive process

16:49:02   22  as well.  Isn't that true?

16:49:04   23  A.   Yes.

16:49:04   24  Q.   But there are no -- and we're going to talk about this

16:49:08   25  more later, but there are no actual specific physical

FITZPATRICK - CROSS

16:49:10  1    requirements over and above what's required for all of the

16:49:15  2    uniformed staffed in EMS to become a commander.  Is that true?

16:49:19  3    A.   There are no specific physical requirements of a commander

16:49:23  4    over another field provider, no.

16:49:25  5    Q.   And it's true that those -- those requirements are

16:49:29  6    applied, say, to cadets and paramedics when they first enter

16:49:33  7    the organization; is that right?

16:49:35  8    A.   Yes.

16:49:35  9    Q.   But there's no retest, for instance, as a commander to

16:49:39  10   ensure that you meet some sort of specific physical

16:49:41  11   requirement; is that right?

16:49:43  12   A.   Not to my knowledge, no.

16:49:45  13   Q.   And it's true as well that, as a field commander, you

16:49:49  14   actually receive ongoing training from EMS in management; isn't

16:49:53  15   that right?

16:49:54  16   A.   Some.  Yes.

16:49:54  17   Q.   And EMS has either called in people to teach courses or

16:50:00  18   has sent you to courses in management, haven't they?

16:50:02  19   A.   Yes.

16:50:02  20   Q.   Now, we've talked at some length today about -- already

16:50:09  21   today about what, sort of, your typical day looks like as a

16:50:13  22   district commander.  And I want to kind of go through this and

16:50:17  23   break that down a little bit further.

16:50:21  24        I guess first off I'd like to go ahead and put up

16:50:26  25   Defendant's Exhibit 1, if we could.  I'm sorry.  I guess I mean

FITZPATRICK – CROSS

| | | |
|---|---|---|
| 16:50:35 | 1 | Defendant's Exhibit 56.  I apologize. |
| 16:50:43 | 2 | While that's coming up, Commander Fitzpatrick, you |
| 16:50:48 | 3 | agree that field commanders are assigned to manage one of six |
| 16:50:52 | 4 | districts in EMS; is that right, on any given shift? |
| 16:50:55 | 5 | A.   Yes. |
| 16:50:56 | 6 | Q.   And I think you said that you were assigned to district |
| 16:51:01 | 7 | six; is that right? |
| 16:51:02 | 8 | A.   That's correct. |
| 16:51:03 | 9 | Q.   And that has seven ambulances? |
| 16:51:05 | 10 | A.   That's correct, yes. |
| 16:51:06 | 11 | Q.   So there are six different stations; is that right? |
| 16:51:11 | 12 | There's an ambulance assigned to your station as well? |
| 16:51:15 | 13 | A.   There are seven different stations and one ambulance |
| 16:51:17 | 14 | assigned to every station.  And I'm assigned as well with an |
| 16:51:20 | 15 | ambulance in my station. |
| 16:51:20 | 16 | Q.   I understand.  Now, each ambulance is staffed with two |
| 16:51:23 | 17 | field people; is that right? |
| 16:51:25 | 18 | A.   With two providers, yes. |
| 16:51:27 | 19 | Q.   Okay.  I want to just kind of direct your attention over |
| 16:51:32 | 20 | here to Defendant's Exhibit 56. |
| 16:51:34 | 21 | A.   Mr. Coppola, I don't have Defendant's Exhibit 56 in my |
| 16:51:37 | 22 | binder. |
| 16:51:38 | 23 | Q.   No.  It's up here.  I don't know if you can see it, |
| 16:51:40 | 24 | Commander Fitzpatrick. |
| 16:51:42 | 25 | A.   I'll do my best. |

FITZPATRICK - CROSS

16:51:43  1  Q.   Okay.  Well, what I'll point out to you, if you can't see

16:51:47  2  it, at the top of the organization is Chief Rodriguez; is that

16:51:51  3  right?

16:51:51  4  A.   That's correct, yes.

16:51:52  5  Q.   Underneath him is James Shamard.  He's the chief of staff

16:51:57  6  of Field Operations; is that correct?

16:51:59  7  A.   Correct.

16:51:59  8  Q.   And I think -- I think you mentioned before that there

16:52:03  9  were six operations managers; is that right?

16:52:06  10  A.   There were six, yes.  I believe so.

16:52:08  11  Q.   But it's correct to say there are only two individual

16:52:12  12  division chiefs or operations managers over Field Operations;

16:52:17  13  is that correct?

16:52:17  14  A.   That's correct.  For Field Operations there are two.

16:52:20  15  Q.   Okay.  And then there are six -- there's actually seven

16:52:25  16  boxes here for district commanders; is that correct?

16:52:28  17  A.   It looks to be so, yes.

16:52:30  18  Q.   Do you know why there are seven?

16:52:35  19  A.   I can't read them from here.  I know there are six

16:52:38  20  geographic districts, and because of the number of district

16:52:41  21  commanders we have, we have a seventh district that's just kind

16:52:43  22  of almost like an overflow, a floating a district.

16:52:47  23  Q.   Okay.  And then underneath each district commander, there

16:52:50  24  are multiple medic units; is that correct?

16:52:54  25  A.   That's correct.

FITZPATRICK - CROSS

16:52:56  1  Q.   Now, each of those boxes for medic units, that doesn't

16:52:59  2  represent sort of an individual person, does it?  That

16:53:02  3  represents medic units, ambulances; is that correct?

16:53:06  4  A.   That's correct.  It represents the ambulance.

16:53:09  5  Q.   And as you mentioned before, there were about actually 330

16:53:12  6  or so paramedics in EMS?

16:53:14  7  A.   Yes.

16:53:14  8  Q.   And the district commanders supervise that entire staff?

16:53:17  9  A.   Yes.

16:53:18  10  Q.   Now, when the -- when the field staff comes in and

16:53:29  11  reports -- and we've talked about these geographic districts --

16:53:32  12  they don't come centrally to some headquarters to start off

16:53:37  13  with, do they?

16:53:37  14  A.   No, they do not.

16:53:38  15  Q.   Everybody reports directly to a station; isn't that right?

16:53:41  16  A.   Correct.

16:53:42  17  Q.   And most of these stations -- in fact, there's really only

16:53:44  18  six where there's a commander.  Most of these stations, the

16:53:47  19  field staff comes in and there's no supervisor there at all,

16:53:50  20  isn't that right?

16:53:51  21  A.   That's correct.

16:53:52  22  Q.   And so one of the things you do as the field commander is

16:53:56  23  you spend a large portion of your day -- you mentioned you

16:53:59  24  spend, say, six hours driving around.  And you also spend

16:54:02  25  another five hours, isn't it true, actually visiting the

FITZPATRICK - CROSS

16:54:06   1   stations and speaking with the crews each day.  Isn't that

16:54:09   2   true?

16:54:09   3   A.   As best I can, yes.

16:54:11   4   Q.   Now, it's true in your station, as the field commander,

16:54:17   5   you mentioned that you're possibly in there with some field

16:54:20   6   staff.  But it's true that you as the field commander have a

16:54:23   7   separate office?

16:54:25   8   A.   Yes, I do.

16:54:26   9   Q.   Okay.  And it's true that you can lock that office?

16:54:30   10   A.   Yes, I can.

16:54:31   11   Q.   And you may store some or have -- there may be access in

16:54:35   12   that office to personnel records?

16:54:38   13   A.   We're not encouraged to keep personnel records in those

16:54:41   14   offices.  I have access to a computer where I can get personnel

16:54:44   15   records.  I generally keep it locked when I'm back there,

16:54:47   16   though.

16:54:47   17   Q.   And the medics, they don't have the field staff and they

16:54:54   18   don't have a separate private office space like field

16:54:58   19   commanders, do they?

16:54:59   20   A.   They have a common area which we call a day room, in which

16:55:03   21   they do their administrative work.

16:55:03   22   Q.   But that's an area common to all the employees?

16:55:05   23   A.   Yes.

16:55:05   24   Q.   And it's true as well that you as the field commander have

16:55:08   25   a separate sleeping quarters separate from the field staff?

16:55:11  1  A.   It's actually part of my office.  I have a bunk in my

16:55:14  2  office.

16:55:14  3  Q.   And the field staff shares the sleeping quarters; isn't

16:55:18  4  that right?

16:55:19  5  A.   Yes.

16:55:19  6  Q.   It's true as well that field staff are required to keep

16:55:23  7  the station clean and maintain the common areas in the station?

16:55:26  8  A.   Yes.

16:55:27  9  Q.   And you as the commander, you're not required to clean or

16:55:30 10  maintain the common areas, are you?

16:55:32 11  A.   Not required, no.

16:55:34 12  Q.   And as the commander, we've talked about the idea that you

16:55:39 13  may go around and visit the various stations.  You can go into

16:55:43 14  any of your stations and do spot inspections on those stations

16:55:47 15  to make sure the crews are keeping them up to snuff, can't you?

16:55:50 16  A.   Yes.

16:55:51 17  Q.   We've also talked about the idea or the fact, I suppose,

16:55:58 18  that you're assigned a vehicle -- a command vehicle; is that

16:56:00 19  right?

16:56:00 20  A.   Yes, I am.

16:56:01 21  Q.   And that's physically a different vehicle than an

16:56:04 22  ambulance, isn't it?

16:56:06 23  A.   Yes, it is.

16:56:07 24  Q.   And, actually, as opposed to an ambulance, you actually

16:56:13 25  ride out alone in that vehicle?

FITZPATRICK – CROSS

16:56:16  1    A.    Yes.  I'm by myself.

16:56:18  2    Q.    But an ambulance, it can only function with two crew

16:56:21  3    members.  Isn't that true?

16:56:23  4    A.    That's correct.

16:56:24  5    Q.    And it's true as well that your command truck doesn't

16:56:28  6    actually carry a stretcher; isn't that right?

16:56:31  7    A.    Not a stretcher as you would put a patient on an

16:56:34  8    ambulance.  No, it does not.

16:56:36  9    Q.    Now, it's true that when a piece of equipment breaks, say,

16:56:41  10   in an ambulance -- one of the ambulances in your district, one

16:56:45  11   of the things you'll do is you'll go -- you may go, if you

16:56:49  12   choose to, you may go take a piece of equipment from your

16:56:53  13   vehicle, say a cardiac monitor, and you may take that to the

16:56:56  14   crew and replace their malfunctioning cardiac monitor with your

16:57:00  15   cardiac monitor.  Isn't that true?

16:57:02  16   A.    That's correct.

16:57:03  17   Q.    And at that point you would have to travel out and go to,

16:57:09  18   say, a central logistics area to pick up a replacement piece of

16:57:14  19   equipment; isn't that right?

16:57:16  20   A.    That's correct.

16:57:17  21   Q.    And you would give that piece of equipment to the crew

16:57:19  22   even if it meant you couldn't respond to a call yourself as the

16:57:23  23   commander, wouldn't you?

16:57:24  24   A.    That's correct.

16:57:25  25   Q.    And during that time that you choose to give the piece of

16:57:28  1  equipment to the crew, you're out of service, aren't you?

16:57:32  2  A.   Not necessarily.

16:57:33  3  Q.   You could be, though; isn't that true?

16:57:36  4  A.   I could also not be.  I'm in a reduced response capacity

16:57:40  5  at that time, depending on the piece of equipment I gave them.

16:57:43  6  My cardiac monitor, for example, would be a critical piece of

16:57:47  7  equipment.  But if someone were to go into cardiac arrest, as I

16:57:50  8  mentioned earlier, we carry AED.  That could restart someone's

16:57:54  9  heart, potentially.

16:57:54  10  Q.   I understand that, Commander Fitzpatrick, and I appreciate

16:57:58  11  that answer.  Thank you.  But there critical pieces of

16:58:02  12  equipment in your vehicle that you could choose to give to a

16:58:04  13  crew that would make you unavailable to respond to any call;

16:58:08  14  isn't that true?

16:58:09  15  A.   It would put me in a reduced response capacity, yes.  I

16:58:14  16  guess yes.

16:58:16  17  Q.   So when you -- when you first come on duty at -- well,

16:58:24  18  before I move on from that topic, you also were speaking with

16:58:28  19  Mr. Deats about a couple of pieces of equipment that only the

16:58:32  20  command trucks carry.  I think you mentioned a carbon monoxide

16:58:39  21  detector, a cyanide kit and a Stokes basket.  Are those the

16:58:44  22  three piece of equipment?

16:58:45  23  A.   Those are the three that come to mind, yes.

16:58:47  24  Q.   Okay.  Now, it's true, isn't it, that as a commander, just

16:58:52  25  because you carry them, that doesn't mean you're the --

FITZPATRICK - CROSS

16:58:55  1  commanders are the only people at EMS that are authorized to
16:59:00  2  use that equipment, does it?
16:59:01  3  A.    Not authorized to use it.  Any one of our medics that are
16:59:04  4  familiar with that equipment are authorized to use it.  I'm
16:59:07  5  just the only one that carries it.
16:59:09  6  Q.    So if you go to a call where there's, say, a carbon
16:59:12  7  monoxide incident, it's possible that you could just provide
16:59:15  8  that piece of equipment to the crew to use; isn't that true?
16:59:18  9  A.    Yes.
16:59:22  10  Q.    Now, when you -- excuse me.  When you come on duty at
16:59:26  11  7 a.m., I think you mentioned one of the first things you do
16:59:30  12  every day is get a shift report from the off-going field
16:59:33  13  commander; isn't that right?
16:59:35  14  A.    That's correct.
16:59:36  15  Q.    And that report is designed to tell you about issues that
16:59:39  16  arose during the prior shift that you as the commander, the
16:59:43  17  manager of that district, may have to deal with that shift;
16:59:47  18  isn't that right?
16:59:47  19  A.    Among other things, yes.
16:59:49  20  Q.    That might include a facility -- some issue with one of
16:59:53  21  the stations, the facilities that's in your district that needs
16:59:57  22  to be addressed?
16:59:58  23  A.    Yes.
16:59:58  24  Q.    That might include a piece of broken equipment somewhere
17:00:01  25  that you have to deal with?

FITZPATRICK – CROSS

17:00:03  1    A.    Yes.

17:00:03  2    Q.    It might even include -- say there was a negative

17:00:08  3    interaction of some sort between one of the field staff and,

17:00:13  4    say, another first responder, say a police officer or a

17:00:16  5    firefighter.  That can happen sometimes, too, can't it?

17:00:19  6    A.    Yes.

17:00:19  7    Q.    And you actually as the field commander, you have the

17:00:24  8    ability to pick up the phone and call a higher-ranking officer

17:00:28  9    say in the fire department to talk about that interaction,

17:00:32  10   don't you?

17:00:32  11   A.    Yes.

17:00:33  12   Q.    In fact, if you're dealing with one of the county

17:00:37  13   emergency service districts, you have the ability as the

17:00:41  14   commander to pick up the phone and call the chief at that

17:00:44  15   district, don't you?

17:00:44  16   A.    I could.

17:00:46  17   Q.    Now, you also get some other reports at the end of your

17:00:56  18   shift.  Those are called op stat reports.  Is that true?

17:00:59  19   A.    That's correct.

17:01:00  20   Q.    And those are reports that only commanders receive of the

17:01:03  21   people out in field.  Is that true?

17:01:05  22   A.    In the field, yes.  Commanders and on up receive them in

17:01:09  23   the organization.  But in the field only commanders receive

17:01:12  24   them, yes.

17:01:13  25   Q.    So maybe a better way to say that is the paramedics and

FITZPATRICK - CROSS

17:01:16  1  captains don't receive those reports?

17:01:18  2  A.    That's correct.  They don't.

17:01:19  3  Q.    Now, one of the -- you know, we've talked about a couple

17:01:26  4  of different types of those reports.  I think we've already

17:01:28  5  talked about one that's the out-of-chute time, for instance.

17:01:30  6  There's a specific time standard, for instance, that a crew,

17:01:33  7  between the time they are dispatched to the call to the time

17:01:36  8  they start responding to the call, that's their out-of-chute

17:01:40  9  time; is that right?

17:01:41  10  A.    That's correct.

17:01:42  11  Q.    And when you get that report, you actually look through it

17:01:45  12  for instances of one of your crews where they didn't meet a

17:01:49  13  specific time standard; isn't that right?

17:01:52  14  A.    That's correct.

17:01:52  15  Q.    And then it's your responsibility as the field commander

17:01:55  16  to contact that crew or crews and kind of figure out what

17:01:59  17  happened, what the reason was why they were slow in responding

17:02:03  18  to a call.  Isn't that true?

17:02:05  19  A.    Yes.

17:02:07  20  Q.    Now, in that explanation, you could -- could be mundane,

17:02:12  21  but you take that up to your chief; is that right?

17:02:15  22  A.    Depending on the explanation, yes.

17:02:17  23  Q.    And it could be a more serious issue in EMS, couldn't it?

17:02:22  24  A.    Yes, it could be.

17:02:24  25  Q.    Sometimes you're authorized to deal with those issues

FITZPATRICK - CROSS

280

17:02:27  1  yourself if the crew reports some mundane issue.  Isn't that

17:02:30  2  true?

17:02:30  3  A.   If it's a really mundane issue, yes.

17:02:32  4  Q.   You also have the ability to make a note in an RMS file if

17:02:36  5  you feel like a crew has maybe violated a policy, for

17:02:40  6  instance.  Isn't that true?

17:02:41  7  A.   Yes.

17:02:41  8  Q.   And, indeed, you could start a disciplinary investigation

17:02:44  9  if you thought the crew -- if their behavior was serious enough

17:02:49  10  to merit such an investigation, couldn't you?

17:02:52  11  A.   I could start the investigation, yes.

17:02:55  12  Q.   And any one of those reactions is up to you.  You can just

17:02:57  13  talk with the crew, you can write it down in RMS, or you could

17:03:00  14  start a disciplinary investigation, couldn't you?

17:03:03  15  A.   Yes.

17:03:05  16  Q.   Now, you also get what's called a -- I don't know if this

17:03:09  17  is the technical term for it because I'm not in EMS, of

17:03:12  18  course.  But you also get something called a hospital drop time

17:03:15  19  report or something like that?

17:03:16  20  A.   Uh-huh.

17:03:16  21  Q.   And that report -- is that a "yes," sir?  I'm sorry.

17:03:20  22  A.   Yes.  I'm sorry.

17:03:22  23  Q.   And that report, as I understand it, it tells you how long

17:03:25  24  the crew spends at a hospital dropping off a patient; is that

17:03:29  25  right?

17:03:29   1   A.   It gives us those averages, yes.

17:03:32   2   Q.   Okay.  And you may notice, say, if you look at -- if you

17:03:36   3   look at those reports, you may notice, for instance, if a crew

17:03:40   4   has an issue at a particular hospital that's causing a number

17:03:44   5   of crews to spend too long there.  Is that something you might

17:03:47   6   notice?

17:03:48   7   A.   Yes.

17:03:48   8   Q.   And you may even -- if you see an issue at a particular

17:03:52   9   hospital, again, you as the commander have the ability to pick

17:03:55   10   up the phone and talk to managers at the hospital about that

17:03:57   11   issue, don't you?

17:03:59   12   A.   Yes.

17:03:59   13   Q.   Now, in addition to -- to viewing these various op stat

17:04:10   14   reports --

17:04:10   15             THE COURT:  Well, why don't we at this point, this is

17:04:13   16   a good time to take our evening recess.

17:04:15   17             Ladies and gentlemen, at this time we'll take our

17:04:17   18   evening recess.  You'll be in recess until 9 o'clock in the

17:04:22   19   morning.  Please be back in your jury room a little before

17:04:25   20   9:00.

17:04:26   21             Remember the instructions the Court has previously

17:04:28   22   given you:  Do not talk about this case among yourselves or

17:04:32   23   with anyone else.  Do not read any newspapers or observe any

17:04:36   24   radio -- observe or listen to any radio or television news

17:04:40   25   broadcast that may have information about this case in it.  Do

FITZPATRICK – CROSS

17:04:43  1  not use any electronic device to try to find out information

17:04:47  2  about this case or to transmit any information about this

17:04:50  3  case.  Drive carefully and don't forget to vote.  And we'll see

17:04:54  4  you here in the morning.

17:04:56  5       (Recess)

17:04:57  6       (Open Court, no jury)

17:05:18  7            THE COURT:  Court's in recess until 9 o'clock.

17:05:21  8       (End of transcript)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **UNITED STATES DISTRICT COURT      )**

2    **WESTERN DISTRICT OF TEXAS          )**

3         I, Arlinda Rodriguez, Official Court Reporter, United

4    States District Court, Western District of Texas, do certify

5    that the foregoing is a correct transcript from the record of

6    proceedings in the above-entitled matter.

7         I certify that the transcript fees and format comply with

8    those prescribed by the Court and Judicial Conference of the

9    United States

10        WITNESS MY OFFICIAL HAND this the 12th day of August 2013.

11

12                              /S/ Arlinda Rodriguez
                                Arlinda Rodriguez, Texas CSR 7753
13                              Expiration Date:  12/31/2014
                                Official Court Reporter
14                              United States District Court
                                Austin Division
15                              501 West 5th Street, Suite 4152
                                Austin, Texas 78701
16                              (512) 391-8791

17

18

19

20

21

22

23

24

25